# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DONALD J. TRUMP, in his capacity as the 45th President of the United States, The Mar-A-Lago Club 1100 S. Ocean Blvd. Palm Beach, FL 33480, | |
|       Plaintiff, | Civil Action No. 21-2769 |
|         v. | |
| BENNIE G. THOMPSON, in his official capacity as Chairman of the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol, 2466 Rayburn House Office Building U.S. House of Representatives Washington, D.C. 20515, | |
| THE UNITED STATES HOUSE SELECT COMMITTEE TO INVESTIGATE THE JANUARY 6TH ATTACK ON THE UNITED STATES CAPITOL, U.S. House of Representatives Washington, D.C. 20515, | |
| DAVID S. FERRIERO, in his official capacity as Archivist of the United States, National Archives and Records Administration 700 Pennsylvania Avenue, NW Washington, D.C. 20408, and | |
| THE NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, 700 Pennsylvania Avenue, NW Washington, D.C. 20408, | |
|       Defendants. | |

## COMPLAINT

1.     Plaintiff President Donald J. Trump brings this civil action seeking declaratory and injunctive relief under the Presidential Records Act, 44 U.S.C. §§ 2201–2209 ("PRA"), 36 C.F.R. § 1270.44(f)(3), the Declaratory Judgment Act, 28 U.S.C. § 2201, Executive Order No. 13489, and the Constitution of the United States.

## INTRODUCTION

2.     The United States House Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Committee") has decided to harass President Trump and senior members of his administration (among others) by sending an illegal, unfounded, and overbroad records request to the Archivist of the United States. This self-described "sweeping"[1] request is almost limitless in scope and effectively seeks every presidential record and communication that could tenuously relate to events that occurred on January 6, 2021. The request also seeks records with no reasonable connection to the events of that day. In a political ploy to accommodate his partisan allies, President Biden has refused to assert executive privilege over numerous clearly privileged documents requested by the Committee. The Committee's request amounts to nothing less than a vexatious, illegal fishing expedition openly endorsed by Biden and designed to unconstitutionally investigate

---

[1] *See Select Committee Issues Sweeping Demand for Executive Branch Records*, United States House Select Committee to Investigate the January 6th Attack on the United States Capitol (Aug. 25, 2021), https://january6th.house.gov/news/press-releases/select-committee-issues-sweeping-demand-executive-branch-records.

President Trump and his administration. Our laws do not permit such an impulsive, egregious action against a former President and his close advisors.

3.     On August 25, 2021, the Committee sent sweeping requests for documents and records to the Archivist of the United States seeking information from the Executive Office of the President ("EOP") and the Office of the Vice President ("OVP"). *See* Letter from Bennie G. Thompson to David S. Ferriero (Aug. 25, 2021) (attached hereto as Exhibit 1). These requests were signed by Chairman of the Committee Bennie G. Thompson. Among many other items, these requests reiterated the requests made in the March 25, 2021, correspondence from multiple committees of the House of Representatives to the White House and the Archivist. *See* Letter from Congressional Committees to Ron Klain and David S. Ferriero (Mar. 25, 2021) (attached hereto as Exhibit 2).

4.     The Committee's requests are unprecedented in their breadth and scope and are untethered from any legitimate legislative purpose.

5.     The Committee's boundless requests included over fifty individual requests for documents and information, and mentioned more than thirty individuals, including those working inside and outside government during the unreasonably overbroad time period covered by the request. Aside from being overly broad and seeking records protected by numerous legal privileges, these requests are also unduly burdensome because of the substantial time required to conduct an adequate review of the voluminous records sought by the Committee.

6.    For example, among the myriad other documents requested, the Committee has asked for:

> [a]ll documents and communications relating in any way to remarks made by Donald Trump or any other persons on January 6, including Donald Trump's and other speakers' public remarks at the rally on the morning of January 6, and Donald Trump's Twitter messages throughout the day.

Similarly, and even more invasive, the Committee requested, "[f]rom November 3, 2020, through January 20, 2021, all documents and communications related to prepared public remarks and actual public remarks of Donald Trump." Issued public statements are one thing, but the notion that Congress is somehow entitled to ask for and review any and all private conversations, remarks, or drafts of public statements considered by the President of the United States and his close advisors, without limitations on (among other things) subject matter, would destroy the very fabric of our constitutional separation of powers and invade fundamental privileges designed to maintain the autonomy and functioning of the Executive Branch. *See Trump v. Mazars USA, LLP*, 140 S.Ct. 2019, 2032 (2020) ("[Executive] privilege safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is 'fundamental to the operation of Government.'") (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)).

7.    The Committee has also asked for "[a]ll documents and communications within the White House on January 6, 2021 relating in any way to," among others, the President, the Vice President, over two dozen of the highest-ranking officials in the Federal government (including the National Security Advisor and his Deputy,

and the White House Counsel and his Deputy), any Member of Congress or congressional staff, or the Department of Defense, the Department of Justice, the Department of Homeland Security, the Department of the Interior, or any element of the National Guard. This single request demands access to any number of records to which the Committee is in no way entitled. Such records have nothing to do with the events of January 6th, the scope of the Committee's authority as defined in H.R. 503, or any conceivable legislative purpose, and many of the records are clearly protected by executive privilege and other privileges. *See* H.R. 503, 117th Cong. (2021) (attached hereto as Exhibit 3). Those records seek documents and communications that could include, but are not limited to, conversations with (or about) foreign leaders, attorney work product, the most sensitive of national security secrets, along with any and all privileged communications among a pool of potentially hundreds of people.

8.     The Committee's request also asks for "[a]ll schedules for any individuals identified . . . above on January 6, 2021, and all documents relating to such meetings, including memoranda, read-aheads, and summaries of such meetings." Again, the idea that the Committee should be free to review *any and all* materials related to any and all presidential communications, deliberative-process conversations or documents, or meetings involving national security and foreign affairs, the vast majority of which do not relate to the Committee's charter, makes a mockery of our tri-partite government of checks and balances.

9.    The Committee further seeks access to other vast swaths of information, including all documents and communications related to the 2020 election, from April 1, 2020, through January 20, 2021, among the President, his private counsel, his Chief of Staff, his Campaign Managers, other senior campaign officials, and over forty other advisors. Such requests have no reasonable connection to the Committee's charter or to any legitimate legislative purpose.

10.    The Committee also requested information about personnel changes in the Departments of Defense and Justice, the FBI, the CIA, and the Department of Homeland Security, despite the fact that any and all members of these departments and agencies serve at the pleasure of the President, and any personnel changes in these Departments are at the sole discretion of the Executive and his designees.

11.    Plaintiff first challenges as contrary to law the Committee's self-assumed authority to ignore the constitutional limits on Congress's power to investigate. Article I of the Constitution does not contain an "Investigations Clause" or an "Oversight Clause." It gives Congress the power to enact certain legislation. Accordingly, investigations are permissible only insofar as they further some legitimate legislative purpose. As the Supreme Court recognized in shooting down another congressional fishing expedition directed at President Trump's records, such legitimate legislative purposes do not include "law enforcement" powers "assigned under our Constitution to the Executive and the Judiciary," inquiry into private affairs, or "to expose for the sake of exposure." *Mazars*, 140 S.Ct. at 2032. Although congressional investigations are due significant deference from the courts, *McGrain*

*v. Daugherty,* 273 U.S. 135, 178 (1927), that deference has limits. In *Watkins v. United States,* 354 U.S. 178 (1957), the Supreme Court held that, while "[t]he public is of course entitled to be informed concerning the workings of government, [t]hat cannot be inflated into a general power to expose." *Id.* at 200. Similarly, this Court later held that if a congressional subpoena "is issued solely for sake of exposure or intimidation, then it exceeds the legislative function of Congress." *Hentoff v. Ichord,* 318 F. Supp. 1175, 1182 (D.D.C. 1970). Inquiries, like the one Congress is engaged in here, conducted "for the personal aggrandizement of the investigators or to punish those investigated are indefensible." *Mazars*, 140 S.Ct. at 2032.

12. No investigation can be an end in itself; there is nothing in the overwhelming majority of the records sought that could reasonably be justified as a means of facilitating the legislative task of enacting, amending, or repealing laws. The "informing function" that Congress possesses under Article I "is that of informing itself about subjects susceptible to legislation, not that of informing the public." *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 531 (9th Cir. 1983) (citing *Hutchinson v. Proxmire*, 443 U.S. 111, 132-33 (1979)).

13. Nevertheless, the Committee has requested an extremely broad set of potentially millions of presidential records, which assuredly include information within the scope of various components of executive privilege, including but not limited to the presidential-communications, deliberative-process, attorney-client, and attorney-work-product privileges, and which include law enforcement information, national security information, and information relating to sensitive intelligence

sources and methods. Condoning such requests would allow Congress to "exert an imperious controul over the Executive Branch and aggrandize itself at the President's expense, just as the Framers feared." *Mazars*, 140 S. Ct. at 2034.

14.     Ultimately, the Committee is attempting to damage the republic itself, and the citizens of the United States, for executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is 'fundamental to the operation of Government.'" *Id.* at 2032 (quoting *Nixon*, 418 U.S. at 708). Courts have "recognized a 'great public interest' in preserving 'the confidentiality of conversations that take place in the President's performance of his official duties' because such confidentiality is needed to protect 'the effectiveness of the executive decision-making process.'" *In re Sealed Case (Espy)*, 121 F.3d 729, 742 (D.C. Cir. 1997). For this reason, presidential conversations "are presumptively privileged." *Nixon v. Sirica*, 487 F.2d 700, 716 (D.C. Cir. 1973)). Because the Committee's requests seek to expose confidential and privileged information while lacking "a legitimate legislative purpose," this Court has the power to declare the requests invalid and to enjoin their enforcement. Plaintiff is entitled to that relief.

15.     On September 24, 2021, during the pendency of good-faith discussions between Plaintiff's counsel and the Biden Administration concerning the potential for reasonable accommodations to the Committee, the Biden White House made public statements that it would not object to the production of certain records created during the Trump Administration that are unquestionably subject to constitutionally protected privileges. *See* The White House, Press Briefing by Press Secretary Jen

Psaki and Secretary of Homeland Security Alejandro Mayorkas, Sept. 24, 2021, https://www.whitehouse.gov/briefing-room/press-briefings/2021/09/24/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-homeland-security-alejandro-mayorkas-september-24-2021/. On October 8, 2021, the Biden White House notified the Archivist that it would not be asserting executive privilege over certain documents identified as responsive to the Committee's request. *See* Letter from Dana A. Remus to David S. Ferriero (Oct. 8, 2021) (attached hereto as Exhibit 4). That same day, pursuant to the PRA, associated regulations, and Executive Order No. 13489 (the "Executive Order"), President Trump notified the Archivist that he has made a formal assertion of executive privilege with respect to a limited number of documents as well as a protective assertion of executive privilege over any additional materials that may be requested by the Committee. *See* Letter from President Donald J. Trump to the Archivist of the United States (Oct. 8, 2021) (attached hereto as Exhibit 5). Then, the Biden White House notified the Archivist the same day that it would not assert executive privilege over the documents identified in President Trump's October 8 letter and instructed the Archivist to provide the privileged documents to the Committee "absent any intervening court order" thirty days after notifying President Trump. *See* Letter from Dana A. Remus to David S. Ferriero (Oct. 8, 2021) (attached hereto as Exhibit 6).

16.     On October 13, 2021, the Archivist notified President Trump that, "[a]fter consultation with Counsel to the President and the Acting Assistant Attorney General for the Office of Legal Counsel, and as instructed by President Biden" the

Archivist has "determined to disclose to the Select Committee" all responsive records that President Trump determined were subject to executive privilege on November 12, 2021 "absent any intervening court order." *See* Letter from David S. Ferriero to Donald J. Trump (Oct 13, 2021) (attached hereto as Exhibit 7).

17.     Notably, the Biden Administration's waiver of executive privilege is a myopic, political maneuver designed to maintain the support of its political rivals and is not based on any discernable legal principle. In fact, the Biden administration's unprincipled political accommodation is directly contrary to long-standing Supreme Court precedent that "information subject to executive privilege deserves 'the greatest protection consistent with the fair administration of justice.'" *Mazars*, 140 S. Ct. at 2024 (quoting *Nixon*, 418 U.S. at 715). Nevertheless, this waiver is irrelevant insofar as the Committee's request serves no valid legislative purpose and is thus unconstitutional.

18.     As it relates to any materials being sought in situations like this, where fundamental privileges and constitutional issues are at stake and where a committee has declined to grant sufficient time to conduct a full review, there is a longstanding bipartisan tradition of protective assertions of executive privilege designed to ensure the ability to make a final assertion, if necessary, over some or all of the requested material. *See Protective Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 1 (1996) (opinion of Attorney General Janet Reno). In the event this Court does not declare the requests invalid and unconstitutional, this protective assertion will ensure President Trump's ability to

decide whether to make any further conclusive assertions of privilege following a full review of all of the requested materials. *See* Letter from William P. Barr, Attorney General, to President Donald J. Trump, at 1-2 (May 8, 2019) (attached hereto as Exhibit 8).

19.     In sum, Plaintiff files this action requesting that the Court invalidate the Committee's requests and enjoin the Archivist from turning over the records in question. At a bare minimum, the Court should enjoin the Archivist from producing any potentially privileged records until President Trump is able to conduct a full privilege review of all of the requested materials.

## PARTIES

20.     Plaintiff Donald J. Trump is the 45th President of the United States. President Trump brings this suit solely in his official capacity as a former President under the PRA, associated regulations, the Executive Order, the Declaratory Judgment Act, and the Constitution of the United States.

21.     Defendant Bennie G. Thompson is the Chairman of the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol. He is sued in his official capacity.

22.     Defendant United States House Select Committee to Investigate the January 6th Attack on the United States Capitol is a select committee of the United States House of Representatives. After the 2020 election, the Democratic Party controlled Congress and created the Committee pursuant to House Resolution 503 to investigate and report upon the facts, circumstances, and causes relating to the

events of January 6, 2021, at the United States Capitol. The Committee is sued in its official capacity.

23.     Defendant David S. Ferriero is the Archivist of the United States. He is sued in his official capacity.

24.     Defendant National Archives and Records Administration is the federal government agency that stores documents and materials created in the course of business conducted by the United States federal government.

## JURISDICTION AND VENUE

25.     This Court has subject-matter jurisdiction because this case arises under the Constitution and laws of the United States. 28 U.S.C. § 1331. This Court has jurisdiction to grant both declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202. This Court also has jurisdiction pursuant to 44 U.S.C. § 2204(e) and 28 U.S.C. § 2201(a).

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claim have occurred, and are occurring, in this District. Venue is also proper pursuant to 44 U.S.C. § 2204(e).

## FACTUAL BACKGROUND

27.     After the 2020 election, the Democrats in Congress created the Committee pursuant to House Resolution 503 in a misguided attempt to intimidate and harass President Trump and his supporters under the guise of investigating the events of January 6, 2021. House Resolution 503 provides the Committee with the

power to investigate the activities of intelligence agencies, law enforcement agencies, and the Armed Forces surrounding January 6th, and provides that the Committee will issue a final report on its activities. *See* Exh. 3. Notably, this resolution never discusses the EOP nor does the Committee's charter permit an investigation into the Executive Office of the President's deliberations and response to the events that occurred on January 6th. *Id.*

28.    It would make no sense for the Committee's charter to encompass such an investigation. As has been widely reported, the FBI has *not* found evidence supporting the Democrats' contention that the events at the Capitol on January 6 were part of some organized plot to overturn the results of the 2020 election.[2] Likewise, as has been reported, the FBI has "so far found no evidence" that former President Donald Trump or "people directly around him were involved in organizing the violence." *Id.* If anything, the FBI *has* found that a small group of individuals planned to breach the Capitol prior to January 6. A subsequent joint report by the Senate Homeland Security and Rules Committees blamed "intelligence and security failures," not the President or any of his advisers, for what happened at the Capitol that day.[3] And Congress has already conducted a thorough investigation of this entire matter during its failed impeachment effort.

---

[2] Mark Hosenball and Sarah N. Lynch, *Exclusive: FBI finds scant evidence U.S. Capitol attack was coordinated – sources*, Reuters (Aug. 20, 2021, 10:43 PM), https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/.

[3] Staff of S. Comm. On Homeland Security and Governmental Affairs and S. Committee on Rules and Administration, *117th Cong., Examining the U.S. Capitol Attack: A review of the Security, Planning, and Response Failures on January 6,*

29.     The Committee's *ultra vires* request purports to be made "pursuant to the Presidential Records Act (44 U.S.C. § 2205(2)(C))," *see* Exh. 1. The Presidential Records Act ("PRA") of 1978, 44 U.S.C. §§ 2201-2209, governs the official records of Presidents and Vice Presidents. The Archivist and the National Archives and Records Administration ("NARA") are charged with working with the President to administer and store presidential records after the President leaves office. *See generally* 44 U.S.C. §§ 2202-2208.

30.     The PRA defines "presidential records" as follows:

> documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2202. Prior to the end of his term of office, President Trump specified that access to his presidential records would remain restricted for a period of twelve years, as permitted by law. 44 U.S.C. § 2204.

31.     Section 2205(2)(C), the portion of the PRA cited by the Committee in issuing its records request to the Archivist, provides one of three exceptions to the PRA's access restrictions. It provides that "Presidential records shall be made

---

https://www.rules.senate.gov/imo/media/doc/Jan%206%20HSGAC%20Rules%20Report.pdf (last visited Oct. 18, 2021). It is indisputable that during the President's speech at the Ellipse on January 6 the President stated that his supporters should "peacefully and patriotically make [their] voices heard." Nonetheless Committee members have claimed that the President's speech is what incited the violence on January 6th.

available . . . (C) to either House of Congress, or, to the extent of matter within its jurisdiction, to any committee or subcommittee thereof if such records contain information that is needed for the conduct of its business and that is not otherwise available." 44 U.S.C. § 2205(2)(C). Importantly, while Congress has purportedly arrogated to itself the power to request documents in certain instances under the statute, all congressional requests must still comply with the United States Constitution, the separation of powers principles contained in that governing document, and have "valid legislative purpose."

32.     The PRA gives the Archivist the power to promulgate regulations to administer the statute. 44 U.S.C. § 2206. Pursuant to those regulations, the Archivist must promptly notify the President of a records request for records made during his term of office as well as the incumbent President. 36 C.F.R. § 1270.44. Once the Archivist notifies the former and incumbent Presidents of the Archivist's intent to disclose records, either President may assert a claim of constitutionally based privilege against disclosing the record within thirty calendar days after the date of the Archivist's notice. *Id.* The incumbent or former President must personally make any decision to assert a claim of constitutionally based privilege against disclosing a Presidential record or a reasonably segregable portion of it. *Id.*

33.     If a former President asserts the privilege claim, the Archivist consults with the incumbent President, as soon as practicable and within thirty calendar days from the date that the Archivist receives notice of the claim, to determine whether the incumbent President will uphold the claim. *Id.* If the incumbent President

upholds the claim asserted by the former President, the Archivist does not disclose the presidential record unless the incumbent withdraws his decision or a court directs the Archivist to disclose the record. *Id.* If the incumbent President does not uphold the claim asserted by the former President, the Archivist discloses the Presidential record sixty calendar days after the Archivist received notification of the claim unless a court order in an action in any federal court directs the Archivist to withhold the record. *Id.* Finally, the Executive Order provides that the Archivist shall notify the incumbent and former Presidents of his determination to release certain records at least thirty days prior to disclosure of the records, unless a shorter time-period is required in the circumstances set forth in section 1270.44 of the NARA regulations. Exec. Order No. 13489.

34.    Pursuant to this regulatory and statutory framework, the Archivist notified President Trump on August 30, 2021, that he intended to produce certain documents in response to the Committee's expansive request. On October 8, 2021, the Biden White House notified the Archivist that it would not be asserting executive privilege over certain documents identified as responsive to the Committee's request. *See* Exh. 4. That same day, pursuant to the PRA, associated regulations, and the Executive Order, President Trump notified the Archivist that he has made a formal assertion of executive privilege with respect to a small subset of documents as well as a protective assertion of executive privilege over any additional materials that may be requested by the Committee. *See* Exh. 5. Then, the Biden White House notified the Archivist the same day that it would not assert executive privilege over the

16

documents identified in President Trump's October 8 letter and instructed the Archivist to turn the records over to the Committee thirty days from the date of notifying President Trump of Biden's decision, subject to a determination by this Court pursuant to 44 U.S.C. § 2204(e). *See* Exh. 6. On October 13, 2021, the Archivist notified President Trump that, "[a]fter consultation with Counsel to the President and the Acting Assistant Attorney General for the Office of Legal Counsel, and as instructed by President Biden" the Archivist has "determined to disclose to the Select Committee" all responsive records that President Trump determined were subject to executive privilege on November 12, 2021, "absent any intervening court order." *See* Exh. 7.

35. Plaintiff has identified numerous, insurmountable challenges with the process of reviewing presidential records supplied to him by the Archivist. Often, documents are not unitized and are provided out of sequence. This results in the reviewer being unable to determine whether certain documents are part of a single record or are otherwise unrelated and could lead to substantial confusion by members of the Committee and its staff and inadvertent production of non-responsive records. Similarly, the identified custodian and/or author of certain records may be materially different from the actual author or custodian of the record. Given the short time periods for review under the PRA, it is unlikely that Plaintiff and his staff will be able to ensure that the records being produced to the Committee are what they purport to be. This could lead to inadvertent disclosure of records subject to privileges for which the document was not reviewed. Therefore, unless there is an opportunity for a

complete review of all records determined to be responsive by NARA, Plaintiff will suffer additional irreparable harm.

36.     The current President's decision to waive executive privilege for his own political benefit will undoubtedly cause sustainable injury and irreparable harm to future presidential administrations.

37.     President Trump now commences this lawsuit seeking to enjoin the Committee's records request and prevent the Defendants from enforcing or complying with the request with respect to the privileged documents and any additional documents the Archivist seeks to turn over to the Committee.

## LEGAL BACKGROUND AND CLAIM FOR
## JUDICIAL DETERMINATION AND DECLARATORY JUDGMENT

38.     Most fundamentally, the Committee's request lacks a valid legislative purpose and thus violates the Constitution and separation of powers. The Supreme Court in *Mazars* set forth a four-part, non-exclusive balancing test to analyze the constitutional propriety of congressional requests directed to presidential records. Satisfaction of the *Mazars* standard is a threshold issue that the Committee cannot overcome. First, the Supreme Court cautions courts to "carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers." *Mazars*, 140 S.Ct. at 2035-36. Further, the Court noted that "Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs in light of its particular legislative objective. The President's unique constitutional position means that Congress may not look to him as a 'case study' for general legislation." *Id.*

Importantly, 44 U.S.C. § 2205(2)(C) generally mirrors these requirements and provides that presidential records "shall be made available . . . (C) to either House of Congress, or, *to the extent of matter within its jurisdiction*, to any committee or subcommittee thereof if such records contain information that is *needed for the conduct of its business* and that is *not otherwise available*." (emphasis added). Likewise, 36 C.F.R. § 1270.44 effectively repeats and mirrors these requirements. Indeed, the Committee's requests fails to satisfy the relevant constitutional, statutory, and regulatory frameworks.

39.     The "legitimate legislative purpose" requirement stems directly from the Constitution. "The powers of Congress . . . are dependent solely on the Constitution," and no express power in that instrument allows Congress to investigate individuals or to issue compulsory process. *Kilbourn v. Thompson*, 103 U.S. 168, 182-89 (1880). The Constitution instead permits Congress to enact certain kinds of legislation. *See, e.g.*, Art. I, § 8. Thus, Congress's power to investigate "is justified solely as an adjunct to the legislative process." *Watkins v. United States*, 354 U.S. 178, 197 (1957).

40.     "Oversight" and "transparency," in a vacuum, are not legitimate legislative purposes. "[T]here is no congressional power to expose for the sake of exposure." *Id.* at 200. "No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress." *Id.* at 187.

41.     Second, the Supreme Court in *Mazars* noted "courts should insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective." 140 S.Ct. at 2036. Thus, the Supreme Court has noted that where, as here,

a plaintiff issues broad requests that "ask for everything under the sky," the burden should not be placed on the President of "critiquing the unacceptable discovery requests line by line." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 387-88 (2004). Courts should therefore be wary of requiring the President even to assert the executive privilege in response to broad requests. *Id.*

42.   Third, "courts should be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose." *Mazars*, 140 S.Ct. at 2036. Where Congress contemplates legislation that "raises sensitive constitutional issues, such as legislation concerning the Presidency . . . it is impossible to conclude that a subpoena is designed to advance a valid legislative purpose unless Congress adequately identifies its aims and explains why the President's information will advance its consideration of the possible legislation." *Id.*

43.   The Committee has utterly failed to come forward with such evidence here to satisfy the standard; there is no specific legislative need for the privileged documents and materials requested, much less a "demonstrably critical" one. *Senate Select Comm.*, 498 F.2d at 731.

44.   What the Committee appears to seek here is a "precise reconstruction of past events," not because there are "specific legislative decisions that cannot responsibly be made without" it, but simply for the sake of the information itself. *Id.* at 732-33. That purpose does not clear the high bar required to overcome an assertion of executive privilege. The "informing function" Congress possesses under Article I "is that of informing itself about subjects susceptible to legislation, not that of

informing the public." *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 531 (9th Cir. 1983) (citing *Hutchinson v. Proxmire*, 443 U.S. 111, 132-33 (1979)); *see also Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 8 (2007) ("Broad, generalized assertions that the requested materials are of public import are simply insufficient under the 'demonstrably critical' standard."). The Committee has not identified any "specific legislative decisions that cannot responsibly be made without access" to the privileged materials. *Senate Select Comm.*, 498 F.2d at 733.

45.     Additionally, because Congress must have a legitimate legislative purpose, it cannot exercise "any of the powers of law enforcement." *Quinn v. United States*, 349 U.S. 155, 161 (1955). Those powers "are assigned under our Constitution to the Executive and the Judiciary." *Id.* Put simply, Congress is not "a law enforcement or trial agency," and congressional investigations conducted "for the personal aggrandizement of the investigators" or "to punish those investigated" are "indefensible." *Watkins*, 354 U.S. at 187. Our tripartite system of separated powers requires that "any one of the[] branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other." *Kilbourn*, 103 U.S. at 190-91.

46.     Further, when a request for information is issued by a single committee, a legislative purpose is not legitimate unless it falls within that committee's jurisdiction. "The theory of a committee inquiry is that the committee members are

serving as the representatives of the parent assembly in collecting information for a legislative purpose." *Watkins*, 354 U.S. at 200. Congress therefore must "spell out that group's jurisdiction and purpose with sufficient particularity . . . in the authorizing resolution," which "is the committee's charter." *Id.* at 201. The committee "must conform strictly to the resolution." *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978). And when an investigation is "novel" or "expansive," courts will construe the committee's jurisdiction "narrowly." *Tobin v. United States*, 306 F.2d 270, 275 (D.C. Cir. 1962).

47.     By contrast, the Committee has read its own charter— "to investigate and report upon the facts, circumstances, and causes relating to the events of January 6, 2021, at the United States Capitol"— expansively, and apparently believes it has been given a free pass to request a sweeping set of documents and records, which unquestionably contain information protected from disclosure by the executive and other privileges, including but not limited to the presidential-communications, deliberative-process, and attorney-client privileges.

48.     Finally, the *Mazars* court instructed that "burdens imposed by a congressional subpoena should be carefully scrutinized, for they stem from a rival political branch that has an ongoing relationship with the President and incentives to use subpoenas for institutional advantage." *Mazars*, 140 S.Ct. at 2036. These burdens are not sufficiently diminished by the fact that the President is no longer in office. The Supreme Court has "reject[ed] the argument that only an incumbent

President may assert" separation-of-powers claims. *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 439 (1977).

49.   Executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is 'fundamental to the operation of Government.' As a result, information subject to executive privilege deserves 'the greatest protection consistent with the fair administration of justice.'" *Id.* at 2032 (quoting *Nixon*, 418 U. S., at 708, 713). "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Nixon*, 418 U.S. at 705. As the Supreme Court has recognized, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way that many would be unwilling to express except privately." *Id.* at 708.

50.   The President has identified a limited number of records allegedly responsive to the Committee's request that are covered by numerous privileges, including the presidential communications privilege, and the deliberative process privilege, among others. Moreover, the request seeks documents protected by the attorney-client privilege and the attorney work-product doctrine. The Committee has failed to explain or even articulate any need for the information it has requested, much less a demonstrated, specific one worthy of piercing executive privilege and other privileges. And nothing in the Committee's request meets the high bar of

explaining how or why the requested information is demonstrably critical to a legislative purpose. Thus, the Court should invalidate the Committee's request.

51.     The Committee has instructed the Archivist to provide all of the requested information no later than September 9, 2021, but the Archivist has indicated that he will provide the privileged requested documents by November 12, 2021, subject to a court order. This Court should intervene, invalidate the requests, and require the Committee to narrow its search prior to burdening the President with a line-by-line critique. *See Cheney*, 542 U.S. at 389-390. The process of obtaining and reviewing documents from NARA in such a truncated time frame is unbelievably burdensome. The default time frame provided in the PRA protects records from political vicissitudes and also gives the Archivist time to properly process the records. Given these substantial burdens, the Court should intervene and invalidate the requests.

52.     Further, in cases like this, where a committee has declined to grant sufficient time to conduct a full review, there is a longstanding bipartisan tradition of protective assertions of executive privilege designed to ensure the ability of the Executive to make a final assertion, if necessary, over some or all of the requested material. *See Protective Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 1 (1996) (opinion of Attorney General Janet Reno). In the event this Court does not declare the requests invalid and unconstitutional, this protective assertion will ensure President Trump's ability to

decide whether to make a conclusive assertion of executive privilege following a full review of the requested materials. *See* Exh. 8.

53.     If the PRA is read so broadly as to allow an incumbent President unfettered discretion to waive the previous President's executive privilege, mere months following an administration change, then it would render the act unconstitutional. As has been reaffirmed by the Supreme Court, the executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is fundamental to the 'operation of Government.'" *Mazars,* 140 S.Ct. at 2032 (quoting *United States v. Nixon,* 418 U.S. 683, 708 (1974)).

## CLAIM FOR RELIEF

54.     Plaintiff incorporates all prior allegations.

WHEREFORE, Plaintiff asks this Court to enter judgment in his favor and to provide the following relief:

a.      A declaratory judgment that the Committee's requests are invalid and unenforceable under the Constitution and laws of the United States;

b.      In the alternative, a declaration that the Presidential Records Act is an unconstitutional violation of separation of powers and is void *ab initio*;

c.      A preliminary and permanent injunction enjoining the Committee including Chairman Thompson from taking any actions to enforce the requests, from imposing sanctions for noncompliance with the requests, and from inspecting, using, maintaining, or disclosing any information obtained as a result of the requests;

d.      A preliminary and permanent injunction enjoining the Archivist and NARA from producing the requested information;

e.      In the alternative to the above, a preliminary injunction enjoining the Archivist and NARA from producing the requested information, and enjoining the Committee and Chairman Thompson from taking any actions to enforce the requests, until President Trump has had sufficient opportunity to conduct a comprehensive review of all records the Archivist intends to produce before any presidential record is produced to the Committee;

f.      Plaintiff's reasonable costs and expenses, including attorneys' fees, as permitted by law; and

g.      Such other and further relief as the Court may deem just proper.


Dated: October 18, 2021                    Respectfully submitted,


                                           /s/ Jesse R. Binnall
                                           Jesse R. Binnall (VA022)
                                           BINNALL LAW GROUP, PLLC
                                           717 King Street, Suite 200
                                           Alexandria, Virginia 22314
                                           Phone: (703) 888-1943
                                           Fax: (703) 888-1930
                                           Email: jesse@binnall.com

                                           *Attorney for Plaintiff*