IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DONALD J. TRUMP, in his capacity as
the 45th President of the United States,

      Plaintiff,

          v.

BENNIE G. THOMPSON, in his official
capacity as Chairman of the United States
House Select Committee to Investigate
the January 6th Attack on the United
States Capitol; THE UNITED STATES
HOUSE SELECT COMMITTEE TO
INVESTIGATE THE JANUARY 6TH
ATTACK ON THE UNITED STATES
CAPITOL; DAVID S. FERRIERO, in his
official capacity as Archivist of the United
States; and THE NATIONAL ARCHIVES
AND RECORDS ADMINISTRATION,

      Defendants.

Civil Action No. 21-2769

STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION

TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION ...........................................................................................1

BACKGROUND ..............................................................................................8

ARGUMENT .................................................................................................14

  I.  The Four Factors for a Preliminary Injunction Favor Plaintiff ................. 15

  II.  Binding Precedent Requires Granting Plaintiff's Motion ........................... 39

CONCLUSION..............................................................................................41

CERTIFICATE OF SERVICE.....................................................................42

# TABLE OF AUTHORITIES

## Cases

*22nd Avenue Station, Inc. v. City of Minneapolis*,
   429 F.Supp.2d 1144, 1152 (D. Minn. 2006) ............................................................ 39

*Ass'n of Community Organizations For Reform Now (ACORN) v. FEMA*,
   463 F. Supp. 2d 26, 36 (D.D.C. 2006) ...................................................................... 39

*Bank Markazi v. Peterson*,
   136 S. Ct. 1310, 1336 (2016) .................................................................................... 18

*Barenblatt v. United States*,
   360 U.S. 109, 133 (1959) .................................................................................... 18, 19

*Cheney v. U.S. Dist. Ct. for D.C.*,
   542 U.S. 367, 387 (2004) .......................................................................................... 21

*Council on Am.-Islamic Relations v. Gaubatz*,
   667 F. Supp. 2d 67, 76 (D.D.C. 2009) ................................................................. 6, 36

*Doe v. Mattis*,
   928 F.3d 1, 7 (D.C. Cir. 2019) ................................................................................. 14

*Exxon Corp. v. FTC*,
   589 F.2d 582, 592 (D.C. Cir. 1978) ......................................................................... 26

*FBME Bank Ltd. v. Lew*,
   125 F. Supp. 3d 109, 127 (D.D.C. 2015) ................................................................. 38

*Franklin v. Massachusetts*,
   505 U.S. 788, 801 (1992) .......................................................................................... 27

*Fund For Animals v. Norton*,
   281 F. Supp. 2d 209, 222 (D.D.C. 2003) ................................................................. 38

*In re Beef Indus. Antitrust Litig.*,
   589 F.2d 786, 787-88 (5th Cir. 1979) ...................................................................... 25

*In re Ford Motor Co.*,
   110 F.3d 954, 963 (3rd Cir. 1997) ............................................................................ 36

*In re Grand Jury,*
    821 F.2d 946, 959 (3d Cir. 1987) ............................................................ 30

*In re Lindsey,*
    158 F.3d 1263, 1270 (D.C. Cir. 1998) ..................................................... 30

*In re Sealed Case 98-3077,*
    151 F.3d 1059, 1065 (D.C. Cir. 1998) ..................................................... 36

*\* In re Sealed Case,*
    121 F.3d 729, 752 (D.C. Cir. 1997) ........................................ 28, 29, 30, 31

*John Doe Co. v. CFPB,*
    235 F. Supp. 3d 194, 206 (D.D.C. 2017) ................................................. 38

*\* Jud. Watch, Inc. v. Dep't of Just.,*
    365 F.3d 1108, 1114 (D.C. Cir. 2004) ........................................ 28, 30, 31

*Kilbourn v. Thompson,*
    103 U.S. 168, 182-89 (1880) ............................................................. 16, 18

*Metro. Life Ins. Co. v. Usery,*
    426 F. Supp. 150, 172 (D.D.C. 1976) ...................................................... 37

*Metzenbaum v. FERC,*
    675 F.2d 1282, 1287 (D.C. Cir. 1982) .................................................... 26

*NFIB v. Sebelius,*
    567 U.S. 519, 559 (2012) ....................................................................... 18

*\* Nixon v. Administrator of General Services,*
    433 U.S. 425, 439 (1977) ................................................................. 28, 34

*Nken v. Holder,*
    556 U.S. 418, 435 (2009) ....................................................................... 38

*NLRB v. Sears Roebuck & Co.,*
    421 U.S. 132, 150–54 (1975) ................................................................. 30

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
    557 U.S. 193, 205, (2009) ...................................................................... 35

*O'Donnell Const. Co. v. District of Columbia,*
    963 F.2d 420, 429 (D.C. Cir. 1992) ........................................................ 39

*PepsiCo, Inc. v. Redmond*,
   1996 WL 3965, at *30 (N.D. Ill. 1996) ...................................................................... 36

*Providence Journal Co. v. FBI*,
   595 F.2d 889, 890 (1st Cir. 1979) ..................................................................... 36, 38

*Quinn v. United States*,
   349 U.S. 155, 161 (1955) .............................................................................................. 16

*Senate Select Committee on Presidential Campaign Activities v. Nixon*,
   98 F.2d 725, 731 (D.C. Cir. 1974) ..................................................................... 24, 32

*Shapiro v. U.S. Dep't of Justice*,
   2016 WL 3023980, at *7 (D.D.C. May 25, 2016) .................................................. 38

*Trump v. Mazars USA LLP*,
   No. 19-cv-01136, 2021 WL 3602683 (D.D.C. Aug. 11, 2021) ...................... 24, 25, 28

* *Trump v. Mazars USA, LLP*,
   140 S.Ct. 2019 (2020) ........................................................................................ passim

* *U.S. Servicemen's Fund v. Eastland*,
   488 F.2d 1252, 1256-57 (D.C. Cir. 1973) .............................................. 7, 15, 39, 40

*United States v. Ballin*,
   144 U.S. 1, 5 (1892) ...................................................................................................... 26

*United States v. Bass*,
   404 U.S. 336, 349 (1971) ............................................................................................ 27

* *United States v. Nixon*,
   418 U.S. 683, 708 (1974) ..................................................................................... passim

*United States v. Welden*,
   377 U.S. 95, 117 (1964) ............................................................................................... 18

* *Watkins v. United States*,
   354 U.S. 178, 198 (1957) .................................................................................... passim

*Yellin v. United States*,
   374 U.S. 109 (1963) ..................................................................................................... 26

## Statutes

44 U.S.C. § 2205(2) .................................................................................................... 11, 27

44 U.S.C. §§ 2201-2209 .......................................................................... 10, 12

## Other Authorities

Exec. Order No. 13489 ................................................................................ 13

*Protective Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 1 (1996) (opinion of Attorney General Janet Reno) .... 31

*Select Committee Issues Sweeping Demand for Executive Branch Records*, United States House Select Committee to Investigate the January 6th Attack on the United States Capitol (Aug. 25, 2021), https://january6th.house.gov/news/press-releases/select-committee-issues-sweeping-demand-executive-branch-records ...... 1

The Federalist No. 48, at 308 (James Madison) (Rossiter ed., 1961) ........................ 18

## Rules

\* 36 C.F.R. § 1270.44 ............................................................................ 12, 27

## U.S. Constitution

\* Art. I, § 8................................................................................................ 16

\* Astericks indicates authorities on which counsel chiefly relies.

## INTRODUCTION

Congressional committees do not have the broad and boundless authority of inquisition; their investigatory powers are confined by their legislative function and the legitimate Constitutional prerogatives of their co-equal branches of government. Nevertheless, the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Committee") has undertaken to harass President Trump and senior members of his administration (among others) by sending an illegal, unfounded, and overbroad records request to the Archivist of the United States. This self-described "sweeping"[1] request is almost limitless in scope and effectively seeks every presidential record and communication that could tenuously relate to events that occurred on January 6, 2021.[2] The request also seeks records with no reasonable connection to the events of that day. In a political ploy to accommodate his partisan allies, President Biden has refused to assert executive privilege over numerous clearly privileged documents requested by the Committee

---

[1] *See Select Committee Issues Sweeping Demand for Executive Branch Records*, United States House Select Committee to Investigate the January 6th Attack on the United States Capitol (Aug. 25, 2021), https://january6th.house.gov/news/press-releases/select-committee-issues-sweeping-demand-executive-branch-records.

[2] The Committee also sought testimony and documents from several individuals, some of whom were serving in the Trump Administration in January and others who were not. To preserve all privileges applicable to him and the Presidency, President Trump sent a letter to a number of these individuals, instructing them to preserve any and all relevant and applicable privileges, including without limitation the presidential communications and deliberative process privileges and attorney-client privilege, all to the extent allowed by law.

without articulating any coherent theory as to why this unprecedented move would be appropriate.

The Committee's request amounts to nothing less than a vexatious fishing expedition designed to unconstitutionally target President Trump and those who served in his administration. Our laws do not permit such an impulsive action against a former President and his close advisors.

The congressional request here lacks a legitimate legislative purpose, violates the constitutional separation of powers, is contrary to controlling statutes and regulations, and seeks records protected by executive privilege and by numerous other legal privileges.[3] *See Trump v. Mazars USA, LLP*, 140 S.Ct. 2019 (2020); *see also* 44 U.S.C. § 2205; 36 C.F.R. § 1270.44. The Court in *Mazars* found that congressional requests for information related to the President "implicate weighty concerns regarding the separation of powers" and must be "no broader than reasonably necessary to support Congress's legislative purpose." *Id.* at 2034-35. Always prescient, the Court warned against Congress declaring "open season on the President's information held by schools, archives, internet service providers, e-mail clients, and financial institutions," and underscored the threat to Democracy posed by badgering and overbroad congressional requests. *Id.*

The *ultra vires* congressional request at issue here is, in fact, the ultimate declaration of "open season" presaged by the *Mazars* Court. For example, the

---

[3] The request specifically seeks "legal advice or legal analysis," which is plainly privileged. *See* Complaint ("Compl."), Exh. 1.

Committee has asked for "[a]ll documents and communications within the White House on January 6, 2021 relating in any way to," among others, the President, the Vice President, over two dozen of the highest-ranking officials in the federal government (including the National Security Advisor and his Deputy, and the White House Counsel and his Deputy), any Member of Congress or congressional staff, or the Department of Defense, the Department of Justice, the Department of Homeland Security, the Department of the Interior, or any element of the National Guard. Compl., Exh. 1. This single section of the request alone demands access to any number of records to which the Committee is in no way entitled. Such records have nothing to do with the events of January 6th, the scope of the Committee's authority as defined in H.R. 503, or any conceivable legislative purpose, and the records sought are in many cases protected by various privileges. *See* Compl., Exh. 3. Those records could include but would not be limited to conversations with (or about) foreign leaders, attorney work product, the most sensitive of national security secrets, along with a litany of privileged communications among a pool of potentially hundreds of people.

President Trump sought to avoid a lawsuit on this matter, operating on a good-faith basis to protect the institution of the presidency by identifying a small number of clearly privileged records purportedly responsive to the Committee's request and agreeing to the production of unprivileged records to the Committee. He did so in the longstanding spirit of accommodation that has traditionally characterized requests for information between the branches. The Biden administration, however, in an

3

attempt to please the partisan Democrats in Congress and give the Committee unfettered access to any and all privileged materials, rejected these good-faith efforts. Instead, they precipitated this dispute by failing to support President Trump's routine assertion of privilege. This partisanship only serves to undermine the independent institution of the presidency and weaken America's constitutional framework.

Judicial intervention is urgently needed now because the Archivist of the United States intends to produce the requested privileged records on November 12, 2021, absent a court order instructing him not to do so. Compl., Exh. 7. Consequently, a preliminary injunction is necessary to maintain the *status quo* and to ensure that President Trump has a fair opportunity to contest the request's constitutional and legal legitimacy. President Trump and his team have reviewed a first set of documents provided by the Archivist responsive to the Committee's request and have permitted all non-privileged records to be released to the Committee. President Trump has asserted numerous legal privileges over only a small subsection of the documents. Further, due to the Biden administration's blanket failure to recognize and assert executive privilege over even a single privileged document, President Trump has made a protective assertion of constitutionally based privilege with respect to all additional records following the first set. Compl., Exh. 5.

Given the foregoing, Plaintiff requests that the Court promptly schedule a hearing and enter a preliminary injunction prior to November 12, 2021, prohibiting Defendants from complying with or enforcing the request with respect to the

privileged documents identified by the President and any additional documents requested by the Committee from the Archivist. This will permit the Court time to reach a final decision on the merits of this critical constitutional dispute. Granting such preliminary relief will ensure that the request does not interfere with the "arduous and delicate task" the Constitution has assigned to this Court. *Watkins v. United States*, 354 U.S. 178, 198 (1957).

Plaintiff's request meets the four-part test for a preliminary injunction and is supported by circuit precedent. First, Plaintiff is likely to prevail on the merits of his claims that the request is not supported by a "valid legislative purpose," *Mazars*, 140 S. Ct. at 2035, and the requested records are privileged. The Committee has not identified any legislative purpose—let alone a potential piece of legislation—that this request is designed to advance. Further, many of the requested records are highly sensitive and subject to numerous privileges including executive privilege and attorney-client privilege, among others. The Committee is bound by a constitutionally proscribed balancing test which requires the request be supported by a demonstrated, specific need for the information that is demonstrably critical for a legislative purpose. The Committee has failed to establish the requisite need, nor has it demonstrated why this information would be critical for whatever legislation they may be planning to propose.

Second, Plaintiff will suffer irreparable harm if this Court does not intervene. There will be no way to undo the damage caused to Plaintiff once the Archivist produces the requested records to the Committee, and the current President's

decision to waive executive privilege for his own political benefit will undoubtedly cause sustainable injury and irreparable harm to the Republic and to future Presidential administrations of both parties. Further, as it relates to the additional materials being sought, Plaintiff has identified numerous, insurmountable challenges with the process of reviewing presidential records supplied to him by the Archivist. For instance, documents are not unitized: they are provided out of sequence. This severely complicates review of the documents as the reviewer is unable to determine whether certain documents are part of a single record or are otherwise unrelated and could lead to substantial confusion by members of the Committee and its staff and inadvertent production of non-responsive records. Without seeing the full picture surrounding the documents, President Trump is unable to complete a meaningful review of the documents identified for production.

Similarly, the identified custodian or author of certain records may be materially different from the actual author or custodian of the record.  Given the short time periods for review under the PRA, it is unlikely that Plaintiff, his counsel, and his staff will be able to ensure that the voluminous records being produced to the Committee are even what they purport to be. This could easily lead to inadvertent disclosure of records subject to privileges for which the document was not reviewed. *See Council on Am.-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 76 (D.D.C. 2009) (a party will "suffer irreparable injury by further disclosure of its proprietary, confidential and privileged information absent issuance of" preliminary relief).

Therefore, unless there is an opportunity for a complete review of all records determined to be responsive by NARA, Plaintiff will suffer irreparable harm.

Third, the balance of equities and public interest favor interim relief. The only harm that the Committee and other Defendants will suffer, if they prevail on the merits, is some delay before receiving the documents. As discussed below, courts have consistently held that such harm is given little weight and pales in comparison to the severe harm that Plaintiff will suffer if the documents are released. After all, Plaintiff seeks only to maintain the *status quo* while this matter is fully considered by the Court. By contrast, the harm to Plaintiff will be great because privileged materials will be released to a rival branch of government, and the confidentiality inherent in these privileged communications will be permanently lost. Similarly, the public interest is served by ensuring that this important constitutional dispute concerning the scope of congressional authority is fully and fairly resolved before the Committee obtains access to records for which they are not legally or constitutionally entitled.

Fourth, binding precedent requires granting preliminary relief here. The Court should issue a stay of the request "until [it] has an opportunity fully to consider" the "serious constitutional questions" raised by the request on the merits so that "compliance . . . does not frustrate . . . judicial inquiry." *U.S. Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1256-57 (D.C. Cir. 1973), *subsequent merits decision rev'd on other grounds*, 421 U.S. 491. Plaintiff thus respectfully requests that the Court grant a preliminary injunction as soon as possible.

## BACKGROUND

After the 2020 election, Democrats in Congress created the Committee pursuant to House Resolution 503 in a thinly veiled attempt to intimidate and harass President Trump and his supporters under the guise of investigating the events of January 6, 2021. Compl., ¶ 27. House Resolution 503 provides the Committee with the power to investigate the activities of intelligence agencies, law enforcement agencies, and the Armed Forces surrounding January 6th, and provides that the Committee will issue a final report on its activities. *Id.* Notably, this resolution never discusses the authority to investigate the Executive Office of the President ("EOP"). *Id.*

Nor would it make any sense for the Committee's charter to include discussion of such an investigation. As has been widely reported, the FBI has *not* found evidence supporting the false Democratic contention that the events at the Capitol on January 6 were part of an organized plot to overturn the results of the 2020 election.[4] Likewise, as has been widely reported, the FBI has found no evidence that former President Donald Trump or "people directly around him were involved in organizing the violence." *Id.* If anything, the FBI *has* found that a small group of individuals planned to breach the Capitol prior to January 6. A subsequent joint report by the Senate Homeland Security and Rules Committees blamed "intelligence and security

---

[4] Mark Hosenball and Sarah N. Lynch, Exclusive: FBI finds scant evidence U.S. Capitol attack was coordinated – sources, REUTERS, Aug. 20, 2021, https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/.

failures," not the President or any of his advisors, for what happened at the Capitol that day.[5] Regardless, any such type of investigation is simply not in the purview of this Committee, and to the limited extent that there is any legislative role that could be argued here, Congress has already conducted a thorough investigation of this entire matter during its failed impeachment effort.

On August 25, 2021, the Committee sent sweeping and boundless requests for documents and records to the Archivist of the United States seeking information from the EOP and the Office of the Vice President ("OVP"). *See* Compl., Exh. 1. These requests were signed by Chairman of the Committee Bennie G. Thompson. *Id.* Among other things, these requests reiterated the requests made in the March 25, 2021, correspondence from multiple committees of the House of Representatives to the White House and the Archivist. *See* Compl., Exh. 2.

The Committee's requests are startling in scope and utterly lacking in specificity. For example, among the myriad other documents requested, the Committee seeks:

> [a]ll documents and communications relating in any way to remarks made by Donald Trump or any other persons on January 6, including Donald Trump's and other speakers' public remarks at the rally on the morning of January 6, and Donald Trump's Twitter messages throughout the day.

---

[5] Staff of S. Comms. On Homeland Security & Gov't Affairs and Rules and Administration, 117TH CONG., EXAMINING THE U.S. CAPITOL ATTACK: A REVIEW OF THE SECURITY, PLANNING, AND RESPONSE FAILURES ON JANUARY 6, https://www.rules.senate.gov/download/hsgac-rules-jan-6-report

Compl., Exh. 1. Similarly, and even more invasive, the Committee requested, "[f]rom November 3, 2020, through January 20, 2021, all documents and communications related to prepared public remarks and actual public remarks of Donald Trump." *Id.* Issued public statements are one thing, but the notion that Congress is somehow entitled to ask for and review any and all private conversations, remarks or drafts of public statements considered by the President of the United States and his close advisors, without limitations on (among other things) subject matter, would destroy the very fabric of our constitutional separation of powers and invade fundamental privileges designed to maintain the autonomy and functioning of the Executive Branch. *See Mazars*, 140 S.Ct. at 2032 ("[Executive] privilege safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is fundamental to the 'operation of Government.'") (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)). The Committee has also requested "[a]ll documents and communications within the White House on January 6, 2021, relating *in any way* to . . . the January 6, 2021, rally . . . Donald J. Trump" and countless other individuals including close personal advisors to the President. Compl., Exh. 1 (emphasis added).

The Committee's request purports to be made "pursuant to the Presidential Records Act (44 U.S.C. § 2205(2)(C))," *see* Compl., Exh. 1. The Presidential Records Act ("PRA") of 1978, 44 U.S.C. §§ 2201-2209, governs the official records of Presidents and Vice Presidents. The Archivist and the National Archives and Records Administration ("NARA") are charged with working with the President to administer

and store presidential records after the President leaves office. *See generally* 44 U.S.C. §§ 2202-2208.

The PRA defines "presidential records" as follows:

documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2202. The President is permitted to specify a term not to exceed twelve years after his term during which access to presidential records will be restricted. *See* 44 U.S.C. § 2204.

Section 2205(2)(C), the portion of the PRA cited by the Committee in issuing its records request to the Archivist, provides three exceptions to the PRA's access restrictions. In pertinent part, it states that "Presidential records shall be made available . . . (C) to either House of Congress, or, to the extent of matter within its jurisdiction, to any committee or subcommittee thereof if such records contain information that is needed for the conduct of its business and that is not otherwise available." 44 U.S.C. § 2205(2)(C). Importantly, while Congress has purportedly arrogated to itself the power to request documents in certain instances under the statute, the Committee failed to comply with the jurisdictional and source limitations contained in the PRA and related regulations.  Moreover, all congressional requests must comply with the United States Constitution.

The PRA gives the Archivist the power to promulgate regulations to administer the statute. 44 U.S.C. § 2206. Pursuant to those regulations, the Archivist must promptly notify both the former and incumbent Presidents of a request for records that were created during the former President's term of office. 36 C.F.R. § 1270.44. Once the Archivist notifies the former and incumbent Presidents of the Archivist's intent to disclose records, either President may assert a claim of constitutionally based privilege against disclosing the record within thirty calendar days after the date of the Archivist's notice. *Id.* The incumbent or former President must personally make any decision to assert a claim of constitutionally based privilege against disclosing a presidential record or a reasonably segregable portion of it. *Id.*

If a former President asserts the privilege claim, the Archivist consults with the incumbent President, as soon as practicable and within thirty calendar days from the date that the Archivist receives notice of the claim, to determine whether the incumbent President will uphold the claim. *Id.* If the incumbent President upholds the claim asserted by the former President, the Archivist does not disclose the presidential record unless the incumbent withdraws his decision or a court directs the Archivist to disclose the record. *Id.* If the incumbent President does not uphold the claim asserted by the former President, the Archivist discloses the Presidential record sixty calendar days after the Archivist received notification of the claim unless a court directs the Archivist to withhold the record. *Id.* Finally, Executive Order No. 13489 provides that the Archivist shall notify the incumbent and former Presidents of his determination to release certain records at least thirty days prior to disclosure

12

of the records, unless a shorter time-period is required in the circumstances set forth in section 1270.44 of the NARA regulations. Exec. Order No. 13489.

Pursuant to this regulatory and statutory framework, the Archivist notified President Trump on August 30, 2021, that he intended to produce certain documents in response to the Committee's expansive request. Compl., ¶ 33. On October 8, 2021, the Biden White House notified the Archivist that it would not be asserting executive privilege over certain documents identified as responsive to the Committee's request. *Id.* That same day, pursuant to the PRA, associated regulations, and the applicable executive order, President Trump notified the Archivist that he has made a formal assertion of executive privilege with respect to a small subset of documents as well as a protective assertion of executive privilege over any additional materials that may be requested by the Committee. *Id.* Then, the Biden White House notified the Archivist that it would not assert executive privilege over the privileged documents identified in President Trump's October 8 letter and instructed the Archivist to turn the records over to the Committee thirty days from the date of notifying President Trump of President Biden's decision, absent an intervening court order. *Id.*

On October 13, 2021, the Archivist notified President Trump that, "[a]fter consultation with Counsel to the President and the Acting Assistant Attorney General for the Office of Legal Counsel, and as instructed by President Biden" the Archivist has "determined to disclose to the Select Committee" on November 12, 2021 all responsive records that President Trump determined were subject to executive privilege, absent an intervening court order. *Id.* Several days later, President Trump

13

commenced this lawsuit seeking to invalidate the Committee's records request and prevent Defendants from enforcing or complying with the request with respect to the privileged documents and any additional documents the Archivist seeks to turn over to the Committee. At a bare minimum, the Court should enjoin the Archivist from producing any potentially privileged records until the courts have fully adjudicated the Committee's lack of authority to request presidential records under these circumstances.

## ARGUMENT

The Court should issue a preliminary injunction enjoining Defendants from complying with or enforcing the request at issue in this case because (a) the request is not in furtherance of a legitimate legislative purpose, *see Mazars*, 140 S.Ct. at 2035, and (b) the request seeks clearly privileged documents and the Committee lacks a specific need for the requested information, *see Nixon*, 418 U. S. at 713. A preliminary injunction should issue based on the consideration of four factors:

> (i) whether the party seeking the injunction is likely to succeed on the merits of the action, (ii) whether the party is likely to suffer irreparable harm without an injunction, (iii) whether the balance of equities tips in the party's favor, and (iv) whether an injunction would serve the public interest.

*Doe v. Mattis*, 928 F.3d 1, 7 (D.C. Cir. 2019). Plaintiff satisfies these requirements here, and binding circuit precedent also counsels in favor of granting Plaintiff's motion.

14

### I.   The Four Factors for a Preliminary Injunction Favor Plaintiff

Plaintiff satisfies the four-factor test for a preliminary injunction. Plaintiff is likely to prevail on the merits of his constitutional claims, will suffer irreparable harm if the *status quo* is not preserved, and the balance of harms and public interest favor interim relief.

### A.  Likelihood of Success on the Merits

Plaintiff is likely to succeed on the merits of his claims that the expansive request here (a) serves no valid legislative purpose, (b) is prohibited because the Committee's request exceeds the statutory framework set forth in the PRA and associated regulations, and (c) that the requested documents are protected by numerous legal privileges and the Committee has no specific need for the requested records.

### 1.  The Request Serves No Valid Legislative Purpose

The Committee's request lacks a legitimate legislative purpose and thus violates the Constitution and separation of powers. When Congress issues a subpoena or request to a third party for another person's information or documents, the law allows the person whose information will be exposed to sue in federal court for an "injunction or declaratory judgment." *Eastland*, 488 F.2d at 1259. All congressional information requests must be supported by a "valid legislative purpose." *Mazars*, 140 S.Ct. at 2035. In this case, the request lacks a valid legislative purpose given its shockingly broad scope and the Committee's abject failure to articulate any valid legislative purpose served by the request.

The "valid legislative purpose" requirement stems directly from the Constitution. "The powers of Congress . . . are dependent solely on the Constitution," and "no express power in that instrument" allows Congress to investigate individuals or to issue boundless records requests. *Kilbourn v. Thompson*, 103 U.S. 168, 182-89 (1880). The Constitution instead permits Congress to enact certain kinds of legislation, *see, e.g.*, Art. I, § 8, and Congress's power to investigate "is justified solely as an adjunct to the legislative process." *Watkins*, 354 U.S. at 197. "Congress is not invested with a general power to inquire into private affairs. The subject of any inquiry always must be one on which legislation could be had." *Eastland*, 421 U.S. at 504 n.15 (cleaned up); *see also Quinn v. United States*, 349 U.S. 155, 161 (1955) ("[T]he power to investigate" does not "extend to an area in which Congress is forbidden to legislate.").

Every information request made by Congress, whether via statutory process or subpoena, must comply with the strictures of the Constitution. *See Mazars*, 140 S.Ct. at 2034-35). Therefore, any argument by the Committee that it need not comply with the constitutional requirements regarding congressional information requests because its request is ostensibly made pursuant to the PRA is meritless. Indeed, Congress cannot arrogate to itself via statute or other means power beyond that which the Constitution provides. Additionally, Congress cannot use information requests to exercise "any of the powers of law enforcement." *Quinn*, 349 U.S. at 161. Those powers "are assigned under our Constitution to the Executive and the Judiciary." *Id.* Put simply, Congress is not "a law enforcement or trial agency," and

16

congressional investigations conducted "for the personal aggrandizement of the investigators" or "to punish those investigated," like this one, are "indefensible." *Watkins*, 354 U.S. at 187 (cleaned up).[6]

Chairman Thompson's request is not supported by a legitimate legislative purpose. In the request, Thompson fails to identify a single piece of legislation he or the Committee is considering. He claims the purpose of his request is to investigate the facts, circumstances, and causes of the events at the United States Capitol on January 6, 2021. *See* Compl, Exh. 1. But he fails to identify anything in the private and privileged communications between and among the President and his closest aides that would advance or inform a legitimate legislative purpose or specific legislation regarding those events. Any investigation into alleged claims of wrong-doing is a quintessential law-enforcement task reserved to the executive and judicial branches. Congress cannot engage in meandering fishing expeditions in the hopes of embarrassing the President or exposing the President's and his staff's sensitive and privileged communications "for the sake of exposure." *Watkins*, 354 U.S. at 200.

While some of the Committee's correspondence accompanying the requests vaguely notes that the Committee seeks information in order to "identify and

---

[6] In an October 18, 2021, televised interview, Committee Member Adam Schiff said that he thinks we should "investigate all of the former President's crimes." While Congressman Schiff will not be dissuaded by the fact that President Trump has time and again been vindicated of Congressman's Schiff's many and baseless allegations against him, the more important point is that he clearly sees the Committee as a law enforcement substitute rather than a legislative vehicle. If Mr. Schiff wants to return to his former career as a prosecutor, he need only resign his seat and seek new employment.

evaluate lessons learned and to recommend to the House and its relevant committees' corrective laws, policies, procedures, rules, or regulations," the Committee does not explain with any specificity how this information will in fact assist the Committee in evaluating the proposed legislation or oversight issues of stated concern to its investigation. If a professed interest in passing remedial legislation is all the Constitution requires, then there is no limit to the law-enforcement investigations upon which Congress can embark. Hollowing out the legitimate-legislative-purpose test permits the Necessary and Proper Clause "to undermine the structure of government established by the Constitution." *NFIB v. Sebelius*, 567 U.S. 519, 559 (2012) (opinion of Roberts, C.J.) and would leave the Executive—to whom "law enforcement . . . power is entrusted," *United States v. Welden*, 377 U.S. 95, 117 (1964)—unarmed in his clash with "'the encroaching spirit' of legislative power." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1336 (2016) (Roberts, C.J., dissenting) (quoting The Federalist No. 48, at 308 (James Madison) (Rossiter ed., 1961)). Accordingly, while a legislative investigation is not illegitimate because it might incidentally expose illegal conduct, a subpoena focused on investigation for its own sake does not become legitimate just because it might incidentally inspire remedial legislation. Allowing mere recitation of a legislative purpose to inoculate a request from challenge turns the constitutional line between a legitimate legislative pursuit and an illegitimate law-enforcement investigation into a magic-words test. The subpoena's primary purpose is what has to count. *Barenblatt v. United States*, 360 U.S. 109, 133 (1959)); *see also Kilbourn*, 103 U.S. at 195.

While safety and election integrity are topics on which legislation theoretically "could be had," *Mazars*, 940 F.3d at 724 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 177 (1927), the key question is whether the information the Committee seeks is "reasonably relevant to its legitimate investigation," *Mazars*, 940 F.3d at 740, for "[e]ven a valid legislative purpose cannot justify a subpoena demanding irrelevant material," *id.* at 723.   The Committee's theory has no limiting principle, and thus it flies in the face of the D.C. Circuit's recognition that the Constitution does not permit "indiscriminate dragnet" subpoenas. *Mazars*, 940 F.3d at 740 (*quoting Barenblatt*, 360 U.S. at 134). The mere fact that potential legislation may touch upon a general policy issue does not and cannot automatically legitimize every Congressional inquiry tangentially related to that issue—otherwise, the limitations on Congressional inquiries would be meaningless. Indeed, "if a committee could subpoena information irrelevant to its legislative purpose, then the Constitution would in practice impose no real limit on congressional investigations." *Id.* at 739-40. Congress of course "cannot investigate events that have not yet occurred," but "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events." *Senate Select Comm.*, 498 F.2d at 732.

Further, even if there were potential legislative decisions to be made, the Committee could obtain any and all of the information it seeks relevant to those decisions from other, non-privileged sources. Aside from the lack of an identified legislative purpose, the Committee has failed to identify anything in the broad swath

of requested materials that it actually needs to *further* any valid legislative purpose. The sensitive and privileged communications and documents requested by the Committee are irrelevant to legislating, and any other factual information needed by the Committee can be easily obtained from other sources.

2. **All Four *Mazars* Factors Confirm that the Request Serves No Valid Legislative Purpose**

Under the four-part test regarding legislative purpose announced by the Supreme Court in *Mazars*, the Committee's request serves no valid legislative purpose. In determining the constitutionality of congressional records requests, the *Mazars* Court instructed courts to "perform a careful analysis that takes adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the unique position of the President." *Mazars*, 140 S. Ct. at 2035. The Court then provided four "special considerations" meant to guide that analysis, *see id.* at 2035-36, all of which confirm that the abusive and wide-ranging request here serves no legitimate legislative purpose.

First, "the asserted legislative purpose" must "warrant[] the significant step of involving the President and his papers." *Id.* at 2035. The alleged legislative purpose underpinning the overbroad request at issue here clearly does not merit involving the President and his records. The Committee has failed to identify anything in the broad swath of requested materials that would inform proposed legislation. If Congress wishes to legislate regarding its own security measures, it may certainly do so, but the President's private communications with and among staff members are irrelevant to that legislation. Further, the Committee does not adequately explain why other

sources of information—outside of the requested records—could not "reasonably provide Congress the information it needs in light of its particular legislative objective." *Id.* at 2035-36. Moreover, "[t]he President's unique constitutional position means that Congress may not look to him as a 'case study' for general legislation." *Id.* at 2036. Chairman Thompson's request openly flouts this rule by admitting that the Committee's request seeks to "identify lessons learned, and recommend laws, policies, procedures, rules, or regulations necessary . . . in the future," effectively treating President Trump as a test subject. Compl., Exh. 1. Nothing in the Constitution permits such a speculative and unfounded records request.

Second, the request should be "no broader than reasonably necessary to support Congress's legislative objective." *Mazars*, 140 S.Ct. at 2036. "The specificity of the . . . request 'serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President.'" *Id.* (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 387 (2004)). This consideration alone counsels strongly against the constitutionality of the Committee's request. The request is unbelievably broad and seeks every presidential record and communication that could tenuously relate to events that occurred on January 6, 2020, in Washington, D.C. Indeed, the breadth of the request is striking, far exceeding any legitimate bounds of legislative purpose. For example, the request asks for "[a]ll documents and communications within the White House on January 6, 2021, relating in any way to . . . the January 6, 2021 rally . . . Donald J. Trump" and over thirty other individuals and government agencies. Compl., Exh. 1. The request encompasses information that is protected by

the presidential communications and deliberative process privileges and attorney-client privilege, among others, and could reasonably be read to include every single e-mail sent in the White House on that day.

The request also seeks records related to the 2020 election, from April 1, 2020, through January 20, 2021, among the President, his private counsel, his Chief of Staff, his campaign managers, other senior campaign officials, and over forty other advisors. Compl., ¶ 9. This strange request is overbroad, serves no valid legislative purpose, and threatens Democracy and free and fair elections in America. Such requests bear no reasonable connection between the information requested and the Committee's charter or to any legitimate legislative purpose. The Committee's startlingly broad requests cannot withstand constitutional scrutiny under the second *Mazars* factor, and thus this Court should grant the preliminary injunction.

Third, "courts should be attentive to the nature of the evidence offered by Congress to establish that a [request] advances a valid legislative purpose." *Mazars*, 140 S.Ct. at 2036. "[U]nless Congress adequately identifies its aims and explains why the President's information will advance its consideration of possible legislation," "it is impossible to conclude that a [request] is designed to advance a valid legislative purpose." *Id.* The Committee has provided no evidence to establish its request advances a legitimate legislative purpose. Indeed, House Resolution 503 generally permits the Committee to investigate intelligence community and law enforcement activities surrounding January 6th but is silent regarding the records and materials of the EOP. The lack of evidence establishing the Committee's overbroad request

serves some legitimate legislative goal dooms the request and weighs in favor of injunctive relief.

Fourth, courts should "assess the burdens imposed on the President by [the request]" because "[the burdens] stem from a rival political branch that has an ongoing relationship with the President and incentives to use [requests] for institutional advantage." *Id.* As discussed above, the number of records encompassed by the Committee's overbroad request is staggering. Further, the limited time-period to review potentially responsive documents adds to the burden of the request. The Committee must, at the very least, narrow its request significantly or the burden on President Trump in reviewing all potentially responsive documents within the time period provided by the PRA will be far too substantial to be practically possible. The request also burdens the presidency generally in the sense that if Congress is permitted to issue such sweeping requests, every future President's close aides will fear disclosure and thus provide less than candid advice. "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Nixon*, 418 U.S. at 705. This chilling effect will harm every President of every party. Permitting these types of requests will also burden every former President going forward, as partisans in Congress will seek to relitigate past grievances perpetually. Thus, this factor also weighs in favor of injunctive relief.

The Committee's request is also extremely broad and thus the Court has a limited ability to weigh the competing interests of Congress and the President. At the

very least, the Committee should be required to make a showing of need like the "demonstrably critical" standard required in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974), before this Court can determine whether they have met this high bar or not. Permitting such requests without performing the appropriate balancing test would allow Congress to "exert an imperious control over the Executive Branch and aggrandize itself at the President's expense, just as the Framers feared." *Mazars*, 140 S. Ct. at 2034 (cleaned up). Ultimately, the Committee is attempting to damage Democracy itself, and the citizens of the United States, for executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is 'fundamental to the operation of Government.'" *Id.* at 2032 (quoting *Nixon*, 418 U.S. at 708).

Finally, that President Biden has waived executive privilege with respect to the requested documents does not absolve this Court from its constitutional responsibility to ensure that the request complies with law, protects the public interest, and serves a valid legislative purpose. All congressional requests must meet this threshold, and this request plainly does not. Thus, the Court should invalidate it as unconstitutional.

### 3.  The Request Fails the "*Mazars* Lite" Test

Even under the "*Mazars* lite" test recently adopted and applied in a case in this district involving a subpoena for President Trump's personal financial information, the request at issue here is constitutionally invalid. *See generally Trump v. Mazars USA LLP*, No. 19-cv-01136, 2021 WL 3602683 (D.D.C. Aug. 11, 2021). In that case,

the court examined the *Mazars* factors "cognizant of the fact that this case now involves a subpoena directed at a former President" and found that a subpoena directed to his  financial records was constitutionally invalid. *Id.* at \*39. The court held that Congress had failed to adequately explain why President Trump's personal papers would "uniquely advance its legislative objectives," *id.*, and found a subpoena that was "undeniably broad" to be invalid. *Id.* at \*53 ("The risk of unnecessary intrusion into the operation of the Office of the President increases with a subpoena's breadth and intrusiveness. The more Congress can invade the personal sphere of a former President, the greater the leverage Congress would have on a sitting President.") (cleaned up).

While President Trump does not endorse the *Mazars* lite test, the court's rationale in its recent decision supports finding the incredibly broad request in this case constitutionally defective. The Committee has failed to explain how the requested materials would uniquely advance its legislative objectives, and the request is far more wide-ranging and broader than any congressional request in modern history. Thus, the request fails even the *Mazars* lite test.

### 4.  The Committee Lacks Express Authority to Issue This Request

Congress has not authorized the Committee to issue requests for a former President's presidential records, and thus the request is invalid. "Congressional committees are themselves the offspring of Congress; they have only those powers authorized by law; they do not have an unlimited roving commission merely by virtue of their creation and existence to ferret out evil or to uncover inequity." *In re Beef Indus. Antitrust Litig.*, 589 F.2d 786, 787-88 (5th Cir. 1979). Hence, congressional

committees "must conform strictly to the resolution establishing [their] investigatory powers" for this request to be statutorily valid. *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978); *see also Watkins*, 354 U.S. at 201. Moreover, judicial review is available where, as here, "rights of persons other than members of Congress are jeopardized by Congressional failure to follow its own procedures." *Metzenbaum v. FERC*, 675 F.2d 1282, 1287 (D.C. Cir. 1982); *see also Yellin v. United States*, 374 U.S. 109 (1963); *United States v. Ballin*, 144 U.S. 1, 5 (1892).

Nothing in H.R. 503 permits the Committee to request presidential records. H.R. 503 never once mentions the President, the EOP, presidential records, any advisors to the President, or the Archivist. *See* Compl., Exh. 3. Absence of an express statement authorizing or even contemplating the Committee's request here should be decisive. "The theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose." *Watkins*, 354 U.S. at 200. Congress therefore must "spell out that group's jurisdiction and purpose with sufficient particularity . . . in the authorizing resolution," which "is the committee's charter." *Id.* at 201. The committee "must conform strictly to the resolution." *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978). And when an investigation is "novel" or "expansive," courts will construe the committee's jurisdiction "narrowly." *Tobin v. United States*, 306 F.2d 270, 275 (D.C. Cir. 1962). "Out of respect for the separation of powers and the unique constitutional position of the President," H.R. 503 should not be interpreted to authorize requests for presidential records absent "an express statement by

26

Congress." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see also United States v. Bass*, 404 U.S. 336, 349 (1971). Nothing authorizes the Committee's sweeping request here, and thus it should be invalidated.

### 5.   The Request Violates the PRA and Associated Regulations

Chairman Thompson's request also runs afoul of the statutory and regulatory requirements for a congressional records request under the PRA, which mirror the constitutional requirements. 44 U.S.C. § 2205(2)(C) provides that presidential records "shall be made available . . . (C) to either House of Congress, or, *to the extent of matter within its jurisdiction*, to any committee or subcommittee thereof *if such records contain information that is needed for the conduct of its business* and that is *not otherwise available*." (emphasis added). This mirrors the regulatory requirements for congressional requests in 36 C.F.R. § 1270.44. For the reasons discussed above, the requested records do not relate to a matter within the Committee's jurisdiction, and the Committee has not explained how information in the records is needed for the conduct of its business and how such information is not otherwise available.

### 6.   The Requested Documents Are Privileged

Even if the Court finds that the request serves some valid legislative purpose, which it does not, and the request is within the Committee's bailiwick, which it is not, President Trump is likely to succeed on his claim that the requested records are protected by numerous legal privileges and thus should not be produced to the Committee. Regardless of President Biden's attempted waiver and his failure to exert executive privilege over clearly privileged documents, the request plainly seeks

privileged documents, and the Committee has failed to demonstrate a specific, critical need for the requested records under *Nixon*. Indeed, President Trump has reviewed and identified a handful of documents that are allegedly responsive to the Committee's request in the first set of documents provided by the Archivist and which are clearly protected by the presidential communications privilege, among others. *See Jud. Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) ("[C]onsistent with the teachings of *Nixon I* and *II* and *In re Sealed Case*, we hold that the presidential communications privilege applies [to materials] 'solicited and received' by the President or his immediate White House advisors who have 'broad and significant responsibility for investigating and formulating the advice to be given the President.'" (quoting *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997)). The Court should grant the preliminary injunction here because President Trump is likely to succeed on the merits of his claim that the identified documents are privileged and that a large portion of the documents requested but not produced are likely privileged as well.

Binding precedent confirms that President Trump possesses the power to assert executive privilege and other privileges over materials requested by Congress. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 439 (1977). As a court in this district acknowledged, "the remaining separation of powers concern at issue [with former Presidents] involves the threat of a post-presidency congressional subpoena for personal information in order to influence how the sitting President treats Congress while in office." *See Mazars*, 2021 WL 3602683, at *52.

28

The documents at issue here are likely to be covered at a minimum by the presidential communications and deliberative process privileges, among others. Indeed, the requests at issue clearly seek documents and communications protected by the attorney-client privilege and the attorney work-product doctrine. The presidential communications privilege applies to "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d at 744. The privilege is intended to promote candid communications between the President and his advisors concerning the exercise of his Article II constitutional duties. *Nixon*, 418 U.S. at 705, 708, 711; *In re Sealed Case*, 121 F.3d at 744. "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Nixon*, 418 U.S. at 705. As the Supreme Court has recognized, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way that many would be unwilling to express except privately." *Id.* at 708. "The presidential communications privilege . . . extends 'beyond communications directly involving and documents actually viewed by the President, to the communications and documents of the President's immediate White House advisors and their staffs,'" *i.e.*, documents "'solicited and received' by the President or his immediate White House advisors who have 'broad and significant responsibility for investigating and

formulating the advice to be given the President.'" *Jud. Watch*, 365 F.3d at 1114

(quoting *In re Sealed Case*, 121 F.3d at 742).

The deliberative process privilege covers records documenting the

decisionmaking of executive officials generally. *In re Sealed Case*, 121 F.3d at 745.

This privilege allows the President to withhold certain documents containing

"confidential deliberations of law or policymaking, reflecting opinions,

recommendations or advice." *In re Grand Jury*, 821 F.2d 946, 959 (3d Cir. 1987)

(citing *NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 150–54 (1975)). In addition, the

attorney-client privilege applies to communications between a client and his lawyer

made for the purpose of obtaining legal advice. *In re Lindsey*, 158 F.3d 1263, 1270

(D.C. Cir. 1998).

After reviewing a first set of documents provided by the Archivist, President

Trump has determined that a handful of documents are privileged. *See* Compl., Exh.

5. Each of these documents is covered by the presidential communications privilege

or the deliberative process privilege. The documents were created during President

Trump's term of office and reflect presidential decisionmaking, deliberations, and

communications between and among close advisors, attorneys and the President.

They involve deliberations and advice given in candor by close advisors and attorneys

to the President or to his close advisors. They plainly include confidential

deliberations, legal advice, and "communications and documents of the President's

immediate White House advisors and their staffs," *i.e.*, documents "'solicited and

received' by the President or his immediate White House advisors who have 'broad

and significant responsibility for investigating and formulating the advice to be given the President.'" *Jud. Watch*, 365 F.3d at 1114 (quoting *In re Sealed Case*, 121 F.3d at 742). Thus, they are presumptively privileged.

In light of this initial review and the Biden administration's failure to defend executive privilege, President Trump necessarily made a blanket assertion of privilege with respect to any additional documents found by the Archivist to be responsive to the Committee's request. This assertion is consistent with past practice under the Constitution. *See Protective Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 1 (1996) (opinion of Attorney General Janet Reno). In the event this Court does not declare the requests invalid and unconstitutional, this protective assertion will ensure President Trump's ability to decide whether to make a conclusive assertion of executive privilege following a full review of the requested materials. *See* Compl., Exh. 8. At the very least, the Court should instruct the NARA to provide a more reasonable review timeframe.

In sum, the Court should grant President Trump's motion for a preliminary injunction so that the Court may fully analyze President Trump's privilege claims both with respect to the identified documents and any additional documents over which President Trump wishes to assert privilege. The Court should grant the motion here because the Committee's expansive request likely violates separation of powers and the Constitution by seeking privileged documents to which the Committee is not entitled because the records are not critical to any cognizable legislative purpose.

**7.** **The Request Fails to Meet the Demanding Standard for Congressional Requests for Sensitive and Privileged Presidential Communications**

The Committee lacks the required specific, demonstrated need for the requested privileged information and fails to show how the information is critical to its legislative purpose. The Supreme Court has made clear that when Congress is seeking the most sensitive privileged presidential records, like those requested by the Committee, it must establish a "'demonstrated, specific need' for the . . . information." *Mazars*, 140 S.Ct. 2031 (quoting *Nixon*, 418 U. S. at 713). Further, the Committee "must show that the . . . information is 'demonstrably critical' to its legislative purpose." *Id.* (quoting *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974)). The Committee has utterly failed to meet these "demanding standards," which apply to this case because it involves presidential communications including "Oval Office communications over which the President asserted executive privilege." *Id.* at 2031-32. This privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is 'fundamental to the operation of Government.' As a result, information subject to executive privilege deserves 'the greatest protection consistent with the fair administration of justice.'" *Id.* at 2032 (quoting *Nixon*, 418 U. S., at 708, 713).

The Committee has failed to explain or even articulate any need for the information it has requested, much less a demonstrated, specific one. Nothing in the Committee's request meets the high bar of demonstrating how or why the requested information is critical to a legislative purpose. The information requested by the

Committee includes sensitive communications and information involving the President himself and his closest advisors. As a result, President Trump has exerted executive privilege over this information. Thus, the Court must afford this information with the greatest protection consistent with the fair administration of justice, and the Committee has not and cannot identify a specific, demonstrated need for the information or how the information is demonstrably critical for a specific legislative purpose. The Court should invalidate the Committee's request for this reason alone.

Finally, President Biden's politically motivated waiver of executive privilege as to plainly privileged documents is irrelevant to the validity of President Trump's claim of executive privilege. In fact, when White House Press Secretary Jennifer Psaki was recently asked about this lawsuit, she effectively acknowledged that President Biden's attempt to waive executive privilege was due to a political, rather than a legal analysis.

Speaking from the podium of the James Brady Press Briefing Room, she stated:

> Well, our view, and I think the view of the vast majority of Americans is that former President Trump abused the office of the presidency and attempted to subvert a peaceful transfer of power. Something that had happened between Democratic and Republican presidencies for decades and decades throughout history. The former president's actions represented a unique and existential threat to our democracy that we don't feel can be swept under the rug. And as President Biden determined, and as we have provided updates to all of you as we've made, as our legal team has made evaluations, the constitutional protections of executive privilege should not be used to shield

information that reflects a clear and apparent effort to subvert the constitution itself.[7]

Clearly, the Biden Administration made its privilege determination based upon a predetermined conclusion that Predident Trump attempted to subvert the peaceful transefer of power, a conclusion contrary to statements by the FBI and the report of the the Senate Committee on Homeland Security and Government Relations.

Indeed, Ms. Psaki's statement makes it clear that the White House's privilege determination is simply exposure for the sake of exposure, without regard for the legal and constitutional intracacies of the relevant privileges, any legitimate legislative purpose, or the long-term effect on the Presidency. President Biden's transparent attempt to distract from his current political woes while targeting a political foe is precisely the reason the Supreme Court has held that executive privilege "survives the individual President's tenure." *Nixon*, 433 U.S. at 449. "[T]he privilege is not for the benefit of the President as an individual, but for the benefit of the Republic." *Id.* It ensures that the President is well-served by candid advice that cannot be pried from the Archivist in a politically motivated and collusive effort by a vengeful Congress and President.

### 8. Allowing an Incumbent President *Carte Blanche* Authority to Waive the Privilege of his Predecessor Would Render the Presidential Records Act Unconstitutional.

If the PRA is read so broadly as to allow an incumbent President unfettered discretion to waive former Presidents' executive privilege, then it would render the

---

[7] Press Secretary Jen Psaki White House Press Conference Transcript October 19, REV, https://www.rev.com/blog/transcripts/press-secretary-jen-psaki-white-house-press-conference-transcript-october-19.

act unconstitutional. As has been reaffirmed by the Supreme Court, the executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is fundamental to the 'operation of Government.'" *Mazars,* 140 S. Ct. at 2032 (quoting *Nixon,* 418 U.S. at 708). If the incumbent President could waive the full extent of the constitutionally based executive privilege without judicial review, then it would certainly chill such confidential communication regarding the President. Every President, cabinet official, and advisor would be hamstrung by the knowledge that a subsequent President from a rival political party could simply waive all privilege and expose confidential executive communications to the world.

Such a ruling would render the PRA unconstitutionally overbroad in its delegation of power to the incumbent President, and the PRA would undermine the separation of powers that it was created to protect. The executive privilege is a fundamental privilege rooted in the Constitution and the separation of powers doctrine, allowing infringement upon it in such a way would undermine the functioning of the entirety of the United States Government.

The Court need not take the bait. Indeed, the canon of constitutional avoidance counsels against interpreting a statute in such a way that would raise constitutional questions when there is some other ground upon which to dispose of the case. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205, (2009) (recognizing "[the] well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case"). Here, the executive

privilege, presidential communications privilege, and other privileges all weigh in favor respecting the underlying privleges and protecting the documents from production.

### B. Irreparable Harm

Plaintiff will suffer irreparable harm if the Court does not issue an order halting production of the requested documents by November 12, 2021. If the Court does not intervene, the Archivist could give the Committee confidential, privileged information. Courts in this district have recognized that the disclosure of privileged information can constitute an irreparable harm because such information, once disclosed, loses its confidential and privileged nature. *See Gaubatz*, 667 F. Supp. 2d at 76. If such material is disclosed before the Court has an opportunity to hear Plaintiff and to determine the merits of his claim, the very rights Plaintiff seeks to protect will have been destroyed. *See In re Sealed Case 98-3077*, 151 F.3d 1059, 1065 (D.C. Cir. 1998) ("In this respect, petitioner is asserting something akin to a privilege insofar as 'once [the] putatively protected material is disclosed, the very right sought to be protected has been destroyed.'") (quoting *In re Ford Motor Co.*, 110 F.3d 954, 963 (3rd Cir. 1997)). This is irreparable harm. Such a result would also injure President Trump and future presidents by chilling advice given by presidential aides.

"Once the documents are surrendered," in other words, "confidentiality will be lost for all time. The *status quo* could never be restored." *Providence Journal Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979); *see PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *30 (N.D. Ill. 1996) ("[J]ust as it is impossible to unring a bell, once disclosed, . . .

confidential information lose their secrecy forever"); *Metro. Life Ins. Co. v. Usery*, 426 F. Supp. 150, 172 (D.D.C. 1976) ("Once disclosed, such information would lose its confidentiality forever.").

Aside from the documents over which President Trump has already made an formal assertion of privilege, the threat of inadvertent disclosure of privileged documents is real given the time-consuming nature of the PRA process. For example, Plaintiff has identified numerous and serious challenges with the process of reviewing presidential records supplied to him by the Archivist. Documents provided by the Archivist are not unitized and are provided out of sequence. This causes the reviewer to be unable to determine whether certain documents are part of a single record or are otherwise unrelated and could lead to substantial confusion by members of the Committee and its staff and inadvertent production of non-responsive records. Similarly, the identified custodian or author of certain records may be materially different from the actual author or custodian of the record. Given the short time periods for review under the PRA, it is unlikely that Plaintiff will be able to ensure that the records being produced to the Committee are what they purport to be. This could lead to inadvertent disclosure of records subject to privileges for which the document was not reviewed.

Importantly, another due date for compliance with the Committee's request is only days away, and therefore immediate intervention is needed to preserve the opportunity for Plaintiff to secure judicial review of his claims. "Courts routinely issue injunctions to stay the *status quo* when" events might otherwise "moot the losing

party's right to appeal." *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 206 (D.D.C. 2017). Plaintiff has raised important constitutional claims and denying him interim relief may "entirely destroy [his] rights to secure meaningful review." *Providence Journal Co.*, 595 F.2d at 890. The harm here is clear and irreparable.

### C. Balance of the Equities and Public Interest

The balance of equities and public interest also favor granting Plaintiff's motion. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C. 2015). Unlike the irreparable harm Plaintiff will suffer absent interim relief, there is no harm to Defendants by delaying production while the parties litigate the request's validity. The Committee and other Defendants lack an urgent need for the documents.

In addition, the records sought by the Committee are in the custody and control of NARA and therefore are being preserved as a matter of law. The Committee's "interest in receiving the records immediately" thus "poses no threat of irreparable harm to them." *Shapiro v. U.S. Dep't of Justice*, 2016 WL 3023980, at *7 (D.D.C. May 25, 2016). Interim relief only "postpones the moment of disclosure . . . by whatever period of time may be required" to finally adjudicate the merits of Plaintiff's claims. *Providence Journal*, 595 F.2d at 890; *see Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.D.C. 2003) (rejecting government's claim of harm in having its action "delayed for a short period of time pending resolution of this case on the merits"); *22nd Avenue Station, Inc. v. City of Minneapolis*, 429 F.Supp.2d 1144, 1152 (D. Minn.

2006) (similar). Finally, the limited interest the Committee may have in immediately obtaining the requested records pales in comparison to Plaintiff's interest in securing judicial review before he suffers irreparable harm.

Last, the public interest weighs strongly in favor of granting Plaintiff's motion. The D.C. Circuit "has clearly articulated that the public has an interest in the government maintaining procedures that comply with constitutional requirements." *Ass'n of Community Organizations For Reform Now (ACORN) v. FEMA*, 463 F. Supp. 2d 26, 36 (D.D.C. 2006) (citing *O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992)). The Constitution entrusts this Court to determine whether the Committee has exceeded its constitutional authority. Denying Plaintiff's motion would "abdicate the responsibility placed by the Constitution upon the judiciary to ensure that the Congress" has not acted illegitimately in issuing this request for privileged information. *Watkins* 354 U.S. at 198-99. Permitting the Committee to evade judicial review is not in the public interest.

## II.    Binding Precedent Requires Granting Plaintiff's Motion

In addition to the fact that Plaintiff has met the test for a preliminary injunction, binding precedent confirms that the Court should grant that relief. The D.C. Circuit granted similar relief in *Eastland*, a case in the same procedural posture as this one. In *Eastland*, a congressional committee requested "records pertaining to or involving the" plaintiff from the plaintiff's bank. 488 F.2d at 1254. The plaintiff sued the committee chairman, committee counsel, and the bank for a declaration that the request was unenforceable and for an injunction prohibiting the defendants from

enforcing or complying with it. *Id.* at 1254-56. When the district court denied preliminary relief, the D.C. Circuit reversed and stayed the request's enforcement. *See id.* at 1256.

The "decisive element" favoring a stay, the *Eastland* court explained, was the fact that "unless a stay is granted this case will be mooted, and there is likelihood, that irreparable harm will be suffered by [plaintiff when the due date arrives]." *Id.* The court stated that the stay was warranted because the case raised "serious constitutional questions that require more time" and issues "of such significance that they require" further "consideration and deliberation." *Id.*

In this case, as in *Eastland*, Plaintiff faces "irreparable harm" if he does not obtain interim relief before the request's due date. *Id.* at 1256. Just like the *Eastland* plaintiff, Plaintiff raises "serious constitutional questions" that should be resolved once there has been full merits briefing, oral argument, and this Court's "best available perspective" after thoughtful "consideration and deliberation." *Id.* at 1256-57. The constitutional questions raised in this case are highly consequential and merit the granting of a preliminary injunction until they can be fully resolved.

## CONCLUSION

Plaintiff respectfully moves this Court for a preliminary injunction prohibiting Defendants from enforcing or complying with the Committee's request until the Court can issue a final judgment. Plaintiff further requests a hearing within 21 days pursuant to Local Rule 65.1(d).

Dated: October 19, 2021             Respectfully submitted,


                                    /s/ Jesse R. Binnall
                                    Jesse R. Binnall (VA022)
                                    BINNALL LAW GROUP, PLLC
                                    717 King Street, Suite 200
                                    Alexandria, Virginia 22314
                                    Phone: (703) 888-1943
                                    Fax: (703) 888-1930
                                    Email: jesse@binnall.com
                                    *Counsel for President Donald J. Trump*

## CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will cause a copy to be sent to all counsel of record.

Dated: October 19, 2021    Respectfully submitted,

           /s/ Jesse R. Binnall
           Jesse R. Binnall (VA022)
           BINNALL LAW GROUP, PLLC
           717 King Street, Suite 200
           Alexandria, Virginia 22314
           Phone: (703) 888-1943
           Fax: (703) 888-1930
           Email: jesse@binnall.com
           *Counsel for President Donald J. Trump*