**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DONALD J. TRUMP,

*Plaintiff,*

v.                                                        Case No. 1:21-cv-02769 (TSC)

BENNIE G. THOMPSON, *et al.*,

*Defendants.*

## CONGRESSIONAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 3

    I.   Mr. Trump's Attempts to Undermine the Results of the 2020 Election ............................ 3

    II.  Events on or Around the January 6 Assault on the Capitol ......................................... 7

    III.  The Select Committee's Investigation and Presidential Records Act Requests .............. 11

        A.   The Presidential Records Act .................................................................. 11

        B.   The Select Committee's Presidential Records Act Requests ..................................... 13

ARGUMENT .................................................................................................................... 17

    I.   Mr. Trump Fails to Satisfy the Preliminary Injunction Standard ..................................... 17

        A.   Mr. Trump Is Not Likely to Succeed on the Merits .................................................. 18

            1.   The Select Committee's Request Serves a Valid Legislative Purpose .............. 18

            2.   Executive Privilege Does Not Bar Release of the Records ............................... 23

                a.   Mr. Trump's claim of executive privilege fails because the Select Committee's need for the documents outweighs any countervailing interests in confidentiality ............................................... 23

                b.   Mr. Trump's assertion that this Court should enforce a far-reaching assertion of "protective privilege" is deeply flawed .................................... 28

            3.   The Other Balancing Tests Mr. Trump Cites Do Not Apply, but Even If They Did, the Select Committee Satisfies Them ....................................................... 29

                a.   Senate Select Committee .......................................................... 30

                b.   *Mazars* ................................................................................ 31

                    i.   The *Mazars* test does not apply .................................. 31

                    ii.  Even if the *Mazars* test applies, the request satisfies that test ............... 35

        B.   Mr. Trump Fails to Satisfy the Remaining Preliminary Injunction Factors .............. 38

            1.   Mr. Trump Has Not Established Irreparable Harm ........................................ 38

            2.   The Equities Tilt Decisively Against Injunctive Relief .................................... 40

            3.   The Public Interest Precludes Injunctive Relief ............................................ 42

    II.  The Separation-of-Powers Doctrine Bars the Court from Issuing an Injunction Against Legislative Defendants ...................................................................................... 43

CONCLUSION ................................................................................................................. 45

CERTIFICATE OF SERVICE ......................................................................................... 46

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Hist. Ass'n v. Nat'l Archives & Recs. Admin.*,
  516 F. Supp. 2d 90 (D.D.C. 2007) ........................................................................... 29

*Armstrong v. Bush*,
  924 F.2d 282 (D.C. Cir. 1991) ................................................................................ 34

*Barenblatt v. United States*,
  360 U.S. 109 (1959) ............................................................................................... 21

*Bean LLC v. John Doe Bank*,
  291 F. Supp. 3d 34 (D.D.C. 2018) .......................................................................... 41

*Byrd v. EPA*,
  174 F.3d 239 (D.C. Cir. 1999) ................................................................................ 42

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ................................................................................ 39

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ............................................................................................... 42

*Comm. on Judiciary of U.S. House of Representatives v. McGahn*,
  968 F.3d 755 (D.C. Cir. 2020) .......................................................................... 40, 41

*Comm. on Judiciary, U.S. House of Representatives v. Miers*,
  558 F. Supp. 2d 53 (D.D.C. 2008) .......................................................................... 40

*Commonwealth of Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ............................................................................................... 44

*Dellums v. Powell*,
  561 F.2d 242 (D.C. Cir. 1977) .......................................................................... 24, 25

*Donald J. Trump for President v. Bookvar*,
  502 F. Supp. 3d 899 (M.D. Pa. 2020) ...................................................................... 5

*Donald J. Trump for President, Inc. v. Secretary of Pa.*,
  830 Fed. Appx. 377 (3d Cir. 2020) ........................................................................... 5

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
  286 F. Supp. 3d 96 (D.D.C. 2017) .......................................................................... 42

*Eastland v. U.S. Servicemen's Fund*,
  421 U.S. 491 (1975) ..................................................................................... 20, 40, 41

*Exxon Corp. v. FTC*,
  589 F.2d 582 (D.C. Cir. 1978) .......................................................................... 40, 41

*Hastings v. U.S. Senate, Impeachment Trial Comm.*,
  716 F. Supp. 38 (D.D.C. 1989) ............................................................................... 44

*Hearst v. Black*,
    87 F.2d 68 (D.C. Cir. 1936) ................................................................. 44

*Hutcheson v. United States*,
    369 U.S. 599 (1962) ........................................................................... 21

*In re Chapman*,
    166 U.S. 661 (1897) ........................................................................... 19

*In re Lindsey*,
    148 F.3d 1100 (D.C. Cir. 1998) .................................................... 27, 39

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ................................................ 23, 24, 26

*Jubilant DraxImage Inc. v. U.S. Int'l Trade Comm'n*,
    490 F. Supp. 3d 169 (D.D.C. 2020) ................................................... 39

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ........................................................................... 17

\* *McGrain v. Daugherty*,
    273 U.S. 135 (1927) ............................................................... 18, 19, 21

*Munaf v. Geren*,
    553 U.S. 674 (2008) ........................................................................... 17

*Mylan Pharms., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) ....................................................... 42

\* *Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977) ................................................................... passim

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................... 42

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,
    930 F.3d 519 (D.C. Cir. 2019) ...................................................... 38, 43

*Pauling v. Eastland*,
    288 F.2d 126 (D.C. Cir. 1960) ........................................................... 44

*Payne Enters. v. United States*,
    837 F. 2d 486 (D.C. Cir. 1988) .......................................................... 42

*Protect Democracy Project, Inc. v. NSA*,
    10 F.4th 879 (D.C. Cir. 2021) ........................................................... 39

*Public Citizen v. Burke*,
    843 F.2d 1473 (D.C. Cir. 1988) ......................................................... 25

*Quinn v. United States*,
    349 U.S. 155 (1955) ........................................................................... 18

*Rubin v. United States*,
    524 U.S. 1301 (1998) ......................................................................... 39

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
    498 F.2d 725 (D.C. Cir. 1974) ................................................................ passim

*Sinclair v. United States*,
    279 U.S. 263 (1929) ................................................................................. 21

*Trump v. Kemp*,
    511 F. Supp. 3d 1325 (N.D. Ga. 2021) .................................................. 5

*Trump v. Mazars USA LLP*,
    2021 WL 3602683 (D.D.C. Aug. 11, 2021) ............................................ passim

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020) ............................................................................. passim

*Trump v. Mazars USA, LLP*,
    380 F. Supp. 3d 76 (D.D.C. 2019) .......................................................... 21

*Trump v. Mazars USA, LLP*,
    940 F.3d 710 (D.C. Cir. 2019) ................................................................ 21

*United States v. Nixon*,
    418 U.S. 683 (1974) ................................................................................. 23, 24

*United States v. Reynolds*,
    345 U.S. 1 (1953) ..................................................................................... 25

*United States v. Rumely*,
    345 U.S. 41 (1953) ................................................................................... 19

*Vander Jagt v. O'Neill*,
    699 F.2d 1166 (D.C. Cir. 1982) .............................................................. 43, 44

*Watkins v. United States*,
    354 U.S. 178 (1957) ................................................................................. 22

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................... 17, 38, 42

**Statutes**

2 U.S.C. § 5571 ................................................................................................ 45

44 U.S.C. § 2201 .............................................................................................. 34

44 U.S.C. § 2202 .............................................................................................. 12, 34

44 U.S.C. § 2204 .............................................................................................. 12

44 U.S.C. § 2205 .............................................................................................. 12, 14

44 U.S.C. § 2208 .............................................................................................. 12

44 U.S.C. §§ 2201-2209 ................................................................................... 11

**Rules of the U.S. House of Representatives, 117th Cong.**

House Rule XI.2 .................................................................................................................. 14, 15

**Legislative Materials**

167 Cong. Rec. 189 (Oct. 27, 2021) ........................................................................... 20

H. Res. 503, 117th Cong. (2021) ........................................................................... passim

H.R. Rep. No. 95-1487 (1978) ..................................................................................... 34

**Administrative and Executive Materials**

36 C.F.R. § 1270.44 ........................................................................... 12, 13, 24, 29

74 Fed. Reg. 4669 ........................................................................................................ 13

*Assertion of Exec. Priv. in Response to Cong. Demands for Law Enforcement Files*,
  6 Op. O.L.C. 31 (Nov. 30, 1982) ........................................................................... 26

Mem. for the Heads of Exec. Depts. & Agencies from President Ronald Reagan, *Re:
  Procedures Governing Responses to Cong. Requests for Information* (Nov. 4, 1982)............ 29

*Ways and Means Comm.'s Request for the Former President's Tax Returns and Related Tax
  Information Pursuant to 26 U.S.C. § 6103(f)(1)*,
  45 Op. O.L.C. __, (July 30, 2021) ........................................................................... 30

**Other Authorities**

Appellants' Br., *Trump v. Mazars USA LLP*, Nos. 21-5176, 21-5177 (D.C. Cir. Sept. 2, 2021). 33

Intervenor's Combined Opp'n to the Mots. to Dismiss, *Comm. on Ways & Means v. Treasury*,
  No. 1:19-cv-1974 (D.D.C. Oct. 36, 2021), ECF No. 140 ........................................................ 33

Pl.'s Mot. for Summ. Judgment, *Trump v. Mazars USA LLP*, No. 1:19-cv-01136 (D.D.C. Apr.
  5, 2021), ECF No. 54 ........................................................................... 33

Case 1:21-cv-02769-TSC   Document 19   Filed 10/29/21   Page 7 of 52

## INTRODUCTION

In 2021, for the first time since the Civil War, the Nation did not experience a peaceful transfer of power.  On January 6, while both Houses of Congress were convened to carry out their constitutional duty to count the electoral votes from the 2020 Presidential election, rioters stormed the U.S. Capitol building, seeking to stop the count and invalidate the will of the American people. The mob forced its way past law enforcement officers, entered the Senate chamber just minutes after lawmakers were evacuated, and destroyed federal property.  Several people died, and approximately 140 police officers were injured.  This violent assault marked the first time the Capitol had been breached by hostile forces since the War of 1812.  And it followed a months-long effort by then-President Donald J. Trump to persuade the public that the election had been stolen and to assemble thousands of supporters in Washington to "Stop the Steal."

The House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") is now studying the attack and developing remedial legislation.  As a crucial part of this investigation, the Select Committee has requested Presidential records from the National Archives containing White House communications relating to the events on and leading up to January 6.

Former President Trump now seeks to foil the Select Committee's investigation by asking this Court to enjoin both the Executive and the Legislative Branches, and stop the Archivist from complying with the Select Committee's request.  This Court should decline this extraordinary plea. As an initial matter, Mr. Trump is extremely unlikely to win on the merits.  The Select Committee's request is squarely within its jurisdiction and driven by a clear legislative purpose: to understand the facts and causes surrounding the January 6 attack to develop legislation and other measures that will protect our Nation from a similar assault in the future.  The Select Committee has reasonably concluded that it needs the documents of the then-President who helped foment the

breakdown in the rule of law.

Moreover, Mr. Trump's broad claims of executive privilege are unprecedented and deeply flawed. Executive privilege exists to protect the Executive Branch, and the sitting President—President Biden—has declined to assert executive privilege over the documents contested here. Mr. Trump offers no valid reason for this Court to override that determination. The Supreme Court has made clear that any continuing interest a former President may have in asserting executive privilege to protect the confidentiality of records created during his administration is greatly diminished. Here, Mr. Trump's conclusory interest must give way to the Select Committee's urgent need for the records, as President Biden has likewise determined. In support of his novel theory, Mr. Trump relies on balancing tests applied in cases involving requests for information from *sitting* Presidents, which do not apply to the official records of a *former* President. And even if those tests applied in this case, they are satisfied.

Nor can Mr. Trump satisfy the other preliminary injunction factors. Although he claims he would be irreparably injured, he cannot show that releasing the documents would harm the Executive Branch. President Biden has already determined that the interest in protecting candid deliberations within the Executive Branch is overcome by the Select Committee's need for the documents. Finally, the equities and public interest heavily favor the Select Committee, which needs the records for the essential task of identifying the causes of the January 6 attack, and proposing legislative measures and other actions to safeguard our democracy for our Nation's future.

A peaceful transfer of power from one President to another is crucial to the continuation of our democratic government. It is difficult to imagine a more critical subject for Congressional investigation, and Mr. Trump's arguments cannot overcome that pressing legislative need. Both

political branches of government agree that these records should be disclosed to the Select Committee, and Mr. Trump's request to preliminarily enjoin that action should be denied.

**STATEMENT OF FACTS**

On November 3, 2020, the American people elected a President.  In accordance with law, each state counted and certified the vote.  On December 14, 2020, the Electoral College convened in the several states.  Joseph Biden prevailed, winning 306 electoral votes.  The remaining 232 electoral votes were cast for Donald Trump.  On January 6, 2021, as required by the Twelfth Amendment and the Electoral Count Act, Congress convened in a joint session, presided over by Vice President Mike Pence, to count the electoral votes.

Ever since the 1887 passage of the Electoral Count Act, Congress's count of the electoral votes has been a formality, occurring well after the losing candidate conceded.  The significance of this formality cannot, however, be overstated because it enables one of the most crucial parts of our democracy:  the peaceful transition of power from one President to another, which started with President George Washington emulating the legendary Roman statesman Cincinnatus.  Once this changeover is completed, the former President no longer embodies the Executive Branch of the Federal Government; rather, he reverts to being a private citizen.

This year, however, was different:  The count in Congress occurred following two months of unprecedented efforts by the losing candidate, Mr. Trump, to overturn the election results.

I.    **Mr. Trump's Attempts to Undermine the Results of the 2020 Election**

Before the election, Mr. Trump laid the groundwork to cast doubt on an electoral defeat, refusing to agree to accept the results.  In his Republican National Convention speech, he claimed that "the only way they can take this election away from us is if this is a rigged election."[1]  Pressed

---

[1] *Donald Trump 2020 RNC Speech Transcript August 24*, Rev (Aug. 24, 2020), https://perma.cc/2V8P-7L47.

in September 2020 on whether he would "commit to making sure that there is a peaceful transferal [*sic*] of power," he said only, "we're going to have to see what happens."[2]

Hours after polls closed, Mr. Trump claimed victory, tweeting, "[w]e are up BIG, but they are trying to STEAL the Election. We will never let them do it."[3]  After all major media outlets reported that Mr. Biden had prevailed, Mr. Trump insisted "[t]his was a stolen election."[4]  In the weeks that followed, he would repeatedly implore his supporters to "Stop the Steal!"[5]  He claimed that corrupt state election officials, fraudulent voters, doctored voting machines, and international conspirators deprived him of victory.   In a December 2 speech, for example, he alleged "tremendous voter fraud and irregularities" resulting from a late-night "massive dump" of votes; he added that certain votes were "counted in foreign countries," "[m]illions of votes were cast illegally in the swing states alone," and it was "statistically impossible" that he lost.[6]

Mr. Trump filed 62 lawsuits to challenge the results in six states: Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin.[7]  Every suit was dismissed, except one minor

---

[2] Remarks by President Trump in Press Briefing, Sept. 23, 2020, https://perma.cc/M6AA-9PW7.

[3] Donald J. Trump (@realDonaldTrump), Twitter (Nov. 4, 2020, 12:49 AM).  It is not possible to provide direct links to Mr. Trump's tweets because, in the wake of the January 6 attack, Twitter permanently suspended Mr. Trump's account and removed all of his tweets.  Mr. Trump's tweets remain available at private archives such as https://www.thetrumparchive.com/ and https://factba.se/trump/.

[4] Donald J. Trump (@realDonaldTrump), Twitter (Nov. 8, 2020, 9:17 AM).

[5] *See e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (Nov. 21, 2020 3:34 PM) ("Watch: Hundreds of Activists Gather for 'Stop the Steal' Rally in Georgia https://t.co/vUG1bqG9yg via BreitbartNews Big Rallies all over the Country. The proof pouring in is undeniable. Many more votes than needed. This was a LANDSLIDE!"); *Donald Trump Speech on Election Fraud Claims Transcript*, Rev (Dec. 2, 2020) ("[Y]ou can't let another person steal that election from you.  All over the country, people are together in holding up signs, 'Stop the steal.'"), https://perma.cc/9696-PKZP.

[6] *Donald Trump Speech on Election Fraud Claims Transcript*, Rev (Dec. 2, 2020), https://perma.cc/9696-PKZP.

[7] William Cummings et al., *By the Numbers: President Donald Trump's Failed Efforts to Overturn the Election*, USA Today (Jan. 6, 2021), https://perma.cc/M52G-K3GC.

Pennsylvania challenge that did not affect the outcome in that state.[8]  Courts found Mr. Trump's claims "not credible" and "without merit"; a "Frankenstein's monster" of "improperly stitched together theories."[9]  As one court noted, "calling an election unfair does not make it so.  Charges require specific allegations and then proof.  We have neither here."[10]  Another court remarked that Mr. Trump's attempt "[t]o interfere with the result of an election that . . . has been audited and certified on multiple occasions" would "breed confusion, undermine the public's trust in the election, and potentially disenfranchise . . . millions of Georgia voters."[11]  The Supreme Court denied numerous emergency applications aimed at overturning the results; in response, Mr. Trump tweeted that the Court was "totally incompetent and weak on the massive Election Fraud that took place in the 2020 Presidential Election."[12]

At the same time, Mr. Trump launched an unprecedented pressure campaign aimed at getting state officials to reverse the election results.  He focused particularly on Georgia, whose Secretary of State, Brad Raffensperger, he called an "enemy of the people" for stating that there was no indication of widespread voter fraud or improprieties in counting.[13]  On January 2, Mr.

---

[8] *Id.*

[9] Rosalind S. Helderman & Elise Viebeck, *'The last wall': How dozens of judges across the political spectrum rejected Trump's efforts to overturn the election*, Wash. Post (Dec. 12, 2020), https://perma.cc/G37P-YUV3; *Donald J. Trump for President v. Bookvar*, 502 F. Supp. 3d 899, 910 (M.D. Pa. 2020).

[10] *Donald J. Trump for President, Inc. v. Secretary of Pa.*, 830 Fed. Appx. 377, 381 (3d Cir. 2020).

[11] *Trump v. Kemp*, 511 F. Supp. 3d 1325, 1339 (N.D. Ga. 2021).

[12] Donald J. Trump (@realDonaldTrump), Twitter (Dec. 26, 2020, 8:51 AM).

[13] Mr. Trump's focus on Georgia was not to the exclusion of other states.  *See, e.g.*, Maggie Haberman et al., *Trump Targets Michigan in His Ploy to Subvert the Election*, N.Y. Times (Nov. 19, 2020) https://perma.cc/B7DR-DED9; Amy Gardner et al., *Trump asks Pennsylvania House Speaker for Help Overturning Election Results, Personally Intervening in a Third State*, Wash. Post (Dec. 8, 2020), https://perma.cc/MUD8-DWWF; Ryan Randazzo et al., *Arizona Legislature 'Cannot and Will Not' Overturn Election, Republican House Speaker Says*, Arizona Republic (Dec. 4, 2020) https://perma.cc/GUR8-66PD.

Trump called Mr. Raffensperger to push him to "find" enough votes to overturn the state's results: "I just want to find 11,780 votes, which is one more than we have because we won the state."[14] He warned Mr. Raffensperger that failing to "find" enough votes to overturn the results of the Georgia election would be "a criminal offense" and "a big risk to you."[15]

At the same time, Mr. Trump targeted the Department of Justice ("DOJ"), attempting to enlist it in his personal crusade to undo the election he had lost.  On December 1, Attorney General William Barr announced that DOJ had not seen evidence of election fraud that would have affected the outcome of the election; he would later note that Mr. Trump's fraud claims were "all bullshit."[16] Despite this, Mr. Trump repeatedly asked DOJ officials to initiate spurious investigations and file frivolous lawsuits on his behalf—and threatened to fire them if they did not.[17]  His Chief of Staff demanded that DOJ investigate a panoply of conspiracy theories, including a bizarre theory that the Central Intelligence Agency and an Italian company used military satellites to alter vote totals.[18]  Mr. Trump met with a DOJ political appointee, Jeffrey Clark, who had expressed sympathy for Mr. Trump's baseless claims, and considered firing Acting Attorney General Jeffrey Rosen and installing Mr. Clark in his place.[19]  Mr. Trump backed down only after an Oval Office meeting at which DOJ senior leaders, Mr. Trump's White House Counsel, and his Deputy White

---

[14] Amy Gardner & Paulina Firozi, *Here's the Full Transcript and Audio of the Call Between Trump and Raffensperger*, Wash. Post (Jan. 5, 2021), https://perma.cc/2E68-34EV.

[15] *Id.*

[16] Michael Balsamo, *Disputing Trump, Barr Says No Widespread Election Fraud*, Associated Press (Dec. 1, 2020), https://perma.cc/9DAE-WN7A; Jonathan D. Karl, *Inside William Barr's Breakup With Trump*, The Atlantic (June 27, 2021), https://perma.cc/W4GR-GTX9.

[17] Senate Committee on the Judiciary, Majority Staff Report, *Subverting Justice: How the Former President and His Allies Pressured DOJ to Overturn the 2020 Election*, at 13-28 (Oct. 7, 2021).

[18] *Id.* at 3.

[19] *Id.* at 3-4.

House Counsel informed him that, if he did so, they all would resign.[20]

As this timeline demonstrates, Mr. Trump continued to wage his battle to overturn the election long after every state certified its results and after the Electoral College met and voted on December 14.  Days later, Mr. Trump implored, "@senatemajldr and Republican Senators have to get tougher, or you won't have a Republican Party anymore. We won the Presidential Election, by a lot. FIGHT FOR IT. Don't let them take it away!"[21]

## II.     Events on or Around the January 6 Assault on the Capitol

Mr. Trump soon focused on January 6, the date Congress would jointly meet to count the electoral votes, as his final opportunity to overturn the election.  On December 19, he began an effort to assemble thousands of supporters in Washington on January 6, tweeting: "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!"[22]  Two days before the Joint Session, Mr. Trump warned, "Democrats are trying to steal the White House . . . [y]ou can't let it happen. You can't let it happen," and "they're not taking this White House. We're going to fight like hell, I'll tell you right now."[23]

Meanwhile, Mr. Trump launched a public and private campaign to convince Vice President Pence, who in his capacity as President of the Senate was to preside over the electoral count, to violate the Constitution by disrupting the formal process.  Aides enlisted a law professor to write a memorandum asserting that the Vice President could halt the electoral count, and Mr. Trump arranged for a January 4 meeting between the Vice President, the professor, and himself.[24]  "If

---

[20] *Id.* at 38-39.

[21] Donald J. Trump (@realDonaldTrump), Twitter (Dec. 18, 2020, 9:14 AM).

[22] Donald J. Trump (@realDonaldTrump), Twitter (Dec. 19, 2020, 1:42 AM).

[23] Donald Trump Rally Speech in Dalton, Georgia: Senate Runoff Election, Rev (Jan. 4, 2021), https://perma.cc/VAD2-TWVQ.

[24] Michael S. Schmidt & Maggie Haberman, *The Lawyer Behind the Memo on How Trump Could Stay in Office*, N.Y. Times (Oct. 2, 2021), https://perma.cc/3J2V-AWBK.

Vice President @Mike_Pence comes through for us," he tweeted the following day, "we will win the Presidency."[25] Mr. Trump reiterated this demand the morning of January 6:  "States want to correct their votes, which they now know were based on irregularities and fraud, plus corrupt process never received legislative approval. All Mike Pence has to do is send them back to the States, AND WE WIN. Do it Mike, this is a time for extreme courage!"[26]

Just before noon on January 6, Mr. Trump took the stage at the "Save America Rally."  He spent the next hour reiterating his claim that Democrats had "stolen" the election and exhorting the crowd to "fight much harder" to "stop the steal" and "take back our country."[27]  He demanded again that the Vice President abandon his oath of office and interfere with the electoral count.

At numerous points, Mr. Trump urged the crowd toward the Capitol, where the Joint Session was about to start.  After saying that those marching toward the Capitol should do so "peacefully," he delivered 50 minutes more of incendiary rhetoric, declaring "we fight, we fight like hell" because "if you don't fight like hell, you're not going to have a country anymore."[28] Many in the crowd wore combat vests, helmets, and other military-style gear appropriate for a physical confrontation.[29]  In response, an early wave surged toward the Capitol building and started to pull down barricades around its perimeter.[30]

---

[25] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 6, 2021, 1:00 AM).

[26] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 6, 2021, 8:17 AM).

[27] Donald Trump "Save America" Rally Speech Transcript January 6, Rev, https://perma.cc/CJ76-F735.

[28] *Id.*

[29] Senate Committee on Rules and Administration and Senate Homeland Security and Governmental Affairs Committee, Staff Report, *Examining the U.S. Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6*, at 27-30 (June 8, 2021).

[30] Shelly Tan et al., *How one of America's ugliest days unraveled inside and outside the Capitol*, Wash. Post (Jan. 9, 2021), https://perma.cc/7LMH-4JJX.

While Mr. Trump was speaking, Vice President Pence made clear that he would not participate in any effort to overturn the election. "It is my considered judgment," he announced, "that my oath to support and defend the Constitution constrains me from claiming unilateral authority to determine which electoral votes should be counted and which should not."[31]

The basic contours of the events that followed are, by now, well known. Hundreds of Trump supporters assaulted the Capitol and the law enforcement officers charged with its defense. Rioters wearing Trump paraphernalia shoved and punched police officers, gouged their eyes, assaulted them with chemical sprays and projectiles, and called them "traitor" and "n-----."[32] After storming through the barricades surrounding the building, rioters laid siege to the Capitol itself. The mob physically overwhelmed law enforcement personnel guarding the entrances to the building and smashed through windows to gain access.[33]

The Joint Session of Congress required by the Constitution was disrupted; the House and Senate Chambers were evacuated and the latter was overrun by rioters, from whom both Republican and Democratic lawmakers fled. The mob specifically hunted Vice President Pence and House Speaker Nancy Pelosi. "Once we found out Pence turned on us and that they had stolen the election, like, officially, the crowd went crazy," said one person.[34] Rioters chanted, "Hang

---

[31] Mike Pence (@Mike_Pence), Twitter (Jan. 6, 2021, 1:02 PM), https://perma.cc/FV4W-P28J.

[32] Luke Broadwater & Nicholas Fandos, *'A hit man sent them.' Police at the Capitol recount the horrors of Jan. 6 as the inquiry begins.*, N.Y. Times (July 27, 2021), https://perma.cc/N7UZ-XSFL.

[33] Marc Fisher et al., *The Four-Hour Insurrection*, Wash. Post (Jan. 7, 2021), https://perma.cc/B78N-NS92.

[34] Ashley Parker et al., *How the Rioters Who Stormed the Capitol Came Dangerously Close to Pence*, Wash. Post (Jan. 15, 2021), https://perma.cc/TYX3-PAFU.

Mike Pence!"[35]  Another shouted, "Mike Pence, we're coming for you . . . fucking traitor!"[36]  One rioter bragged that he and others kicked in the door to the office of the Speaker of the U.S. House of Representatives and that the Speaker would have been killed had she been there.[37]

Attackers desecrated and vandalized the Capitol.  They broke windows and furniture, stole electronics and other sensitive material, smeared feces in hallways, and destroyed monuments, including a commemorative display honoring the late Representative John Lewis.[38]

Meanwhile, Mr. Trump was described by those around him as "borderline enthusiastic because it meant the certification was being derailed."[39]  As a wide range of Republican officials tried to convince him to call off his supporters, he refused to act.[40]  He eventually sent a pair of tepid and ineffectual tweets that called on supporters to be "peaceful."[41]  He was advised to announce publicly that his supporters should leave the Capitol immediately, but he did not do so for hours.[42]  At his aides' behest, as additional law enforcement resources were assembling and

---

[35] Peter Baker et al., *Pence Reached His Limit with Trump. It Wasn't Pretty*, N.Y. Times (Jan. 12, 2021), https://perma.cc/4XND-LXNV.

[36] Alec MacGillis, *Inside the Capitol Riot: What the Parler Videos Reveal*, ProPublica (Jan. 17, 2021), https://perma.cc/K58C-EB7C.

[37] David K. Li & Ali Gostanian, *Georgia lawyer said he kicked in Pelosi's door, she could've been 'torn into little pieces'*, NBC News (Jan. 19, 2021), https://perma.cc/MB6M-CYUM.

[38] Natasha Bertrand, *Justice Department warns of national security fallout from Capitol Hill insurrection*, Politico (Jan. 7, 2021), https://perma.cc/Q6P9-2DJC; Wilson Wong, *Shattered glass, ransacked offices: Images of damage at U.S. Capitol left by pro-Trump mob*, NBC News (Jan. 7, 2021), https://perma.cc/94JJ-3K6X; Chris Sommerfeldt, *Pro-Trump rioters smeared poop in U.S. Capitol hallways during belligerent attack*, N.Y. Daily News (Jan. 7, 2021), https://perma.cc/B7HE-HPK7; Zack Budryk, *Hoyer says rioters destroyed display commemorating John Lewis*, The Hill (Jan. 7, 2021), https://perma.cc/YDX8-A8YP.

[39] Kaitlan Collins (@kaitlancollins), Twitter (Jan. 6, 2021, 10:34 PM), https://perma.cc/H7QW-52SG.

[40] Ashley Parker et al., *Six hours of paralysis: Inside Trump's failure to act after a mob stormed the Capitol*, Wash. Post (Jan. 11, 2021), https://perma.cc/XK4C-8SZB.

[41] *Id.*

[42] *Id.*

arriving at the scene, he finally issued an apparently scripted video that called for "peace" and "law and order," but claimed that he won in a "landside" and concluded by telling the rioters: "We love you, you're very special. . . . I know how you feel. But go home and go home in peace."[43]  At 6:01 p.m. he tweeted, "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace. Remember this day forever!"[44]

Through the efforts of law enforcement officers and National Guard troops, the Joint Session of Congress resumed in the evening and finished its constitutionally mandated responsibility that night.

On January 20, Mr. Trump departed the White House and President Biden assumed the Presidency.

## III.    The Select Committee's Investigation and Presidential Records Act Requests

With the adoption of House Resolution 503, the House of Representatives created the Select Committee, authorizing it to investigate the January 6 assault on the Capitol to learn what happened, assess the causes, and propose remedial legislation to ensure such an attack on American democracy never happens again.  *See* H. Res. 503, § 3, 117th Cong. (2021).

### A.    The Presidential Records Act

As part of this investigation, the Select Committee submitted a request to the U.S. National Archives and Records Administration ("NARA") for White House documents and communications relating to the January 6 attack.  That request is the subject of this lawsuit and was submitted pursuant to the Presidential Records Act ("PRA"), 44 U.S.C. §§ 2201-09.

---

[43] President Trump Video Statement on Capitol Protestors, C-SPAN (Jan. 6, 2021), https://perma.cc/7TLK-Q9Q.

[44] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 6, 2021, 6:01 PM).

The PRA establishes a comprehensive framework for the preservation and disclosure of Presidential records.  That Act makes clear that the United States, and not the President, retains ownership of all Presidential records, even after a President leaves office.  *Id.* § 2202.  The PRA provides that, upon leaving office, Presidents may choose to restrict public access to certain categories of records from their administration for up to 12 years.  *Id.* § 2204(a).  However, subject to applicable privileges, Presidential records "shall be made available . . . to either House of Congress, or, to the extent of matter within its jurisdiction, to any committee or subcommittee thereof if such records contain information that is needed for the conduct of its business and that is not otherwise available."  *Id.* § 2205(2)(C).

The PRA's implementing regulations allow both incumbent and former Presidents to assert claims of executive privilege over Presidential records, but make clear that the final decision on disclosure is made by the incumbent President.  *See* 36 C.F.R. § 1270.44(d).[45]  When Congress requests such records, the regulations provide that, once the Archivist has notified both the incumbent President and the relevant former President of the Archivist's intent to disclose responsive records to Congress, "either President may assert a claim of constitutionally based privilege against disclosing the record" within 30 days.  *Id.* § 1270.44(d).  Should the incumbent President assert such a claim, the Archivist will not disclose the records unless the President withdraws the claim or a court orders disclosure.  *Id.* § 1270.44(e).

---

[45] One provision of the PRA itself expressly addresses claims of privilege by former and incumbent Presidents, but that provision by its terms applies only "[w]hen the Archivist determines . . . to make available *to the public* any Presidential record."  44 U.S.C. § 2208 (emphasis added).  It does not apply to Presidential records requested by Congress under the Congressional access provision.  *See id.* § 2205 (exceptions to restricted public access apply "[n]otwithstanding any restrictions on access imposed pursuant to sections 2204 and 2208").  The terms of 36 C.F.R. § 1270.44 (d), however, largely mirror Section 2208.

If the former President raises a privilege claim, "the Archivist consults with the incumbent President, as soon as practicable and within 30 calendar days from the date that the Archivist receives notice of the claim, to determine whether the incumbent President will uphold the claim." *Id.* § 1270.44(f)(1).   "If the incumbent President upholds the claim asserted by the former President," the Archivist will not disclose the records unless the incumbent withdraws the claim or a court orders the records to be disclosed.  *Id.* § 1270.44(f)(2).  Critically for this case, if "the incumbent President does not uphold the claim asserted by the former President," the Archivist will release the records after 60 days unless otherwise ordered by a court.  *Id.* § 1270.44(f)(3).

Executive Order No. 13489 imposes a similar structure for resolving claims of executive privilege.  *See* 74 Fed. Reg. 4669 (Jan. 21, 2009).[46]  It provides both the incumbent and former Presidents an opportunity to review and assert privilege over records the Archivist has designated for release, but, like the regulations, makes clear that the incumbent has authority to make the final determination in the event of a disagreement.  *Id.* § 4(b) ("the Archivist shall abide by any instructions given him by the incumbent President").  The Order also establishes an extensive consultation process whenever executive privilege claims arise, involving the incumbent President, the Attorney General (through the Office of Legal Counsel), and the White House Counsel.  *Id.* §§ 2-4.  This Order has remained in effect without change since 2009—including through the duration of Mr. Trump's presidency.

**B.    The Select Committee's Presidential Records Act Requests**

On March 25, the chairpersons of six House committees issued a document request to the Archivist, David Ferriero, pursuant to the Congressional access provision of the PRA, 44 U.S.C.

---

[46] This Order was issued before the 2014 amendments to the PRA and current regulations were promulgated.  To the extent the Order's procedures differ from the later regulations, the regulations control; however, any such discrepancies are irrelevant for purposes of this case.

§ 2205(2)(C), for documents and communications related to Mr. Trump's remarks, movements, calendars, and schedules on January 6, as well as other White House communications and documents related to the events of that day.  Ex. 2 to Pl.'s Mot. for a Prelim. Inj. ("PI Mot.").

On June 30, the House adopted a resolution establishing the Select Committee.  H. Res. 503, 117th Cong. (2021).  This Resolution empowers the Select Committee to (1) "investigate the facts, circumstances, and causes relating to" the January 6 attack; (2) "identify, review, and evaluate the causes of and the lessons learned from" the attack; and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures . . . as it may deem necessary."  *Id.* § 4(a).  Such corrective measures may include

> changes in law, policy, procedures, rules, or regulations that could be taken—
> (1) to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions;
> (2) to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans; and
> (3) to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism.

*Id.* § 4(c).  In addition, the resolution authorizes the Select Committee to publish interim reports, which may include "legislative recommendations as it may deem advisable."  *Id.* § 4(b).

The following day, the Speaker named Rep. Bennie Thompson as Chairman.

The Select Committee is authorized "to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of books, records, correspondence, memoranda, papers, and documents as it considers necessary."[47]  Rule XI.2(m)(1)(B), Rules of the U.S. House of Representatives, 117th Cong. (2021) ("House Rules"); *see also* H. Res. 503, § 5(c) (unless otherwise specified, Rule XI applies to the Select Committee).  Under House Rule XI,

---

[47] https://perma.cc/QM5L-E9GL.

> Subpoenas for documents or testimony may be issued to any person or entity, whether governmental, public, or private, within the United States, including, but not limited to, the President, and the Vice President, whether current or former, in a personal or official capacity, as well as the White House, the Office of the President, the Executive Office of the President, and any individual currently or formerly employed in the White House, Office of the President, or Executive Office of the President.

House Rule XI.2(m)(3)(D).

On August 25, the Select Committee issued a document request to the Archivist under the PRA.  PI Mot. Ex. 1.  The request reiterated the other committees' March 25 request, and added additional requests to the extent not covered by that request.  The additional requests fell into six categories: (1) planning by the White House and others for legal or other strategies to delay, halt, or otherwise impede the electoral count; (2) recruitment, planning, coordination, and other preparations for the rallies leading up to and including January 6 and the violence on January 6; (3) information Mr. Trump received following the election regarding the election outcome, and what he told the American people about the election; (4) what Mr. Trump knew about the election's likely outcome before the election results and how he characterized the validity of the nation's election system; (5) responsibilities in the transfer of power and the obligation to follow the rule of law; and (6) other materials relevant to the challenges to a peaceful transfer of power.

On October 8, in response to a notification from the Archivist providing a tranche of responsive documents for review, Counsel to the President Dana Remus wrote to the Archivist that "President Biden has determined that an assertion of executive privilege is not in the best interests of the United States, and therefore is not justified as to any of the Documents" in that tranche.  PI Mot. Ex. 4 at 1.  She further noted:

> As President Biden has stated, . . . Congress has a compelling need in service of its legislative functions to understand the circumstances that led to these horrific events.  . . .  The Documents shed light on events within the White House on and about January 6 and bear on the Select Committee's need to understand the facts

> underlying the most serious attack on the operations of the Federal Government since the Civil War.
>
> These are unique and extraordinary circumstances. . . . The constitutional protections of executive privilege should not be used to shield, from Congress or the public, information that reflects a clear and apparent effort to subvert the Constitution itself.

*Id.* at 1-2. The same day, Mr. Trump wrote the Archivist, purporting to assert executive privilege over certain pages of certain documents. PI Mot. Ex. 5. He also purported to "make a protective assertion of constitutionally based privilege with respect to all additional records following the First Tranche." *Id.* at 2. After the Archivist informed Ms. Remus of Mr. Trump's letter, Ms. Remus wrote to the Archivist that "President Biden has considered the former President's assertion" but, for the reasons in her previous letter, "does not uphold the former President's assertion of privilege." PI Mot. Ex. 6. Accordingly, under Executive Order 13489 and "[i]n light of the urgency of the Select Committee's need for the information," she notified the Archivist that the President instructed him to provide the Select Committee the pages in question "30 days after your notification to the former President, absent any intervening court order." *Id.*

On October 18, Mr. Trump filed this action against Chairman Thompson, the Select Committee, the Archivist, and NARA. The complaint seeks, *inter alia*, a declaratory judgment that the Select Committee's requests are invalid and unenforceable, an injunction against the Congressional defendants' enforcement of the requests or use of any information obtained via the requests, and an injunction against the Archivist and NARA's production of the requested information. Compl. at 25-26. The following day, Mr. Trump moved for a preliminary injunction "prohibiting Defendants from enforcing or complying with the Committee's request." PI Mot. 3.

## ARGUMENT

**I.      Mr. Trump Fails to Satisfy the Preliminary Injunction Standard**

Mr. Trump cannot satisfy the standard for a preliminary injunction, which "is an 'extraordinary and drastic remedy'; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted).  A preliminary injunction "'should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'"  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Mr. Trump cannot succeed on the merits of his claim.  *First*, the Select Committee's request serves a valid legislative purpose:  The requested information is crucial to the Select Committee's investigation of the extraordinary events surrounding the January 6 attack on the Capitol and its ability to propose legislation to ensure a similar assault on democracy never happens again. *Second*, both the House and President Biden agree that the first tranche of documents is not validly subject to executive privilege.  Despite Mr. Trump's assertion of that privilege, the Select Committee is entitled to those records because its need for them outweighs any diminished interest in confidentiality that Mr. Trump, as a former President, might have.  *Third*, although Mr. Trump suggests that the Select Committee's request is invalid under several other balancing tests that courts have applied in cases involving requests for information from *sitting* Presidents—including *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974), and *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020)—those tests do not apply in this case, which involves a *former* President.  But even if those tests did apply here, the Select Committee's overriding need for the information easily satisfies them.

In addition, Mr. Trump cannot make a strong showing of irreparable harm, and the balance of equities and the public interest tilt decisively in the Select Committee's favor.

Accordingly, this Court should reject Mr. Trump's privilege claims and deny the motion for a preliminary injunction.

### A.      Mr. Trump Is Not Likely to Succeed on the Merits

### 1.      The Select Committee's Request Serves a Valid Legislative Purpose

Contrary to Mr. Trump's contentions, the Select Committee has a valid legislative purpose for its request for information related to the January 6 attack on the Capitol.  *See* Pl.'s Statement of Pts. & Auth. ISO Mot. for Prelim. Inj. ("Br.") at 15-20.  Congress's broad power of investigation is well established.  As the Supreme Court has stated, "the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function."  *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).  "This power, deeply rooted in American and English institutions, is indeed co-extensive with the power to legislate."  *Quinn v. United States*, 349 U.S. 155, 160 (1955).  "Without the power to investigate . . . Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively."  *Id.* at 160-61.  This "broad" and "indispensable" power "encompasses inquiries into the administration of existing laws, studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.'"  *Mazars*, 140 S. Ct. at 2031.

Congress's power to investigate is not unlimited:  It must "concern[] a subject on which legislation 'could be had.'"  *Id.*  Congress "may not issue a subpoena for the purpose of 'law enforcement,'" nor is there "'congressional power to expose for the sake of exposure.'"  *Id.* at 2032.  At the same time, though,

> [i]t is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees.  It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents.  Unless Congress

have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served.

*Id.* at 2033 (quoting *United States v. Rumely*, 345 U.S. 41, 43 (1953)).  Courts "'are bound to presume that the action of the legislative body was with a legitimate object, if it is capable of being so construed.'"  *McGrain*, 273 U.S. at 178.

Mr. Trump wrongly criticizes the Select Committee's request (Br. 17) on the ground that it "fails to identify a single piece of legislation [] the Committee is considering."  This is not the standard.  Congress need not (and usually does not) identify specific legislation within the context of a request for documents or testimony, nor need it do so when establishing a select committee or when that committee requests documents.  The Supreme Court in *McGrain* upheld the validity of a subpoena issued by a Select Committee even though the Senate's "resolution directing the investigation d[id] not in terms avow that it is intended to be in aid of legislation."  273 U.S. at 177; *see also In re Chapman*, 166 U.S. 661, 669, 670 (1897) ("[I]t was certainly not necessary that the resolutions should declare in advance what the [S]enate meditated doing when the investigation was concluded.").  The subpoena was valid because the investigation's subject "was one on which legislation could be had and would be materially aided by the information which the investigation was calculated to elicit."  *McGrain*, 273 U.S. at 177.

Here, the House has, in any event, gone further than *McGrain* requires and has specifically articulated the Select Committee's legislative purview.  *See* H. Res. 503 § 4(c).  Indeed, Mr. Trump concedes (Br. 25), as he must, that "safety and election integrity are topics on which legislation theoretically could be had."  Although it would be premature to set forth proposed corrective measures before the vital task of identifying, reviewing, and evaluating the causes of and lessons learned from the attack on the Capitol is completed, there are numerous areas of potential

legislation the Select Committee could recommend.  The following examples—which Select Committee Vice Chair Liz Cheney described in a floor statement with which Chairman Thompson associated himself[48]—are merely illustrative.

*First*, the January 6 attack attempted to disrupt Congress's exercise of its responsibilities under the Electoral Count Act.  The investigation may yield recommendations as to whether and how Congress should pass legislation to revise the mechanics of the electoral counting.  *Second*, during the attack, President Trump reportedly knew it was occurring yet took no action to stop it. Congress may wish to enhance the legal consequences for any such dereliction of duty by a President or other Executive Branch official in the future.  *Third*, President Trump pressured DOJ to take extraordinary steps to support his false claims about the election.  The investigation may produce legislative recommendations for how to prevent a future President from enlisting federal resources in such a manner.  *Fourth*, President Trump took steps to convince state election officials to "find votes" for his campaign.  Congress may choose to review the laws applicable to such activity in order to deter it.  Of course, before the completion of the investigation, it is impossible to predict its outcome:  "The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises.  To be a valid legislative inquiry there need be no predictable end result."  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 509 (1975).

For the same reasons, Mr. Trump has no basis for his complaint (Br. 18) that "the Committee does not explain with any specificity how the requested information will in fact assist the Committee in evaluating the proposed legislation or oversight issues of stated concern to its investigation."  Congress is not obligated to accompany a request for documents or testimony by

---

[48] 167 Cong. Rec. 189 at E1151 (Oct. 27, 2021).

matching up each request with potential legislation.[49]   In any event, the relevance of the requested documents is plain given the examples of potential legislation described above.

Mr. Trump wrongly claims (Br. 17) that "[a]ny investigation into alleged claims of wrongdoing is a quintessential law-enforcement task reserved to the executive and judicial branches."  But as the D.C. Circuit recently noted, Congressional "interest in past illegality can be wholly consistent with an intent to enact remedial legislation."  *Trump v. Mazars USA, LLP*, 940 F.3d 710, 728 (D.C. Cir. 2019), *rev'd on other grounds*, 140 S. Ct. 2019 (2020); *see also Hutcheson v. United States*, 369 U.S. 599, 616-17 (1962) (plurality opinion); *Sinclair v. United States*, 279 U.S. 263, 289-90, 295 (1929); *McGrain*, 273 U.S. at 176-77, 180.  Indeed, "[h]istory has shown that congressionally-exposed criminal conduct by the President or a high-ranking Executive Branch official can lead to legislation."  *Trump v. Mazars USA, LLP*, 380 F. Supp. 3d 76, 98 (D.D.C. 2019), *rev'd on other grounds*, 140 S. Ct. 2019 (2020).  Numerous statutes emerged from Congress's investigation of Presidential wrongdoing in Watergate, including the Ethics in Government Act and the Independent Counsel Statute.  *Id.* at 99.  Likewise, Congress's investigation into the Teapot Dome Scandal "motivated Congress to enact several good-government reforms, including the Revenue Act of 1924 and the Federal Corrupt Practices Act of 1925."  *Id.*

Mr. Trump's attempt to impugn the Select Committee's motives is unavailing: first, because it is plainly false, and second, because "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power."  *Barenblatt v. United States*, 360 U.S. 109, 132 (1959); *see*

---

[49]   Nonetheless, if this Court believes that any of the Select Committee's requests are overbroad, that is not reason to invalidate them in their entirety.  In such a situation, the appropriate remedy would be to limit the scope of the requests.

*also id.* ("Nor can we accept the further contention that this investigation should not be deemed to have been in furtherance of a legislative purpose because the true objective of the Committee and of the Congress was purely 'exposure.'"); *Watkins v. United States*, 354 U.S. 178, 200 (1957) (improper motive "would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served").

Even more absurd is Mr. Trump's suggestion (Br. 19) that, "even if there were potential legislative decisions to be made, the Committee could obtain any and all of the information it seeks relevant to those decisions from other, non-privileged sources." This is an astounding assertion. The lengthy *public* record of Mr. Trump's statements and actions discussed above provides an abundant basis to seek the *nonpublic* records of the person whom the attackers sought to maintain in the White House. Any inquiry that did not insist on examining Mr. Trump's documents and communications would be worse than useless—the equivalent of staging a production of "Hamlet" without the Prince of Denmark.

Equally baseless is Mr. Trump's claim (Br. 21) that Congress is improperly looking to a President as a "'case study' for general legislation" (quoting *Mazars*, 140 S. Ct. at 2036). Mr. Trump is—as of now—a case of one. He is—as of now—the only failed Presidential candidate not to concede, to spend months spreading lies about the election, to encourage a self-coup that would illegally keep him in office, or to inspire a mob to attack the Capitol. There is no one more important to study to determine how legislation can prevent the repetition of such acts.

Finally, Mr. Trump's allegation (Br. 26) that "[n]othing in H.R. [*sic*] 503 permits the Committee to request presidential records" is flatly wrong. As noted above, H. Res. 503 incorporates by reference House Rule XI, which expressly authorizes the Select Committee—like all committees—to request documents from the President.

## 2. Executive Privilege Does Not Bar Release of the Records

Mr. Trump's general assertion of purported privilege also does not shield the requested records from disclosure. Notwithstanding Mr. Trump's arguments to the contrary (Br. 27-36), executive privilege does not apply, as the Select Committee and President Biden both agree.

> ### a. Mr. Trump's claim of executive privilege fails because the Select Committee's need for the documents outweighs any countervailing interests in confidentiality

Mr. Trump contends (Br. 34-36) that the PRA cannot be read to give a sitting President unreviewable authority to decide whether to invoke executive privilege over a former President's objection. But, even assuming Mr. Trump retains some interest in claiming privilege over documents created during his administration when the current President disagrees, Mr. Trump's executive privilege claim fails because the Select Committee's need for the requested records far outweighs his interest in keeping them confidential.[50]

Executive privilege is a qualified privilege that requires balancing a President's interests in maintaining confidentiality with the need for disclosure. *See, e.g.*, *Nixon v. Adm'r of Gen. Servs.* (*GSA*), 433 U.S. 425, 454 (1977) (considering the privilege claim of a former President); *United States v. Nixon*, 418 U.S. 683, 711-12 (1974); *In re Sealed Case*, 121 F.3d 729, 737, 745 (D.C. Cir. 1997). Here, Mr. Trump has not articulated a need for invoking the privilege beyond a generalized interest in confidentiality—an interest the Supreme Court has recognized diminishes substantially once a President has left office. By contrast, both President Biden and the Select Committee agree that there is a substantial need for the records as part of the Select Committee's ongoing investigation into the attack on the Capitol and to fulfill its responsibility to recommend

---

[50] The Select Committee maintains, for preservation purposes, that the Constitution and the PRA foreclose a former President from asserting executive privilege over the disagreement of the incumbent President, and foreclose a claim of executive privilege to thwart a Congressional request. To rule in the Select Committee's favor, however, this Court need not decide those issues.

remedial measures, including legislation, to prevent such a tragedy from recurring. Therefore, any purported privilege must yield to the Select Committee's overriding need for the information.

1. Mr. Trump's interest in keeping the records confidential in this matter is exceedingly weak. Although Mr. Trump claims (Br. 27) that "the requested records are protected by numerous legal privileges," at most his assertions reduce to claims based on a generalized interest in confidentiality. Mr. Trump has informed the Archivist that he believes the records should be withheld based on "presidential communications and deliberative process privileges." PI Mot. Ex. 5 at 1. Under the Presidential communications privilege, Presidents may shield certain communications involving close advisers to protect "the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *Nixon*, 418 U.S. at 708. Similarly, the deliberative process privilege "'prevent[s] injury to the quality of agency decisions' by allowing government officials to debate alternative approaches in private." *In re Sealed Case*, 121 F.3d at 737.

Here, "[i]t is of cardinal significance . . . that the claim of privilege is being urged solely by a former president, and there has been no assertion of privilege by an incumbent president." *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977). "The expectation of the confidentiality of executive communications . . . has always been limited and subject to erosion over time after an administration leaves office." *GSA*, 433 U.S. at 451. This fact is reflected in the PRA and its implementing regulations, which ensure that the current President has the final say in the Executive Branch over whether to invoke privilege. *See* 36 C.F.R. § 1270.44(d). This structure reflects a longstanding recognition that, although a former President "may also be heard to assert" such claims, "only the incumbent is charged with performance of the executive duty under the Constitution." *GSA*, 433 U.S. at 439, 448; *see also, e.g.*, *United States v. Reynolds*, 345 U.S. 1, 7

(1953) ("The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party."); *Public Citizen v. Burke*, 843 F.2d 1473, 1479 (D.C. Cir. 1988) ("[T]he incumbent President is not constitutionally obliged to honor former President Nixon's invocation of executive privilege with respect to the Nixon papers.").

Therefore, President Biden's rejection of Mr. Trump's claim "detracts from the weight of [Mr. Trump's] contention" that disclosing the records would "impermissibly intrude[] into the executive function and the needs of the Executive Branch." *GSA*, 433 U.S. at 449; *see Dellums*, 561 F.2d at 247 ("Absence of support from the incumbent at least indicates that 'the risk of impairing necessary confidentiality is attenuated.'").  As the Supreme Court has recognized, an incumbent President has access to more information and a better institutional perspective than a former President about whether invoking executive privilege would be "for the benefit of the Republic." *GSA*, 433 U.S. at 449.  The incumbent "may be inhibited in disclosing confidences of a predecessor when he believes that the effect may be to discourage candid presentation of views by his contemporary advisers." *Id.* at 448.  In addition, "to the extent that the privilege serves as a shield for executive officials against burdensome requests for information which might interfere with the performance of their duties, a former President is less in need of it than an incumbent." *Id.* (citations omitted).  And "there are obvious political checks against an incumbent's abuse of the privilege" that do not apply to a former President.  *Id.*  Therefore, the "incumbent President"— as opposed to a former President—is "in the best position to assess the present and future needs of the Executive Branch, and to support invocation of the privilege accordingly." *Id.* at 449.

Mr. Trump furthermore fails to support his claims beyond conclusory assertions (Br. 30) that the purportedly privileged documents "were created during President Trump's term of office and reflect presidential decisionmaking, deliberations, and communications between and among

close advisors, attorneys and the President."  These broad contentions are barely adequate to demonstrate that privilege applies at all, much less to show that Mr. Trump has an overriding interest in maintaining the confidentiality of their contents.  For example, the Presidential communications privilege "is limited to communications 'in performance of a President's responsibilities' '*of his office*' and made 'in the process of shaping policies and making decisions.'"  *GSA*, 433 U.S. at 449 (emphasis added; citations and alteration omitted).  To the extent any of the communications at issue involve Mr. Trump's efforts to undermine the integrity of the election, such records are not privileged.  Likewise, any material that is not both "predecisional" and "deliberative" would fall outside the scope of any deliberative process privilege.  *In re Sealed Case*, 121 F.3d at 737.

Moreover, where (as here) "there is reason to believe the documents sought may shed light on government misconduct, 'the privilege is routinely denied,' on the ground[] that shielding internal government deliberations in this context does not serve 'the public's interest in honest, effective government.'"  *Id.* at 738; *see Senate Select Committee*, 498 F.2d at 731 ("[T]he Executive cannot, any more than the other branches of government, invoke a general confidentiality privilege to shield its officials and employees from investigations by the proper governmental institutions into possible criminal wrongdoing."); *see also Assertion of Exec. Priv. in Response to Cong. Demands for Law Enforcement Files*, 6 Op. O.L.C. 31, 36 (Nov. 30, 1982) ("[P]rinciples [of executive privilege] will not be employed to shield documents which contain evidence of criminal or unethical conduct by agency officials from proper [Congressional] review.").[51]

---

[51] Similarly, at various points in his brief (Br. 2 n.3, 3, 29), Mr. Trump suggests that some documents may be covered by attorney-client privilege.  But he has not identified which documents arguably fall under this privilege; provided a privilege log; or otherwise offered

For all these reasons, Mr. Trump fails to state a compelling need for maintaining confidentiality of the requested documents.

2.  In contrast to Mr. Trump's generalized and diminished interest in confidentiality, both President Biden and the Select Committee agree that there exists a compelling, specific interest in the Presidential records at issue.  As explained in detail above, *see supra* pp. 14-15, 18-22, the Select Committee is specifically charged with investigating the facts and circumstances of the January 6 attack; identifying the causes and lessons learned; and reporting back to the House recommendations, including "changes in law, policy, procedures, rules, or regulations."  H. Res. 503, § 4.  The Select Committee needs the requested information to reconstruct the extraordinary events of that day—as well as Mr. Trump's extensive efforts to undermine confidence in the election before and after Election Day, without which it is impossible to imagine the horrific attack occurring.  *Cf. GSA*, 433 U.S. at 453 (former President Nixon's executive privilege assertion overcome by need to "facilitat[e] a full airing of the events leading to [his] resignation, and Congress's need to understand how those political processes had in fact operated in order to gauge the necessity for remedial legislation").

President Biden concurs that the Select Committee has a substantial need for this information.  Although Mr. Trump dismisses President Biden's conclusion as "politically motivated" (Br. 33), the White House's stated reasons for declining to invoke privilege disprove that contention:  "[T]he insurrection that took place on January 6, and the extraordinary events surrounding it, must be subject to a full accounting to ensure nothing similar ever happens again.

---

sufficient information to show that the documents contain legal advice as opposed to "advice on political, strategic, or policy issues, [which] would not be shielded from disclosure by the attorney-client privilege."  *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998).  Moreover, to the extent such government communications include evidence of malfeasance, attorney-client privilege may not be invoked to cover it up.  *Id.*

Congress has a compelling need in service of its legislative functions to understand the circumstances that led to these horrific events," and "[t]he Documents shed light on events within the White House on and about January 6 and bear on the Select Committee's need to understand the facts." PI Mot. Ex. 4 at 1. Further, the White House emphasized, "[t]he constitutional protections of executive privilege should not be used to shield, from Congress or the public, information that reflects a clear and apparent effort to subvert the Constitution itself." *Id.* at 2.

The political branches are thus united in their conclusion: The Select Committee's compelling need for the records in the first tranche outweighs Mr. Trump's conclusory and generalized asserted interest in keeping them confidential. Any purported claim of privilege must yield and the preliminary injunction should be denied.

> ### b. *Mr. Trump's assertion that this Court should enforce a far-reaching assertion of "protective privilege" is deeply flawed*

Mr. Trump also appears to argue (Br. 31) that this Court should accept and enforce a wholesale "protective" assertion of executive privilege over all other documents that the Archivist has yet to produce. That contention is wrong. Enforcing such a claim would require this Court to extend executive privilege doctrine well beyond its boundaries to encompass unfounded claims of secrecy asserted by a former President who has not even reviewed the documents at issue.

Although the Executive Branch at times makes such "protective" assertions during the accommodation process to preserve privilege pending a Presidential determination, "the request itself does not constitute a form of privilege." Mem. for the Heads of Exec. Depts. & Agencies from President Ronald Reagan, *Re: Procedures Governing Responses to Cong. Requests for Information* at 2 (Nov. 4, 1982).[52] Mr. Trump's speculation that he may wish to assert privilege over documents in future tranches, which have not yet been made available to him or President

---

[52] https://perma.cc/5D54-T5T6.

Biden, is an insufficient ground to convert a tool of interbranch accommodation into a new constitutional privilege.

Moreover, the PRA's implementing regulations set forth the specific timeframes by which assertions of privilege must be made, and grant the Archivist discretion to extend those timeframes when necessary.  *See supra* pp. 11-13; 36 C.F.R. § 1270.44.  Although Mr. Trump complains that the records still to be processed are voluminous, he provides no specific reason to believe he will be unable to complete his review of future tranches within these timeframes.  Regardless, "the Constitution does not require the Archivist to permit a former president an unlimited amount of time to review materials for privilege."  *Am. Hist. Ass'n v. Nat'l Archives & Recs. Admin.*, 516 F. Supp. 2d 90, 111 (D.D.C. 2007).  This Court should therefore reject Mr. Trump's overreaching attempt to preemptively declare privilege for all future tranches of records responsive to the Select Committee's request.

          **3.**       **The Other Balancing Tests Mr. Trump Cites Do Not Apply, but Even If They Did, the Select Committee Satisfies Them**

Unable to assert a successful claim of privilege, Mr. Trump contends that the Select Committee's request fails the balancing tests in *Senate Select Committee*, 498 F.2d 725, and *Mazars*, 140 S. Ct. 2019, which he argues should apply in addition to the executive privilege analysis above.  Those tests, however, do not govern here because they originated in cases involving Congressional requests for information from incumbent Presidents, which accordingly presented separation-of-powers concerns arising from a "clash between rival branches of government." *Mazars*, 140 S. Ct. at 2034.  Those concerns are irrelevant here, where both political branches agree that the records at issue should be released to the Select Committee.  Regardless, the Select Committee satisfies those tests as well.

### *a. Senate Select Committee*

Mr. Trump argues (Br. 32-34) that the Select Committee must also satisfy the standard articulated in *Senate Select Committee*, which requires a showing that the records are "demonstrably critical to the responsible fulfillment of the Committee's functions." 498 F.2d at 731. *Senate Select Committee* does not apply here because that case involved an assertion of executive privilege by a sitting President "designed to ensure that the President and those upon whom he directly relies in the performance of his duties could continue to work under a general assurance that their deliberations would remain confidential." *Id.* at 730. For the reasons explained above, the assertion of such an interest by a former President, like Mr. Trump, carries far less weight than the same assertion by an incumbent President. *See supra* pp. 24-25. In addition, the Congressional request in this case was made under the PRA, a statute passed through bicameralism and presentment. *Cf. Ways and Means Comm.'s Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. __, at *23-24 (July 30, 2021) (Slip Op.). Those differences make any separation-of-powers concerns in this case less acute than those in *Senate Select Committee* and accordingly "support reduced judicial scrutiny." *Trump v. Mazars USA LLP*, 2021 WL 3602683, at *13 (D.D.C. Aug. 11, 2021), *appeal pending*, No. 21-5176 (D.C. Cir.).

Even if that case did apply here, for many of the reasons previously discussed, *see supra* pp. 23-28, the Select Committee easily satisfies the *Senate Select Committee* standard. In addition to requiring the records to enable it to reconstruct the events leading up to the January 6 insurrection, the Select Committee needs the information for remedial legislation it is considering. *See supra* pp. 18-22. For all those potential legislative initiatives (and others), the Select Committee requires information that resides in the requested records created by the Trump White House. Unlike in *Senate Select Committee*, where the Senate committee's investigation

"substantially overlap[ped]" with the ongoing investigation of another committee, which already had the requested material in its possession, the Select Committee's need in this case is not "merely cumulative." 498 F.2d at 732. It cannot obtain this information through other means. If the Select Committee does not receive the requested records, Congress may never know the full story of what happened on January 6 and will be hamstrung in its ability to legislate effectively to prevent a similar future assault on American democracy.

### b. *Mazars*

Mr. Trump also erroneously contends (Br. 20) that the request violates the separation of powers because it does not satisfy the four-factor test recently announced by the Supreme Court in *Trump v. Mazars*. The *Mazars* test does not apply to a Congressional request for a former President's official documents pursuant to a statute. Rather, consistent with the Supreme Court's decision in *Nixon v. GSA*, any separation-of-powers concerns raised in this case are addressed by balancing the former President's interest in maintaining confidentiality with the need for disclosure. *See* 433 U.S. at 454. As already explained, that balance weighs decisively in the Select Committee's favor, *see supra* pp. 23-28, and no further inquiry is required. In any event, even if the four-factor *Mazars* test did apply, the Select Committee's request satisfies that test.

#### i. The Mazars *test does not apply*

1. In *Mazars*, the Supreme Court analyzed Congressional subpoenas issued while Mr. Trump was in office for his personal, non-privileged financial information. 140 S. Ct. at 2026-27. Although the information sought was not related to Mr. Trump's official duties, the Court held that "Congressional subpoenas for information from the President" raise "significant separation of powers issues" because "Congress and the President have an ongoing institutional relationship as the 'opposite and rival' political branches established by the Constitution." *Id.* at 2033-34, 2036. Accordingly, the Court determined that a "balanced approach is necessary"—one that accounts for

"both the significant legislative interests of Congress and the 'unique position' of the President." *Id.* at 2035.

The Court identified four "special considerations" that should inform a court's analysis when evaluating a subpoena directed at a sitting President's personal information:  (1) "whether the asserted legislative purpose warrants the significant step of involving the President and his papers"; (2) whether a subpoena is "broader than reasonably necessary to support Congress's legislative objective"; (3) whether Congress has offered "detailed and substantial" evidence "to establish that a subpoena advances a valid legislative purpose"; (4) the "burdens imposed" on the Presidency by a subpoena.  *Mazars*, 140 S. Ct. at 2035-36.  The case was remanded for further proceedings, and amid those proceedings Mr. Trump lost the 2020 election.

On remand, the district court in the *Mazars* litigation held that Mr. Trump's status as a former President "affect[ed] the foundations of the *Mazars* test."  2021 WL 3602683 at *13.  The court observed that, "because President Trump no longer 'alone composes a branch of government,' this dispute no longer implicates a present 'clash between rival branches of government.'"  *Id.* at *13 (quoting *Mazars*, 140 S. Ct. at 2034).  Further, the court recognized that "the *Mazars* test was crafted against a 'tradition of negotiation and compromise' between co-equal branches of government," but a former President's "incentives to accommodate Congress are greatly diminished compared to those of an incumbent."  *Id.* (quoting *Mazars*, 140 S. Ct. at 2031).  The court thus applied what it called "*Mazars* lite":  an application of the four *Mazars* factors, but using "reduced judicial scrutiny," "cognizant of the fact that this case now involves a subpoena directed at a former President."  *Id.*

2.  The Supreme Court's *Mazars* test does not apply in this case because the "significant" separation-of-powers concerns raised by a subpoena for a sitting President's "personal information" are absent here.  *See* 140 S. Ct. at 2032-33.

*First*, the Select Committee's request seeks materials relating to a *former* President.  Where a former President's personal information is sought, the "ongoing relationship" between the Legislative and Executive Branches that "necessarily inform[ed]" the Supreme Court's analysis in *Mazars* is gone.  *Id.* at 2026.  The Congressional request neither "pit[s] the political branches against one another" nor occurs in a context where there are political incentives for the two branches to engage in "negotiation and compromise."  *Id.* at 2031, 2034.  And because "the close connection between the Office of the President and its occupant" has been severed, there is no risk that the Congressional "demand" could "harass the President or render him 'complaisan[t] to the humors of the Legislature.'"  *Id.* at 2034.

Moreover, unlike in *Mazars*, the request here was first made when Mr. Trump was no longer President.  In *Mazars* and other litigation, Mr. Trump has repeatedly argued that the Supreme Court's *Mazars* test should apply because the request was initially made *when he was still President*.[53]  The House has maintained in those cases that the *Mazars* test is inapplicable given Mr. Trump's status as a former President*, regardless* of when the request was first made.  But, at the very least, the Supreme Court's test cannot possibly apply here, when the request was not made or even contemplated until *after* Mr. Trump had left office.

*Second*, the Select Committee's request was made under the PRA, a statute passed through

---

[53] *See, e.g.*, Intervenor's Combined Opp'n to the Mots. to Dismiss at 24-32, *Comm. on Ways & Means v. Treasury*, No. 1:19-cv-1974 (D.D.C. Oct. 36, 2021), ECF No. 140; Pl.'s Mot. for Summ. Judgment at 18-19, 28-29, *Trump v. Mazars USA LLP*, No. 1:19-cv-01136 (D.D.C. Apr. 5, 2021), ECF No. 54; Appellants' Br. at 25-26, *Trump v. Mazars USA LLP*, Nos. 21-5176, 21-5177 (D.C. Cir. Sept. 2, 2021).

bicameralism and presentment that was designed to address the very separation-of-powers concerns that Mr. Trump raises. *See Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991) (noting that Congress was "keenly aware" of the separation-of-powers concerns implicated by the PRA); H.R. Rep. No. 95-1487, at 8 (1978) (discussing the Supreme Court's decision in *Nixon v. GSA* and explaining that Congress sought to "balanc[e]" the "availability" of Presidential records and the potential for a "chilling effect" on Presidents and staff); Br. 35 (acknowledging that the PRA was "created to protect" the separation of powers).  The Executive Branch thus participated in the legislative process that resulted in the statute pursuant to which Congress made its request, greatly diminishing any separation-of-powers concerns.  *See GSA*, 433 U.S. at 441 (separation-of-powers concerns were mitigated because "[t]he Executive Branch became a party to the Act's regulation when President Ford signed the Act into law"); *Mazars*, 2021 WL 3602683, at *18 n.30 (distinguishing a statutory request from enforcement of Congressional subpoena).  What is more, the Executive Branch here disagrees with Mr. Trump's position in this case, which further "detracts from the weight of his contention" that the request intrudes "into the executive function and the needs of the executive branch."  *GSA*, 433 U.S. at 449.

*Third*, the Select Committee's request from the Archives does not seek Mr. Trump's personal, private information.  It seeks Mr. Trump's official records relating to his communications and actions while President, which have now been placed in complete "ownership, possession, and control" of the United States under the PRA.  44 U.S.C. §§ 2201(2), 2202.  In *Mazars*, the Supreme Court repeatedly emphasized that the subpoenas at issue sought a sitting President's private papers, which the Court thought could pose a "heightened risk" of impermissible purpose because of the documents' "personal nature" and "less evident connection to a legislative task." 140 S. Ct. at 2035.  The Select Committee's request for official papers does not present those same concerns.

3.   Accordingly, this Court should reject Mr. Trump's attempt to "transplant" the *Mazars* standard "root and branch" to the Select Committee's distinct request for a former President's official documents.   140 S. Ct. at 2033.   This case—in which the Legislative and Executive Branches share the same view—does not present the separation-of-powers concerns at issue in *Mazars*.   To the extent a former President can claim that this request presents any separation-of-powers concern, that concern is addressed by applying the relevant privilege balancing test from *Nixon v. GSA*, which tilts conclusively in the Select Committee's favor, as the current President determined.   *See supra* pp. 23-28.   Beyond that, Mr. Trump relies on burdens that *he* claims he will suffer, but those burdens do not affect the *Presidency*.   *See infra* pp. 37-38.   There is simply no "potential for disruption" of the Executive Branch posed by the Select Committee's request, and thus no additional separation-of-powers inquiry or balancing is needed.   *GSA*, 433 U.S. at 426 (explaining that "[o]nly where the potential for disruption is present" must the court determine "whether that impact is justified by an overriding need").   The Select Committee's request comports with the separation of powers.

### ii.   *Even if the* Mazars *test applies, the request satisfies that test*

If this Court nonetheless concludes that *Mazars* applies here, for all the reasons discussed above, the Court should apply the *Mazars* factors with reduced scrutiny and cognizant of Mr. Trump's status as a former President, as the district court did in that case.   *See supra* p. 32.   In any event, the Select Committee's request satisfies any version of the four-factor test.

*First*, Congress's legislative purpose here "warrants" the involvement of the President's papers.   *Mazars*, 140 S. Ct. at 2035.   As explained above, the Select Committee seeks to identify and examine the causes of the January 6 attack to enact legislation relating to the Presidential election process and to ensure future peaceful transfers of power.   *See supra* pp. 14-15.   The requested materials are indispensable to that investigation, as Mr. Trump's conduct may have

precipitated or exacerbated the breakdown of the rule of law surrounding the 2020 election. *See supra* pp. 18-22.

For the same reasons, the first *Mazars* factor likewise weighs in the Select Committee's favor under reduced scrutiny, as the district court applied on remand in *Mazars*. That approach recognizes that a request for a former President's information is a less "significant step" than a request for the information of a sitting President, and thus requires a "less rigorous" inquiry into "alternative sources." *Mazars*, 2021 WL 3602683 at *13. Under such an inquiry, the Select Committee's legislative purpose definitively warrants the involvement of the President's papers.

*Second*, the Select Committee's request is tailored to what is "reasonably necessary" to serve the Select Committee's legislative purpose. *Mazars*, 140 S. Ct. at 2035. On their face, the requests are connected to the events of January 6, and the information Mr. Trump knew and conveyed about the election outcome and the transfer of power. *See* PI Mot. Ex. 1. Especially in light of the extraordinary events surrounding Mr. Trump and the 2020 election—and the serious threats to our system of government—the scope of the request is reasonable. *See supra* pp. 3-11, 17-22.

At a minimum, this factor weighs in the Select Committee's favor under a reduced-scrutiny approach. When the request is for a former President's information, "a court need not 'insist' on as precise a fit" between the legislative purpose and the request because of the reduced separation-of-powers concerns at stake. *Mazars*, 2021 WL 3602683 at *13.

*Third*, the Select Committee has "adequately" supported its request with "detailed and substantial" evidence of its legislative objective. 140 S. Ct. at 2036. The Select Committee has plainly articulated its legislative objectives in its authorizing resolution, its letter to the Archivist requesting the documents at issue, and various public statements. *See supra* pp. 14-15, 18-22.

36

Moreover, the Select Committee has specifically identified certain legislation that its investigation may inform. *See supra* pp. 18-22. That is more than sufficient.

At the very least, under reduced scrutiny, the evidence of legislative purpose weighs in the Select Committee's favor. A court evaluating a request for a former President's information must "remain attentive" to Congress's evidence, but "a less 'detailed and substantial' submission to substantiate Congress's claimed purpose may suffice given the circumscribed separation of powers concerns at play." *Mazars*, 2021 WL 3602683. The Select Committee has adequately detailed its legislative purpose.

*Fourth*, Mr. Trump cannot plausibly claim that the Archivist's compliance with the Select Committee's request will unduly "burden[]" the Office of the President. *Mazars*, 140 S. Ct. at 2036. The Executive Branch has already determined that it will comply with the Select Committee's request. Former President Trump is thus in no position to argue that the request will "'intru[de] into the operation of the Office of the President'" or divert the President's "time and attention." *Id.* Mr. Trump contends (Br. 23) that the request will burden *him* "in reviewing all potentially responsive documents," but fails to explain why such a burden on Mr. Trump alone—with no impact on the Office of the President—matters in the separation-of-powers analysis. It does not.

Mr. Trump contends (Br. 23) that the request also burdens the Presidency "generally" because if Congress is permitted to issue such requests, "every future President's close aides will fear disclosure and thus provide less than candid advice." But the executive privilege analysis entirely addresses that concern, and, as already explained, it is easily outweighed by the Select Committee's legislative need. *See supra* pp. 23-28. Mr. Trump asserts (Br. 23) that "partisans in Congress will seek to relitigate past grievances perpetually," but, even if that speculation were

true, Mr. Trump never explains how such relitigation would burden the *Presidency*, as opposed to merely the former President.  What is more, Mr. Trump's speculation contradicts the presumption of good faith due to a co-equal branch of government and overlooks the horrific events necessitating the Select Committee's request for information in this case.

Under reduced scrutiny, the burden factor likewise weighs heavily in the Select Committee's favor.  *See Mazars*, 2021 WL 3602683, at *13.  As President Biden has determined, any burden on the Office of the President is vastly outweighed by the Select Committee's pressing need for the information to pass legislation of vital importance to our democracy.  The request thus does not violate the separation of powers under *Mazars* or any other standard.

**B.**     **Mr. Trump Fails to Satisfy the Remaining Preliminary Injunction Factors**

**1.**     **Mr. Trump Has Not Established Irreparable Harm**

The Supreme Court "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22.  The D.C. Circuit "has said time and again that the degree of proof required for 'irreparable harm' is 'high,' and that a failure to surmount it provides 'grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.'"  *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019).  And although it is necessary for a preliminary injunction, a showing of irreparable harm does not compel that an injunction be granted.  *Winter*, 555 U.S. at 23.

Mr. Trump claims (Br. 36) he will suffer irreparable harm if the Archivist discloses the documents Mr. Trump claims are covered by the executive privilege because "such information, once disclosed, loses its confidential and privileged nature."  Although "any privileged information would be lost forever," that does not automatically mean that the "harm caused by the [disclosure] will be irreparable" without a further showing that the purposes behind the privilege will be

harmed.  *Rubin v. United States*, 524 U.S. 1301, 1301 (1998) (Rehnquist, J., in chambers); *see also, e.g.*, *Jubilant DraxImage Inc. v. U.S. Int'l Trade Comm'n*, 490 F. Supp. 3d 169, 189 (D.D.C. 2020) ("removing the redactions from [movant's] brief will be irreversible, but [movant] has not shown that it will cause the company irreparable harm").  Mr. Trump has not made such a showing.

Executive privilege exists to "safeguard[] the public interest in candid, confidential deliberations within the Executive Branch," *Mazars*, 140 S. Ct. at 2032, and Mr. Trump fails to show that releasing the specific documents here will harm that interest.  *See In re Sealed Case*, 148 F.3d 1079, 1080 (D.C. Cir. 1998) (refusing to find irreparable harm based on the government's claim of privilege, emphasizing "[t]he harm asserted is future harm, depending on a prediction about what the President will do in the absence of the privilege").  Executive privilege is "qualified, not absolute." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 886 (D.C. Cir. 2021).  And "a former President is in less need of it than an incumbent." *GSA*, 433 U.S. at 448.  Although Mr. Trump offers his personal opinion that the privilege's purposes support its assertion here, President Biden—who is in a better position than Mr. Trump "to assess the present and future needs of the Executive Branch," *id*. at 449—has determined that relying on the privilege is not warranted. President Biden's determination "detracts" from the strength of Mr. Trump's claim of harm.  *GSA*, 433 U.S. at 449.[54]  Although the records, once disclosed, cannot be undisclosed, Mr. Trump has failed to demonstrate that disclosure will cause "certain and great" harm, particularly given the considered judgment of the Executive Branch rejecting any such harm.

---

[54] Mr. Trump also claims irreparable harm if other documents—over which he has not formally claimed executive privilege—are turned over because there is a possibility that they contain privileged information.  "Such an injury is far too speculative to warrant preliminary injunctive relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 298 (D.C. Cir. 2006).

### 2.    The Equities Tilt Decisively Against Injunctive Relief

In contrast, an injunction would cause direct, substantial, and immediate harm to the Select Committee and ongoing legislative activities.  The Select Committee's work is of the highest importance and urgency: investigating one of the darkest episodes in our nation's history, a deadly assault on the United States Capitol and Congress, and an unprecedented disruption of the peaceful transfer of power.  H. Res. 503.  The urgency of the work cannot be overstated; the threat that brought the attack on January 6 is ongoing.  Those who falsely claimed the election was stolen (including Mr. Trump) continue to do so; some prominent commentators either defend the attack on the Capitol or question whether it was a "false flag."  A preliminary injunction would deny the Select Committee the information to which it is entitled.  The D.C. Circuit has recognized a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress."  *Exxon Corp. v. FTC*, 589 F.2d 582, 594 (D.C. Cir. 1978).  The information is sought pursuant to "Congress's discharge of its primary constitutional responsibilities[, including] legislating [and] conducting oversight of the federal government."  *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 764 (D.C. Cir. 2020) (en banc).  "Congress's power of inquiry is as broad as its power to legislate and lies at the very heart of Congress's constitutional role.  Indeed, the former is necessary to the proper exercise of the latter: according to the Supreme Court, the ability to compel testimony is 'necessary to the effective functioning of courts and legislatures.'"  *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 102 (D.D.C. 2008).  Without the information requested by the Select Committee, it "may not be able to do the task assigned to it by Congress."  *Eastland*, 421 U.S. at 505.

Delay itself would inflict a serious constitutional injury on the Select Committee because it would hinder the Select Committee from fulfilling its constitutional duty.  *See Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 50 n.11 (D.D.C. 2018) (citing *Exxon*, 589 F.2d at 594).  The Select

Committee needs the documents now because they will shape the direction of the investigation. For example, the documents could inform the Select Committee's decisions regarding which witnesses to depose and what questions to ask them. The Supreme Court has indicated that preliminary injunctions against legislative investigations are intolerable because they threaten to "delay and disrupt the legislative function." *Eastland*, 421 U.S. at 503.[55]

Preventing the Select Committee from receiving the requested information while litigation is ongoing could effectively mean that the Select Committee *never* receives it. "A Congress lasts for only two years, *see* U.S. Const. art. I, § 2, cl. 1; *id.* amend. XX, § 1, and the current Congress may expire before the House of Representatives can complete the present litigation." *McGahn*, 968 F.3d at 772. This is exactly what happened in *Eastland*, where preliminary injunctive relief prevented the committee from ever receiving the information it requested during its lifespan. 421 U.S. at 512 ("it appears that the Committee that issued the subpoenas has been abolished by the House"). The risk that an injunction—even if eventually reversed—could prevent the Select Committee from *ever* receiving the information to which it is entitled points decisively against granting Mr. Trump's requested relief.

Although Mr. Trump contends "Congress has almost no interest in quickly obtaining and reviewing the requested documents, as the requested records address past events," PI Mot. ¶ 3, he fails to appreciate that future elections are imminent and there could be future attacks on democracy. The Select Committee's task to study and suggest legislation to ensure that January 6 is not repeated and that our Nation's democracy remains intact is of the utmost urgency.

---

[55] Mr. Trump claims (Br. 39-40) that the D.C. Circuit decision to grant an injunction in *Eastland* is binding precedent (citing *U.S. Servicemen's Fund v. Eastland*, 488 F.2d 1252 (D.C. Cir. 1973)), but neglects to mention that the Supreme Court *reversed* the D.C. Circuit and criticized the lower court proceedings for "interfering with the legislative process" and "frustrat[ing]" a "legislative inquiry." 421 U.S. at 511.

Even when Congress's constitutional interests are not at stake, courts recognize that "where an obligation to disclose exists, [requesters] may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017). "[S]tale information is of little value, [and] the harm in delaying disclosure is not necessarily redressed even if the information is provided at some later date." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 319 (D.D.C. 2017) (citing *Payne Enters. v. United States*, 837 F. 2d 486, 494 (D.C. Cir. 1988); *Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999)). This rationale holds special force when the information is being sought by a Congressional committee on a matter of the highest public importance.

### 3.    The Public Interest Precludes Injunctive Relief

"[W]hen the Government is the opposing party," the balance of equities and public interest "factors merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). "The responsibilities for . . . resolving the struggle between competing views of the public interest are not judicial ones;" rather "[o]ur Constitution vests such responsibilities in the political branches." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984) (citation omitted). Thus, "[i]t is in the public interest for courts to carry out the will of Congress." *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 45 (D.D.C. 2000). "Any judicial decision to override that congressional judgment would be both "extraordinary and drastic." *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019); *see also Vander Jagt v. O'Neill*, 699 F.2d 1166, 1176 (D.C. Cir. 1982) ("it would be . . . a 'startlingly unattractive' idea, given our respect for a coequal branch of government" to enjoin the Speaker of the House, and judicial "discretion to

withhold equitable and declaratory relief supplies us with ample foundation upon which to base our decision").

The Constitution gives Congress the power to determine how best to pursue the public interest, and a duly appointed Congressional committee has concluded that review of the records will best further the interests of the American people.  The Executive Branch, acting through the President, agrees that disclosure of the contested documents will further the public interest.  PI Mot. Ex. 6 ("[T]he President maintains his conclusion that an assertion of executive privilege is not in the best interests of the United States").  Not only is the combined judgment of the political branches about where the public interest lies entitled to controlling weight, but it is indisputably correct.  The deadly January 6 attack on the Capitol and the threat to the peaceful transfer of power cut to the heart of our constitutional republic, and the Select Committee's investigation is vital to preventing such attacks in the future.  The public interest lies in furthering—not interfering with—the political branches' ongoing cooperation to study and learn from the attack on democracy.

## II.     The Separation-of-Powers Doctrine Bars the Court from Issuing an Injunction Against Legislative Defendants

Mr. Trump complains (Br. 41) that President Biden failed to sustain Mr. Trump's claim of executive privilege over a group of documents to be turned over to the Select Committee on November 12.  Mr. Trump asks this Court (*id.*) to enjoin both the Legislative and Executive Branches from "enforcing or complying with the Committee's request until the Court can issue a final judgment."  Such an extraordinary request not only improperly relies on speculation about unknown future events, but flies in the face of precedent that courts cannot enjoin legislative defendants.  Mr. Trump's requested injunction is improper and must be denied.

"The general rule is that neither department may invade the province of the other and neither may control, direct, or restrain the action of the other."  *Commonwealth of Massachusetts*

*v. Mellon*, 262 U.S. 447, 488 (1923).  Yet Mr. Trump seeks to enjoin a duly constituted House Select Committee, an intrusion that "would be utterly foreign to our system of divided powers." *Hastings v. U.S. Senate, Impeachment Trial Comm.*, 716 F. Supp. 38, 41 (D.D.C. 1989), *aff'd sub nom. Hastings v. U.S. Senate*, 887 F.2d 332 (D.C. Cir. 1989) ("we have not found any case in which the judiciary has issued injunctive or declaratory relief intercepting ongoing proceedings of the legislative branch").  An injunction specifying what a Congressional committee may and may not do "would be extraordinarily intrusive" and would create "nothing less than a revolution in the judiciary's relationship to the political branches."  *Vander Jagt*, 699 F.2d at 1181 (Bork, J., concurring).  Consistent with this separation-of-powers principle, the D.C. Circuit has refused injunctions against Congressional defendants exercising the legislature's investigative power, explaining that such relief "would be an illegal impingement by the judicial branch upon the duties of the legislative branch."  *Pauling v. Eastland*, 288 F.2d 126, 129-30 (D.C. Cir. 1960); *Hearst v. Black*, 87 F.2d 68, 72 (D.C. Cir. 1936).

The same result is required here.  Mr. Trump cannot obtain an injunction against the Chairman or the Select Committee prohibiting either of them from acting regarding a document request made to the Archivist.  Whatever interest Mr. Trump may have in asserting executive privilege over the documents to be turned over on November 12, he has not pointed to any basis for broader preliminary injunctive relief challenging future productions or enjoining future enforcement actions by the Select Committee.  Similarly, his narrow concern about executive privilege in the relatively small number of documents now at issue does not justify wide-ranging judicial scrutiny of the political branches' decisions, such as whether the Select Committee's request to the Archivist could be narrowed or whether the Archivist's mode of supplying

documents could be more efficient.  This Court should reject Mr. Trump's requested relief, which

violates the basic tenets of separation of powers.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion for a preliminary injunction.

Respectfully submitted,

| | |
|---|---|
| Annie L. Owens (D.C. Bar No. 976604)<br>Mary B. McCord (D.C. Bar No. 1018768)<br>Joseph W. Mead (MD Bar No. 2102240015)<br>INSTITUTE FOR CONSTITUTIONAL<br>ADVOCACY AND PROTECTION<br>Georgetown University Law Center<br>600 New Jersey Avenue NW<br>Washington, D.C. 20001<br>Telephone: (202) 662-9042<br>ao700@georgetown.edu | */s/ Douglas N. Letter*<br>Douglas N. Letter (D.C. Bar No. 253492),<br>   *General Counsel*<br>Todd B. Tatelman (VA Bar No. 66008),<br>   *Deputy General Counsel*<br>Eric R. Columbus (D.C. Bar No. 487736),<br>   *Special Litigation Counsel*<br>Stacie M. Fahsel (D.C. Bar. No. 1034314),<br>   *Associate General Counsel*<br>OFFICE OF GENERAL COUNSEL[56]<br>U.S. HOUSE OF REPRESENTATIVES<br>5140 O'Neill House Office Building<br>Washington, D.C. 20515<br>Telephone: (202) 225-9700<br>Douglas.Letter@mail.house.gov<br><br>*Counsel for Defendants Bennie Thompson and the Select Committee to Investigate the January 6th Attack on the United States Capitol of the U.S. House of Representatives* |

October 29, 2021

---

[56] Attorneys employed or retained by the Office of General Counsel for the U.S. House of Representatives are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States or of any State or political subdivision thereof without compliance with any requirements for admission to practice before such court."  2 U.S.C. § 5571.

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2021, I caused the foregoing document to be filed via the CM/ECF system for the U.S. District Court for the District of Columbia, which I understand caused a copy to be served on all registered parties.

/s/ *Douglas N. Letter*
Douglas N. Letter