**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DONALD J. TRUMP, in his capacity as former President of the United States,<br><br>Plaintiff,<br><br>v.<br><br>BENNIE G. THOMPSON, in his official capacity as Chairman of the Select Committee to Investigate the January 6th Attack on the United States Capitol, United States House of Representatives, *et al.*,<br><br>Defendants. | No. 1:21-cv-2769 (TSC) |

**NARA DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Dated: October 29, 2021

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ELIZABETH J. SHAPIRO
JAMES J. GILLIGAN
SERENA M. ORLOFF
CRISTEN C. HANDLEY
JULIA A. HEIMAN
Attorneys

U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Telephone:     (202) 514-5302
Fax:              (202) 616-8470
E-mail:          Elizabeth.Shapiro@usdoj.gov

*Counsel for the NARA Defendants*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ..................................................................................................... 1

LEGAL BACKGROUND ......................................................................................... 3

I.      Enactment of the PRA in the Wake of the Nixon Era ................................... 3

        A.      In *Nixon v. GSA*, the Supreme Court Upheld a Statute Lodging Ownership of Presidential Records in the United States ................................................. 3

        B.      The Presidential Records Act .................................................................. 5

II.     NARA's Process for Releasing Presidential Records to Congress ................ 6

FACTUAL BACKGROUND .................................................................................... 7

I.      The January 6 Attack on the United States Capitol ...................................... 7

II.     The Establishment of the Select Committee and the Instant Request to NARA ......... 9

LEGAL STANDARD ............................................................................................. 12

ARGUMENT .......................................................................................................... 13

I.      Plaintiff Is Unlikely to Succeed on the Merits of His Claims ..................... 13

        A.      A Former President's Residual Right Recognized in *Nixon v. GSA* Is Confined to Executive Privilege ................................................................................. 13

        B.      The Select Committee's Purposes Are Legitimate and Compelling ........... 15

                1.      Congress's Power of Inquiry Is Broad as Long as It Is Exercised for a "Legitimate Legislative Purpose" ................................................... 16

                2.      The Select Committee's Legislative Purposes Are Manifestly  Legitimate ........ 17

                3.      The *Mazars* and *Senate Select Committee* Standards Do Not Apply ............ 22

        C.      The Scope of the Select Committee's Request Does Not Exceed Its Authority ........ 24

                1.      The Select Committee's Request Falls Within Its Legislative Jurisdiction ......... 25

                2.      The Select Committee's Request is Reasonably Related to the Subject Matter of its Inquiry Concerning the January 6 Attack. ...................... 27

D.   The Court Should Defer to the Incumbent President's Reasonable Assessment that the Public Interest Requires Production to Congress .................................................... 30

    1.   An Incumbent President's Balancing of Interests Is Entitled to Great Deference ........................................................................................................................ 31

    2.   President Biden Reasonably Determined that an Assertion of Executive Privilege Over the Records at Issue Was Not in the Public Interest ................. 32

    3.   Past Presidents Have Also Determined that Congressional Need Outweighs the Need for Confidentiality Protected by Executive Privilege in Some Instances ............................................................................................................................ 35

E.   Plaintiff's Constitutional Challenge to the PRA Disregards the Compelling Rationales Supporting President Biden's Determination and Misinterprets the PRA ................. 37

II.   Plaintiff Meets None of the Equitable Requirements for Preliminary Injunctive Relief. ........................................................................................................................................... 38

A.   Plaintiff Has Adduced No Evidence of Irreparable Harm that Would Warrant a Cessation of All Activity to Comply With the Select Committee's Request ............... 39

B.   Neither the Balance of Equities Nor the Public Interest Favors an Injunction .......... 41

C.   An Injunction Preventing Release of the Records Over Which President Trump Has Already Claimed Privilege Would Also Be Unjustified ........................................... 42

CONCLUSION ................................................................................................................................. 43

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Aamer v. Obama,*
   742 F.3d 1023 (D.C. Cir. 2014) ...................................................................................12

*Barenblatt v. United States,*
   360 U.S. 109 (1959) ..........................................................................................*passim*

*Barry v. United States ex rel. Cunningham,*
   279 U.S. 597 (1929) ...................................................................................................17

*Dellums v. Powell,*
   561 F.2d 242 (D.C. Cir. 1977) ................................................................ 13, 14, 31, 32

*Eastland v. U.S. Servicemen's Fund,*
   421 U.S. 491 (1975) ..........................................................................................*passim*

*Exxon Corp. v. FTC,*
   589 F.2d 582 (D.C. Cir. 1978) ............................................................................. 27, 28

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ...................................................................................................27

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.,*
   561 U.S. 477 (2010) ...................................................................................................13

*Hutcheson v. United States,*
   369 U.S. 599 (1962) ...................................................................................................22

*In re Chapman,*
   166 U.S. 661 (1897) ...................................................................................................19

*In re Sealed Case,*
   121 F.3d 729 (D.C. Cir. 1997) ..................................................................................14

*McGrain v. Daugherty,*
   273 U.S. 135 (1927) ............................................................................................. 16, 22

*McPhaul v. United States,*
   364 U.S. 372 (1960) ................................................................................. 25, 28, 29, 30

*Mexichem Specialty Resins, Inc. v. EPA,*
   787 F.3d 544 (D.C. Cir. 2015) ..................................................................... 12, 40, 41

*Munaf v. Geren,*
    553 U.S. 674 (2008) ............................................................................................12

*Nixon v. Administrator of General Services ("Nixon v. GSA"),*
    433 U.S. 425 (1977) .......................................................................................*passim*

*Nixon v. GSA,*
    408 F. Supp. 321 (D.D.C. 1976)........................................................................32

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................12

*Quinn v. United States,*
    349 U.S. 155 (1955) ............................................................................................28

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
    140 S. Ct. 2183 (2020) ........................................................................................13

*Senate Select Committee on Presidential Campaign Activities v. Nixon,*
    498 F.2d 725 (D.C. Cir. 1974) .................................................................... 22, 24

*Sinclair v. United States,*
    279 U.S. 263 (1929) .................................................................................... 21, 22

*Sun Oil Co. v. United States,*
    514 F. 2d 1020 (Cl. Ct. 1975).............................................................................31

*Tobin v. United States,*
    306 F.2d 270 (D.C. Cir. 1962) ...........................................................................27

*Townsend v. United States,*
    95 F.2d 352 (D.C. Cir. 1938) .............................................................................17

*Trump v. Mazars USA, LLP, ("Mazars, II"),*
    940 F.3d 710 (D.D.C. 2019) ...................................................................18, 22, 25

*Trump v. Mazars USA, LLP, ("Mazars, III"),*
    140 S. Ct. 2019 (2020)....................................................................................*passim*

*Trump v. Mazars USA, LLP, ("Mazars, IV"),*
    2021 WL 3602683 (D.D.C. Aug. 11, 2021) ..........................................23, 30, 32

*U.S. Servicemen's Fund v. Eastland,*
    488 F.2d 1252 (D.C. Cir. 1974) .........................................................................42

*United States v. Cua,*
    No. CR 21-107 (RDM), 2021 WL 918255 (D.D.C. Mar. 10, 2021).................. 8, 9

*United States v. Gaudin,*
  515 U.S. 506 (1995) ...................................................................................................21

*United States v. Mazzocco,*
  Cr. No. 21-0054 (D.D.C. Oct. 4, 2021) .....................................................................33

*United States v. Nixon,*
  418 U.S. 683 (1974) ............................................................................................*passim*

*United States v. Rumely,*
  345 U.S. 41 (1953) .....................................................................................................25

*Watkins v. United States,*
  354 U.S. 178 (1957) ...........................................................................................*passim*

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .................................................................................................12, 41

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017) ...............................................................................................31

**Constitutional Provisions**

U.S. Const. art. I § 5 ..........................................................................................................16

U.S. Const. art. I § 9 ..........................................................................................................16

U.S. Const. art. II §1 ..........................................................................................................16

U.S. Const. art. II § 1, cl. 1 ................................................................................................13

U.S. Const. art. II § 3 .........................................................................................................13

**Statutes**

44 U.S.C. § 2107 ................................................................................................................38

44 U.S.C. § 2202 ...........................................................................................................13, 14

44 U.S.C. § 2203 .............................................................................................................5, 13

44 U.S.C. § 2204 ..........................................................................................................*passim*

44 U.S.C. § 2205 ..........................................................................................................*passim*

44 U.S.C. § 2208 ....................................................................................................15, 38, 39

**Legislative Materials**

House Resolution 503, 117th Cong., 1st Sess. (2021), https://www.congress.gov/bill/117th-congress/ house-resolution/503/text .................................................................................*passim*

H.R. Rep. No. 95-1487 ...................................................................................... 3, 5, 30

H.R. Rep. No. 117-152 (Oct. 19, 2021) ..........................................................................20

*Report of the Congressional Committees Investigating the Iran-Contra Affair*, H.R. Rep. No. 100-433, S. Rep. No. 100-216 (1987) ..............................................................................36

Staff Report, *Examining the U.S. Capitol Attack:  A Review of the Security, Planning, and Response Failures on January 6*, U.S. Senate Comm. On Homeland Security and Gov. Affairs & Comm. on Rules and Adm. (June 8, 2021) (HSGAC Report), https://www.rules.senate.gov/imo/media/doc/Jan%206%20HSGAC%20Rules%20Report.pdf ............................................................8

*Stmt. of the Hon. J. Brett Blanton*, Hearing on Health and Wellness of Employees and State of Damage and Preservation as a Result of January 6, 2021 (Feb. 24, 2021), https://www.aoc.gov/sites/default/files/2021-03/AOC_Testimony_House_Hearing-2021-02-24.pdf ......................................9

**Regulations**

36 C.F.R. § 1270.40 ..........................................................................................5

36 C.F.R. § 1270.44 ................................................................................6, 7, 10, 11

36 C.F.R. § 1270.38 ..........................................................................................5

Executive Order 13489 ..................................................................................... 6, 7

**Other Authorities**

Letter Responding to the Senate Select Committee on Presidential Campaign Activities Request for Presidential Testimony and Access to Presidential Papers (July 7, 1974), *Pub. Papers of Pres. Richard Nixon* (1973) ........................................................................................36

Louis Nelson, *White House: Trump Will not Assert Executive Privilege to Block Comey's Testimony*, Politico (June 5, 2017) ..................................................................................36

Peter Baker, *Trump Pressed Ukraine's President to Investigate Democrats as a 'Favor,'* N.Y. Times, Sept. 25, 2019, https://www.nytimes.com/2019/09/25/us/politics/donald-trump-impeachment-probe.html ..................................................................................................37

Peter Baker, *Trump Will Not Block Comey From Testifying, White House Says*, N.Y. Times, June 5, 2017,
 https://www.nytimes.com/2017/06/05/us/politics/trump-will-not-block-comey-from-
 testifying-white-house-says.html ................................................................................36

Philip Shenon & David E. Sanger, *Bush and Cheney Tell 9/11 Panel of '01 Warnings*, N.Y. Times, Apr.
 30, 2004, at A1, https://www.nytimes.com/2004/04/30/us/threats-responses-investigation-
 bush-cheney-tell-9-11-panel-01-warnings.html? ....................................................36

Scope of Congressional Oversight and Investigative Power With Respect to the Executive
 Branch, 9 Op. O.L.C. 60 (1985) ...............................................................................16

Statements About the Watergate Investigations (May 22, 1973),
 *Pub. Papers of Pres. Richard Nixon* (1973) ...............................................................36

Transcript of Former President Trump's Remarks on Jan. 6, 2021,
 https://www.cnn.com/2021/02/08/politics/trump-january-6-speech-transcript/index.html ......20

## INTRODUCTION

On January 6, 2021, the United States Capitol was attacked as the Joint Session of Congress convened for the counting of the electoral votes in the 2020 presidential election.  This assault on the Capitol not only resulted in deaths, injuries, widespread violence, and damage to the Capitol, but also disrupted the official function of counting the electoral votes that is a vital part of the peaceful transition of power at the very heart of our democracy.  Subsequently, on June 30, 2021, the House of Representatives voted to establish the Select Committee to Investigate the January 6th Attack on the United States Capitol.  As part of its investigation, and pursuant to section 2205 of the Presidential Records Act (PRA), the Select Committee has requested that the National Archives and Records Administration (NARA) provide to the Select Committee documents from the Executive Office of the President and the Office of the Vice President that are in NARA's possession and that are potentially relevant to the Select Committee's investigation of the January 6 attack and, more broadly, efforts by former President Trump and others to undo the results of the 2020 presidential election.

Over the last two months, NARA has provided several batches of records responsive to the Select Committee's request to representatives of the former and incumbent Presidents for review consistent with the PRA and its implementing regulations and executive order.  Some of those records are of the type that would be subject to the presidential communications component of executive privilege and, in the ordinary course, would be kept confidential for a term of years after a President's departure from office in order to encourage full and frank advice to current and future Presidents. This, however, is not the ordinary case.  In light of the extraordinary circumstances underlying the Select Committee's investigation, and after consideration of the former President's assertions of privilege, President Biden concluded that the Select Committee's need for the information provided in the initial batches of records outweighs the Executive Branch confidentiality interests underlying the privilege, and that an assertion of executive privilege is neither justified nor in the best interests of the Nation.  This suit followed.

Plaintiff's motion for preliminary injunctive relief should be denied for several reasons.  First, he is unlikely to succeed on his claims.  As the Supreme Court has held, the incumbent is best

positioned to evaluate the long term interests of the Executive Branch, including to balance the benefits of disclosure against any marginal reduction in the ability of future Executive Branch advisors to provide full and frank advice as a result.  Plaintiff's claims of executive privilege fail because the privilege is not absolute, and here it is outweighed by Congress's compelling need for information about the extraordinary attack that occurred on the Capitol.  The Committee's investigation into the January 6 attack plainly embodies a legitimate legislative purpose; its subject is one "on which legislation could be had," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975).  The Committee's requests are pertinent to the inquiry, and the inquiry lies within the Committee's authority and jurisdiction, as conferred by the full House.  Likewise, Plaintiff's invitation to apply the stricter judicial scrutiny applicable to congressional demands for information from sitting Presidents should be rejected; Plaintiff is not the sitting President, and his assertion of privilege is counteracted by the incumbent President's determination that the public interest favors disclosure.  Nor can Plaintiff be heard to complain of the practical burden of reviewing documents responsive to the Select Committee's request, when, in reality, the number of documents and timeframes involved have been entirely manageable, and extensions for review may be granted where reasonably necessary (and indeed already have).  Lastly, Plaintiff's argument attacking the constitutionality of the PRA should be rejected because it disregards the compelling rationales supporting President Biden's determination and misinterprets the PRA.

Plaintiff also fails to make out the additional elements necessary for a preliminary injunction— whether to halt all compliance with the Select Committee's request, as he seeks, or even to delay the release of records that has already been scheduled.  He makes no showing that he personally will be injured by compliance with the Select Committee's request, and instead asserts that a voluntary release of records at the direction of the sitting President, limited to the January 6 attack, might compromise future interests in effective Executive Branch decisionmaking.  That assertion of harm is far outweighed, as the Nation's Chief Executive has himself concluded, by the surpassing public interest in a full, fair, and timely accounting of the events of January 6.  There is no basis here for a court to

second-guess the judgment of the sitting President, as only he is positioned to decide the best interests of the Executive Branch and weigh that interest against congressional need.

## LEGAL BACKGROUND

I.      **Enactment of the PRA in the Wake of the Nixon Era**

      A.      **In *Nixon v. GSA,* the Supreme Court Upheld a Statute Lodging Ownership of Presidential Records in the United States**

The historical treatment of Presidential records as the personal property of a President changed following the Watergate scandal. *See* H.R. Rep. No. 95-1487 at 5 (1978); *see also Nixon v. Adm'r of Gen. Servs.* ("*Nixon v. GSA*"), 433 U.S. 425, 431 (1977). In 1974, shortly after his resignation, former President Nixon concluded an agreement with the Administrator of General Services that would have provided for the eventual destruction of tape recordings made by the former President during his presidency. *See Nixon v. GSA*, 433 U.S. at 433. To abrogate the agreement, Congress enacted, and President Ford signed, the Presidential Recordings and Materials Preservation Act of 1974 (PRMPA) to give custody of former President Nixon's records to the National Archives, which at that time was part of the GSA, and to prohibit the destruction of the tapes or any other presidential materials. *See* H.R. Rep. No. 95-1487 at 5.

In *Nixon v. GSA*, former President Nixon brought suit to challenge the constitutionality of the PRMPA, asserting that it violated separation of powers, presidential privilege, and several personal rights. *See* 433 U.S. at 439-455. The Supreme Court rejected each argument, holding that the PRMPA was constitutional on its face. *See id.* As to the separation of powers, the Supreme Court reasoned, *inter alia*, that "[t]he Executive Branch became a party to the Act's regulation when President Ford signed the Act into law, and the administration of President Carter . . . vigorously supports . . . sustaining its constitutionality." *Id.* at 441. Moreover, the Supreme Court explained that, "in determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* at 443 (citing *United States v. Nixon*, 418 U.S. 683, 711-12 (1874)).

The Supreme Court then turned to the former President's argument that the PRMPA itself—by requiring the former President's records to be turned over to the Archivist—impermissibly undermined the presidential communications privilege, *id.* at 446, a privilege that the Court recognized as "deriv[ing] from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Id.* at 447 (citing *United States v. Nixon*, 418 U.S. at 706); *see also id.* at 449 ("the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic"). The Supreme Court first examined whether President Nixon, as a former President, could assert the privilege at all. It observed that "only the incumbent is charged with performance of the executive duty under the Constitution," and "to the extent that the privilege serves as a shield for executive officials against burdensome requests for information which might interfere with the proper performance of their duties, . . . a former President is in less need of it than an incumbent." *Id.* at 448 (citations omitted). The Court further noted that "obvious political checks" guard against potential abuse of the privilege by an incumbent President. *Id.* The Supreme Court agreed with the Solicitor General that the privilege survives a President's term in office, in light of his relationships of confidence with former advisors and the need for future advisors to provide confidential advice to a sitting President, and held that a former President possessed a residual right to assert this claim in court notwithstanding his departure from office. *Id.* at 448-49. But the fact that neither President Ford nor President Carter supported President Nixon's argument that PRMPA undermined the presidential communications privilege "detract[ed] from the weight of [former President Nixon's]" argument, because "the incumbent President is . . . vitally concerned with and in the best position to assess the present and future needs of the Executive Branch, and to support invocation of the privilege accordingly." *Id.* at 449. And on the merits, the Supreme Court held that former President Nixon's claim of privilege was outweighed by Congress's purposes in enacting the PRMPA. Among other "substantial public interests" that led Congress to enact that legislation, the Court noted "Congress's need to understand how [the] political processes [leading to former President Nixon's resignation] had in fact operated in order to gauge the necessity for remedial legislation." *Id.* at 453. The Court also

observed that "[t]he expectation of the confidentiality of executive communications . . . has always been limited and subject to erosion over time after an administration leaves office." *Id.* at 451.

Although *Nixon* v. *GSA* addressed disclosures to the Archivist, and did not itself involve any questions about whether the presidential communications privilege would protect the disclosure of particular records to Congress or to the public, it is widely understood to have established that a former President "may … be heard to assert" claims of the presidential communications privilege involving his own communications, *id.* at 439, at least in circumstances where Congress has provided for adjudication of such claims, as it has done in the Presidential Records Act.

### B.     The Presidential Records Act

In 1978, guided by the Supreme Court's reasoning in *Nixon v. GSA*,[1] Congress enacted the PRA, which changed the legal ownership of the official records of the President from private to public, and established a new statutory structure under which Presidents, and subsequently NARA, must manage the records of their Administrations.   Under the PRA, records reflecting "the activities, deliberations, decisions, and policies" of the Presidency are "maintained as Presidential records."  44 U.S.C. § 2203(a).   When a President leaves office, the Archivist "assume[s] responsibility for the custody, control, and preservation of, and access to" the Presidential records of the departing administration.  *Id.* § 2203(g)(1).   The Archivist generally must make records covered by the PRA available to the public under the Freedom of Information Act (FOIA) starting five years after the President leaves office.  *Id.* § 2204(b)(2), (c)(1); *see also* 36 C.F.R. § 1270.38.   However, the outgoing President may specify that access to records in six defined categories be restricted for up to twelve years after leaving office.  44 U.S.C. § 2204(a); *see also* 36 C.F.R. § 1270.40(a).

"Notwithstanding any restrictions on access" imposed under section 2204, the PRA specifies that Presidential records shall be made available "to either House of Congress, or, to the extent of matter within its jurisdiction, to any committee or subcommittee thereof if such records contain information that is needed for the conduct of its business and that is not otherwise available."  44

---

[1] *See* H.R. Rep. No. 95-1487 at 6 (noting that *Nixon v. GSA* "established principles that would govern legislation dealing more broadly with control of and access to Presidential papers").

U.S.C. § 2205(2)(C).[2]  Such release is "subject to any rights, defenses, or privileges which the United States or any agency or person may invoke," *id.* § 2205(2), and the statute provides that this Court "shall have jurisdiction over any action initiated by the former President asserting that a determination made by the Archivist violates the former President's rights or privileges."  *Id.* § 2204(e).  The statute does not, however, "confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President."  *Id.* § 2204(c)(2).

## II.    NARA's Process for Releasing Presidential Records to Congress

Under NARA regulations and Executive Order 13489, after receiving a special access request from a congressional committee or subcommittee under PRA section 2205 and identifying records that NARA believes are responsive, NARA notifies the representatives of the former and incumbent Presidents (collectively, the "PRA Representatives") of its intent to disclose the records to the requesting committee.    The former and incumbent Presidents, acting through their PRA Representatives, are then given an opportunity to review the records and decide whether to assert a constitutionally-based privilege such as executive privilege.  *See* Laster Decl. ¶ 6, filed herewith.[3]  The presumptive review period is 30 calendar days, *see* 36 C.F.R. § 1270.44(d); *see also* Exec. Order No. 13489, 74 Fed. Reg. 4669, § 2(b) (Jan. 12, 2009), but NARA's regulations provide that "[t]he Archivist may adjust any time period or deadline under this subpart, as appropriate, to accommodate records requested under this section."  *See* Laster Decl. ¶ 8 (quoting 36 C.F.R. § 1270.44(g)).

NARA first notifies the PRA representatives of the former President, and then notifies the representative of the incumbent President approximately one week later, allowing the representatives of the former President to continue their review while the incumbent's review is still ongoing.  *Id.* ¶ 8.  Depending on the volume and complexity of the records and the need and expectations of the requesting congressional committee, NARA may extend the period allowed for review by either or both PRA Representatives beyond the prescribed time period, as part of the accommodation process

---

[2] NARA refers to requests under section 2205 as "special access requests," as distinct from "public access requests," which remain subject to the restrictions imposed under section 2204.  *See* Laster Decl. ¶ 5.

[3] Mr. Laster serves as the Director of the White House Liaison Division of NARA's Office of Legislative Archives, Presidential Libraries, and Museum Services.  Laster Decl. ¶ 1.

with the committee.  *Id.*  In addition, under Executive Order 13489, the incumbent President or his designee may instruct the Archivist "to extend the time period for a time certain[.]"  *Id.* (quoting Exec. Order No. 13489, § 2(b)).  Also, depending on the complexity of the search and the volume of potentially responsive records, NARA may provide notifications to the PRA Representatives on a rolling basis.  *Id.* ¶ 9.  Similarly, NARA may allow the PRA Representatives to conduct their review of records subject to a notification in subsets, through rolling disclosures to the requesting committee, while the PRA Representatives continue to review the remaining records.  *Id.*[4]

If a former President asserts a claim of privilege, the Archivist consults with the incumbent President within 30 calendar days "to determine whether the incumbent President will uphold the claim."  36 C.F.R. § 1270.44(f)(1).  As relevant here, if the incumbent President does not uphold the claim asserted by the former President, the Archivist discloses the Presidential record 60 days after the Archivist received notification of the former President's claim of privilege unless a court order directs the Archivist to withhold the record.  *Id.* § 1270.44(f)(3); *see also* Exec. Order No. 13489, § 4(b) (providing that the Archivist shall abide by the incumbent President's determination as to a privilege assertion by a former President unless otherwise directed by a final court order, and that the Archivist "shall notify the incumbent and former Presidents of his determination at least 30 days prior to disclosure of the Presidential records").  As noted above, however, the regulations provide that "[t]he Archivist may adjust any time period or deadline" arising as part of this process, as appropriate.  *See* Laster Decl. ¶ 8 (quoting 36 C.F.R. § 1270.44(g)).

## FACTUAL BACKGROUND

### I.   The January 6 Attack on the United States Capitol

In the afternoon of January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate ("the Joint Session") convened in the United States Capitol, with then-Vice President Michael R. Pence, in his constitutional role as President of the

---

[4] In the course of their review, the PRA Representatives may seek clarification from NARA on whether specific records are responsive to a request.  Laster Decl. ¶ 10.  Upon receipt of such a request for clarification, NARA will examine the record(s), considering the issues raised by the PRA Representatives.  *Id.*  If NARA agrees that a record is not responsive, the record is withdrawn from the notification process and is not provided to the committee.  *Id.*

Senate, presiding.  Congress's purpose that day was to certify the results of the Electoral College vote of the 2020 U.S. Presidential Election.  According to a recent report by the Senate Committee on Homeland Security and Government Affairs and the Committee on Rules and Administration, as the Joint Session was getting underway, a large crowd amassed outside the Capitol perimeter, some in "full tactical gear" or with weapons.  Staff Report, *Examining the U.S. Capitol Attack:  A Review of the Security, Planning, and Response Failures on January 6*, U.S. Senate Comm. on Homeland Security and Gov. Affairs & Comm. on Rules and Adm., at 23, 28-29 (June 8, 2021) (HSGAC Report);[5] *see also id.* at 22 (describing reports of "what look[ed] like a wall of people [who] suddenly arriv[ed] about a block west of the Capitol").  Earlier that day, during his 75-minute speech to a crowd of his supporters at the so-called "Save America" rally near the White House, former President Trump had "continued his claims of election fraud and encouraged his supporters to go to the Capitol."  *Id.*

"[O]verwhelmed and outnumbered," Capitol Police officers tried to maintain order as the crowd descended on the building, but the rioters forcefully and violently overran police barricades and "pressed towards the Capitol building—climbing the inaugural platform and scaling walls."  *Id.* at 24.  Certain individuals eventually "smashed through first-floor windows on the Capitol's south side, making a hole big enough to climb through," and "a stream of protestors entered, with two individuals kicking open a door to let others into the Capitol."  *Id.* at 24-25.  Inside, the "solemn process of certifying a presidential election," *United States v. Cua*, Crim. A No. 21-107 (RDM), 2021 WL 918255, at *3-4 (D.D.C. Mar. 10, 2021), was brought to a halt and members of the House and Senate, including Vice President Pence, were evacuated, HSGAC Report at 24.

According to one congressional report, these events "marked the most significant breach of the Capitol in over 200 years."  HSGAC Report at 21.  The attack "resulted in multiple deaths, physical harm to over 140 members of law enforcement, and terror and trauma among [congressional] staff, institutional employees, press and Members."  H. Res. No. 503, 117th Cong., 1st Sess., at 1 ("House Resolution 503" or "H. Res. 503"); *see also* HSGAC Report at 29 (describing injuries to law

---

[5]    Available   at   https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.CapitolAttack.pdf.

enforcement officers). Speaking to the House Appropriations Committee, the Architect of the Capitol described how the inauguration platform his team had been assembling was "wrecked, there was broken glass and other debris, sound systems and other photography equipment was damaged beyond repair or stolen," and "precious artwork," including "[s]tatues, murals, historic benches and original shutters" were damaged from pepper spray, other chemicals, and fire extinguishers. *Stmt. of the Hon. J. Brett Blanton*, Hearing on Health and Wellness of Employees and State of Damage and Preservation as a Result of January 6, 2021 (Feb. 24, 2021).[6] As Judge Moss put it, the attack was "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *Cua*, 2021 WL 918255, at *3.

## II.     The Establishment of the Select Committee and the Instant Request to NARA

In the aftermath of the events of January 6, the House passed House Resolution 503, establishing the Select Committee. *See* H.R. 503 § 1.[7] The Select Committee was tasked with "investigat[ing] and report[ing] upon the facts, circumstances, and causes relating to" the events of January 6, "including facts and causes relating to the preparedness and response of the United States Capitol Police and other . . . law enforcement agencies, . . . as well as the influencing factors that fomented such an attack on American representative democracy while engaged in a constitutional process." *Id.* § 3(1).[8] To that end, H.R. 503 authorizes the Select Committee to inquire into a range of matters relevant to January 6, including "dissemination and information sharing among the branches and other instrumentalities of government," *id.* § 4(a)(1)(A); "how technology, including online platforms, . . . may have factored into the motivation, organization, and execution" of the January 6 attack, *id.* § 4(a)(1)(B); and the federal government's "structure, coordination, operational

---

[6]     Available at https://www.aoc.gov/sites/default/files/2021-03/AOC_Testimony_House_Hearing-2021-02-24.pdf.

[7] Available at https://www.congress.gov/bill/117th-congress/ house-resolution/503/text.

[8] The select committee is also tasked with "examin[ing] and evaluat[ing] evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances surrounding" the January 6 attack, and "build[ing] upon the investigations of other entities and avoid[ing] unnecessary duplication of efforts" of other committees regarding January 6. *See* H.R. 503 § 3(2)-(3).

plans, policies, and procedures, . . . particularly with respect to detecting, preventing, preparing for, and responding to" the January 6 attack, *id.* § 4(a)(2)(B).

On August 25, 2021, the Select Committee submitted a special access request to NARA under section 2205(2)(C) of the PRA for production of several categories of records in furtherance of the Committee's investigation.[9]   *See* Laster Decl. ¶ 13 (citing Attachment B thereto).   The Select Committee's request sought materials relating to the January 6, 2021 events—whether in written communications, calendar entries, videos, photographs, or other media—shedding light on the events that occurred on that date, including materials relating to the President's remarks, the rally and subsequent march, the violence at the Capitol, and the response thereto within the White House.   *See id.* Attach. B, at 2-4.   The request further sought materials from specified timeframes within 2020–2021 related to any planning by the White House and others to impede the January 6 electoral count, *id.* at 4-7; preparations for the rallies leading up to the January 6 violence, *id.* at 7-8; information former President Trump received regarding the election outcome, *id.* at 9-10; and former President Trump's public remarks regarding the election outcome and the validity of the election system more broadly, *id.*   Finally, for a specified timeframe surrounding the 2020 election, the request sought documents and communications of the President and certain of his advisors relating to the transfer of power and obligation to follow the rule of law, including with respect to actual or potential changes in personnel at certain Executive Branch agencies, and relating to foreign influence in that election.   *Id.* at 10-12.[10]

Citing the urgent nature of its request, the Select Committee asked that NARA expedite the consultation and processing times for its production of responsive records pursuant to 36 C.F.R. § 1270.44(g), Laster Decl., Attachment B, which provides that "[t]he Archivist may adjust any time period or deadline under this subpart . . . to accommodate records requested under this section."

In response to the Select Committee's request, NARA began searches of the Trump Presidential records within its custody and control.   Laster Decl. ¶ 14.   While the search for and review

---

[9] That August 25 request subsumed a request dated March 25, 2021 from the House Committee on Oversight and Reform and five other House Committees.   *See* Laster Decl. ¶ 13 (citing Attachment A thereto); *id.* Attachment B at 2.

[10]   None of the records requested by the Select Committee is subject to public access requests under section 2204 of the PRA.

of responsive records remains ongoing, *see id.* ¶¶ 14, 15, NARA has thus far identified four tranches of responsive records and, on a rolling basis, provided notifications to the current and former Presidents' PRA Representatives of its intent to disclose those materials.  *See id.* ¶¶ 16, 21, 22, 27. First, on August 30, 2021, NARA notified Plaintiff's PRA representatives of its intent to disclose approximately 136 pages of records responsive to the Committee's request (the "First Notification"). *Id.* ¶ 16.  On October 8, 2021, the Counsel to President Biden responded that the President had determined that "an assertion of executive privilege is not in the best interests of the United States, and therefore is not justified as to any of" the records subject to NARA's notification. Laster Decl., Attachment D. As the Counsel's letter explained, "Congress is examining an assault on our Constitution and democratic institutions provoked and fanned by those sworn to protect them, and the conduct under investigation extends far beyond typical deliberations concerning the proper discharge of the President's constitutional responsibilities.  The constitutional protections of executive privilege should not be used to shield, from Congress or the public, information that reflects a clear and apparent effort to subvert the Constitution itself." *Id.*

After Plaintiff asserted a constitutionally-based privilege over 39 pages in the first batch of records,[11] *id.* ¶ 17—and President Biden indicated he would not uphold that privilege claim—the Archivist informed Plaintiff that NARA would disclose the records in the First Notification subject to Plaintiff's claim of privilege to the Select Committee on November 12, 2021, per 36 C.F.R. § 1270.44(g), absent any intervening court order.  *Id.* ¶ 19.[12]

On September 9 and 16, 2021, respectively, NARA sent Plaintiff's PRA representatives its Second and Third Notifications, informing them of its intent to disclose 888 pages of additional material.  *Id.* ¶¶ 21, 22.[13]  NARA subsequently withdrew three pages from the Second Notification

---

[11] Plaintiff's letter also asserted privilege over the seven pages of non-responsive records that had been withdrawn from the notification.  *See* Laster Decl. ¶ 17.

[12] On October 13, 2021, NARA disclosed to the Select Committee the 90 pages of records in the First Notification that were not subject to any claim of privilege.  *See* Laster Decl. ¶ 20.

[13] On October 17, 2021, the incumbent's review period for the Second Notification was extended to coincide with the end of the review period for the Third Notification.  Laster Decl. ¶ 23.  The PRA Representatives of former President Trump were afforded the same extension.  *Id.*

because they were not Presidential records. *Id.* ¶¶ 24. After Plaintiff asserted a constitutionally-based privilege over 724 of the pages subject to the Second and Third Notifications, *id.*—and President Biden indicated that, for the reasons previously explained, he would not uphold that privilege claim—the Archivist informed Plaintiff that NARA would disclose the records in those notifications subject to Plaintiff's claim of privilege to the Committee on November 26, 2021, per 36 C.F.R. § 1270.44(g), absent any intervening court order. *Id.* ¶¶ 25-26.

On October 15, 2021, NARA provided the Fourth Notification to Plaintiff's PRA representatives of its intent to disclose approximately 551 pages of records responsive to the Select Committee's request. *Id.* ¶ 27. The review period for that batch of records is ongoing. NARA anticipates providing multiple additional notifications on a rolling basis as its search and review locates additional responsive records. *Id.* ¶ 28.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted), and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must establish by "clear evidence" that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20. The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The "first and most important factor" is whether the moving party has "established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The Supreme Court has also stressed, however, that a preliminary injunction cannot issue based on based on a mere "possibility" of harm. *Winter*, 555 U.S. at 22. Rather, as long held in this Circuit, the moving party must establish that the claimed injury is "both certain and great," "actual and not theoretical." *E.g.*, *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).

## ARGUMENT

I.    **Plaintiff Is Unlikely to Succeed on the Merits of His Claims**

    A.    **A Former President's Residual Right Recognized in *Nixon v. GSA* Is Confined to Executive Privilege**

"[T]he 'executive Power'—all of it—is 'vested in a President,'" who has been elected by the people and "must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1, cl. 1 & § 3)). The Executive Branch's exercise of its constitutional prerogatives "acquires its legitimacy and accountability" from this structure. *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 498 (2010). Plaintiff, however, is no longer the President, and he lacks general authority to speak for the Executive Branch or to assert its interests. Only the "incumbent is charged with performance of the executive duty under the Constitution" and is situated to protect Executive Branch interests while still being subject to "political checks against . . . abuse" of that power. *Nixon v. GSA*, 433 U.S. at 448. Accordingly, "it is the new President"—not his predecessor—"who has the information and attendant duty of executing the laws in the light of current facts and circumstances," and "the primary, if not the exclusive" duty of deciding when the need of maintaining confidentiality in communications "outweighs whatever public interest or need may reside in disclosure." *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977).

    In *Nixon v. GSA*, the Supreme Court recognized a single residual right of a former President: he may assert "the privilege recognized in *United States v. Nixon*, [418 U.S. 683 (1974)]" that is, the presidential communications privilege. 443 U.S. at 449; *see also id.* at 440. This residual right to assert the privilege—subject to potential repudiation by the incumbent President and, ultimately, judicial review—exists "for the benefit of the Republic," rather than for the former "President as an individual," *id.* at 449, and is rooted in the qualified "assurance of confidentiality" the President provides his advisors in the interest of eliciting from them "the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Id.* at 448-49. The privilege thus "survives the end of the President's tenure" and can be asserted by a President after he has departed from office. *Id.* But that residual right to assert executive privilege after departure from office is

premised in the same concerns that underlie the privilege itself: "the need . . . to ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge." *In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997). And in evaluating the assertion of that interest, it "is of cardinal significance" that a "claim of privilege is being urged solely by a former president, and there has been no assertion of privilege by an incumbent president[.]" *Dellums*, 561 F.2d at 247.

Plaintiff seeks to expand the residual interest recognized in *Nixon v. GSA* well beyond any principled application. Indeed, many of his arguments do not properly relate to the presidential communications privilege at all, but rather attack the legitimacy of the congressional investigation into the January 6 attack. Thus, he spends the bulk of his motion arguing that the Select Committee is a "political ploy," wholly engaged in a "vexatious fishing expedition" and serving no legitimate legislative purpose. Pl.'s Mot. at 1-2, 15-27, ECF No. 5-1. But the premise of these arguments—that he may attack the Archivist's decision on any legal ground because "the law allows [a] person whose information will be exposed to sue in federal court," *id.* at 15—is wholly misplaced.

The United States "retain[s] complete ownership, possession, and control" of the records of a former President. 44 U.S.C. § 2202; *see also Nixon v. GSA*, 433 U.S. at 459 (distinguishing between former President Nixon's "private communications" and records reflecting "the official conduct of his Presidency"). As a former President, Plaintiff therefore retains only the residual right recognized in *Nixon v. GSA*, 433 U.S. at 448-49, and the right to assert his own personal "rights or privileges," if any. 44 U.S.C. § 2204; *see also Nixon v. GSA*, 433 U.S. at 455-83 (analyzing former President Nixon's assertion of personal rights, including privacy and First Amendment associational rights).[14] But nothing in the PRA "expand[s] any constitutionally-based privilege which may be available to" him in

---

[14] Plaintiff does not appear to invoke his personal rights or privileges. He makes conclusory assertions of attorney-client privilege and attorney work product, but he appears to do so as a species of executive privilege. *See, e.g.*, Pl.'s Mot. at 3 (referring indiscriminately to "various privileges," including "conversations with (or about) foreign leaders, attorney work product, the most sensitive national security secrets, along with a litany of privileged communications among a pool of potentially hundreds of people."); *id.* at 5 (referring without elaboration to "executive privilege and attorney-client privilege"); *id.* at 30 (referring to deliberative process privilege and attorney-client privilege in the same discussion relating to "the President"). In any event, Plaintiff does not elaborate on these claims with sufficient detail to assess them. *See Barenblatt v. United States*, 360 U.S. 109, 112 (1959) (the congressional "power [of inquiry] and the right of resistance to it are to be judged in the concrete, not on the basis of abstractions.").

his capacity as a former President, 44 U.S.C. § 2204(c)(2), or confers a generalized right to resist disclosure of official records to Congress.  On the contrary, the PRA presumes that the restricted records of a former President will be available to Congress for its work, absent a countervailing privilege or right, 44 U.S.C. § 2205(2)(C), and that the incumbent President has the final word over whether to uphold a constitutionally-based claim of executive privilege, absent a contrary court order, 44 U.S.C. § 2208(c)(2)(C) ("If the incumbent President determines not to uphold the claim of privilege asserted by the former President, or fails to make the determination[,]  . . . the Archivist shall release the Presidential record," absent a court order).  Thus, beyond Plaintiff's limited ability to assert executive privilege, as recognized in *Nixon v. GSA*, there is no authority to permit him to assert other interests of the Executive Branch, which remain the sole prerogative of the current President to assert.

\*       \*       \*       \*

As to executive privilege, as explained further below, Plaintiff provides no meaningful analysis as to why any privilege attaching to the specific documents at issue should not give way.  President Biden's determination not to assert or uphold executive privilege here is manifestly reasonable in the face of a congressional investigation into the extraordinary events of January 6.  The incumbent President's judgment plainly outweighs the Executive Branch interest in confidentiality on which Plaintiff relies.  Having little to say about the balance of interests, then, Plaintiff focuses his attention on the validity of the legislative inquiry itself, including the legislative purpose and the pertinence of the request to the investigation.  We first dispense with these threshold challenges, and then return to the issue at hand:  the assertion of executive privilege over certain enumerated documents and the balancing of respective interests.  And that balance is clear:  President Biden's sober determination that the public interest requires disclosure is manifestly reasonable, and his to make.

**B.      The Select Committee's Purposes Are Legitimate and Compelling**

**1.      Congress's Power of Inquiry Is Broad as Long as It Is Exercised for a "Legitimate Legislative Purpose"**

Plaintiff's challenges to the legitimacy and propriety of the Committee's request fail.  The Supreme Court has long recognized that the "power of inquiry" is "an essential and appropriate

15

auxiliary to the legislative function." *Trump v. Mazars*, 140 S. Ct. 2019, 2031 (2020) ("*Mazars III*") (citing *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927)); *see also Eastland*, 421 U.S. at 504 ("the power to investigate is inherent in the power to make laws"). This power belongs to each of the two houses of Congress independently, *see McGrain*, 273 U.S. at 173, and is rooted in the understanding that a "legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change[.]" *Id.* at 175. The power encompasses, among other things, "inquiries into the administration of existing laws, studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.'" *Mazars III*, 140 S. Ct. at 2031 (citing *Watkins v. United States*, 354 U.S. 178, 187 (1957)); *see also* Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch, 9 Op. O.L.C. 60, 60 (1985) (it is "beyond dispute" that Congress may obtain information "pertinent to possible legislation and in order to evaluate the effectiveness of current laws").

The Congressional power of inquiry is "broad," but it is not unlimited. *Mazars III*, 140 S. Ct. at 2031. Its exercise must serve a "valid legislative purpose" in that it must be "related to, and in furtherance of, a legitimate task of the Congress," typically in the sense that it "concern[s] a subject on which legislation could be had." *Id.*[15] A congressional subpoena may not, therefore, be used for impermissible purposes, such as for "law enforcement" or to "try someone before [a] committee for any crime or wrongdoing." *Id.* at 2032. Also, Congress "has no general power to inquire into private affairs" or to use compulsory process to "compel disclosures" simply to "expose for the sake of exposure." *Id.* Nevertheless, while an inquiry into private matters must be "justif[ied] in terms of the functions of the Congress," *Watkins*, 354 U.S. at 187, an inquiry is not illegitimate simply because it calls for information that is private or confidential, that might be embarrassing, or that could have law enforcement implications. *See, e.g.*, *id.* at 198 (Congress may "compel disclosure of private matters");

---

[15]   Congress possesses legitimate functions beyond the enactment of legislation, such as the authority of each House to determine the rules of its proceedings, U.S. Const. art. I, § 5, and Congress's responsibility to certify electoral votes in a presidential election, *id.* art. II § 1. These functions are implicated here, where the events of January 6 occurred on Capitol grounds during a Joint Session to certify electoral results.

*Townsend v. United States*, 95 F.2d 352, 361 (D.C. Cir. 1938) (the fact that a Congressional inquiry might seem "incompetent, irrelevant," "embarrass[ing]," or even "impertinent" is generally immaterial). And, in assessing the legitimacy of a legislative purpose, "the proceedings of the houses of Congress, when acting upon matters within their constitutional authority" are entitled to a "presumption in favor of regularity." *Barry v. U.S. ex rel. Cunningham*, 279 U.S. 597, 619 (1929).

### 2. The Select Committee's Legislative Purposes Are Manifestly Legitimate.

The Select Committee's request easily conforms to these requirements. H.R. 503, which established the Committee and the subject matter within its purview, explains that "January 6, 2021, was one of the darkest days of our democracy, during which insurrectionists attempted to impede Congress's Constitutional mandate to validate the presidential election and launched an assault on the United States Capitol Complex that resulted in multiple deaths, physical harm to over 140 members of law enforcement, and terror and trauma among [congressional] staff, institutional employees, press and Members." H. Res. 503 at 1. Citing the testimony of law enforcement officials at the Federal Bureau of Investigation and the United States Capitol Police, it elaborates that the events of that day were connected to "ideologically-motivated violent extremists with objections to the exercise of governmental authority and the presidential transition . . . fueled by false narratives [that] could continue to mobilize to incite or commit violence," *id.*, and that these threats "remain constant," *id.* at 2. And to understand and respond to these threats, and prevent their recurrence, the Resolution outlines several purposes and functions of the Select Committee:

- To investigate and report upon: (1) "the facts, circumstances, and causes relating to" the attack and "the interference with the peaceful transfer of power"; (2) the "activities of intelligence agencies, law enforcement agencies, and the Armed Forces, . . . with respect to intelligence collection, analysis, and dissemination" surrounding the attack; and (3) the "influencing factors that contributed to the" attack, including how "online platforms, financing, and . . . campaigns may have factored into [its] motivation, organization, and execution," *id.* ¶¶ 3, 4(a)(1);

- To "identify, review, and evaluate the causes of and the lessons learned from the" attack, including as to "the command, control, and communications of" law enforcement and the coordination and planning of the Federal Government, *id.* ¶ 4(a)(2); and

- To "issue a final report to the House" with "recommendations for . . . changes in law, policy, [or] procedures . . . that could be taken[ ] to prevent future acts of violence, domestic

terrorism, and domestic violent extremism, including acts targeted at American democratic institutions" . . . and "strengthen the security and resilience of" American democratic institutions, *id.* ¶ 4(a)(3), (c).

Plaintiff concedes that these purposes and functions "are topics on which legislation theoretically 'could be had.'" Pl.'s Mot. at 19, and he is right. Congress could move in numerous legislative directions based on the Select Committee's findings and recommendations. Congress might, for example, enact or amend criminal laws to deter and punish violent conduct targeted at the institutions of democracy. Congress might impose structural reforms on Executive Branch agencies to prevent their abuse for antidemocratic ends. Congress could also address resource allocation and intelligence sharing by federal agencies charged with detecting, and interdicting, foreign and domestic threats to the security and integrity of our electoral processes. These are just a few examples of potential reforms that Congress might, as a result of the Select Committee's work, conclude are necessary or appropriate to securing democratic processes, deterring violent extremism, protecting fair elections, and ensuring the peaceful transition of power.

But to identify effective reforms, Congress must first understand the failures that led to the events of January 6. Doing so includes understanding what happened before and on January 6, including whether and how the actions of then-presidential advisors, other government officials, and Plaintiff himself were implicated in the events, and how, if at all, those individuals used their power and influence to promote, foment, prevent, quell, or otherwise respond to the attack and the events that gave rise to it. It therefore is not necessary for Congress to have "identif[ied] a single piece of legislation . . . [it] is considering." *Id.* at 17. Congress's investigative authority encompasses any subject on which "legislation *may* be had," *Trump v. Mazars*, 940 F.3d 710, 723 (D.C. Cir. 2019) ("*Mazars II*"), *vacated and remanded on other grounds*, 140 S. Ct. 2019 (2020) (emphasis in original), that is, any area "in which [Congress] may potentially legislate," *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). "[T]he House is under no obligation to enact legislation after every investigation," *Mazars II*, 940 F.3d at 727, and it need not "shoot[] in the dark" by developing legislation before educating itself on the facts. *Mazars III*, 140 S. Ct. at 2031; *see also In re Chapman*, 166 U.S. 661, 670 (1897) ("it [is] certainly not necessary" to identify future legislation "in advance"). Nor must the Select Committee "identify"—

18

before it has seen the records—the specific materials that will "advance or inform [its] legitimate legislative purpose or specific legislation." Pl.'s Mot. at 17. The only relevant question is whether the Select Committee is seeking "data to be used by the House or the Senate in coping with a problem that falls within its legislative sphere." *Watkins*, 354 U.S. at 206.

The Select Committee's request here plainly clears that hurdle. The Committee is endeavoring to "investigate and report upon the facts, circumstances, and causes" of a serious attack on the operations of the Federal Government, expressly to devise and recommend legislative and other changes to "prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions." H. Res. 503 §§ 3(1), 4(c)(1). That is plainly a legitimate legislative purpose and is all the more compelling because the attack was targeted at Congress itself. The Select Committee is therefore seeking data to cope with problems that fall squarely "within its legislative sphere." *Watkins*, 354 U.S. at 206.

Plaintiff's assertion that the Select Committee is "fishing" for information designed solely to "embarrass" him and expose "sensitive and privileged communications 'for the sake of exposure,'" Pl.'s Mot. at 17, similarly fails. The Committee has ample basis to conclude that Presidential records responsive to its requests will include information directly relevant to its investigation, and those requests have been identified by NARA with particularity. *See* Laster Decl. ¶¶ 30, 32, 33. Plaintiff spoke at the rally directly preceding the attack in which he (1) reiterated claims, rejected by numerous courts, that the election was "rigged" and "stolen"; (2) urged then-Vice President Pence, who was preparing to convene Congress to tally the electoral votes,  to "to do the right thing" by rejecting certain states' electors and declining to certify the election for President Biden; and (3) told protesters to "walk down to the Capitol" to "give them the kind of pride and boldness that they need to take back our country" and to "peacefully and patriotically make your voices heard" because "you'll never take back our country with weakness."[16]

---

[16]   *See* Transcript of Former President Trump's Remarks on Jan. 6, 2021, https://www.cnn.com/2021/02/08/politics/trump-january-6-speech-transcript/index.html

These are not the only facts justifying a congressional investigation into the involvement of Plaintiff and his allies and advisors in the events of January 6.  According to the Select Committee, Stephen Bannon, once Plaintiff's Senior Counselor and a longtime ally, "encourage[d] Mr. Trump to 'focus on January 6th' [as] a plan to have millions of Americans consider [President] Biden [as] an illegitimate President," and made "frequent contact with the White House" in the weeks and days leading up to the attack, even speaking "directly with [Plaintiff] several times."  H.R. Rep. No. 117-152, at 6 (Oct. 19, 2021).  The Select Committee has stated that shortly before the attack, Mr. Bannon set up a "war room" at the Willard InterContinental Washington D.C. Hotel two blocks from the White House with prominent members of Plaintiff's campaign team to "discuss[] plans to stop or delay the January 6th counting of election results or persuade Members of Congress to block the electoral count."  *Id.* at 3, 7.  Mr. Bannon also allegedly "urged [Plaintiff] to pressure then-Vice President Pence to assist in overturning the results of the 2020 election."  *Id.* at 6.  And in public statements the day before the attack, Mr. Bannon allegedly stated that the constitutional "crisis [was] about to go up about five orders of magnitude tomorrow" and that "[a]ll hell [was] going to break loose tomorrow."  *Id.* at 5; *see also id.* at 6 (quoting Mr. Bannon as stating on January 5 that "[i]ts all converging, and now we're on the point of attack tomorrow").

Thus, the Select Committee has identified more than sufficient reason to probe, among other things: (1) what, if anything, Plaintiff, his advisors, other government officials, and those close to him knew about the likelihood of the protest turning violent; (2) when they knew it; (3) whether they sought to encourage or prevent it and the actions they took in response; and (4) how if at all their actions facilitated, exacerbated or led to the violence that overtook the protest.  Far from "fishing," or looking to the former President and his advisors as a "case study," *Mazars III*, 140 S. Ct. at 2036, the Select Committee is investigating known events involving the White House and relating to a singular attack on the Capitol.

For similar reasons, Plaintiff fails to demonstrate that the Select Committee is improperly seeking exposure of his Presidential records purely for the sake of exposure.  *See* Pl.'s Mot. at 17.  The Committee's investigation of a domestic attack on the Capitol and its connection to the Office of the

President is indisputably a "matter of concern to the United States," not "merely . . . private or personal affairs." *Sinclair v. United States*, 279 U.S. 263, 294 (1929), *overruled on other grounds*, *United States v. Gaudin*, 515 U.S. 506 (1995).

Plaintiff's complaint that some committee members may hope to "embarrass[]" or "expos[e]" him and his staff, Pl.'s Mot. at 17, is not a valid objection. The Supreme Court has long held that so long as Congress acts in furtherance of its legislative objectives, as it has done here, the mere fact that some members may hope the investigation will prove embarrassing to its subject is not an obstacle to disclosure. *See Barenblatt*, 360 U.S. at 132 (emphatically rejecting similar "contention that this investigation should not be deemed to have been in furtherance of a legislative purpose because the true objective of the Committee and of the Congress was purely 'exposure,'" and holding that "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power"); *Eastland*, 421 U.S. at 508 ("in determining the legitimacy of a congressional act," courts may "not look to the motives alleged to have prompted it"). Indeed, in *Watkins*, the Supreme Court rejected an identical exposure argument notwithstanding an "impressive array of evidence that some Congressmen have believed that [exposure] was their duty, or part of it," because "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." 354 U.S. at 199-200 & n.32. Here too, any allegation of improper motive does not override the legislative purpose of the inquiry.

Plaintiff also is wrong to attack the Select Committee's investigation as a "law-enforcement task" purportedly "reserved to the executive and judicial branches." Pl.'s Mot. at 17. The Select Committee is investigating the circumstances around the January 6 attack to develop and propose legal and policy changes, *see* H. Res. 503 § 4(a)(3), (c)(1)-(3), and the fact that its inquiry also "might . . . disclose crime or wrongdoing" is not a "valid objection." *McGrain*, 273 U.S. at 180; *see also Sinclair*, 279 U.S. at 295 (Congress's "authority . . . to require pertinent disclosures in aid of its own constitutional power is not abridged" merely "because the information sought to be elicited may also

be of use" in criminal prosecutions). In *Mazars*, the D.C. Circuit applied these principles to hold that a legislative inquiry was "not transform[ed] . . . [into] a law-enforcement endeavor" simply because it "might expose criminal conduct," "easily reject[ing]" Plaintiff's arguments to the contrary. *Mazars II*, 940 F.3d at 724, 728; *see also Hutcheson v. United States*, 369 U.S. 599, 617-18 (1962) (concluding that a Senate committee's investigation into illegal conduct did not vitiate the legitimate purpose of considering remedial federal legislation). And in *Sinclair*, the Congressional resolution at issue expressly cited evidence of "fraud" as a basis for the congressional inquiry, 279 U.S. at 289, yet the Court concluded that the purpose of the inquiry was not law enforcement in light of Congress's "plenary power . . . to make all needful rules and regulations respecting the" subject matter at issue and to "investigate the actual administration of the . . . laws." *Id.* at 294-95. The same conclusions follow here. The Committee is investigating the facts, circumstances, and causes of an attack on Congress's own institutions and proceedings, and the fact that some of the information at issue might also be the subject of a law-enforcement inquiry or that individual committee members may have referred to "the former President's crimes," Pl.'s Mot. at 17 n.6, does not transform the Committee's legislative purpose into a law enforcement undertaking.

### 3. The *Mazars* and *Senate Select Committee* Standards Do Not Apply

Unable to demonstrate that the Select Committee's request is invalid, Plaintiff invokes the standards for evaluating legislative purpose articulated in *Mazars* and the different standard articulated by the D.C. Circuit in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974). *See* Pl.'s Mot. at 20-25, 32-34. Those arguments are misplaced.

In *Mazars*, the Supreme Court considered subpoenas for Plaintiff's personal financial information while he was still President, which Plaintiff sued to enjoin. *See* 140 S. Ct. at 2026-28. The Court concluded that the subpoenas "implicate[d] weighty concerns regarding the separation of powers," *id.* at 2035, and "unavoidably pit the political branches against one another." *Id.* at 2034. Emphasizing that two centuries of accommodation between the political branches could "be transformed" by an approach that afforded too much deference to either branch in the inter-branch

dispute over Plaintiff's financial records, *id.* at 2035, the Court articulated four non-exhaustive factors to evaluate whether the subpoena should be enforced. *See id.* at 2035-36.

This case, however, is not governed by *Mazars*. Plaintiff's claims challenge not a congressional subpoena but a request made pursuant to the PRA, which was enacted with the participation of both branches and vests the United States with ownership and control of Presidential records upon a President's departure from office, 44 U.S.C. § 2204; *see also Nixon v. GSA*, 433 U.S. at 441 (noting that separation-of-powers concerns were mitigated because "[t]he Executive Branch became a party to the Act's regulation when President Ford signed the Act into law"). The PRA expressly contemplates that such records will be disclosed to Congress where necessary for its functions. *See* 44 U.S.C. § 2205(2)(C). Relatedly, unlike in *Mazars*, where the records of a *sitting* President were sought, the Committee's request is directed to records from the Administration of a *former* President who has no authority to speak for the Executive Branch. There is no "ongoing institutional relationship" between Congress and Plaintiff, *id.* at 2033, and no "clash between rival branches of government." *Mazars III*, 140 S. Ct. at 2034.

Nor is a "*Mazars*-lite" approach appropriate here, where the Executive Branch has agreed to provide the requested documents under the PRA, and compulsory process is not at issue. On remand from the Supreme Court in *Mazars*, another member of this Court applied a relaxed version of the *Mazars* factors to the subpoenas at issue there in recognition of Plaintiff's departure from office. *See Trump v. Mazars*, 2021 WL 3602683, at *13 (D.D.C. Aug. 11, 2021) ("*Mazars IV*") (observing that because former "President Trump no longer 'alone composes a branch of government,'" the Congressional inquiry will not "'intru[de] into the operation of the Office of the President'" or "burden 'the [sitting] President's time and attention'"). This case, however, is not similarly-situated to *Mazars*. As noted above, unlike the subpoena in *Mazars*, the request here was made pursuant to a statute enacted with bicameralism and presentment, which reflects the long-standing judgment of the political branches that Congress should have access to the government-owned records of a former President as necessary for its work, absent objection by the incumbent President and subject to the narrow right of a former President to ask that a court weigh his privilege claims. Further, the request

here seeks official information owned by the United States, not personal information in the custody of a third party, and under the statutory framework established by the PRA, the Executive Branch maintains custody of the Presidential records and therefore has been able to review the records prior to making a determination about releasing them.

Plaintiff's reliance on *Senate Select Committee* fails for similar reasons. There, a special committee of the Senate issued to President Nixon, while he was still President, a subpoena for taped recordings of specified conversations with his White House Counsel. *See Senate Select Comm.*, 498 F.2d at 727. In response, President Nixon invoked executive privilege, and the D.C. Circuit determined that the committee had not overcome the invocation of privilege because it had not shown that the tapes were "demonstrably critical" to its investigation. *Id.* at 731. That conclusion was merely an application of the principle that "generally, 'application of Executive privilege depends on a weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case." *Id.* at 729 (citation omitted). It is thus rooted in the same principles embraced by *Nixon v. GSA*, that "in the case of the general privilege of confidentiality of Presidential communications, its importance must be balanced against the inroads of the privilege upon the effective functioning of" a coordinate branch. 433 U.S. at 447. But the claim of executive privilege in *Senate Select Committee* was made by a sitting President. By contrast, Plaintiff is a former President and he asserts privilege "against the very Executive Branch in whose name the privilege is invoked." 433 U.S. at 447-48. That fact strongly "detracts from the weight of his contention that the [request] impermissibly intrudes into the executive function and the needs of the Executive Branch[,] . . . for it must be presumed that the incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch." *Id.* at 449. And in light of that critical difference, the "demonstrably critical" standard adopted in *Senate Select Committee* is inapposite. *Nixon v. GSA* most closely resembles this case, and its analysis controls.

### C.    The Scope of the Select Committee's Request Does Not Exceed Its Authority.

Plaintiff next shifts focus from the purpose of the Select Committee's request to its scope. To constitute a valid exercise of Congress's investigative power, a committee's request for information

that is supported by a valid legislative purpose must also be, *inter alia,* authorized by the committee's parent House, *United States v. Rumely,* 345 U.S. 41, 42-43 (1953), and "reasonably relevant to the [committee's] inquiry," *McPhaul v. United States,* 364 U.S. 372, 381-82 (1960).  *See generally Mazars II,* 940 F.3d at 722-23, 740.  Though the purpose of the Select Committee's request is a valid one, Plaintiff nevertheless maintains that it fails to meet these additional requirements.  His complaints, however, are unfounded.

> ### 1.   The Select Committee's Request Falls Within Its Legislative Jurisdiction.

Plaintiff first issues a list of reasons why, in his view, the Select Committee's mandate to investigate the January 6 attack on our democracy does not include authority to search Presidential records.  Pl.'s Mot. at 25-27.  But none of the reasons he offers is sound.

Plaintiff initially argues that "[n]othing" in H.R. 503—the Select Committee's foundational document—"permits the Committee to request presidential records" from NARA, or even "mentions the President, the EOP, presidential records, any advisors to the President, or the Archivist."  *Id.* at 26.  This argument is readily disposed of.  H.R. 503 states expressly that the primary purpose of the Select Committee is "[t]o investigate and report upon the facts, circumstances and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex[,]" H. Res. No. 503, 117th Cong., 1st Sess., § 3(1), "as well as the influencing factors that fomented such an attack on American representative democracy while engaged in [the] constitutional process" of tabulating electoral votes and certifying the 2020 election, *id.*  The resolution defines the Select Committee's functions in like terms, as "investigat[ing] the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol," *id.* § 4(a)(1), including "influencing factors that contributed to the attack[,]" *id.* § 4(a)(1)(B), and "entities of the public and private sector[s] as determined relevant" by the Select Committee, *id.* § 4(a)(1)(C).

The Select Committee reasonably could find it necessary to investigate the extent to which the January 6 attack on the Capitol may have been an outgrowth of a sustained effort to overturn the 2020 election results, involving numerous individuals both in and outside government.  *See* August 25 Request at 4.  It could expect White House documents and communications created, sent, or received

on January 6, or relating to the events of that day, to shed light on any White House planning and strategies (1) concerning public messaging about the election, (2) to halt, delay, or otherwise affect the electoral count, and (3) to prepare for the January 6 rally.  *See* August 25 Request at 4, 7, 8, 9.  That kind of information would be material to the Select Committee's mandate to discover and report on "the facts, circumstances, and causes relating to the January 6 [attack]."  H. Res. No. 503, § 3(1).

It is no objection here that the House's resolution does not, as Plaintiff observes, expressly refer to the acquisition of White House records, Pl.'s Mot. at 26; *see also id.* at 22, or specifically "discuss[ ] authority to investigate the [EOP]," *id.* at 8.  While the House resolution identifies certain public and private entities that the Select Committee may investigate to ascertain the facts, circumstances, and causes of the January 6 attack, H. Res. No. 503 §§ 3(1), 4(a)(1)(A), (B), the resolution also extends that authority, in black and white, to any "other [public or private entities] as determined relevant by the [Select Committee]" for that investigation, *id.* §4(a)(1)(C).  Records of activities and communications within the White House related to January 6 are plainly within the scope of inquiry authorized by H.R. 503.

Plaintiff's reliance on *Watkins* is therefore misplaced.  He seeks support for his position in *Watkins'* statement that the parent House of a committee must "'spell out that [committee's] jurisdiction and purpose with sufficient particularity.'"  Pl.'s Mot. at 26 (quoting 354 U.S. at 201).  But H.R. 503 clearly does that, identifying with particularity the event and its surrounding circumstances that the Select Committee is tasked with investigating.  Thus, as *Watkins* requires, a reviewing court may "reasonably deduce from [that] charter the kind of investigation that the [Select] Committee was directed to make," 354 U.S. at 204, and the resolution is not so "nebulous" as to make it "impossible" to determine whether "the [Select] Committee has ranged beyond the area committed to it[,]" *id.* at 205.[17]

---

[17]  Plaintiff's position is also unsupported by his selective quotations from *Exxon Corp. v. FTC*, 589 F.2d 582 (D.C. Cir. 1978), and *Tobin v. United States*, 306 F.2d 270 (D.C. Cir. 1962).  *See* Pl.'s Mot. at 26.  *Exxon*'s remark that a committee "must conform strictly to the resolution establishing its investigatory powers" concerned *who* may issue subpoenas on a committee's behalf.  589 F.2d at 592.  *Tobin* held only that an unprecedented investigation undertaken by the (standing) committee in that case was "entirely foreign" to the type of investigation that the committee had been traditionally thought to be authorized to conduct.  360 F.2d at 775-76.  Neither issue is presented here.

The former President also contends that, "'[o]ut of respect for the separation of powers and the unique position of the President,'" H.R. 503 should not be construed to authorize requests for Presidential records absent an "'express statement'" to that effect. Pl.'s Mot. at 26-27 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992)). But any separation-of-powers concerns that may arise from a congressional request seeking Presidential records of a past President are necessarily resolved by striking the proper balance of interests under the *Nixon v. GSA* approach, *see supra* at 22–24, *infra* at 30–35, and so no special rule of construction is required here. Moreover, the situation here is twice removed from the circumstances in *Franklin*. The canon of construction announced in *Franklin* applies where a statute of general application is invoked as support for regulating "the President's performance of his statutory duties." 505 U.S. at 801. But a congressional request for records of a past administration does not trigger a canon of construction concerning regulation of the performance of a sitting President's official duties.

### 2. The Select Committee's Request Is Reasonably Related to the Subject Matter of Its Inquiry Concerning the January 6 Attack.

Plaintiff next appears to suggest that the Select Committee's request is not reasonably related to unearthing the facts, circumstances, and causes of the January 6 attack, contending that the Request is "shockingly," "unbelievably," "striking[ly]," "startlingly," and "incredibly" broad. Pl.'s Mot. at 15, 21, 22, 25. Plaintiff advances no legal or factual arguments to match his rhetoric.

As noted above, Plaintiff essentially concedes that the January 6 attack and related topics of investigation in H.R. 503 "are topics of investigation on which legislation theoretically could be had." Pl.'s Mot. at 19 (quotation omitted). Congress's power to investigative such matters is "necessarily broad," *Eastland*, 421 U.S. at 504 n.15; *see Quinn v. United States*, 349 U.S. 155, 160-61 (1955), "as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution," *Barenblatt*, 360 U.S. at 111. Moreover, "the investigatory process must proceed step by step." *Barenblatt*, 360 U.S. at 130. A committee must often pursue its inquiry without knowledge or intimation of the precise information a subject possesses, *see Exxon*, 589 F.2d at 591, and cannot know in advance whether the facts it seeks to discover, once revealed, will turn out to be as pertinent to its

investigation as hoped, *see, e.g., Eastland*, 421 U.S. at 506-07; *McPhaul*, 364 U.S. at 381.   Surely Congress's power of inquiry can be no less "penetrating and far-reaching" in this case than any other, *Barenblatt*, 360 U.S. at 111, where the subject of inquiry is the use of violence to subvert vital democratic processes of our Government, *see id.* at 127-32, such as the peaceful transfer of presidential power.

Considered with these established principles in mind, the Select Committee's August 25 Request rests easily within the bounds of its authority to pursue lines of inquiry that are "reasonably related" to the task of uncovering facts surrounding the January 6 attack.   As discussed, the Select Committee's request seeks records pertaining to five subjects:  (1) the events or aftermath of January 6, including but not limited to the counting of the electoral college vote, Request at 2-4; (2) planning and strategies by the White House and others to delay, halt, or otherwise impede the electoral count, *id.* at 4-7; (3) planning, coordination, and preparation for rallies leading up to and including the Save America Rally on January 6, *id.* at 7-8; (4) information that then-President Trump received, before and afterward, concerning the outcome of the 2020 election, and what he said publicly about the election's validity, *id.* at 8-10; and (5) planning, preparations, and options considered concerning the certification of the electoral vote and the forthcoming transfer of power, *id.* at 10-12.   Although the Select Committee's request is undeniably lengthy, the topics on which it focuses are certainly no broader in scope than the Select Committee's mandate to examine facts and circumstances that may have led to a violent assault on the seat of our democracy.   Indeed, as discussed above, many of the records over which the former President has asserted privilege relate to the January 6 attack, its aftermath, and events that may have led up to it, and will clearly be useful to the Select Committee's work.   *Supra* at 25-26.

Plaintiff makes no showing to the contrary, and certainly not that the Select Committee's request, in its entirety, is "plainly incompetent or irrelevant to any lawful purpose" for which the Select Committee was established.   *McPhaul*, 364 U.S. at 381 (quotation omitted).   He points repeatedly to just a single line item seeking "[a]ll documents and communications within the White House *on January 6, 2021*, relating in any way to . . . the January 6, 2021 rally," "march to the Capitol," and "violence at the Capitol," the electoral vote count, "public communications on that date" by then-President Trump

and others, and a list of Trump Administration personnel, Trump associates and advisors, and Trump family members, known or reasonably believed to have been involved with those events. *See* Request at 3-4 (emphasis added); Pl.'s Mot. at 3, 10, 21.  He criticizes this request, inaccurately, as "hav[ing] nothing to do with the events of January 6th." Pl. PI Br. 3.  But the fact is that, when exercising Congress's broad power of inquiry, the Select Committee is not obligated at the outset of its inquiry, to formulate a more targeted request for relevant information, as yet unknown to it, about the events of January 6 than to ask for documents and communications "on January 6" concerning those events, and persons reasonably believed to have been involved with them.

The same is true for the three additional line-item requests that the former President singles out for criticism, Pl.'s Mot. at 9-10, 22; *see* Request at 2, 7-8, 9.  The pertinence of these requests to the Save America Rally, to efforts beforehand to overturn the 2020 election results, and to the relationship of those events and efforts to the January 6 tabulation of the electoral vote, should require no explanation.  To condemn these requests as "utterly lacking in specificity," "invasive," and "bear[ing] no reasonable connection . . . to the Committee's charter," Pl.'s Mot. at 9-10, 22, is to advance a "constricted view of the nature of the investigatory process" that the Supreme Court has unequivocally rejected.  *Barenblatt*, 360 U.S. at 130.

Plaintiff's overbreadth objections also fail on yet another fundamental level.  Even if one or more of the specific line-item requests he has singled out could in theory be faulted as in some respects lacking a reasonable relationship to the Select Committee's assigned subject of inquiry, that would not provide ground for invalidating the Request as a whole.  To date, NARA has only identified approximately 1,600 pages of responsive documents, with many thousands more to be reviewed. Laster Decl. ¶¶ 15, 16, 21, 22, 27.  As a practical matter, none of the individual line-items included in the Request can be adjudged overbroad, or "plainly incompetent or irrelevant" to the Select Committee's investigation, *McPhaul*, 364 U.S. at 381, until more is known about the nature of any documents found responsive to them.  In *Nixon v. GSA* the Supreme Court warned against relying on "future possibilities for constitutional conflict" as a basis for making delicate judgments involving the interests of the political Branches.  433 U.S. at 444-45; *see also id.* at 449-50.  And there is no cause for

doing so here. If NARA, in the future course of its compliance with the Select Committee's request, should propose to release records that the former President believes have no bearing on the events of January 6, he will then have opportunity in the ordinary course of the accommodation process to make his case to NARA, and even to the incumbent President, that the documents either are not responsive, or are of such marginal relevance that they need not be produced. *See* Laster Decl. ¶ 10, 12. Should he fail to bring NARA, or the incumbent President, to his point of view, Plaintiff could then claim privilege and seek relief from this Court, which could then evaluate the claimed overbreadth of a particular line-item request in light of actual records viewed as coming within its terms, within the balancing set forth in *Nixon v. GSA*. Even then, the proper remedy for any perceived overbreadth would be to circumscribe, or at most excise, the particular portion of the Request in contention, not to abrogate the Request in its entirety. *See Mazars IV*, 2021 WL 3602683, at *22 (refusing to quash a committee subpoena outright on grounds of partial overbreadth).

In sum, Plaintiff's objections based on scope and relevance supply no justification for invalidating the Select Committee's Request as a whole.[18]

### D. The Court Should Defer to the Incumbent President's Reasonable Assessment that the Public Interest Requires Production to Congress

Plaintiff argues that, because the requested records "are protected by numerous legal privileges," they should not be turned over to the Select Committee. Pl.'s Mot. at 27. But the executive privilege is not absolute. Plaintiff provides no meaningful analysis as to why any privilege attaching to the specific documents at issue should not give way to a congressional investigation into one of the most extraordinary assaults on the democratic process in the history of the Nation. Moreover, the incumbent President's determination that preventing the disclosure of such records to Congress is not in the public interest carries far more weight than the assessment of his predecessor, as only the

---

[18] It follows from the foregoing analysis that Plaintiff's attempt to mount a claim under 44 U.S.C. § 2205(2)(C), Pl.'s Mot. at 27, also cannot succeed. The conditions stated therein for committee access to otherwise restricted Presidential records mirror the constitutional limitations on Congress's powers of inquiry, as set forth in the Supreme Court's precedents. And the legislative history makes clear that section 2205 "is not intended to modify the legal and constitutional rights of parties concerning the availability of presidential or executive branch records." H.R. Rep. No. 95-1487, at 17 (1978). In addition the records are not "otherwise available" because they remain restricted under the provisions of 44 U.S.C. § 2204.

incumbent is charged with the protection of Executive Branch interests. The incumbent's decision in this case not to assert or uphold privilege, including his determination that disclosure best serves the public interest, is reasonable, consistent with historical practice, and entitled to deference.

1. **An Incumbent President's Balancing of Interests Is Entitled to Great Deference**

Plaintiff asserts that the requested documents are privileged, but appears to overlook that executive privilege, while constitutionally weighty, can be overcome. *See, e.g.*, Pl.'s Mot. at 27-29; *Nixon v. GSA*, 433 U.S. at 446 ("[T]he [presidential] privilege is a qualified one"); *United States v. Nixon*, 418 U.S. at 707 (legitimate needs of the judiciary in a criminal case may outweigh presidential privilege); *Sun Oil Co. v. United States*, 514 F.2d 1020, 1023 (Cl. Ct. 1975) (presidential privilege "not absolute" even in a civil case); *Dellums*, 561 F.2d at 245 (rejecting contention that "a generalized interest in presidential confidentiality, without more, works an absolute bar to discovery of presidential conversations").

Moreover, to the extent that a former President and an incumbent President disagree on how the balancing of needs should be resolved, the Supreme Court has made clear that the incumbent's view is accorded the greater weight. "[O]nly the incumbent is charged with performance of the executive duty under the Constitution, . . . [and] there are obvious political checks against an incumbent's abuse of the privilege." *Nixon v. GSA*, 433 U.S. at 448. The decision to accommodate a congressional request for information, moreover, is one that only the incumbent President is entitled to make as part of the "hurly-burly, the give-and-take of the political process between the legislative and the executive." *Mazars III*, 140 S. Ct. at 2029. The "dynamic process" of negotiation with the legislative branch ensures that the interests of the Executive Branch are protected, as well as the public interest, which the incumbent President is entrusted by the people to protect. *See supra* at 4; *Nixon v. GSA*, 433 U.S. at 449 ("The incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch."). Indeed, in assessing the relative weight of privilege versus need, the "[a]bsence of support from the incumbent at least indicates that 'the risk

of impairing necessary confidentiality is attenuated.'" *Dellums*, 561 F.2d at 247 (quoting *Nixon v. GSA*, 408 F. Supp. at 344 (3 judge court)). *See generally supra* at 4.

Plaintiff does not acknowledge the deference owed to the incumbent President's judgment. *See generally* Pl.'s Mot. Nor does Plaintiff assess the balancing of interests that the Supreme Court prescribes through the lens of the nature of a former President's assertion of the privilege. *Nixon v. GSA*, 433 U.S. at 449. Viewed through that lens, the balance of interests weighs heavily in favor of the incumbent's decision not to shield from Congress's investigation documents that relate to its legislative inquiry into the events of January 6, irrespective of whether privilege would otherwise attach.

> **2.    President Biden Reasonably Determined that an Assertion of Executive Privilege Over the Records at Issue Was Not in the Public Interest**

Plaintiff cites the interest in Executive Branch confidentiality as the basis for his assertion of privilege, and raises the prospect of routine "post-presidency congressional subpoena[s] for personal information," Pl.'s Mot at 28 (quoting *Mazars IV*, 2021 WL 3602683, at *52). But the request at issue does not seek the former President's personal information. Rather, it seeks information belonging to the United States, about an event of paramount public interest (and within Congress's legislative power to address) and any executive privilege over these materials exists "not for the benefit of the President as an individual, but for the benefit of the Republic." *Nixon v. GSA*, 433 U.S. at 449. The incumbent President's judgment not to invoke privilege under the unique circumstances here thus "detracts from the weight" of Plaintiff's invocation of the Executive's need for confidentiality. *Id.*

Balanced against the former President's claim of privilege is President Biden's focused determination of the importance of Congress's effort to understand the full scope of the unprecedented attack that occurred on January 6, 2021. As this Court described it,

> [w]hat happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government. They erected hangman's scaffolding. They broke down doors and barriers. They destroyed property in Congress. They fought law enforcement, who were outnumbered that day, resulting in the injury and death of police officers.

Transcript of Sentencing at 24:19-25:3, *United States v. Mazzocco*, Cr. No. 21-0054-TSC (D.D.C.) (Oct. 4, 2021).  Congress is investigating how these events came to pass and what precipitated them.  *See supra* at 9-10.  The House's stated goals include statutory reform, preventing a recurrence of such an attack, protecting the electoral process and the security of Congress itself, and providing a record for itself and the American people of the full scope of the events and causes of the January 6 attack, all legitimate and important inquires within the jurisdiction of the Select Committee.  *See supra* at 9-10, 17-18.  The incumbent President's carefully arrived-at decision to provide Congress with potentially privileged documents bearing on these issues, therefore, can hardly be characterized as "exposure for the sake of exposure," or having been taken merely to wound "a political foe."  Pl.'s Mot at 34.  To the contrary, President Biden's decision was made with the sober recognition that the events of January 6 reflected an attack on the Constitution itself and a firm conviction that the constitutional protections of executive privilege should not be used to shield from Congress information relevant to its investigation into the causes and circumstances of those horrific events.

Plaintiff insists that the incumbent President has not tightly correlated each document to Congress's specific needs, nor established that each is unobtainable from another source.  *Id.* at 32-33.  But such specificity is not required of the incumbent President, who is entitled to conclude that it may not be knowable in advance the role each document may play in the Select Committee's inquiry and that the balance of interests thus lies on the side of disclosure.  *See Eastland*, 421 U.S. at 509 ("The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises"); *supra* at 27-28.

Here, each set of documents relates to Congress's inquiry and its stated needs.  In the first notification, the 39 pages of documents subject to Plaintiff's privilege assertion include daily presidential diaries, schedules, appointments showing White House visitors, activity logs, call logs, and switchboard shift-change checklists showing phone calls to the President and Vice President, all specifically for or encompassing January 6, 2021; drafts of speeches, remarks, and correspondence concerning the events of January 6, 2021; and handwritten notes concerning the events of January 6, 2021.  Laster Decl ¶ 31.  These records all relate to the events on or about January 6, and may assist

the Select Committee's investigation into that day, including what was occurring at the White House immediately before, during and after the January 6 attack.

The vast majority of documents in the second notification appear to comprise pages from multiple binders of the former press secretary, which is made up almost entirely of talking points and statements related to the 2020 election. *Id.* ¶ 33. Even assuming the applicability of executive privilege, however, the documents may assist the Select Committee in understanding efforts to communicate with the American public, including those who attacked the Capitol on January 6, on the subjects of alleged voter fraud, election security, and other topics concerning the 2020 election. A much smaller number of documents in the second notification include presidential activity calendars and a related handwritten note for January 6, 2021; draft text of a presidential speech for the January 6, 2021, Save America March; a handwritten list of potential or scheduled briefings and telephone calls concerning election issues; and a draft Executive Order concerning election integrity. *Id.* All of these documents are pertinent to the Select Committee's work, *supra*, and, like the documents in the first notification may assist the Committee in understanding the events of January 6 and how they came to occur.

The documents over which Plaintiff asserted privilege in the third notification are similarly correlated to the Select Committee's investigation. The documents in this set consist of a draft proclamation honoring deceased Capitol Police officers Brian Sicknick and Howard Liebengood, and associated e-mails from the Office of the Executive Clerk, which relate to the Select Committee's interest in the White House's response to the Capitol attack. . Laster Decl. ¶ 35. They also contain a memorandum apparently originating outside the White House regarding a potential lawsuit by the United States against several states President Biden won; an email chain originating from a state official regarding election-related issues; talking points on alleged election irregularities in one Michigan county; a document containing presidential findings concerning the security of the 2020 election after it occurred and ordering various actions; and notes apparently indicating from whom some of the foregoing were sent. These documents also fall within the articulated needs of the Select Committee, and the Committee cannot readily obtain them elsewhere, as records of the prior administration are all legally within the custody and control of NARA.

34

President Biden's determination not to assert or uphold executive privilege over the records in these three notifications—a determination entitled to great weight and deference—is manifestly reasonable in the face of a congressional investigation into what happened on January 6 and why it happened.  The incumbent President's judgment plainly outweighs the assertion of Executive Branch confidentiality on which Plaintiff relies.

> ### 3.   Past Presidents Have Also Determined that Congressional Need Outweighs the Need for Confidentiality Protected by Executive Privilege in Some Instances

President Biden's decision in this extraordinary case does not diminish the well-established importance of protecting presidential communications, *see United States v. Nixon*, *supra*, nor diminish the force of constitutionally-based privileges in the ordinary case.  Contrary to Plaintiff's contention that the incumbent's decision here is "unprecedented," Pl.'s Mot. at 2, past Presidents have declined to assert executive privilege—including the presidential communications privilege—when, in their considered judgment, Congress's need for the information outweighed the confidentiality interests that the privilege protects.  For example, President Reagan authorized testimony and the production of documents related to the Iran-Contra affair, including excerpts from the President's own diaries, and information about his communications and decision-making process.  *See Report of the Congressional Committees Investigating the Iran-Contra Affair*, H.R. Rep. No. 100-433, S. Rep. No. 100-216, at xvi (1987).

In May 1973, President Nixon directed that executive privilege not be invoked in any testimony by present or former White House staff "concerning possible criminal conduct or discussions of possible criminal conduct, in the matters presently under investigation" by the Senate Select Committee on Watergate, and also waived the attorney-client privilege to permit the testimony of his former counsel, John W. Dean III.  Statements About the Watergate Investigations (May 22, 1973), *Pub. Papers of Pres. Richard Nixon* at 547, 554 (1973).  In July 1973, President Nixon went further: Although he continued to refuse to turn over papers and tapes to the Committee, he "agreed to permit the unrestricted testimony of present and former White House staff members" before the Committee.  Letter Responding to the Senate Select Committee on Presidential Campaign Activities Request for

Presidential Testimony and Access to Presidential Papers (July 7, 1974), *Pub. Papers of Pres. Richard Nixon* 636, 637 (1973).

In 2004, President George W. Bush, along with Vice President Cheney, sat for a private Oval Office interview before the National Commission on Terrorist Attacks Upon the United States (the 9/11 Commission) to discuss the events surrounding the September 11, 2001 attacks.  According to one report, President Bush "answered every question that they asked," and the panel stated that it "found the president and the vice president forthcoming and candid" and that "'the president gave us real insights into his thinking.'"  Philip Shenon & David E. Sanger, *Bush and Cheney Tell 9/11 Panel of '01 Warnings*, N.Y. Times, Apr. 30, 2004, at A1, https://www.nytimes.com/2004/04/30/us/threats-responses-investigation-bush-cheney-tell-9-11-panel-01-warnings.html?.

And, most recently, former President Trump did not assert privilege to prevent then-former FBI Director James Comey's congressional testimony, which was expected to (and did) include Comey's recollection of conversations with the President.  *See* Peter Baker, *Trump Will Not Block Comey From Testifying, White House Says*, N.Y. Times, June 5, 2017, https://www.nytimes.com/2017/06/05/us/politics/trump-will-not-block-comey-from-testifying-white-house-says.html; *see also* Louis Nelson, *White House: Trump Will not Assert Executive Privilege to Block Comey's Testimony*, Politico (June 5, 2017). Then-President Trump also did not assert executive privilege to stop the public release of the Report of Special Counsel Robert Mueller, which included extraordinarily detailed information about presidential communications, including with President Trump's then-Chief of Staff, White House Counsel, and other senior presidential advisors.  And later in 2019, former President Trump declassified and released a rough transcript of his July 25, 2019 phone call with Ukrainian President Volodymyr Zelenskyy after a whistleblower claimed that the former President had sought to pressure Zelenskyy to investigate activities of a relative of President's Trump's political rival.  *See* Peter Baker, *Trump Pressed Ukraine's President to Investigate Democrats as a 'Favor,'* N.Y. Times, Sept. 25, 2019, https://www.nytimes.com/2019/09/25/us/politics/donald-trump-impeachment-probe.html.

Plaintiff claims that failing to assert executive privilege "is attempting to damage Democracy itself."  Pl.'s Mot at 24.  But it was the actual attack on democracy that occurred on January 6, the

potential involvement of high-ranking federal officials in activities related to that event, and the public's interest in preventing such an attack in the future, that prompted President Biden to provide even privileged information to Congress in aid of its inquiry. The incumbent President has determined that the need for Congress to develop a complete understanding of what happened on January 6 outweighs the interest in confidentiality that might ordinarily attach to documents containing presidential communications. That assessment is entitled to great weight, and should be upheld by this Court.

### E.    Plaintiff's Constitutional Challenge to the PRA Disregards the Compelling Rationales Supporting President Biden's Determination and Misinterprets the PRA

Plaintiff's final claim asserts that, "[if] the PRA is read so broadly as to allow an incumbent President unfettered discretion to waive former Presidents' executive privilege," then the PRA would be rendered unconstitutional. *See* Pl.'s Mot. at 34-35. But executive privilege principally exists to protect Executive Branch interests, and the incumbent President is charged with protecting those interests. *See Nixon v. GSA*, 433 U.S. at 449. And President Biden's determination not to uphold privilege here was supported by an extraordinarily compelling rationale—*i.e.*, the "unique and extraordinary circumstances" surrounding the January 6 attack on the U.S. Capitol. *See* Laster Decl., Attach. D at 1. Given those circumstances, President Biden reasonably determined that "[t]he constitutional protections of executive privilege should not be used to shield, from Congress or the public, information that reflects a clear and apparent effort to subvert the Constitution itself." *Id.* Moreover, as contemplated by the PRA, Plaintiff has received the opportunity to challenge President Biden's determination and to have this Court adjudicate his claims. Thus, the PRA has not been unconstitutionally applied to him.

Plaintiff's claim is also unsustainable because it is based on a misunderstanding of the PRA. The PRA does not create or expand executive privilege authority; rather, executive privilege arises from the Constitution, *Nixon v. GSA*, 433 U.S. at 447, and the Constitution assigns greater weight to the incumbent's privilege determination because the incumbent is "in the best position to assess the present and future needs of the Executive branch." *Id.* at 449. The PRA does not purport to alter

this constitutional rule.  *See* 44 U.S.C. § 2204(c)(2) ("Nothing in this Act shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President.").  Instead, the PRA simply establishes a process by which a former President may assert executive privilege and the incumbent may decide whether to uphold that assertion.  *See id.* § 2208(c)(1).  And judicial review is available to the former President to challenge the incumbent's decision.  *See id.* § 2208(c)(2)(C) & § 2204(e).  The Constitution affords the former President nothing more.  For these reasons, Plaintiff misses the mark in levying his constitutional challenge against the PRA.

Lastly, in pressing his separation of powers claim, Plaintiff fails to acknowledge that the Supreme Court in *Nixon v. GSA* rejected a facial separation of powers challenge to the precursor to the PRA, the PRMPA, 44 U.S.C. § 2107 *et seq.*  *See* 433 U.S. at 441.  There, former President Nixon argued that a provision of the PRMPA delegating to a subordinate Executive officer "the decision whether to disclose Presidential materials and to prescribe the terms that govern any disclosure" violated separation of powers principles.  *See id.* at 440.  The Court disagreed, concluding that "the proper inquiry focuses on the extent to which [the Act] prevents the Executive from accomplishing its constitutionally assigned functions."  *Id.*

Applying that principle here, nothing in the PRA prevents the President from fulfilling his constitutional duties.  As discussed above, the PRA expressly does not expand or otherwise alter any constitutional privileges.  *See* 44 U.S.C. § 2204(c)(2).  Additionally, like the PRMPA, the PRA protects against release in circumstances where a valid assertion of privilege has been made.  *See id.* § 2208(a)(3)(A); *see also Nixon v. GSA*, 433 U.S. at 444 ("[T]he Act facially is designed to ensure that the materials can be released only when release is not barred by some applicable privilege inherent in th[e] [Executive] branch.").  The PRA therefore does not disrupt the Executive's functions; it procedurally advances them.

## II.     Plaintiff Meets None of the Equitable Requirements for Preliminary Injunctive Relief.

In addition to the fact that former President Trump's claims exhibit no likelihood of success, his request for preliminary relief halting all compliance with the Select Committee's request must be

denied, as he has satisfied none of the equitable pre-requisites for such sweeping relief.  Nor can he justify, alternatively, staying the scheduled release of privileged records in the First, Second, and Third Notifications.

### A.    Plaintiff Has Adduced No Evidence of Irreparable Harm that Would Warrant a Cessation of All Activity to Comply With the Select Committee's Request.

The analysis here must begin with an appreciation of the extraordinary nature of the relief that Plaintiff demands.  He is seeking an injunction that would "stay[ ]" the Select Committee's Request, enjoin the NARA Defendants "from disclosing, revealing, delivering, or producing the information requested" therein to the Select Committee, and enjoin the Committee Defendants from taking any action to enforce the Request, until the merits of Plaintiff's claims are adjudicated.  Pl.'s Proposed Order ¶¶ 1-4, ECF No. 5-3.  He insists, in other words, that NARA should be prohibited from providing even another sheet of information to the Select Committee, privileged or not, for months or even years to come.  Plaintiff has made no showing of injury to support such a demand.

Plaintiff first asserts that he himself "will suffer irreparable harm if the Court does not issue an order halting production" to the Select Committee, and that without such an injunction "[t]here will be no way to undo the damage caused to [him]."  Pl.'s Mot. at 5, 36.  But he claims no personal interest in the Government records the Select Committee has requested, or the information they contain, and identifies no cognizable injury to privacy, property, or otherwise that he as an individual will suffer if the Select Committee's request is complied with.  Plaintiff points to no personal injury he might suffer, much less a harm that is "both certain and great," *Mexichem*, 787 F.3d at 555, if preliminary relief is denied.

The former President contends alternatively that compliance with the Select Committee's request "will undoubtedly cause sustainable injury and irreparable harm" to future Presidents because releasing confidential communications between him and his advisors concerning his duties and responsibilities as President to a "rival branch of government" will "chill[ ] advice given by presidential aides[.]"  Pl.'s Mot. at 6, 7, 36.  Thus he purports to invoke Executive Branch interests protected by the privilege attaching to presidential communications, but that privilege "is not for the benefit of the

President as an individual, but for the benefit of the Republic." *Nixon v. GSA*, 433 U.S. at 449. Plaintiff has made no demonstration of imminent irreparable harm to any interests protected by executive privilege that compels an immediate halt to all compliance with the Select Committee's request.

To begin, Plaintiff has not shown that all records found responsive to the Select Committee's request will also be privileged, so as to require a complete cessation of production until the case is decided. In fact, the record proves otherwise, as President Trump has asserted privilege over some, but not all, of the responsive records that NARA has located to date. Laster Decl. ¶¶ 31, 33, 35. There is no reason why NARA should not continue its search for responsive records, or continue to produce any non-privileged records it identifies while this case is pending.

Second, Plaintiff's arguments concerning the extent of the harm to Executive Branch interests that may come from providing privileged records to the Select Committee are based in large measure on conjecture about the nature of those documents. Plaintiff takes for granted that all responsive records of a privileged nature will involve the most sensitive of communications between him and his advisors concerning a wide range of his previously assigned duties as President. Pl.'s Mot. at 3, 10, 17. But there is no reason to expect that a records request focused on the facts, circumstances, and causes of the January 6 attack will capture a wide swathe of privileged documents and communications concerning unrelated topics, or even that the records in question will necessarily involve communications between the President and his close advisors. Of the 763 pages of responsive records over which President Trump has asserted privilege to date, 629 are talking points prepared for the White House Press Secretary, and another 43 include presidential schedules, appointments, activity logs, call logs, and the like. Laster Decl. ¶¶ 31, 33, 35.

This is not to suggest that these records could not be protected by executive privilege. The point is that under the circumstances presented here the predicate of Plaintiff's claim of injury is far overstated. What is contemplated here is a release of records of varying sensitivity, on the specific range of topics covered by the Select Committee's request, under circumstances of extraordinary importance and rarity—all subject to the consent and direction of the sitting President now best

positioned to determine where the interests of the Executive Branch lie.  The notion that such a limited, rare, and at bottom voluntary disclosure of Executive Branch information will so irredeemably undermine the expectations of presidential advisors in the confidentiality of their communications, as to diminish the candor and quality of their advice to future Presidents, is refuted by the actions of past Presidents in similar times of crisis such as Watergate, 9/11, and Iran-Contra.  *See supra* at 35–36.  At best it is altogether too uncertain to qualify as irreparable harm.  *Winter*, 555 U.S. at 22; *Mexichem*, 787 F.3d at 555.[19]

### B.    Neither the Balance of Equities Nor the Public Interest Favors an Injunction.

Plaintiff's request for preliminary relief must also be denied because he has not shown that the balance of equities tips in his favor, or that injunctive relief would serve the public interest.  It should require no further explanation that discovering and coming to terms with the causes underlying the January 6 attack is a matter of unsurpassed public importance.  Learning the lessons of January 6 is crucial to protecting our democratic institutions, and to restoring public confidence in them.  *Cf. Nixon v. GSA*, 433 U.S. at 453 (citing the "substantial public interest" served by Congress's "desire to restore public confidence in our political processes").  Simply put, the public interest served by the Select Committee's inquiry overwhelms Plaintiff's asserted fears of injury to Executive Branch interests, especially when weighed against the considered judgment of the person "in the best position to assess the past and future needs of the Executive Branch," the incumbent President, *Nixon v. GSA*, 433 U.S. at 449, who has already spoken to the compelling public interest in ensuring that the Select Committee has access to the information necessary to complete its investigation.

---

[19] Plaintiff also contends that an injunction is needed to protect against a risk of inadvertent disclosure of privileged documents, allegedly due to the "short time periods" allowed under the PRA for review of potentially large volumes of documents whose sensitivity may not be apparent if their authors or custodians cannot be readily ascertained.  Pl.'s Mot. at 37.  This too is a matter of conjecture.  Thus far, Plaintiff's PRA Representatives have successfully reviewed the records in the first three notifications, and Plaintiff has invoked privilege over a number of them.  *See supra* at 11.  Moreover, NARA routinely accommodates requests from former Presidents for additional time to complete their reviews when the volume or complexity of records requires.  Laster Decl. ¶ 11.  NARA maintains the records in the same order and manner of organization as they were transmitted to NARA by the outgoing administration.  *Id.* ¶ 6.  To the extent practicable and necessary, NARA informs the PRA Representatives where the responsive records came from, such as from a staff member's office files. *Id.*  When asked, NARA also assists former Presidents in identifying records' authors and custodians. *Id.* ¶ 11.

On this score, Plaintiff has little to say, except to opine that "there is no harm to Defendants by delaying production" of records to the Select Committee while the case is litigated.  Pl.'s Mot. at 38.  Federal courts, however, cannot be so dismissive of the consequences of "halt[ing] the functions of a coordinate branch."  *Eastland*, 421 U.S. at 511 n.17.  Contrary to the lesson drawn by Plaintiff, Pl.'s Mot. at 39-40, *Eastland* teaches that judicially imposed delays in the conduct of legislative business are often contrary to the public interest, and should not be taken lightly.  That is certainly the case here, where the public interest in the timely and unfettered completion of the Select Committee's work is paramount.[20]

## C.     An Injunction Preventing Release of the Records Over Which President Trump Has Already Claimed Privilege Would Also Be Unjustified.

As noted, the records over which President Trump has claimed privilege in the First, Second, and Third Notifications are scheduled to be released to the Select Committee on November 12 and 26, 2021.  Laster Decl. ¶¶ 19, 26.  The Court should also reject any request by the former President that, in lieu of a broader injunction, the release of these specific records be delayed.

The assertedly privileged records in the first three notifications consist principally, as discussed above, of talking points prepared for the White House Press Secretary, and presidential schedules, activity logs, and call logs.  *Id.* ¶¶ 31, 33, 35.  President Trump has made no showing that releasing these specific records will, in and of itself, cause such immediate injury to the long-term interests of the Executive Branch as to justify impeding the progress of the Select Committee's investigation.  To the contrary, President Biden, the individual best positioned to assess the interests of the Executive Branch, has already determined that the release of these particular records would do no harm to those interests that would justify withholding the documents from the Select Committee.  At the very least, in the absence of a clear and convincing showing by Plaintiff of a palpable injury demanding immediate

---

[20]  As Plaintiff observes, Pl.'s Mot. at 39-40, at the onset of litigation in *Eastland* the D.C. Circuit entered a stay of the sub-committee subpoena that had been issued in that case.  *U.S. Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1254-57 (D.C. Cir. 1974).  That decision drew rebuke from the Supreme Court, however, for "frustrat[ing] a valid congressional inquiry" while the case "dragged through the courts."  *Eastland*, 421 U.S. at 511 & n.17.  The stay decision in *Eastland* is also not binding here, *contra* Pl.'s Mot at 39-40, for the additional reason that the "decisive element" in the Court of Appeals' decision to stay the sub-committee's subpoena was the irreparable harm that the plaintiffs personally would have suffered otherwise, 488 F.2d at 356, a showing President Trump has not made here.

relief, the Court has no basis on which to second-guess the judgment of the sitting President on a matter such as this, concerning the Executive Branch's own interests.

## CONCLUSION

The NARA Defendants respectfully request that the motion for a preliminary injunction be denied.

Dated:  October 30, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

_/s/ Elizabeth J. Shapiro_
ELIZABETH J. SHAPIRO
JAMES J. GILLIGAN
SERENA M. ORLOFF
CRISTEN C. HANDLEY
JULIA A. HEIMAN
Attorneys

U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Telephone: (202) 514-5302
Fax:          (202) 616-8470
E-mail:      elizabeth.shapiro@usdoj.gov

_Counsel for NARA Defendants_

43