**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DONALD J. TRUMP,                                  *
                                                                *
            Plaintiff,                               *
                                                                *
            v.                                         *          Civil Action No. 1:21-cv-02769 (TSC)
                                                                *
BENNIE G. THOMPSON, *et al.*,            *
                                                                *
            Defendants.                          *
                                                                *

*        *        *        *        *        *        *        *        *        *        *        *        *

**_AMICI CURIAE_ BRIEF IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**
_____

Kelly B. McClanahan, Esq.
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for* Amici Curiae

## **TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES ...........................................................................................ii

INTERESTS OF *AMICI CURIAE*..................................................................................1

ARGUMENT ..................................................................................................................2

     I.       PLAINTIFF'S CLAIM IS INCOMPATIBLE WITH THE PRA................5

     II.      PLAINTIFF LACKS THE CONSTITUTIONAL AUTHORITY TO
ASSERT ANY CONSTITUTIONAL PRIVILEGE ....................................8

          A.     *NIXON V. GSA* WAS DECIDED IN A SIGNIFICANTLY
DIFFERENT CONTEXT..................................................................9

          B.     *NIXON V. GSA* IS ABOUT PRESERVING PROTECTED
STATUS.........................................................................................12

     III.    PLAINTIFF CANNOT ASSERT ANY OTHER PRIVILEGES .................14

CONCLUSION..............................................................................................................19

CORPORATE DISCLOSURE STATEMENT ..................................................................21

CERTIFICATE OF SERVICE.........................................................................................22

i

## TABLE OF AUTHORITIES

**Cases:**                                                                                                        **Pages**

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979) ................................................................. 6

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992) ........................................................... 6

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988) ...................................................... 6

*In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998) ................................................................ 15-17

*In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982) ........................................................... 16, 18

*In re Von Bulow*, 828 F.2d 94 (2d Cir. 1987) .................................................................. 10

*Little v. Barreme*, 6 U.S. 170 (1804) .............................................................................. 6

*Marks v. CIA*, 590 F.2d 997 (D.C. Cir. 1978)................................................................... 6

*Medellin v. Texas*, 552 U.S. 491 (2008) ........................................................................... 2

*Merrill Lynch v. Dabit*, 547 U.S. 71 (2006)...................................................................... 6

*\*Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425 (1977).......... .......... .......... …*passim*

*Nixon v. Freeman*, 670 F.2d 346 (D.C. Cir. 1982)............................................................. 8

*Pa. v. Union Gas Co.*, 491 U.S. 1 (1989) ......................................................................... 8

*Public Citizen v. Burke*, 843 F.2d 1473 (D.C. Cir. 1988).................................................. 4, 12

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989).......................... 12

*United States v. Nixon*, 418 U.S. 683 (1974) .................................................................... 13

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) ............................................................ 17

*Whitaker v. CIA*, 31 F. Supp. 3d 23 (D.D.C. 2014) ........................................................... 12

*Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP*, 684 F.3d 1364 (Fed. Cir. 2012)..... 10

*\*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .... .......... .......... ….*passim*

**Statutes and Regulations:**

44 U.S.C. § 2204 ......................................................................................................... 7

44 U.S.C. § 2208 ..................................................................................................... 5, 7

Exec. Order 13233 ...................................................................................................... 5

Exec. Order 13489 ...................................................................................................... 5

Fed. R. App. P. 29(a)(4) ............................................................................................ 1

L.R. 7(o)(5)   ............................................................................................................ 1

## *AMICI CURIAE* BRIEF IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

The Government Accountability Project, Government Information Watch, National

Security Counselors, Jason R. Baron, Norman Eisen, Louis Fisher, Heidi Kitrosser, Mark J.

Rozell, and Mitchel A. Sollenberger (collectively "Amici") respectfully submit this *Amici Curiae*

Brief in Opposition to Plaintiff's Motion for a Preliminary Injunction, Dkt. #5 (filed Oct. 19,

2021).

### INTERESTS OF *AMICI CURIAE*[1]

Amici are divided into two categories: (1) non-profit organizations organized under

Section 501(c)(3) of the Internal Revenue Code which specialize in, *inter alia*, government

transparency and accountability issues; and (2) law professors and/or scholars who teach,

research, and/or write about topics related to Executive Privilege or the Presidential Records Act.

They submit this brief in support of Defendants to explain why there is no legitimate basis for a

former President to prevail in a case in which the incumbent President has expressly waived the

relevant privileges, and that there is accordingly no reason to grant a preliminary injunction on

the grounds that former President Trump might prevail. Their interest in this case is ensuring that

a former President cannot use claims of privilege under the Presidential Records Act as a means

to override the legitimate interests of the incumbent President and the American people in

government transparency.

As noted below, there is no legal theory of privilege which would allow former President

Trump to prevail in this litigation, and the Court should accordingly deny Plaintiff's motion for

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4), as incorporated by this Court's Local Civil Rule 7(o)(5), undersigned counsel states that no party's counsel authored this brief in whole or in part. Nor did any party or party's counsel, or any other person other than *amici curiae* or their counsel, contribute money that was intended to fund preparing or submitting this brief.

failure to show a likelihood of success. Because any preliminary injunction or stay of the

approaching 12 November 2021 deadline would only be in the service of delay, and because, as

the House of Representatives Select Committee to Investigate the January 6th Attack on the

United States Capitol ("Select Committee"), the National Archives and Records Administration

("NARA"), and sixty-six former Members of Congress who also filed an *amici curiae* brief

("Former Congressional Amici") argued, there is an overwhelming need for the Select

Committee to receive this information as soon as possible, the Court should not assist in

Plaintiff's attempts to delay the inevitable.

## **ARGUMENT**

"The President's authority to act, as with the exercise of any governmental power, 'must

stem either from an act of Congress or from the Constitution itself.'" *Medellin v. Texas*, 552 U.S.

491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).

"Justice Jackson's familiar tripartite scheme provides the accepted framework for evaluating

executive action." *Id.* Simply put, this test is as follows:

1.  When the President acts pursuant to an express or implied authorization of
    Congress, his authority is at its maximum, for it includes all that he
    possesses in his own right plus all that Congress can delegate. In these
    circumstances, *and in these only*, may he be said (for what it may be
    worth) to personify the federal sovereignty. . . .

2.  When the President acts in absence of either a congressional grant or
    denial of authority, he can only rely upon his own independent powers, but
    there is a zone of twilight in which he and Congress may have concurrent
    authority, or in which its distribution is uncertain. . . .

3.  When the President takes measures incompatible with the expressed or
    implied will of Congress, his power is at its lowest ebb, for then he can
    rely only upon his own constitutional powers minus any constitutional
    powers of Congress over the matter. Courts can sustain exclusive
    presidential control in such a case only by disabling the Congress from
    acting upon the subject.

*Youngstown*, 343 U.S. at 635-38 (Jackson, J., concurring) (emphasis added). At its core, this case

boils down to a dispute over how Justice Jackson would classify a former President's ability to

control information after the end of his Administration.

In order for a former President to unequivocally assert a personal ability to invoke any

privilege held by the Office of the President over the objections of the incumbent President, he

would have to "personify the federal sovereignty." *Id.* at 636. In other words, he would need to

act "pursuant to an express or implied authorization of Congress." *Id.* at 635. This is the category

Plaintiff attempts to lay claim to, arguing that his right to do so is authorized both by the

Constitution and by the Presidential Records Act ("PRA"). However, not only does former

President Trump's claim not fit within the first category, it does not even fit within the

framework. In order to explain this case in terms of *Youngstown*, the Court will need to create a

fourth, even weaker category:

> 4.    When a former President takes measures incompatible with the expressed
> or implied will of both Congress and the incumbent President, his power is
> virtually nonexistent, for then he can rely only upon his own constitutional
> powers minus any constitutional powers of Congress over the matter and
> minus any constitutional powers of the incumbent President over the
> matter. Courts can sustain exclusive control by a former President in such
> a case *only by disabling both the Congress and the incumbent President*
> from acting upon the subject.

To the extent that the Court recognizes some form of Presidential communications privilege that

can be invoked by a former President over the objection of an incumbent President—which,

notwithstanding *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425 (1977) ("*Nixon v. GSA*"), it

should not, as explained below—it is this fourth category into which such an assertion would

fall. As a practical concern, however, it is impossible to imagine a scenario where such authority

could be held to exist, where a court would nonetheless choose to itself "intrude[] into the

executive function and the needs of the Executive Branch," *id.* at 449, simply because it believed

3

that the duly elected head of the Executive Branch was not properly safeguarding his own branch's institutional interests. In order to do so, it would have to ignore: (1) the fact that "[i]t is true that only the incumbent is charged with performance of the executive duty under the Constitution," *id.* at 448; (2) "the fact that [the incumbent does not] support[] [the former President]'s claim detracts from the weight of his contention," *id.* at 449; and (3) the fact that "the incumbent President is not constitutionally obliged to honor [a] former President['s] invocation of executive privilege," *Public Citizen v. Burke*, 843 F.2d 1473, 1479 (D.C. Cir. 1988), This framing may sound like hyperbole, but that is exactly what Plaintiff is asking this Court to do, and the Court should forcefully decline.

The remainder of this brief will explain why Plaintiff's claim of the Presidential communications privilege is both contrary to the express will of Congress—through its passage of the Presidential and Federal Records Act Amendments of 2014, Pub. L. 113-187—and unsupported by the Constitution, rendering it a nullity. The brief will conclude by explaining how Plaintiff's vague claims of other potentially applicable privileges are equally unsupported, leaving Plaintiff no chance—let alone a likely chance—of success on the merits.

As an initial note, however, it is important for Amici to clarify the scope of their argument. They do not address whether the Select Committee has demonstrated an overriding interest, or even whether the Select Committee's requests are viable. These are questions better addressed by Defendants and the Former Congressional Amici, to the extent that they need to be answered at all. While Amici agree that the Select Committee's requests are viable and that the Select Committee has demonstrated an overriding interest sufficient to overcome an invocation of the Presidential communications privilege, they maintain that the Court does not need to even *address* the question of balancing the interests, because Plaintiff simply lacks the authority to

claim *any* privilege that President Biden has waived. Put another way, "The Select Committee maintains, for preservation purposes, that the Constitution and the PRA foreclose a former President from asserting executive privilege over the disagreement of the incumbent President, and foreclose a claim of executive privilege" (Cong. Defs.' Opp'n Pl's Mot. Prelim. Inj., Dkt. #19, at 23 n.50 (filed Oct. 29, 2021)); that argument is the almost total focus of this brief.[2]

## I.      PLAINTIFF'S CLAIM IS INCOMPATIBLE WITH THE PRA

When the PRA was initially passed in 1978, it remained silent on the question of the interplay between a former President and an incumbent President in the context of a request for former Presidential records. *Nixon v. GSA* had just been decided the previous year, and the parameters of a hypothetical meritorious claim of a former President were unknown. Accordingly, Presidents were left to their own devices to answer this question, and they did so in a series of Executive Orders which ranged from "the Archivist shall not permit access to the records by a requester unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records," Exec. Order 13233 § 3(d)(1)(ii), to "the Archivist shall abide by any instructions given him by the incumbent President or his designee," Exec. Order 13489 § 4(b). Had this case arisen in 2004, former President Trump's claim would have been classified into Justice Jackson's zone of twilight, if not the first category, because there were insufficient clues to allow a court to ascertain the will of Congress. However, in 2014, Congress amended the PRA to permanently and unequivocally give the incumbent President the final say. *See* 44 U.S.C. § 2208(c)(2)(C) ("If

_____

[2] Given that by the time the Court holds its hearing on Plaintiff's motion on 4 November 2021, there will be at least *six* briefs in the record (one motion, two memoranda of opposition, one reply, and two *amici curiae* briefs), Amici are intentionally keeping this brief as short as possible and will only duplicate arguments made in other briefs when absolutely necessary. They will similarly attempt to refrain from extensive scholarly discussion where a brief discussion sufficiently makes their point.

the incumbent President determines not to uphold the claim of privilege asserted by the former President, . . . the Archivist shall release the Presidential record subject to the claim at the end of the 90-day period beginning on the date on which the Archivist received notification of the claim."). Simply put, Congress passed a statute which superseded the relevant Executive Orders: a phenomenon that courts have uniformly recognized since the Supreme Court's holding in *Little v. Barreme* in 1804. 6 U.S. 170, 179 (1804); *accord Marks v. CIA*, 590 F.2d 997, 1003 (D.C. Cir. 1978) ("Of course, an executive order cannot supersede a statute."). And, of course, the "cardinal canon" of statutory interpretation is that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992), so there can be no question that this statute was an unambiguous reflection of the will of Congress.

Moreover, the Court must presume that when Congress amended the PRA, it did so with knowledge of the current prevailing legal interpretations. *Merrill Lynch v. Dabit*, 547 U.S. 71, 85-86 (2006); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 698-99 (1979). Accordingly, when a new statute changes a standard or a process, the Court must presume that Congress intended to do so. In this case, Congress clearly meant to supersede all the relevant portions of prior Executive Orders, including Executive Order 13489, and so any questions about whether or not that or any other Order would support Plaintiff's claims become academic, notwithstanding the fact that the parties all appear to take it for granted that Executive Order 13489 still remains in force in its entirety. Whatever Congressional silence allowed the President to establish the terms of this relationship and bring disputes like this one into the zone of twilight was irretrievably broken when President Obama

6

signed Pub. L. 113-187, and the Court need not spend any significant time or energy considering that question.

Before completing this discussion of the PRA, it is important to briefly address another provision which could conceivably be considered to implicitly support Plaintiff's claim, but which does not actually do so. The PRA makes mention twice of the potential for a former President to file a lawsuit to prevent the disclosure of information, as former President Trump did in this case. First the law states that this Court "shall have jurisdiction over any action initiated by the former President asserting that a determination made by the Archivist violates the former President's rights or privileges," 44 U.S.C. § 2204(e), and it then explicitly incorporates this possibility into the timeline the process may take, *see id.* § 2208(c)(2)(C) (directing the Archivist to release information "unless otherwise directed by a court order in an action initiated by the former President under section 2204(e) of this title or by a court order in another action in any Federal court"). However, a statutory provision merely providing for the possibility of a lawsuit cannot be read to imply that any such lawsuit would be meritorious, and the Court should not read into these provisions an implicit recognition that such a valid claim would exist.

As noted above, the PRA was written one year after *Nixon v. GSA* was decided by the Supreme Court. In that case, the Court allowed for the possibility that a former President "*may* legitimately assert the Presidential privilege," 433 U.S. at 449 (emphasis added), but gave no indication of what such a legitimate assertion would look like. It is no surprise, then, that Congress incorporated this hypothetical possibility into the PRA a year later, but there is no support in either the statute itself or the legislative history that any Member of Congress held any belief that such a case would be meritorious. Justice Scalia rather colorfully characterized this phenomenon as "[M]embers of Congress . . . need have nothing in mind in order for their votes

to be both lawful and effective." *Pa. v. Union Gas Co.*, 491 U.S. 1, 30 (1989) (Scalia, J., partially dissenting). When Congress amended the PRA in 2014, it simply incorporated a reference to the existing provision into the new framework, and there is no reason to believe that any Member of Congress harbored any belief that such a claim would be meritorious that time either. At most, Congress can be understood to simply believe that "those who see in disclosure a threat to the privilege must be given a meaningful opportunity to contest disclosure on that basis," *Nixon v. Freeman*, 670 F.2d 346, 359 (D.C. Cir. 1982). The Court should accordingly read these provisions as what they are on their face: an allowance that the Supreme Court stated in 1977 that a former President might sue, not that he would ever *win*.

## II.   PLAINTIFF LACKS THE CONSTITUTIONAL AUTHORITY TO ASSERT ANY CONSTITUTIONAL PRIVILEGE

Plaintiff's entire case hangs on the Court's interpretation of *Nixon v. GSA*. That case, however, does not actually support Plaintiff's position, for two reasons. First, as noted above, it is a product of its time, and to the extent that it stated that a former President still retained a residual privilege, it should be read to hold that a former President still retained a residual privilege *in 1977* before Congress unequivocally made its will known in 2014. Second, it is not accurate to read *Nixon v. GSA* to mean that, even in 1977, a former President held a residual privilege personally that he could assert over the incumbent President's objection in a specific dispute over specific records. A better reading would be an interpretation in which the Court is understood to merely have held that the Presidential communications privilege *still protects* information created by previous administrations—as opposed to, for instance, an incumbent President being unable to assert the privilege to protect records created by his predecessor—and that a former President simply had *standing* to assert them if the incumbent President remained

silent. Therefore, the Court should hold that *Nixon v. GSA* is only loosely applicable to the instant case, and that, to the extent it is applicable, it supports Defendants.

A. *NIXON V. GSA* **WAS DECIDED IN A SIGNIFICANTLY DIFFERENT CONTEXT**

It is important to note that *Nixon v. GSA* was a facial challenge to the PRA's predecessor statute, specifically the provision directing the GSA Administrator to promulgate regulations governing the handling of former President Nixon's papers; the Court made clear that its review was limited to the facial validity of the statute in question. *Nixon v. GSA*, 433 U.S. at 455. Furthermore, much of the Court's analysis hinged on the fact that the records were *not* being provided to anyone outside the Executive Branch. *Id.* at 441. Both of these facts counsel against a strict application of *Nixon v. GSA* to the instant case. It did not involve a scenario in which a former President's papers were being given to Congress or disclosed publicly, and it most importantly did not involve the incumbent President's express agreement to such a disclosure.

In *Nixon v. GSA*, the Court made special note of the fact that "[t]he Executive Branch became a party to the Act's regulation when President Ford signed the Act into law, and the administration of President Carter, acting through the Solicitor General, vigorously supports affirmance of the District Court's judgment sustaining its constitutionality." *Id.* However, legally speaking, supporting a statute's constitutionality is not the same as expressly waiving a privilege, and neither former President Ford's signing of the statute nor then-incumbent President Carter's support of the statute are comparable to President Biden's express direction to the Archivist to release the relevant records. Supporting a statute generally is a political decision, while expressly waiving a privilege is a *legally binding* decision.

"[T]he privilege of confidentiality of Presidential communications derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Id.*

at 447. It is, however, just a privilege, and it follows the same rules of any other privilege; most importantly, *once it is expressly waived, it no longer applies.* Simply put, once a privilege is expressly waived by the party with the authority to do so, the information in question cannot be withheld. For instance, it is well-established that if a client authorizes an attorney to release information which would otherwise be protected by the attorney-client privilege, the attorney may not cite the attorney-client privilege to withhold the information. *See generally Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP*, 684 F.3d 1364, 1370 (Fed. Cir. 2012) (voluntary consent constitutes express waiver of attorney-client privilege); *In re Von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987) ("Of course, the privilege belongs solely to the client and may only be waived by him. An attorney may not waive the privilege without his client's consent.").

The question then becomes, who is the party with the authority to waive the presidential communications privilege? Generally, a privilege is held by the party to whom its benefit accrues. A client benefits from the attorney-client privilege because it allows the client to candidly seek and obtain legal advice. A patient benefits from the psychotherapist-patient privilege for much the same reason. With this in mind, it is clear that *Nixon v. GSA* already answered this question: "the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic." 433 U.S. at 449. In other words, it is a *Governmental* privilege, not a personal privilege.

It naturally follows, then, that because the presidential communications privilege is a Governmental privilege, it can only be expressly waived by a representative of the Government. Therefore, even if it may be *asserted* by a former President, it can be *waived* by the incumbent President, and that waiver means that it cannot be withheld from disclosure by any other interested party. Just as a former Chief Executive Officer lacks the legal authority to prohibit a

corporation's in-house counsel from releasing information if the current CEO expressly waives the attorney-client privilege on behalf of the corporation, a former President lacks the legal authority to prohibit an Executive Branch official from releasing information if the incumbent President expressly waives the presidential communications privilege on behalf of the Executive Branch.

Amici turn to briefly address what appears to be former President Trump's main complaint: "In a political ploy to accommodate his partisan allies, President Biden has refused to assert executive privilege over numerous clearly privileged documents requested by the Committee *without articulating any coherent theory as to why this unprecedented move would be appropriate*." (Stmt. P. & A. Supp. Pl.'s Mot. Prelim. Inj., Dkt. #5-1, at 1-2 (filed Oct. 19, 2021) (emphasis added) [hereinafter Pl.'s Mem.].)  In making this complaint, Plaintiff effectively asks this Court to hold that an express waiver of a privilege is only legally binding if it is done for the right reason or if the holder of the privilege "articulat[es] [a] coherent theory as to why [the waiver] would be appropriate." This is, simply put, not how a privilege waiver works.

The holder of a privilege may expressly waive the protection of that privilege for literally *any reason whatsoever*.  In the context of the deliberative process privilege, there is even a term for such a waiver: *discretionary release*.  As in, the Government's choice to release otherwise privileged information is *discretionary*.  Furthermore, with respect to the presidential communications privilege in particular, Presidents have waived its protection for political reasons numerous times. For instance, President Nixon withdrew a privilege claim to prevent White House staff from testifying before Congress, in order that the Senate Judiciary Committee would confirm Richard Kleindienst as Attorney General. Robert C. Randolph & Daniel C. Smith, *Executive Privilege and the Congressional Right of Inquiry*, 10 Harv. J. on Legis. 621,

649 (1973). President Reagan similarly dropped a privilege claim over documents related to William Rehnquist's tenure in the Department of Justice so that the Senate Judiciary Committee would confirm him as Chief Justice of the Supreme Court. Ronald J. Ostrow & David Savage, *Senate Panel to Receive Rehnquist Documents; Administration Ends Impasse on Memos Written as Legal Advisor to Nixon; Scalia Hearings Open*, L.A. Times, Aug. 6, 1986, at A1. In these cases and others, the President simply decided it was not worth the political cost to continue such battles with Congress, and they undeniably had the right to make that determination.

This question of waiver was not before the *Nixon v. GSA* Court, and so its opinion should not be read to counsel otherwise. Moreover, such a reading would place *Nixon v. GSA* directly at odds with the D.C. Circuit's controlling precedent, since the Circuit has held that "the incumbent President is not constitutionally obliged to honor [a] former President['s] invocation of executive privilege with respect to [the former President's] papers." *Public Citizen*, 843 F.2d at 1479. In such a case, this Court is bound by D.C. Circuit controlling precedent. "While Plaintiff may ultimately persuade the D.C. Circuit to reconsider this position, it would be improper for this Court to take such action in disregard of binding D.C. Circuit precedent." *Whitaker v. CIA*, 31 F. Supp. 3d 23, 48 (D.D.C. 2014) (discussing a comparable scenario in which D.C. Circuit and Supreme Court opinions were difficult to reconcile) (citing *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

## B.    *NIXON V. GSA* IS ABOUT PRESERVING PROTECTED STATUS

The *Nixon v. GSA* Court specifically endorsed the position of the U.S. Solicitor General:

Unless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the

> benefit of the Republic. Therefore the privilege survives the individual President's tenure.

*Nixon v. GSA*, 433 U.S. at 448-49. However, it does not necessarily follow that an individual President's ability to unilaterally assert the privilege "survives the individual President's tenure." In context, this opinion is more harmoniously read to say that the *information* protected by the presidential communications privilege continues to be protected beyond the individual President's tenure, because of the compelling reasons for the privilege's existence and the chilling effect it would cause if his advisers believed that their "full and frank submissions of facts and opinions" would completely lose their privileged status in eight years, if not fewer. While the "chilling effect" is a controversial topic in transparency circles, one cannot deny that current jurisprudence fully embraces it, and until that changes, this Court is bound to treat it as a valid concern. As such, the Court's endorsement of the Solicitor General's position on this count was unremarkable; it simply held that such information could still be protected. This statement, however, carries with it an implicit caveat: the information can still be protected by someone with the authority to do so. In other words, it can be protected—or waived—by the lawful head of the Executive Branch, and nobody else.

On this note, it is important to return to the relief that Plaintiff is ultimately asking this Court to grant: he is asking this Court to substitute its own judgment for that of the head of a co-equal branch regarding whether or not that branch is appropriately protecting its interests. This is constitutionally disfavored, if not outright prohibited. "[E]ach branch of the Government has the duty initially to interpret the Constitution for itself, and . . . its interpretation of its powers is due great respect from the other branches." *Id.* at 442-43 (citing *United States v. Nixon*, 418 U.S. 683, 703 (1974)). Regarding the *current* Executive Branch's "interpretation of its powers," this Court is required to afford it "great respect." This respect extends to the determination of

whether or not the public interest is served by potentially chilling Government advisors, and it extends to the determination of whether or not it is bound by the PRA. In order to find that former President Trump has *any* authority to *successfully* enforce a presidential communications privilege claim, the Court will have to, as noted above, disable *both the Congress and the incumbent President* from acting upon the subject. This it cannot do.

## III.  PLAINTIFF CANNOT ASSERT ANY OTHER PRIVILEGES

As to former President Trump's contention that some of the requested records are covered by other privileges, those arguments fall prey to the same infirmity as his assertions of the presidential communications privilege: even if the records are properly protected by those privileges, *he is not the proper person to assert that protection, and the proper person has waived it.* This is true for the attorney-client privilege, the attorney work product privilege, and the deliberative process privilege.

It is well established that White House counsel "represent the institution of the presidency, not [any one President] himself, much as corporate general counsel represent their company and not CEOs." Alison Frankel, *Time for the President to Lawyer Up, Say Legal Experts*, Reuters (May 17, 2017) (quoting several law professors and legal experts), *at* https://www.reuters.com/article/us-otc-trump/time-for-the-president-to-lawyer-up-say-legal-experts-idUSKCN18D2K5 (last accessed Oct. 30, 2021). "White House lawyers have a duty to protect the interests of the presidency even when those interests diverge from the president's individual concerns," according to former associate counsel to President Obama Andrew Wright. *Id.* Further, "the president can't be sure advice he receives from White House lawyers will remain confidential." *Id.* For example, the D.C. Circuit ruled in *In re Lindsey* that White House deputy counsel Bruce Lindsey could not assert attorney-client privilege to avoid testifying before

a grand jury investigating President Bill Clinton's administration, stating, "[T]he Office of the President is a part of the federal government, consisting of government employees doing government business, and neither legal authority nor policy nor experience suggests that a federal government entity can maintain the ordinary common law attorney-client privilege to withhold information relating to a federal criminal offense." 158 F.3d 1263, 1266 (D.C. Cir. 1998).

Plaintiff actually cites *Lindsey* to implicitly suggest attorney-client privilege does apply to some of his Administration's records under the standard articulated in that case. (Pl.'s Mem. at 35-36.) However, the distinction emphasized by Amici here is exactly why this citation says the opposite of the assertion Plaintiff cites it to support. First, Plaintiff asserts that "the requests at issue clearly seek documents and communications protected by the attorney-client privilege." (*Id.* at 35.) Then, he cites *Lindsey* to correctly state that "the attorney client privilege applies to communications between a client and his lawyer made for the purpose of obtaining legal advice." (*Id.* at 36.) But then he states that the documents in question "plainly include . . . legal advice." (*Id.*) While this assertion may be accurate, it needs to be clarified: the documents may include legal advice to the *Office of the President*, but not to former President Trump personally.

The D.C. Circuit in *Lindsey* expressly stated that because the Office of the President is part of the Government, "[i]n the context of federal criminal investigations and trials, there is no basis for treating legal advice differently from any other advice the Office of the President receives in performing its constitutional functions." 158 F.3d at 1266. When there is information regarding possible criminal offenses, attorney-client privilege even for an *incumbent* President— that is, the Office of the President itself—is less likely to apply because of the great public interest and probative value of the information involved. *Id.* Moreover, "[r]ecognizing that a

government attorney-client privilege exists is one thing. Finding that the Office of the President is entitled to assert it here is another." *Id.* at 1270. There is "no clear principle that the government attorney-client privilege has as broad a scope as its personal counterpart," and even the personal version of the privilege "must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *Id.* at 1272 (citing *In re Sealed Case*, 676 F.2d 793, 807 n.44 (D.C. Cir. 1982)).

"When an executive branch attorney is called before a federal grand jury" to testify about possible criminal conduct within the executive branch, "reason and experience, duty, and tradition dictate that the attorney shall provide that evidence . . . [because] government attorneys stand in a far different position from members of the private bar." *Id.* "Their duty is not to defend clients against criminal charges and it is not to protect wrongdoers from public exposure." *Id.* The central principle here is that this applies for *current Government attorneys.* It flies in the face of this framework to suggest that a *former* President can invoke government attorney-client privilege in a personal way to withhold documents when the incumbent President does not object, especially if an incumbent President *might not be able to*.

But even without an investigation into potential criminal activity as a predicate, it is beyond doubt that while Plaintiff was President, he shared no *personal* attorney-client privilege with any White House attorney, as their client would axiomatically be the Office of the President rather than former President Trump himself. *See, e.g.,* Jack Goldsmith, *Thoughts on the Proper Role of the White House Counsel*, Lawfare (Feb. 21, 2017) ("The [White House Counsel] is not, of course a president's personal counsel but is charged with providing legal support to the Office of the Presidency. The President is the 'client,' but so are the individual members of the White House staff, and the obligation extends to the public."), *at*

16

https://www.lawfareblog.com/thoughts-proper-role-white-house-counsel (last accessed Oct. 30,

2021); Maryanne Borelli, Karen Hult, & Nancy Kassop, *The White House Counsel's Office,*

31 Presidential Studs. Quarterly 561, 561 (2001) ("Often called 'the president's lawyer,' the

counsel's office serves, more accurately, as the '*presidency's* lawyer.'"); Bob Bauer, *The White*

*House Counsel and Trump's Attack on the 2020 Election*, Lawfare (Dec. 23, 2020) ("[White

House Counsel Pat Cipollone] is a lawyer for the government, not a personal or political lawyer

for the president, and he is accountable to the public."), *at* https://www.lawfareblog.com/white-

house-counsel-and-trumps-attack-2020-election (last accessed Oct. 30, 2021).

Based on both *Lindsey* and the axiom that a White House attorney is not a President's

personal attorney, former President Trump's current attempt to invoke attorney-client

privilege—either a government attorney-client privilege or a personal one—is wholly

inappropriate and should not be permitted. As with the presidential communications privilege,

this scenario is similarly analogous to the former CEO of a corporation attempting to invoke the

attorney-client privilege to silence the corporation's in-house counsel against the wishes of a new

CEO, which is, to be clear, disallowed because the client is the corporation and not any

individual officer or employee, so the attorney-client privilege attaches to that entity rather than

any one person. *See Upjohn Co. v. United States*, 449 U.S. 383, 389-90 (1981). Likewise, in the

Executive Branch context, the attorney-client privilege is the Office of the President's privilege

to invoke, not the individual President's, because it is the interests of the office and the

Government as a whole which are protected, not the interests of the individual President—let

alone a former President. The attorney-client privilege is a common law privilege, and its

application must follow its normal rules, whether those rules be for government attorney-client

privilege under *Lindsey* or a personal privilege that could not attach between a Government lawyer and a former President.

Amici emphasize that every White House attorney is a Government employee. They swear an oath to uphold the Constitution, they are paid with public funds like any other official, they are bound by the same rules and laws as other officials, and their legal advice is rendered to Government officials and entities. In contrast, they do not swear any oath to the individual occupying the office, and they are not paid by the individual. They do serve at the pleasure of the President, certainly—but the President serves at the pleasure of the American people, and when a President is not reelected, he may no longer assert an attorney-client privilege against the disclosure of documents or testimony related to the office that he no longer occupies. If he could, the privilege would still not cover materials related to an attempt to *retain* the office improperly, as here—but this Court need not even reach that question because there is no good reason for a former President to be able to exercise this privilege in the first place. Former President Trump therefore may not assert the attorney-client privilege to preclude the release of the requested documents.

The attorney work product privilege is similarly inappropriate for an assertion by a former President for a slightly different reason. Because the D.C. Circuit considers this privilege to be held by both the attorney and the client, *see In re Sealed Case*, 676 F.2d 793, 812 n.75 (D.C. Cir. 1982) ("[W]ork product privilege belongs to the lawyer as well as the client"), a former President *could* attempt to argue that the incumbent President could not waive the privilege alone. However reasonable this interpretation might appear on its surface, it does not stand up to close scrutiny, because it does not change the fact that, much like with the attorney-client privilege, the former President simply *was never the client*. Therefore, if Plaintiff cannot

independently assert the attorney-client privilege, he also cannot independently assert the attorney work product privilege.

With respect to any potential claim that the records in question are protected by the deliberative process privilege, those arguments fail for the same reason that Plaintiff's presidential communications privilege arguments fail; the deliberative process privilege is an inherently *Governmental* privilege, not a personal privilege, and it may be waived as an act of discretion by any official in the Executive Branch, which a former President is not.

## CONCLUSION

"With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law." *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring). If a requirement for a free government is that the Executive be under the law, a *former* Executive can ask no more, yet that is what former President Trump requests. Allowing a former President to override a current President on *any* question is undemocratic and threatens to create a "shadow President"; a concept fundamentally foreign to the U.S. Constitution. For the reasons provided above, former President Trump has no legal basis to prevail in this suit, and the Court should accordingly deny his motion for a preliminary injunction.

19

Date:   October 30, 2021

Respectfully submitted,

 /s/ Kelly B.  McClanahan
Kelly B.  McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Amici Curiae*

20

## CORPORATE DISCLOSURE STATEMENT

No publicly-held corporation holds an interest of 10% or more in the Government Accountability Project, Government Information Watch, or National Security Counselors. There are no parent companies, subsidiaries, or affiliates of these corporations with any outstanding securities in the hands of the public.

Date: October 30, 2021

　/s/ Kelly B. McClanahan　
Kelly B. McClanahan, Esq.
*Counsel for Amici*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on 30 October 2021, I served the foregoing document on all counsel of record by filing it using this Court's CM/ECF system.

Date: October 30, 2021

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
*Counsel for Amici*
