**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DONALD J. TRUMP,

                    Plaintiff,

     v.

BENNIE G. THOMPSON, *et al.*,

                    Defendants.

Civil Action No. 1:21-cv-2769 (TSC)

**BRIEF OF FORMER MEMBERS OF CONGRESS AS *AMICI CURIAE* IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE.................................................................................1

INTRODUCTION .....................................................................................................1

ARGUMENT .............................................................................................................5

I.     THE SELECT COMMITTEE'S POWER TO INVESTIGATE THE JANUARY 6TH INSURRECTION ARISES FROM CONGRESS'S LEGISLATIVE AUTHORITY OVER, AMONG OTHER THINGS, FEDERAL ELECTIONS, TRANSITIONS OF PRESIDENTIAL POWER, FEDERAL PROPERTY, AND INSURRECTIONS...............................................................................................5

     A.    Congress Has Broad Constitutional Powers To Pass Legislation To Ensure the Peaceful and Lawful Transfer of Presidential Power..........................................6

     B.    Congress Has A Compelling Need to Engage In A Thorough and Complete Investigation of Mr. Trump's Attempts To Interfere With the Peaceful Transfer of Power So That It Can Exercise Its Legislative Powers......................10

II.    THE CLEAR NEED FOR, AND PUBLIC INTEREST IN, THE SELECT COMMITTEE'S ACCESS TO THE MATERIALS IT SEEKS IS DETERMINATIVE OF THE PRESENT MOTION..........................................................17

CONCLUSION........................................................................................................20

APPENDIX A—LIST OF AMICI CURIAE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burroughs v. United States*,
    290 U.S. 534 (1934)..................................................................................................8

*Ex parte Yarbrough (The Ku-Klux Cases)*,
    110 U.S. 651, 658–59 (1884)....................................................................................8

*McGrain v. Daugherty*,
    273 U.S. 135 (1927)..................................................................................................5

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977)................................................................................................18

*Republic of Iraq v. Beaty*,
    556 U.S. 848 (2009)..................................................................................................3

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
    498 F.2d 725 (D.C. Cir. 1974) (en banc)..................................................11, 16, 19

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020).................................................................................. *passim*

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    413 U.S. 548 (1973)..................................................................................................8

*United States v. Harriss*,
    347 U.S. 612 (1954)..................................................................................................8

*United States v. Nixon*,
    418 U.S. 683 (1974)..................................................................................11, 17, 19

*Watkins v. United States*,
    354 U.S. 178 (1957)................................................................................................11

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)....................................................................................................17

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 18...........................................................................................8

U.S. Const. art. II
    § 1, cl. 2 ...............................................................................................18, 19
    § 1, cl. 4 ........................................................................................................6
    § 2, cl. 2 ........................................................................................................7

U.S. Const. art. IV, § 3 ..................................................................................7, 8

U.S. Const. amend. XII ..........................................................................6, 18, 19

U.S. Const. amend. XIV
    § 3 ...............................................................................................................7, 8
    § 5 ..................................................................................................................7

**Statutes**

2 U.S.C. §§ 1901–82 .........................................................................................9

3 U.S.C.
    § 1 ..................................................................................................................9
    §§ 1–18 ........................................................................................................19
    § 7 ..................................................................................................................9
    § 15 ...........................................................................................................9, 14
    § 102 note (1989) ..........................................................................................9

5 U.S.C.
    § 2302 ............................................................................................................9
    §§ 3345–3349d ..............................................................................................9
    §§ 7321–26 ....................................................................................................9

10 U.S.C.
    §§ 251–54 ......................................................................................................9

18 U.S.C.
    § 111 ..............................................................................................................9
    § 115 ..............................................................................................................9
    § 201 ..............................................................................................................9
    § 1361 ............................................................................................................9
    § 1385 ............................................................................................................9
    §§ 3056–3056A ..............................................................................................9

Act of May 31, 1870, ch. 114, §§ 14–15, 16 Stat. 140, 143–44 ....................7

**Legislative Materials**

H.R. 1405, 117th Cong. (2021) ........................................................................10

H.R. 5314 §§ 901–02, 117th Cong. (2021) ......................................................10

H.R. Res. 503, 117th Cong. (2021)
   § 3(1)............................................................................................................5
   § 4...............................................................................................................5
   § 4(c).........................................................................................................20
   § 5(c)(4)–(6), (7).......................................................................................5

*Joint Inquiry Into the Terrorist Attacks of September 11, 2001*, S. Rep. No.
   107-351, H.R. Rep. No. 107-792 (2002) ................................................4

H.R. Rule XI(2)(m)........................................................................................5

Majority Staff of S. Comm. on the Judiciary, 117th Cong., *Rep. on Subverting
   Justice: How the Former President and His Allies Pressured DOJ to Overturn
   the 2020 Election* (2021), https://www.judiciary.senate.gov/imo/media/doc/
   Interim%20Staff%20Report%20FINAL.pdf ..........................................16

## Court Rules

Fed. R. App. P. 29(a)(4).................................................................................1

D.C. Dist. Ct. R. 5.4(o)(5)..............................................................................1

## Other Authorities

Jacqueline Alemany et al., *Ahead of Jan. 6, Willard Hotel in Downtown D.C. Was
   Trump Team "Command Center" for Effort to Deny Biden the Presidency*,
   Wash. Post, Oct. 23, 2021, https://www.washingtonpost.com/investigations/
   willard-trump-eastman-giuliani-bannon/2021/10/23/c45bd2d4-3281-11ec-
   9241-aad8e48f01ff_story.html...............................................................12

Katie Benner & Charlie Savage, *Jeffrey Clark Was Considered Unassuming. Then
   He Plotted With Trump*, N.Y. Times, Jan. 24, 2021, https://www.nytimes.com/
   2021/01/24/us/politics/jeffrey-clark-trump-election.html ......................15

Michael Biesecker et al., *Capitol Rioters Included Highly Trained Ex-Military
   and Cops*, Associated Press, Jan. 15, 2021, https://apnews.com/article/ex-
   military-cops-us-capitol-riot-a1cb17201dfddc98291edead5badc257 ....................12

Philip Bump, *A Pillow Salesman Apparently Has Some Ideas About Declaring
   Martial Law*, Wash. Post, Jan. 15, 2021, https://www.washingtonpost.com/
   politics/2021/01/15/pillow-salesman-apparently-has-some-ideas-about-
   declaring-martial-law/...........................................................................15

Ashton Carter et al., Opinion, *All 10 Living Former Defense Secretaries:
   Involving the Military in Election Disputes Would Cross into Dangerous
   Territory*, Wash. Post, Jan. 3, 2021, https://www.washingtonpost.com/
   opinions/10-former-defense-secretaries-military-peaceful-transfer-of-
   power/2021/01/03/2a23d52e-4c4d-11eb-a9f4-0e668b9772ba_story.html.............................16

The Declaration of Independence pmbl. (U.S. 1776) ........................................................2

The Federalist No. 76 (Alexander Hamilton) ...........................................................1, 19

Memorandum from John Eastman (2021), *available at* https://cdn.cnn.com/cnn/
 2021/images/09/20/eastman.memo.pdf .................................................................10

Robert Kagan, *Opinion: Our Constitutional Crisis Is Already Here*, Wash. Post,
 Sept. 23, 2021, https://www.washingtonpost.com/opinions/2021/09/23/robert-
 kagan-constitutional-crisis/ .................................................................................2

Alex Leary, *Pence Reject Calls to Overturn Results*, Wall St. J., Jan. 6, 2021,
 https://www.wsj.com/livecoverage/biden-trump-electoral-college-
 certification-congress/card/EYHe5tUFNJJN4SbVQGuB?mod=e2tw ..................10

Ryan Mac & Sheera Frenkel, *Internal Alarm, Public Shrugs: Facebook's
 Employees Dissect Its Election Role*, N.Y. Times, Oct. 22, 2021,
 https://www.nytimes.com/2021/10/22/technology/facebook-election-
 misinformation.html.............................................................................................12

Ann E. Marimow & Josh Dawsey, *What Rosen Told U.S. Senators: Trump
 Applied "Persistent" Pressure to Get Justice to Discredit Election*, Wash.
 Post, Aug. 12, 2021, https://www.washingtonpost.com/national-
 security/rosen-senate-judiciary-testimony-trump/2021/08/12/4b500618-fabd-
 11eb-8a67-f14cd1d28e47_story.html ...................................................................15

Press Release, *McConnell on Impeachment: "Disgraceful Dereliction" Cannot
 Lead Senate to "Defy Our Own Constitutional Guardrails,"* (Feb. 13, 2021),
 https://www.republicanleader.senate.gov/newsroom/remarks/mcconnell-on-
 impeachment-disgraceful-dereliction-cannot-lead-senate-to-defy-our-own-
 constitutional-guardrails ....................................................................................2, 19

Letter from Dana Remus, Counsel to the President, to David Ferriero, Archivist of
 the United States (Oct. 8, 2021), https://www.archives.gov/files/foia/
 pdf/remus-letter-to-ferriero-re-first-january-6-notification.10.08.2021.pdf ..........11

Nicholas Reimann, *Trump Reportedly Asked Advisors About Deploying Military
 to Overturn Election*, Forbes, Dec. 19, 2020, https://www.forbes.com/
 sites/nicholasreimann/2020/12/19/trump-reportedly-asked-advisors-about-
 deploying-military-to-overturn-election/?sh=47f8a674ce2b ..................................10

Warren P. Strobel & Nancy A. Youssef, *White House National Security Council
 Aide Is Named to Top Pentagon Post*, Wall St. J., Nov. 10, 2020,
 https://www.wsj.com/articles/white-house-national-security-council-aide-is-
 named-to-top-pentagon-post-11605037916..........................................................10

Sara Swann, *Reforming One Law Could Prevent Another Election Insurrection, Experts Say*, The Fulcrum, Aug. 31, 2021, https://thefulcrum.us/electoral-count-act-reform ..............................................................................................................9

Hunter Walker, *Jan. 6 Protest Organizers Say They Participated in "Dozens" of Planning Meetings With Members of Congress and White House Staff*, Rolling Stone, Oct. 25, 2021, https://www.rollingstone.com/politics/politics-news/exclusive-jan-6-organizers-met-congress-white-house-1245289/...............................3, 8

## INTEREST OF AMICI CURIAE[1]

*Amici* are former members of Congress.  They submit this brief in support of Defendants to explain why an armed attack on the United States Capitol that disrupted the peaceful transfer of presidential power—and not the document requests necessary to investigate it—is the only grave threat to the Constitution before the Court, and why a congressional investigation and remedial legislation are plainly warranted to protect the Constitution from future assaults on the peaceful transfer of power.  *Amici* urge the Court to deny the request for a preliminary injunction so that the Select Committee to Investigate the January 6th Attack on the United States Capitol (hereinafter, the "Select Committee") can obtain the information it needs to do its work.

## INTRODUCTION

Unfolding like a fever dream in James Madison's restless imagination, Donald Trump's actions leading up to and on January 6th, 2021, tested our constitutional system in ways that no prior occupant of the Office of President of the United States ever had.  Some of those actions, such as his attempts to install acting officials that had "no other merit than that of . . . possessing the necessary insignificance and pliancy to render them the obsequious instruments of his pleasure,"[2] relied on his abuse of core presidential powers.  Others, such as his efforts, as described by Senate Minority Leader Mitch McConnell, to "engineer the campaign of disinformation and rage that" resulted in the storming of the Capitol, which he then "watched . . . happily" on television as "Vice President Pence was in danger" and "the mob carrying Trump banners was beating cops

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4), as incorporated by this Court's Local Civil Rule 5.4(o)(5), undersigned counsel states that no party's counsel authored this brief in whole or in part.  Nor did any party or party's counsel, or any other person other than *amici curiae* or their counsel, contribute money that was intended to fund preparing or submitting this brief.

[2] The Federalist No. 76 (Alexander Hamilton).

and breaching perimeters,"[3] involved actions taken in his private capacity as a failed candidate for reelection.  Taken together, Mr. Trump's public and private actions—some of which are now known, but others of which surely remain unknown—came far closer to blocking a peaceful transfer of power and imperiling the lives of Senators, Representatives, and the Vice President of the United States than *amici*, with their over 850 combined years of congressional service, could have ever imagined.

That state of affairs is untenable for American democracy.  In a country built on the idea that the government can only derive its "just powers from the consent of the governed," The Declaration of Independence pmbl. (U.S. 1776), the success of our democracy depends on a peaceful transfer of presidential power following a free and fair election.  Thankfully, Congress has broad legislative powers grounded in multiple constitutional clauses to enact legislation to respond to the heretofore unimagined vulnerabilities in our constitutional system illustrated by last winter's events.  It also has the investigative tools, including those at issue in this litigation, to gather the information necessary to identify gaps in the guardrails of our democracy and tailor legislation to address current and future threats.  But as our country remains at risk of "its greatest political and constitutional crisis since the Civil War, with a reasonable chance over the next three to four years of incidents of mass violence" and a "breakdown of federal authority,"[4] it is vital that Congress have the ability to exercise those constitutional authorities *now* before the lives of Senators, Representatives, and the Vice President of the United States—along with their staffs and

---

[3] Press Release, *McConnell on Impeachment: "Disgraceful Dereliction" Cannot Lead Senate to "Defy Our Own Constitutional Guardrails,"* (Feb. 13, 2021), https://www.republicanleader. senate.gov/newsroom/remarks/mcconnell-on-impeachment-disgraceful-dereliction-cannot-lead-senate-to-defy-our-own-constitutional-guardrails.

[4] Robert Kagan, *Opinion: Our Constitutional Crisis Is Already Here*, Wash. Post, Sept. 23, 2021, https://www.washingtonpost.com/opinions/2021/09/23/robert-kagan-constitutional-crisis/.

the law enforcement officers charged with protecting the Capitol and its inhabitants—are ever again threatened or the peaceful transfer of power is again imperiled.

In seeking to enjoin the Select Committee from obtaining presidential records from the National Archives and Records Administration ("NARA"), Mr. Trump relies heavily on the proposition that Congress does not need those records to further any legislation. This assertion is dubious given the range of vulnerabilities exposed on January 6th that Congress must now remedy, and it is wholly inapt where Mr. Trump personally orchestrated the assault on our democracy. When Congress seeks to legislate against "known unknowns," it can usually rely on broad "catchalls" to shore up legislation, *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009), and Congress generally may not look to presidential records as a "case study for general legislation," *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2036 (2020) (internal quotation marks omitted). The once unimaginable problem here, of course, is that a sitting president and his aides personally orchestrated a multifaceted assault on the peaceful transition of presidential power, and neither Congress nor the public more broadly yet knows the full range of means deployed or considered and discarded. Just this week, explosive reporting again placed Mr. Trump, his Chief of Staff Mark Meadows, several Members of Congress, and Trump allies with ties to white nationalists at the very center of the plot to disrupt the election's certification and suggested that many involved were led to believe the former President would pardon them for crimes committed in the process.[5] The anonymous sources in this reporting may, of course, be self-interested or even untruthful. But the Select Committee—and the American people—should not have to rely on *Rolling Stone* to do

---

[5] *See* Hunter Walker, *Jan. 6 Protest Organizers Say They Participated in "Dozens" of Planning Meetings With Members of Congress and White House Staff*, Rolling Stone, Oct. 25, 2021, https://www.rollingstone.com/politics/politics-news/exclusive-jan-6-organizers-met-congress-white-house-1245289/.

the fact-checking when these facts, and likely many more, lie in the records the Select Committee now seeks.

From what is publicly known, it is clear that (1) Mr. Trump played an outsized—and likely central—role in orchestrating the events that led to the January 6th attack; and (2) the various means he used or contemplated are likely documented in the records the Committee seeks and are still not known.  If traitors bent on disrupting and damaging our government were to meticulously plan and nearly succeed in flying a jumbo jet into the White House, we would not expect Congress to implement stronger safeguards without the opportunity to investigate the attackers.  And we certainly would not expect Congress to sit on its hands when it comes to such an important matter of national security.  Indeed, Congress thoroughly investigated the 9/11 attacks, including the actions of senior administration officials and the organization of the attacks, precisely to identify key vulnerabilities and recommend reforms.  *See Joint Inquiry Into the Terrorist Attacks of September 11, 2001*, S. Rep. No. 107-351, H.R. Rep. No. 107-792 (2002).  Congress's power to do so here is not reduced—and is likely elevated—where the targets of the investigation include a former President and sitting Members of Congress.  Congress cannot be left "shooting in the dark, unable to legislate wisely or effectively," *Mazars*, 140 S. Ct. at 2031 (internal quotation marks omitted), guessing at "unknown unknowns," when our very democracy hangs in the balance.  Under these circumstances, no personal interests of Mr. Trump or disputed and unresolved questions of executive privilege could possibly tilt the scales against disclosing these records to the Select Committee.

Accordingly, *amici* urge the Court to deny the request for a preliminary injunction so that the Select Committee and Congress may access the critical information to which they are entitled and which Congress needs to successfully exercise its legislative powers to protect our

constitutional democracy from future autocrats and demagogues who seek to exploit weaknesses in the current legislative and constitutional framework—a framework that ensured the peaceful transition from one President to the next for more than two centuries but which is now vulnerable.

## ARGUMENT

I.    **THE SELECT COMMITTEE'S POWER TO INVESTIGATE THE JANUARY 6TH INSURRECTION ARISES FROM CONGRESS'S LEGISLATIVE AUTHORITY OVER, AMONG OTHER THINGS, FEDERAL ELECTIONS, TRANSITIONS OF PRESIDENTIAL POWER, FEDERAL PROPERTY, AND INSURRECTIONS.**

In the wake of the January 6th insurrection, the House of Representatives has unequivocally expressed its intent to legislate in order to help protect the peaceful transfer of power from future violence and interference.  H.R. Res. 503, 117th Cong. (2021).  To further that legislative purpose, the House has delegated its investigatory powers in service of such legislation to the Select Committee.  *Id.*  The Resolution creating the Select Committee tasks it with undertaking a sweeping investigation into the "facts, circumstances, and causes" relating to the January 6th attack so that it may issue a report recommending changes in law to better protect the peaceful transition of power.[6]  The Resolution expressly empowers the Select Committee to issue subpoenas to gather all necessary information to meet that mandate.[7]

*Amici* believe that such an investigation is critical for Congress to be able to "legislate wisely [and] effectively" in order to preserve, protect, and defend our institutions and the peaceful transition of power.  *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927).  In the weeks and months leading up to the January 6th insurrection, those who were determined to end our national heritage of the peaceful transfer of presidential power pursued many novel, even unthinkable tactics in designing their attacks on our democracy.  Their efforts, which the Select Committee is still

---

[6] H.R. Res. 503 §§ 3(1), 4, 117th Cong. (2021).

[7] *Id.* § 5(c)(4)–(6), (7); H.R. Rule XI(2)(m).

uncovering through its subpoenas for testimony and documents, point to multiple heretofore unimagined threats—threats that should be addressed by legislation utilizing all of Congress's applicable powers.  A full and complete investigation into the historically unprecedented assault on the peaceful transfer of power is required so as to ensure that any legislative solution is responsive and proportional to the full breadth of threats our democracy presently faces.

Congress has the unequivocal power to enact legislation on these issues, the House of Representatives has the unequivocal power to task a Select Committee with investigating the January 6th insurrection, and both of these powers have been properly channeled into the document requests at issue in this lawsuit.

### A. Congress Has Broad Constitutional Powers To Pass Legislation To Ensure the Peaceful and Lawful Transfer of Presidential Power.

The Framers of the United States Constitution granted Congress broad powers to protect the peaceful transfer of presidential power based on free and fair elections.  And subsequent constitutional amendments have even further expanded those powers.  As a result, the Select Committee's investigation into the January 6th Insurrection "concern[s]" multiple "subject[s] on which legislation [may] be had."  *Mazars*, 140 S. Ct. at 2031 (internal quotation marks omitted).  Consider, for example, Congress's powers under the following constitutional clauses.

*The Electors Clause and the Twelfth Amendment.*  The Electors Clause directly empowers Congress to "determine the Time of ch[oo]sing the Electors, and the Day on which they shall give their Votes."  U.S. Const. art. II, § 1, cl. 4.  The Twelfth Amendment empowers Congress to count the certificates of elections submitted by the Electoral College.  U.S. Const. amend. XII.

*The Appointments Clause.*  The Appointments Clause of the Constitution grants Congress the power to "by Law vest the Appointment of such inferior Officers, as they think proper, in the

President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

*The Property Clause.* The Property Clause of the Constitution empowers Congress to "make all needful Rules and Regulations respecting . . . Property belonging to the United States." U.S. Const. art. IV, § 3.

*The Fourteenth Amendment Enforcement Power.* Section 5 of the Fourteenth Amendment grants "Congress . . . the power to enforce, by appropriate legislation, the provisions" of the Fourteenth Amendment. One of those provisions—Section 3 of the Fourteenth Amendment—makes it illegal for anyone who had "taken an oath . . . to support the Constitution of the United States" as a "a member of Congress," "an officer of the United States," "a member of any State legislature," or "an executive or judicial officer of any State" from ever again serving as a "Senator or Representative in Congress," serving as an "elector of President and Vice-President," or holding "any office, civil or military, under the United States, or under any State," if they "engaged in insurrection or rebellion against the" Constitution of the United States, or had "given aid or comfort to the enemies thereof." U.S. Const. amend. XIV, § 3. Accordingly, the Fourteenth Amendment grants Congress the legislative power—particularly, after it believes an insurrection has occurred—to pass legislation setting out a process for enforcing the Amendment's provisions in court. *See, e.g.*, Act of May 31, 1870, ch. 114, §§ 14–15, 16 Stat. 140, 143–44 (creating a "duty" for U.S. Attorneys to bring quo warranto actions against individuals holding office in violation of Section 3 of the Fourteenth Amendment that "take precedence of all other

cases on the docket of the court to which it is made returnable," and creating a misdemeanor penalty for holding office in violation of the Amendment).[8]

*The Necessary and Proper Clause*.  The Necessary and Proper Clause grants Congress broad authority to pass laws that are "necessary and proper for carrying into Execution" *either* (i) Congress's legislative powers *or* (ii) "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  U.S. Const. art. I, § 8, cl. 18.  The Clause grants Congress the authority to regulate presidential elections to prevent interference with the federal elections process, as well as to protect the people and processes of the federal government, including from armed assault and burglary.  *See, e.g.*, *Ex parte Yarbrough (The Ku-Klux Cases)*, 110 U.S. 651, 658–59 (1884) (noting that it is beyond question that Congress may pass laws regulating the burglary of federal entities); *Burroughs v. United States*, 290 U.S. 534, 547–48 (1934) (noting Congress's powers to prevent violence and corruption in presidential elections); U.S. Const. art. IV, § 3 (empowering Congress to "make all needful Rules and Regulations respecting . . . Property belonging to the United States").[9]

---

[8] Congress's powers under Section 3 of the 14th Amendment also give rise to an investigative power necessary to determine whether sitting Members of Congress are serving in violation of that constitutional prohibition and to make the case for their expulsion, which it is empowered to effect by Article I, Section 5 of the Constitution.  Recent reporting identifying seven members of Congress involved in orchestrating the attacks makes these powers and their relevance to the Select Committee's work salient.  *See* Hunter Walker, *Jan. 6 Protest Organizers Say They Participated in "Dozens" of Planning Meetings With Members of Congress and White House Staff*, Rolling Stone, Oct. 25, 2021, https://www.rollingstone.com/politics/politics-news/exclusive-jan-6-organizers-met-congress-white-house-1245289/.

[9] *See also United States v. Harriss*, 347 U.S. 612, 625 (1954) (recognizing Congress's power to legislate for "self-protection"); *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 564–65 (1973) (recognizing Congress's power to ensure that "employees in the Executive Branch of the Government, or those working for any of its agencies . . . administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party").

Exercising these and other powers, Congress has long legislated to ensure the peaceful transition of presidential power. That includes, but certainly is not limited to, setting the dates for the election and tallying and certification of electoral college votes, 3 U.S.C. §§ 1, 7, 15; requiring the General Services Administration to name the winner of the election, and providing the designated winner with funds and access to facilitate a smooth transition, 3 U.S.C. § 102 note (1989); limiting the President's ability to use acting officials to subvert the transition, *see* 5 U.S.C. §§ 3345–3349d; prohibiting officials overseeing the transition from engaging in pernicious political activities, *see* 5 U.S.C. §§ 7321–26; criminalizing any intimidation or other attempts to improperly influence officials who oversee and execute presidential transitions, as well as criminalizing the destruction of government property, *see* 18 U.S.C. §§ 111, 115, 1361; protecting whistleblowers who flag efforts to subvert the transition of power, *see, e.g.*, 5 U.S.C. § 2302; prohibiting the President and others from bribing state electors, *see* 18 U.S.C. § 201; providing for the Capitol police and Secret Service, which protect the Capitol complex, legislators, the President, and the President-elect during transitions, *see* 2 U.S.C. §§ 1901–82; 18 U.S.C. §§ 3056–3056A; empowering the President to quell (but not to incite) an insurrection disrupting the transfer of power, *see* 10 U.S.C. §§ 251–54; and limiting the President's ability to deploy the military to subvert the transfer of power, *see, e.g.*, 18 U.S.C. § 1385.

In response to what is known so far about the January 6th attack and broader efforts to undermine the transition of presidential power, Congress is already working to shore up these and other laws to better protect the peaceful transition of power. Members of Congress are actively drafting legislation to reform the Electoral Count Act,[10] drawing on information that has already

---

[10] Sara Swann, *Reforming One Law Could Prevent Another Election Insurrection, Experts Say*, The Fulcrum, Aug. 31, 2021, https://thefulcrum.us/electoral-count-act-reform.

been made public about efforts by Mr. Trump and his consiglieres to subvert the statutory and constitutional processes for Electoral College certificate counting in 2020.[11]  Congress is also actively considering legislation[12] to reform the President's statutorily-created powers to fill temporarily vacant offices after Mr. Trump abused those authorities to interfere with the peaceful transfer of power.[13]  Unsurprisingly, Congress also has proposed a new measure to enforce the Fourteenth Amendment against insurrectionists, *see, e.g.*, H.R. 1405, 117th Cong. (2021), a legislative task necessarily linked to (and furthered by) the Select Committee's investigation.

But Congress cannot protect against weaknesses it does not know about.  That is why it is critical that Congress be granted access to *all* of the information necessary to reveal *all* of the ways in which Mr. Trump, his aides, and his allies considered, attempted, and, in some respects, succeeded in subverting the lawful, peaceful transition of presidential power.

### B. Congress Has A Compelling Need to Engage In A Thorough and Complete Investigation of Mr. Trump's Attempts To Interfere With the Peaceful Transfer of Power So That It Can Exercise Its Legislative Powers.

Given that Congress has broad constitutional authority to pass laws to ensure the peaceful transfer of power, the Select Committee's investigation into the January 6th insurrection's violent interference with the peaceful transfer of power has a "valid legislative purpose" because it

---

[11] Memorandum from John Eastman (2021), *available at* https://cdn.cnn.com/cnn/2021/images/09/20/eastman.memo.pdf.

[12] H.R. 5314 §§ 901–02, 117th Cong. (2021).

[13] *See* Alex Leary, *Pence Reject Calls to Overturn Results*, Wall St. J., Jan. 6, 2021, https://www.wsj.com/livecoverage/biden-trump-electoral-college-certification-congress/card/EYHe5tUFNJJN4SbVQGuB?mod=e2tw; Warren P. Strobel & Nancy A. Youssef, *White House National Security Council Aide Is Named to Top Pentagon Post*, Wall St. J., Nov. 10, 2020, https://www.wsj.com/articles/white-house-national-security-council-aide-is-named-to-top-pentagon-post-11605037916; Nicholas Reimann, *Trump Reportedly Asked Advisors About Deploying Military To Overturn Election*, Forbes, Dec. 19, 2020, https://www.forbes.com/sites/nicholasreimann/2020/12/19/trump-reportedly-asked-advisors-about-deploying-military-to-overturn-election/.

concerns "a subject on which legislation could be had." *Mazars,* 140 S. Ct. at 2031 (internal

quotation marks omitted). So the key question here is not whether the Select Committee is acting

pursuant to a valid legislative purpose (it is) or what its supposed motive is in issuing any particular

request (which is irrelevant),[14] but rather whether Congress has demonstrated a sufficient need to

access the files it seeks here.

It has. In fact, Congress has demonstrated this need *even if* the Court concludes (a) that

Mr. Trump can assert armchair executive privilege from his home in Florida, notwithstanding the

actual President's determination that "an assertion of executive privilege is not in the best interest

of the United States, and therefore is not justified as to any of the[se] [d]ocuments"[15] and the many

subject matter defects in Mr. Trump's privilege claims[16]; and (b) that the heightened standard for

congressional need for a *sitting* President's documents that the courts used in *U.S. v. Nixon* and

*Senate Select Committee v. Nixon* apply. Even then, a full investigation into Mr. Trump's

multifaceted attempts to interfere with the peaceful and lawful transfer of power is so

"demonstrably critical to the responsible fulfillment of the Committee's functions," *Senate Select

Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en

banc), that the Committee has a sufficient "demonstrated, specific need," *United States v. Nixon*,

418 U.S. 683, 713 (1974), to overcome *any* judicially-credited assertion of executive privilege by

the former President. The Court need not parse each and every document to decide whether the

---

[14] When a Committee acts pursuant to a valid legislative purpose, its motives do not vitiate the validity of its requests. *See Watkins v. United States*, 354 U.S. 178, 200 (1957) ("[M]otives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served.").

[15] Letter from Dana Remus, Counsel to the President, to David Ferriero, Archivist of the United States (Oct. 8, 2021), https://www.archives.gov/files/foia/pdf/remus-letter-to-ferriero-re-first-january-6-notification.10.08.2021.pdf.

[16] *See infra*, note 25 and accompanying text.

privilege applies, however, because the events of January 6th, and Mr. Trump's conduct in particular, urgently and unquestionably—specifically, demonstrably, and critically—demand legislative action.

In the weeks leading up to January 6th, Mr. Trump's loyalists, lawyers, and campaign officials gathered at the Willard Hotel in Washington, D.C., in a "command center" where they worked "day and night" to identify "any possible constitutional loophole" that would allow them to "overturn[] the results of the 2020 election."[17]   This was unprecedented, and from the perspective of *amici*, who once sat where Members of the Select Committee do now, previously unimaginable.  On January 6th, most of the command center faithful joined their failed candidate Trump at the White House Ellipse for the "Stop the Steal" rally that subsequently transformed into the insurrectionist mob.  Mr. Trump and his allies in the command center—including some on White House payroll, some within the Department of Justice, and a cast of other Trump supporters from Mike Lindell, CEO of MyPillow, Inc., to far right activist Ali Alexander, the Oath Keepers, and thousands of Americans radicalized and organized on social media[18]—plotted, inspired, and carried out an election subversion campaign that led to the deaths of several people, put at risk the lives of "anyone [the mob] got their hands on," including the Speaker of the House and the Vice President,[19] and terrorized Members of Congress, their staffs, and the law enforcement summoned

---

[17] Jacqueline Alemany et al., *Ahead of Jan. 6, Willard Hotel in Downtown D.C. Was Trump Team "Command Center" for Effort to Deny Biden the Presidency*, Wash. Post, Oct. 23, 2021, https://www.washingtonpost.com/investigations/willard-trump-eastman-giuliani-bannon/2021/10/23/c45bd2d4-3281-11ec-9241-aad8e48f01ff_story.html.

[18] *See* Ryan Mac & Sheera Frenkel, *Internal Alarm, Public Shrugs: Facebook's Employees Dissect Its Election Role*, N.Y. Times, Oct. 22, 2021, https://www.nytimes.com/2021/10/22/technology/facebook-election-misinformation.html.

[19] Michael Biesecker et al., *Capitol Rioters Included Highly Trained Ex-Military and Cops*, Associated Press, Jan. 15, 2021, https://apnews.com/article/ex-military-cops-us-capitol-riot-a1cb17201dfddc98291edead5badc257.

to protect them.  And they came harrowingly close to preventing the peaceful transfer of presidential power for the first time in American history.

Unlike familiar modes of corruption, such as improper lobbying, where Congress well understands the ways and means deployed, Congress has never confronted anything like what happened on January 6th.  Mr. Trump's efforts to exploit the weak points in our political and constitutional systems were novel.  There are no other historical comparators or case studies to which the Select Committee can look in formulating recommendations to the House for designing legislation to safeguard the peaceful transfer of power and for ensuring that any proposed legislation adequately responds to the full spectrum of threats our democracy now faces.

Who, before last winter, would have imagined that a failed presidential candidate would use wild conspiracy theories to stoke an extremist mob, urge it to assemble in Washington, D.C., and then point the mob towards the Capitol?  Who, before last winter, would have expected the President's lawyer to call for "trial by combat" before such a mob?  Who, before last winter, would have imagined a failed presidential candidate calling the chief elections official of a state that he lost (after his loss had been confirmed by two statewide recounts) to demand that the state official "find" one more vote than needed for the failed candidate to win the state?  Who, before last winter, would have imagined that the Administrator for the General Services Administration would delay naming a President-elect, long after the result of the election was clear, due to the brazen sabotage efforts of the losing President?  Who, before last winter, would have imagined the President contemplating conspiring with the acting head of the Civil Division of the U.S. Department of Justice to try to pressure the Acting Attorney General to send demonstrably false letters to state legislatures in an attempt to leverage a lie to prompt the creation of competing slates of state electors?  Who, before last winter, would have imagined the President bullying the Vice President

13

to unlawfully disregard the "regularly given" electoral votes from particular states, *see* 3 U.S.C. § 15, before gleefully watching on television as a mob he assembled and incited threatened the Vice President's life after he refused to break the law and ignore his oath of office?

All these questions lead to this one:  given all the unexpected, unfamiliar, and unpredictable actions that we now know Mr. Trump took last winter in his attempt to cling to power, why would we think that every strategy he and his supporters tried or considered is already a matter of public knowledge?  And how can Congress be expected to design adequate legislative safeguards to meet an unfamiliar future threat if it is kept partially in the dark about what the people posing that threat last time were trying to do?

The documents the Select Committee seeks are necessary to ensure that any legislative solution is properly crafted and sufficiently ambitious to respond to previously unimaginable threats to the peaceful transition of power.  For example:

- The Select Committee requests "[a]ll documents and communications relating in any way to remarks made by Donald Trump or any other persons on January 6," "all documents and communications related to efforts, plans, or proposals to contest the 2020 Presidential election results," and "all documents and communications related to plans, efforts, or discussions regarding the electoral count (including plans, efforts, or discussions regarding delaying or impeding the electoral count)."  Decl. of Jesse R. Binnall Ex. 1 at 2, 5 (Oct. 19, 2021), ECF No. 5-2.  The Select Committee plainly requires those records to learn all of the potential unlawful avenues to overturn the election that Mr. Trump and his allies at the "command center" and elsewhere considered, and whether and to what extent Congress needs to amend campaign finance, political corruption, and election administration laws to prevent the methods deployed (or considered and discarded) from being successful in future elections.

- The Select Committee requests "all documents and communications referring or relating to the 2020 election results between White House officials and officials of State Governments" from November 3, 2020, through January 20, 2021.  *Id.* at 5.  The Committee requires those records to learn the extent and means by which Mr. Trump and his aides improperly pressured state electors into refusing to certify or decertifying the election results, and whether and to what extent Congress should update federal prohibitions on bribery and pernicious political activity as a result.

- The Select Committee seeks "[a]ll documents and communications relating to allegations of election fraud or to challenging, overturning, or questioning the validity

14

of the 2020 Presidential election, and involving personnel of the Department of Justice, including any one or more of the following individuals: Jeffrey Rosen, Richard Donoghue, Steven Engel, Jeffrey Wall, Patrick Hovakimian, Byung J. 'BJay' Pak, Bobby Christine, or Jeffrey Clark." *Id.* at 6.  The Committee needs those records to understand which statutory and regulatory frameworks led some officials at DOJ, such as Acting Attorney General Jeffrey Rosen, to refuse to go along with Mr. Trump's most egregious election subversion ideas,[20] while others, like Acting Assistant Attorney Jeffrey Clark were so pliable,[21] as well as to understand how an obscure acting official like Jeffrey Clark came to wield so much sway within the White House.  Those records are critical to making an informed judgment about whether and to what extent Congress needs to strengthen laws governing the appointment of federal officers, federal vacancies, the politicization of law enforcement, and the civil service in order to better promote fidelity to the oath of office and rule of law and prevent corruption.

- The Select Committee requests "[a]ll documents and communications relating to planned protests, marches, public assemblies, rallies, or speeches in Washington, D.C., on November 14, 2020, December 12, 2020, January 5, 2021, and January 6, 2021." *Id.* at 7.  The Committee requires those records to learn whether and the extent to which Mr. Trump mobilized his supporters for the purpose of unlawfully disrupting the peaceful transition of power, and whether and how Congress could prevent the online mobilization of a failed candidate's supporters to violence while being protective of First Amendment rights.

- The Select Committee requests "all documents and communications relating to challenging the validity of the 2020 election, to, from, or mentioning Mike Lindell" from April 1, 2020, through January 20, 2021.  *Id.* at 9.  The Select Committee requires those records to understand, among other things, the significance of reports that the CEO of a pillow company entered the White House on January 15, 2021, with notes urging the President to declare martial law and appoint Trump loyalist Kash Patel as Acting CIA Director,[22] and whether and to what extent Congress must take action to address our government's vulnerability to improper influence.

- The Select Committee requests "[a]ll documents and communications related to the January 3, 2021, letter from 10 former Defense Secretaries warning of use of the

---

[20] *See* Ann E. Marimow & Josh Dawsey, *What Rosen Told U.S. Senators: Trump Applied "Persistent" Pressure to Get Justice to Discredit Election*, Wash. Post, Aug. 12, 2021, https://www.washingtonpost.com/national-security/rosen-senate-judiciary-testimony-trump/2021/08/12/4b500618-fabd-11eb-8a67-f14cd1d28e47_story.html.

[21] Katie Benner & Charlie Savage, *Jeffrey Clark Was Considered Unassuming. Then He Plotted With Trump*, N.Y. Times, Jan. 24, 2021, https://www.nytimes.com/2021/01/24/us/politics/jeffrey-clark-trump-election.html.

[22] *E.g.*, Philip Bump, *A Pillow Salesman Apparently Has Some Ideas About Declaring Martial Law*, Wash. Post, Jan. 15, 2021, https://www.washingtonpost.com/politics/2021/01/15/pillow-salesman-apparently-has-some-ideas-about-declaring-martial-law/.

military in election disputes." *Id.* at 12.  In that unprecedented op-ed, all former living Secretaries of Defense called for a peaceful transition of power and reiterated that there is no role for the military in election disputes.[23]  The Committee needs the records it seeks to learn whether Mr. Trump and his aides considered deploying the military, and whether and to what extent Congress must strengthen the restrictions on the President's power to deploy the military.

The conduct that the Select Committee is working to address is without precedent in American history.  The bad behavior at issue in the Watergate investigation—a bungled burglary, its cover-up, and the President's strong-arming of federal officials to do his bidding—is almost quaint as compared to the months-long, miles-wide, thousands-strong and, from a conventional perspective, often baffling effort to overturn the 2020 election.  Thus, while the D.C. Circuit of course denied the Senate Select Committee on Presidential Campaign Activities' request for the Watergate tapes related to unlawful campaign activity, January 6th was different in kind from the situation in *Senate Select Committee*.  In that case, the Senate Select Committee sought access to the Watergate tapes already in the possession of the House Committee on the Judiciary, and there was "no indication" that the House Committee's inquiry into the very same materials was "so likely to be inconclusive or long in coming" that the Senate Select Committee "need[ed] immediate access of its own," *id.* at 733.  Here, there is no guarantee that, absent the House Select Committee's investigation, Mr. Trump's full efforts to imperil the peaceful transition of power will be known to Congress as it shapes a legislative correction.[24]  The breadth of the Select

---

[23] Ashton Carter et al., Opinion, *All 10 Living Former Defense Secretaries: Involving the Military in Election Disputes Would Cross into Dangerous Territory*, Wash. Post, Jan. 3, 2021, https://www.washingtonpost.com/opinions/10-former-defense-secretaries-military-peaceful-transfer-of-power/2021/01/03/2a23d52e-4c4d-11eb-a9f4-0e668b9772ba_story.html.

[24] *See, e.g.*, Majority Staff of S. Comm. on the Judiciary, 117th Cong., *Rep. on Subverting Justice: How the Former President and His Allies Pressured DOJ to Overturn the 2020 Election*, at 43, 48 (2021) (noting that various aspects of Mr. Trump's efforts to prevent the transition of power were beyond the scope of that Senate Judiciary Committee's purview and recommending that those issues be investigated by the Select Committee), *available at* https://www.judiciary.senate.gov/imo/media/doc/Interim%20Staff%20Report%20FINAL.pdf.

Committee's power to obtain the information it seeks in this case must be commensurate with the unfamiliarity of the problem at hand and the extreme danger of not addressing it legislatively. Should a President ever succeed in untethering themself from the results of a valid election and again prompt an attack on the Capitol, dozens of Senators and Representatives may well lay dead, and our democracy might never recover.

In sum, Congress has broad legislative powers to protect the peaceful transfer of power and a demonstrated, specific need to gather the information necessary to identify gaps in the guardrails of our democracy and tailor legislation to current and future threats to the peaceful transfer of power. This means that Congress's interests are sufficient to require access to the information it seeks *even if* the Court were to entertain Mr. Trump's armchair executive privilege assertion and apply a heightened standard for access—crediting Mr. Trump's complaint from Florida over the determination by President Biden, the current holder of the relevant privilege—because Congress's access to the information is in the public interest. The risks associated with denying Congress this access far outweigh any insult to the personal interests Mr. Trump may have in these records or any harm to the interests of the Office of the President that the former President gleans but the current holder of the office, chosen by the American people over Mr. Trump, disavows.

## II. THE CLEAR NEED FOR, AND PUBLIC INTEREST IN, THE SELECT COMMITTEE'S ACCESS TO THE MATERIALS IT SEEKS IS DETERMINATIVE OF THE PRESENT MOTION.

Executive privilege is a qualified privilege, and no litigant has a right to a preliminary injunction. *See United States v. Nixon*, 418 U.S. 683, 706 (1974); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Moreover, Donald Trump cannot gain the benefit of either when it would run contrary to the public interest.

That means the clear and overwhelming need for (and public interest in) Congress having documents to further its legitimate legislative purpose is fatal to Mr. Trump's motion, even without

considering some of the unsettled questions of constitutional law lurking at the margins of this dispute. The clock is ticking, not only on the Archivist's regulatory deadline for releasing the records, but also on the Select Committee's ability to conduct its investigation, digest the results, and recommend legislative safeguards that Congress can debate and enact before our next federal election. When such overwhelming congressional and public interest rests on one side of the balance, Mr. Trump's personal interests and the supposed executive interests he raises—and that the current occupant of the Office of the President disclaims—simply do not have sufficient weight to deny or delay Congress's access to these records.

What is more, the law is settled that a former President may potentially assert executive privilege only as to "communications in performance of [a President's] responsibilities, of his office, and made in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.* ("*GSA*"), 433 U.S. 425, 449 (1977) (citations and internal quotation marks omitted). And even when each of these requirements is satisfied, claims of executive privilege by a former President receive less weight when disavowed by the sitting President, who "is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch." *Id.*

Mr. Trump has not alleged that the documents requested by the Select Committee satisfy the requirements set forth in *GSA*, and any such allegation would be implausible because the Select Committee's requests narrowly target documents related to a plot by Mr. Trump, openly pursued in his personal capacity,[25] to overturn the results of a presidential election he lost. Rooted in

---

[25] In particular, many of Mr. Trump's actions up to and on January 6th were taken in his capacity as a losing presidential candidate and not his capacity as President. That's because the Constitution intentionally denies the President any official responsibility for the process of counting electoral votes. The Constitution states that the selection of electors shall be determined by "[e]ach State." U.S. Const. art. II, § 1, cl. 2. The electors then "meet in their respective states and vote by ballot for President and Vice-President." U.S. Const. amend. XII. Then the votes that are cast and certified by the Electors will be counted by the President of the Senate in the presence of the Senate

separation of powers, executive privilege exists to enable "the operation of Government." *Nixon*, 418 U.S. at 708; *Mazars*, 140 S. Ct. at 2032 (same). It accordingly yields when its application would undermine, rather than serve, the operation of government. *Nixon*, 418 U.S. at 708– 13. And as Senate Minority Leader McConnell explained, the efforts to overturn the election were not the official acts of a President; they were "a disgraceful dereliction of duty."[26] The executive privilege does not apply, thus ending the inquiry and dooming Mr. Trump's motion.

Even if Mr. Trump had properly invoked the thin sliver of executive privilege arguably afforded to him under *GSA*, which he has not, it would seem obvious that executive privilege must yield where a President attacks the peaceful transfer of presidential power through avenues known and some yet unknown and then attempts to invoke the privilege to prevent Congress from learning the full scope of those efforts and thus taking adequate corrective measures. *See Nixon*, 418 U.S. at 713; *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). More to the point, the records at issue are the only source that will reveal the full scope of Mr. Trump's efforts to undermine the election and lawful transition of power; the Select Committee's requests are specific and cabined to records related to its mandate; the Select Committee's legislative ends are clear from the resolution creating the Committee (the

---

and House of Representatives. *Id.* Neither the sitting President—nor any of his appointees—has any role in determining the outcome. Nor does the Electoral Count Act, the statute that governs the electoral count process, prescribe a role. 3 U.S.C. §§ 1–18. Indeed, the Framers were so committed to excluding the sitting President that they even "excluded from eligibility to [the electoral college], all those who from situation might be suspected of too great devotion to the President in office." The Federalist No. 68 (Alexander Hamilton). Accordingly, "No senator, representative, or other person holding a place of trust or profit under the United States, can be of the numbers of the electors." *Id.*; *see also* U.S. Const. art. II, § 1, cl. 2.

[26] Press Release, *McConnell on Impeachment: "Disgraceful Dereliction" Cannot Lead Senate to "Defy Our Own Constitutional Guardrails,"* (Feb. 13, 2021), https://www.republicanleader. senate.gov/newsroom/remarks/mcconnell-on-impeachment-disgraceful-dereliction-cannot-lead-senate-to-defy-our-own-constitutional-guardrails.

proportionality of which must be viewed in light of the unfamiliarity and potential danger of the problem at hand), *see* H.R. Res. 503 § 4(c), 117th Cong. (2021); and there is no significant burden on the legitimate operations of the Presidency, as evidenced by President Biden's decision not to invoke executive privilege.  *Cf. Mazars*, 140 S. Ct. at 2035–36.

## CONCLUSION

For the reasons above and those laid out in the brief for the Select Committee, *amici* respectfully urge the Court to deny Donald Trump's motion for a preliminary injunction and permit the Select Committee to move forward with its vital work.

Dated:  October 28, 2021

By:   /s/ Anne H. Tindall
Anne H. Tindall (D.C. Bar No. 494607)
Cameron Kistler (D.C. Bar No. 1008922)
Erica Newland*
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
P:  202-579-4582
anne.tindall@protectdemocracy.org
cameron.kistler@protectdemocracy.org
erica.newland@protectdemocracy.org

John Langford*
UNITED TO PROTECT DEMOCRACY
555 W 5th St.
Los Angeles, CA 90013
P:  202-579-4582
john.langford@protectdemocracy.org

John A. Freedman (D.C. Bar No. 453075)
Owen Dunn (D.C. Bar No. 1044290)
Samuel F. Callahan (D.C. Bar No. 888314461)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone:  (202) 942-5000
Fax: (202) 942-6200
john.freedman@arnoldporter.com
owen.dunn@arnoldporter.com
sam.callahan@arnoldporter.com

*Counsel for Amici Curiae*

*\* Admitted outside the District of Columbia;
practicing in D.C. under the supervision of
attorneys who are D.C. Bar members.*

## APPENDIX A—LIST OF AMICI CURIAE

- Alan Steelman, U.S. Representative (D-Texas), 1973-1977
- Allyson Y. Schwartz, U.S. Representative (D-Pennsylvania), 2005-2015
- Barney Frank, U.S. Representative (D-Massachusetts), 1981-2013; Chairman of the House Financial Services Committee, 2008-2011
- Bart Stupak, U.S. Representative (D-Michigan), 1993-2011
- Bob Inglis, U.S. Representative (R-South Carolina), 1993-1999, 2005-2011
- Brad Miller, U.S. Representative (D-North Carolina), 2003-2013
- Brian Baird, U.S. Representative (D-Washington), 1999-2011
- Bruce Braley, U.S. Representative (D-Iowa), 2007-2015
- Byron Dorgan, U.S. Representative (D-North Dakota), 1992-2011
- Carlos Curbelo, U.S. Representative (R-Florida), 2015-2019
- Charles Boustany, U.S. Representative (R-Louisiana), 2005-2017
- Chris Shays, U.S. Representative (R-Connecticut), 1987-2009
- Claudine Schneider, U.S. Representative (R-Rhode Island), 1981-1991
- Colleen Hanabusa, U.S. Representative (D-Hawaii), 2011-2015, 2016-2019
- Connie Morella, U.S. Representative (R-Maryland), 1987-2003; U.S. Ambassador to the Organization for Economic Co-operation and Development, 2003-2007
- Dave Durenberger, U.S. Senator (R-Minnesota), 1978-1995
- David Emery, U.S. Representative (R-Maine), 1975-1983; House Republican Chief Deputy Whip, 1981-1983
- David Skaggs, U.S. Representative (D-Colorado), 1981-1987; Chair of the Board of Directors of the U.S. Office of Congressional Ethics, 2019-present
- David Wu, U.S. Representative (D-Oregon), 1999-2011
- Deborah Halvorson, U.S. Representative (D-Illinois), 2009-2011
- Doug Bereuter, U.S. Representative (R-Nebraska), 1979-2004
- Earl Pomeroy, U.S. Representative (D-North Dakota), 1993-2011
- Ed Weber, U.S. Representative (R-Ohio), 1981-1983
- Elizabeth Holtzman, U.S. Representative (D-New York), 1973-1981
- Gary Ackerman, U.S. Representative (D-New York), 1983-2013
- Gary Hart, U.S. Senator (D-Colorado), 1975-1987; Vice Chair of the Homeland Security Advisory Council, 2009-2011
- Henry A. Waxman, U.S. Representative (D-California), 1975-2015; Chair of Energy & Commerce Committee, 2009-2010; Chair of Committee on Oversight & Government Reform, 2007-2008
- Howard Berman, U.S. Representative (D-California), 1983-2013
- James Bacchus, U.S. Representative (D-Florida), 1991-1995
- James McDermott, U.S. Representative (D-Washington), 1989-2017

- Jim Greenwood, U.S. Representative (R-Pennsylvania), 1993-2005
- Jim Kolbe, U.S. Representative (R-Arizona), 1985-2007
- Jim Leach, U.S. Representative (R-Iowa), 1977-2007; Chair of the House Banking and Financial Services Committee, 1995-2001
- Jim Turner, U.S. Representative (D-Texas), 1997-2005
- Jim Walsh, U.S. Representative (R-New York), 1989-2009
- Joe Crowley, U.S. Representative (D-New York), 1999-2019; Chair of the House Democratic Caucus, 2017-2019
- John Barrow, U.S. Representative (D-Georgia), 2005-2015
- John LeBoutillier, U.S. Representative (R-New York), 1981-1983
- Larry LaRocco, U.S. Representative (D-Idaho), 1991-1995
- Lois Capps, U.S. Representative (D-California), 1998-2017
- Martin Lancaster, U.S. Representative (D-North Carolina), 1987-1995; Assistant Secretary to the U.S. Army for Civil Works, 1996-1997
- Mary Jo Kilroy, U.S. Representative (D-Ohio), 2009-2011
- Matt McHugh, U.S. Representative (D-New York), 1975-1993
- Max Sandlin, U.S. Representative (D-Texas), 1997-2005
- Mel Levine, U.S. Representative (D-California), 1983-1993
- Mickey Edwards, U.S. Representative (R-Oklahoma), 1977-1993; Chair, House Republican Policy Committee, 1989-1993
- Mike Kopetski, U.S. Representative (D-Oregon), 1991-1995
- Mike Parker, U.S. Representative (D-Mississippi), 1989-1995; U.S. Representative (R-Mississippi), 1995-1999; Assistant Secretary for the Army of Civil Works, 2001-2002
- Paul Hodes, U.S. Representative (D-New Hampshire), 2007-2011
- Peter Smith, U.S. Representative (R-Vermont), 1989-1991
- Reid Ribble, U.S. Representative (R-Wisconsin), 2011-2017
- Richard Gephardt, U.S. Representative (D-Missouri), 1977-2005; Chair of the House Democratic Caucus, 1985-1989; House Majority Leader, 1989-1995; Leader of the House Democratic Caucus, 1995-2003
- Robert Carr, U.S. Representative (D-Michigan), 1975-1981
- Rod Chandler, U.S. Representative (R-Washington), 1983-1993
- Ron Klein, U.S. Representative (D-Florida), 2007-2011
- Russ Carnahan, U.S. Representative (D-Missouri), 2005-2013
- Steve Driehaus, U.S. Representative (D-Ohio), 2009-2011
- Steve Israel, U.S. Representative (D-New York), 2001-2017; Chair of the Democratic Congressional Campaign Committee, 2011-2015; Chair of the House Democratic Policy and Communications Committee, 2015-2017
- Steve Kagen, M.D., U.S. Representative (D-Wisconsin), 2007-2011
- Tim Petri, U.S. Representative (R-Wisconsin), 1979-2015

- Tim Wirth, U.S. Representative (D-Colorado), 1975-1987; Counselor of the Department of State, 1993-1994; Under Secretary of State for Democracy and Global Affairs, 1994-1997
- Tom Andrews, U.S. Representative (D-Maine), 1991-1995
- Tom Coleman, U.S. Representative (R-Missouri), 1976-1993
- Tom Perriello, U.S. Representative (D-Virginia), 2009-2011
- Vic Fazio, U.S. Representative (D-California), 1979-1999; Chair of the House Democratic Caucus, 1995-1999
- Wayne T. Gilchrest, U.S. Representative (R-Maryland), 1991-2009

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 28, 2021, I served the foregoing document on all counsel of record by filing it using this Court's CM/ECF system.

/s/ Owen Dunn