## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DONALD J. TRUMP, in his capacity as
the 45th President of the United States,

      Plaintiff,

          v.

BENNIE G. THOMPSON, in his official
capacity as Chairman of the United States
House Select Committee to Investigate
the January 6th Attack on the United States
Capitol; THE UNITED STATES HOUSE
SELECT COMMITTEE TO INVESTIGATE
THE JANUARY 6TH ATTACK ON THE
UNITED STATES CAPITOL; DAVID S.
FERRIERO, in his official capacity as
Archivist of the United States; and THE
NATIONAL ARCHIVES AND RECORDS
ADMINISTRATION,

      Defendants.

Civil Action No. 21-2769

## REPLY IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS.........................................................................i

TABLE OF AUTHORITIES..................................................................ii

BACKGROUND...............................................................................1

ARGUMENT....................................................................................3

    I.      PRESIDENT TRUMP'S LIKELIHOOD OF SUCCESS ON THE
           MERITS ...................................................................................... 3

          A.   The *Mazars* Factors Apply to this Case ........................................ 3
          B.   Defendants' Test for Determining Whether a Congressional
              Request Has a Valid Legislative Purpose Lacks a Limiting
              Principle ...................................................................................... 5
          C.   Defendants' Post-Hoc, Pretextual Legislative Purposes Are Not
              Valid and Do Not Justify the Committee's Sweeping Request in
              Support of a De Facto Law Enforcement Investigation .............. 7
          D.   President Trump Has a Valid Claim of Privilege ...................... 19
          E.   President Trump is Entitled to Full Judicial Review of His
              Privileged Records Prior to Production to the Committee ........ 22

    II.     THE EQUITIES HEAVILY FAVOR INJUNCTIVE RELIEF;
           PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT AN
           INJUNCTION ............................................................................. 24

CONCLUSION................................................................................25

CERTIFICATE OF SERVICE.............................................................27

# TABLE OF AUTHORITIES

## Cases

*Cheney v. U.S. Dist. Ct. for D.C.*,
   542 U.S. 367, 387-88 (2004) ................................................................................... 11

*Council on American-Islamic Relations v. Gaubatz*,
   667 F. Supp. 2d 67, 76 (D.D.C. 2009) .................................................................... 25

*Exxon Corp. v. FTC*,
   589 F.2d 582, 592 (D.C. Cir. 1978) ........................................................................ 16

*Franklin v. Massachusetts*,
   505 U.S. 788, 801 (1992) .......................................................................................... 17

*In re Ford Motor Co.*,
   110 F.3d 954, 963 (3rd Cir. 1997) ........................................................................... 25

*In re Sealed Case* 98-3077,
   151 F.3d 1059, 1065 (D.C. Cir. 1998) ..................................................................... 25

* *McGrain v. Daugherty*,
   273 U.S. 135, 174 (1927) ............................................................................................. 5

*McPhaul v. United States*,
   364 U.S. 372, 381-82 (1960) ....................................................................................... 7

*Metro. Life Ins. Co. v. Usery*,
   426 F. Supp. 150, 172 (D.D.C. 1976) ..................................................................... 25

* *Nixon v. GSA*,
   433 U.S. 425, 439 (1977) ............................................................................... passim

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
   557 U.S. 193, 205 (2009) .......................................................................................... 24

*PepsiCo, Inc. v. Redmond*,
   1996 WL 3965, at *30 (N.D. Ill. 1996) .................................................................... 25

*Providence Journal Co. v. FBI*,
   595 F.2d 889, 890 (1st Cir. 1979) ........................................................................... 25

*Senate Select Committee on Presidential Campaign Activities v. Nixon*,
  498 F.2d 725, 731 (D.C. Cir. 1974) ................................................................ 8, 9, 17

*Shelton v. United States*,
  404 F.2d 1292, 1297 (D.C. Cir. 1968) .......................................................................... 6

\* *Trump v. Mazars USA, LLP*,
  140 S. Ct. 2019, 2034 (2020) ......................................................................... passim

\* *Trump v. Mazars USA, LLP*,
  940 F.3d 710 (D.C. Cir. 2019) ..................................................................................... 14

\* *Trump v. Mazars USA, LLP*, No. 19-cv-01136,
  2021 WL 3602683, *52 (D.D.C. Aug. 11, 2021) ........................................................ 4

*United States v. Bass*,
  404 U.S. 336, 349 (1971) .............................................................................................. 17

\* *United States v. Nixon*,
  418 U. S. 683, 713 (1974) .................................................................................. 8, 14, 23

*Watkins v. United States*,
  354 U.S. 178, 197, 187 (1957) ......................................................................... 6, 11, 15, 16

## Statutes

\* 44 U.S.C. § 2204(c)(2) ............................................................................................... 22

44 U.S.C. § 2205 .............................................................................................................. 6

44 U.S.C. §2204 ............................................................................................................. 19

## Other Authorities

Exec. Order No.13233 ................................................................................................... 19

Exec. Order No.13489 ................................................................................................... 19

Mark Hosenball and Sarah N. Lynch, *Exclusive: FBI finds scant evidence U.S.*

*Capitol attack was coordinated*, Reuters (Aug. 20, 2021),

https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-

attack-was-coordinated-sources-2021-08-20/ ............................................................. 2

iii

Mary Clare Jalonick, *Senate report details broad failures around Jan. 6 attack*, AP NEWS (June 8, 2021),  https://apnews.com/article/donald-trump-capitol-siege-government-and-politics-96054d62518a7be4c3f30231f51beaf5................................... 3

## Regulations

3 C.F.R. 815.................................................................................................... 19

36 C.F.R. § 1270.44........................................................................................ 6

74 Fed. Reg. 4669............................................................................................ 19

Our constitutional framework is firmly rooted in the separation of powers. In their respective briefs, Defendants argue for unfettered legislative power to seek limitless categories of presidential records. Likewise, they also seek expansive recognition for an incumbent president to waive the executive privilege of his predecessor, broadly and indiscriminately. Indeed, the Executive Branch Defendants discount the well-established right of former presidents to meaningfully challenge a blanket waiver of executive privilege by an incumbent president in court. Defendants are mistaken.

Congressional requests for presidential records must be limited so that each request is tailored to obtain documents related to a legitimate legislative purpose. Here, the Committee failed to do so. Likewise, an incumbent president's waiver of his predecessor's executive privilege is subject to full and thorough judicial review. The Executive Branch Defendants attempt to limit that review by incorrectly encouraging the Court to authorize the waiver simply by disclosing broad categories of documents. Instead, the Court must thoroughly review, *in camera,* the documents and communications at issue before authorizing the waiver. This Court should refuse to allow Defendants' naked political ploy and preserve the institution of the presidency.

## BACKGROUND

Demonstrating that they have already prejudged the facts and circumstances of January 6, 2021, Defendants focus much of their respective briefs recounting the event, *see* Cong. Defs.' Opp'n to Pl.'s Mot. for Preliminary Injunction ("Committee Br.") at 1, 3-11; NARA Defs'. Mem. in Opp'n to Pl.'s Mot. for Preliminary Injunction

("NARA Br.") at 1, 7-9, 17-20, including their conclusory allegations and assumptions that the President and his senior staff were part of a conspiracy to cause violence at the Capitol.[1]

Notwithstanding their allegations and insinuations of conspiracy, investigations by the F.B.I. and the Senate Committee on Government Affairs and Homeland Security rebuff their contentions of wrongdoing by Trump Administration officials. "The FBI has found scant evidence that the Jan. 6 attack on the U.S. Capitol was the result of an organized plot to overturn the presidential election result." Mark Hosenball and Sarah N. Lynch, *Exclusive: FBI finds scant evidence U.S. Capitol attack was coordinated*, REUTERS (Aug. 20, 2021), https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/.

Similarly, a Senate investigation of the events on January 6 "found a broad intelligence breakdown across multiple agencies, along with widespread law enforcement and military failures that led to the violent attack," and never faulted anyone at the White House. Mary Clare Jalonick, *Senate report details broad failures around Jan. 6 attack*, AP NEWS (June 8, 2021), https://apnews.com/article/donald-trump-capitol-siege-government-and-politics-96054d62518a7be4c3f30231f51beaf5. The entire justification for the Committee's fishing expedition is meritless.

---

[1] Defendants breathlessly claim that President Trump "waged . . . battle," "targeted the Department of Justice," and imply that President Trump orchestrated and directed violence with no evidentiary basis to support such a claim. Committee Br. at 6-7.

The Committee's bias is far from surprising, given that the Democrats appointed every single member. For purposes of determining whether the Committee's request has a valid legislative purpose, the Court should carefully examine the Committee's charter and its request to NARA in the context of constitutional and judicial precedent.

## ARGUMENT

### I.   President Trump's Likelihood of Success on the Merits

#### A. The *Mazars* Factors Apply to this Case

Defendants contend that the framework outlined by the Supreme Court in *Mazars* does not apply to the Committee's request because President Trump's term of office has expired. Instead, they contend that his sole relief is limited to the balancing test adopted in *Nixon v. Admin. of Gen. Serv. ("GSA"). See* Committee Br. at 31-39; NARA Br. at 22-23. Not so.

As was the case in *Mazars*, the Committee is not engaged in a "run-of-the-mill legislative effort," rather they are hunting for the presidential records of a political rival implicating "intense political interest for all involved." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020). Congress's efforts to obtain records created during President Trump's term of office implicates the same separation of powers concerns adjudicated just last year by the Supreme Court.

The test in *Mazars* is applicable here because every information request made by Congress for presidential records, whether via statutory process or subpoena, implicates the separation of powers and must comply with the strictures of the

3

Constitution, as outlines by the *Mazars* Court. *See Mazars*, 140 S. Ct. at 2034-35. Defendants' claim that a statute that was passed with bicameralism and presentment can somehow vitiate constitutional limits on Congress's power to request information is wrong. NARA Br. at 23; Committee Br. at 34. Regardless of the form, compulsory or via statute, congressional requests must comply with the Constitution. *Id.*

Recently, Judge Mehta acknowledged that "separation of powers considerations do not entirely disappear merely because the entanglement is between Congress and a former President" in a case involving a congressional request for presidential records. *Trump v. Mazars USA, LLP*, No. 19-cv-01136, 2021 WL 3602683, *52 (D.D.C. Aug. 11, 2021).[2] The court reasoned that "the remaining separation of powers concern at issue [with former Presidents] involves the threat of a post-presidency congressional subpoena for personal information in order to influence how the sitting President treats Congress while in office." *Id.* at 13. Moreover, the Supreme Court has "reject[ed] the argument that only an incumbent President may assert" separation-of-powers claims. *Nixon v. GSA,* 433 U.S. 425, 439 (1977). The court further reasoned that the separation of powers concerns discussed in *Nixon* and *Mazars* counseled in favor of invalidating the request to President Trump. *Id.* at *53 ("The risk of unnecessary intrusion into the operation of the Office

---

[2] NARA incorrectly argues that because his term of office has expired, President Trump is somehow limited in the arguments he may make challenging the Committee's request. NARA Br. at 13-15. That argument was rejected by Judge Mehta when he considered the *Mazars* case on remand, holding that "[a]s the Supreme Court held in *Nixon v. GSA*, separation of powers considerations do not entirely disappear merely because the entanglement is between Congress and a former President." *Mazars*, 2021 WL 3602683, *13.

of the President increases with a subpoena's breadth and intrusiveness. The more Congress can invade the personal sphere of a former President, the greater the leverage Congress would have on a sitting President.") (cleaned up). At minimum, then, the separation of powers concerns outlined in *Nixon* and applied to congressional requests in *Mazars* confirm that the test in *Mazars* is applicable here.

The Committee also contends that *Mazars* does not apply because the Committee is not seeking the personal records of the President, *see* Committee Br. at 34. But the Supreme Court in *Mazars* held that *if* the request sought Oval Office and other White House records, as opposed to simply personal records, *then* an even higher standard should apply. *Mazars*, 140 S. Ct. at 2031-32.

### B. Defendants' Test for Determining Whether a Congressional Request Has a Valid Legislative Purpose Lacks a Limiting Principle

The Committee's request lacks a valid legislative purpose because Defendants' stated rationale lacks a limiting principle. Defendants effectively suggest that Congress has plenary power to request any information, from any party, at any time. They claim that the Committee's request here has a valid legislative purpose simply because the subject of the request was one on which legislation "could be had" or "may be had." Committee Br. at 18 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927)); NARA Br. at 18. The Supreme Court soundly rejected this argument barely a year ago. *Mazars*, 140 S. Ct. at 2034 (rejecting Congress's approach because it aggravated separation of powers principles by eschewing any limits on the power to subpoena Presidential records).

Instead, the test for congressional requests is more demanding. A congressional request "is valid only if it is related to, and in furtherance of, a legitimate task of the Congress." *Mazars*, 140 S. Ct. at 2031 (cleaned up). Congress has no "general power to inquire into private affairs and compel disclosures," and "there is no congressional power to expose for the sake of exposure." *Id.* (cleaned up). Because "legislation concerning the Presidency raises sensitive constitutional issues," Congress must "adequately identif[y] its aims and explain[] why the President's information will advance its consideration of the possible legislation." *Id.* at 2035. The Committee's failure to do so here is fatal to its request.[3]

Further, if Defendants are correct that the Committee has plenary authority to request the President's records to investigate any issue it pleases, then it has the same limitless power to request the records of other executive-branch officials, members of Congress, and the federal judiciary. Defendants are wrong. Congress has no freestanding oversight or investigative power; those powers are "justified solely as an adjunct to the legislative process," and they may not be deployed to pursue measures that exceed Article I's limitations. *Watkins v. United States*, 354 U.S. 178, 197, 187 (1957). Further, the Committee is not immune from having its purposes challenged; courts can and should assess its stated, contemporaneous purposes to determine whether they are legitimate or unlawful. *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968). President Trump can challenge the request's

---

[3] The regulations and jurisdictional requirements of the PRA are in alignment with the *Mazars* test requiring requests be pertinent to the business of Congress. *See* 44 U.S.C. § 2205; 36 C.F.R. § 1270.44.

pertinency and overbreadth; under governing law, requests must always be "reasonably relevant" to a legitimate legislative purpose. *McPhaul v. United States*, 364 U.S. 372, 381-82 (1960) (cleaned up).

### C. Defendants' Post-Hoc, Pretextual Legislative Purposes Are Not Valid and Do Not Justify the Committee's Sweeping Request in Support of a De Facto Law Enforcement Investigation

Setting aside Defendants' faulty standard for judging the constitutionality of congressional requests, the stated post-hoc justification for the request is not a valid legislative purpose and is invoked by the Committee to disguise the improper law enforcement function of its investigation. The Committee claims that its request serves a "clear legislative purpose: to understand the facts and causes surrounding the January 6 attack to develop legislation and other measures that will protect our Nation from a similar assault in the future." Committee Br. at 1. The NARA Defendants claim a similar legislative purpose. *See* NARA Br. at 17-18.

The recitation of this aim fails to meet the mark because it is untethered from the broad requests at issue. Indeed, Defendants have failed to "adequately identif[y] [the Committee's] aims and explain[] why the President's information will advance its consideration of the possible legislation." *Mazars*, 140 S.Ct. at 2036. The stated purpose does not even identify any proposed legislation. The Defendants' claim that it could pass legislation after it reviews the President's records proves too much. *See, e.g.*, NARA Br. at 18. If Congress can justify a law-enforcement investigation by asserting that it could pass remedial legislation if it does not like what it finds,

Congress would have unfettered discretion to invade the province of the executive and judicial branches at will.

The Committee's brief provides multiple examples of areas where potential legislation could be had. Committee Br. at 20.  The hypothetical examples and reasoning, however, fail to explain the Committee's need for the *specific* information sought. Members of the Committee have already concluded that the former President is responsible, no matter what the evidence says. They can legislate accordingly, or they must explain why each item requested would be material to any decision they intend to make.

The Supreme Court has made clear that when Congress is seeking privileged presidential records, like those requested by the Committee, and soon to be produced to NARA, it must establish a "'demonstrated, specific need' for the . . . information." *Mazars*, 140 S. Ct. 2031 (quoting *United States v. Nixon,* 418 U. S. 683, 713 (1974)). Further, the Committee "must show that the . . information is 'demonstrably critical' to its legislative purpose." *Id.* (quoting S*enate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974)).

The Committee admits it is their belief that the "Select Committee needs the requested information to reconstruct the extraordinary events of that day." Committee Br. at 27. The D.C. Circuit rejected such an approach when it explained that Congress's legislative tasks differ from that of a grand jury, or other investigative bodies. Instead, "[w]hile fact-finding by a legislative committee is undeniably a part of its task, legislative judgments normally depend more on the

predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d at 732.

Of course, Congressional "interest in past illegality *can* be wholly consistent with an intent to enact remedial legislation." *Trump v. Mazars, USA, LLP*, 940 F.3d 710, 728 (D.C. Cir. 2019) (emphasis added). It just happens *not* to be in the instance at hand. Calling it "absurd" to say that any legislative decisions could be made without access to clearly privileged materials does not make it so; Congress has yet to identify a single decision that would turn on any document or communications they have requested.

Likely cognizant of the missing legislative purpose in the request itself, the Committee and the NARA Defendants attempt, but fail, to cobble together disparate, post-hoc rationales to justify the Committee's request. Committee Br. at 19-20; NARA Br. at 17-22. None of these identified purposes were included in the contemporaneous request or constitute valid legislative aims. Defendants' kitchen-sink approach to justify their overbroad records request highlights its unconstitutionality.

First, the Committee's claim that its "investigation *may* yield recommendations as to *whether and how* Congress should pass legislation to revise the mechanics of the electoral counting," Committee Br. at 20 (emphasis added), fails to explain how "the President's information will advance its consideration of [any] possible legislation." *Mazars*, 140 S.Ct. at 2035. There is no reason why Congress would need the sheer level of detail about the President's activities that the request

demands to possibly enact unqualified legislation regarding how Congress counts electoral votes. As discussed in President Trump's opening brief, the request seeks records wholly unrelated to the events of January 6 at the United States Capitol.

Second, the Committee states that "Congress may wish to enhance the legal consequences for any . . . dereliction of duty by a President." Committee Br. at 20. Congress can already pass such legislation today, without the requested information, and is not permitted to investigate the President as a "case study" for general legislation. *Mazars*, 140 S. Ct. at 2035. Further, many of the Committee's requests seek records that do not involve the President or the events of January 6 at all.

The third legislative purpose cited by the Committee, to investigate the President regarding his interactions with the Department of Justice in the hopes of creating "legislative recommendations for how to prevent a future President from enlisting federal resources," Committee Br. at 20, fails to identify a single piece of proposed or anticipated legislation and speculates regarding presidential wrongdoing. This is improper and fails to explain how "the President's information will advance its consideration of the possible legislation." *Mazars*, 140 S. Ct. at 2035.

Finally, the Committee opaquely references laws regarding the President's interactions with state election officials but similarly fails to explain what laws the Committee is considering or how the President's information would actually inform legislation on that topic. Committee Br. at 20. This failure precludes President Trump and this Court from properly evaluating the Committee's actual need for any specific records and dooms the request.

1. **The Committee and NARA Failed to Explain a Valid Legislative Purpose to Support the Request**

Each of the Committee's alleged legislative purposes suffers from multiple additional flaws. The Committee has effectively requested every document created in the White House on January 6, regardless of its relation to the events of that day. But the Committee fails to identify which specific requests serve which, if any, of the claimed legislative purposes. Where Congress issues broad requests that "ask for everything under the sky," the burden should not be placed on the President of "critiquing the unacceptable discovery requests line by line." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 387-88 (2004).

Even worse, several of the alleged purposes fail to specifically identify what legislation is being contemplated and how the President's information will inform that legislation. "The more detailed and substantial the evidence of Congress's legislative purpose, the better." *Mazars*, 140 S. Ct. at 2035; *see also Watkins*, 354 U.S., at 201 (preferring such evidence over "vague" and "loosely worded" evidence of Congress's purpose). But there is nothing reasonable about the scope of the Committee's request, which lacks specificity by any measure and seeks every presidential record and communication that could tenuously relate to events that occurred on January 6, 2020, in Washington, D.C.[4] In some instances there is no

---

[4] The Committee notes that each of the factors also weighs in favor of the Committee under the *Mazars* lite framework. *See* Committee Br. at 35-38. The request here is "undeniably broad," and even broader than the *Mazars* request. *Mazars*, 2021 WL 3602683 at *53 ("the risk of unnecessary intrusion into the operation of the office of the President increases with a subpoena's breadth and intrusiveness. The more Congress can invade the personal sphere of a former

reasonable connection between the records requested and the events of January 6th. For example, the request asks for "[a]ll documents and communications within the White House on January 6, 2021, relating in any way to . . . the January 6, 2021 rally . . . Donald J. Trump" and over thirty other individuals and government agencies. Compl., Exh. 1. Indeed, the request could reasonably be read to include every single e-mail sent in the White House on that day or potentially every single private communication from anyone working in the White House. Laster Decl. at ¶ 15 (stating NARA has "located several hundred thousand potentially responsive records.").

Finally, the Committee's argument that "[t]o be a valid legislative inquiry there need be no predictable end result," Committee Br. at 20, contradicts the Supreme Court's statement in *Mazars* that it is "impossible" to conclude that a request is designed to advance a valid legislative purpose "unless Congress adequately identifies its aims and explains why the President's information will advance its consideration of the possible legislation." *Mazars*, 140 S. Ct. at 2035.

### 2.    The Information Sought by the Committee is Obtainable Elsewhere

The Committee further claims that it could not obtain the requested information elsewhere, *see* Committee Br. at 22, but the Committee has mountains

---

President, the greater the leverage Congress would have on a sitting President.") (cleaned up). The Committee has failed to explain how the requested materials would uniquely advance its legislative objectives, despite the request being broader than any congressional request in modern history. Thus, the request fails the *Mazars* lite test.

of evidence regarding the events of January 6 that are perfectly adequate to inform any proposed legislation. Additional, privileged records are not needed for the Committee to legislate. The Committee has never explained why other sources of information—outside of the requested records—could not "reasonably provide Congress the information it needs in light of its particular legislative objective." *Mazars,* 140 S. Ct. at 2035-36. The Committee has failed to articulate a *specific* need for the *specific* records requested. The Committee seeks to highlight its need for the requested records because President Trump is a "case of one," Committee Br. at 22, but the Committee cannot ignore the Supreme Court's admonition that the President's unique constitutional position means that Congress may not look to him as a case study for general legislation. *Mazars*, 140 S. Ct. at 2035. The post-hoc legislative purposes proffered by the Committee are simply pretextual and cannot sustain the Committee's broad request.

### 3.    The Breadth of the Records Request is Boundless

The Committee's failed, nearly non-existent attempt to minimize the burden on President Trump specifically and the institution of the Presidency generally under the fourth *Mazars* factor should be rejected. Committee Br. at 37-38. The number of records at issue here is enormous. Further, the limited time-period to review potentially responsive documents adds to the burden of the request. These burdens affect both President Trump as well as future presidents who may face similar requests if this request is authorized by the courts. The Committee's attempt to downplay the future chilling effect its request will have on every President and his

13

aides is similarly unhelpful. Regardless of President Biden's determination, permitting the expansive request here would harm future presidents and their close aides by allowing invasive congressional fishing expeditions that will certainly chill candid advice and harm the institution of the presidency. *Nixon,* 418 U.S. at 705 ("those who expect public dissemination of their remarks may well temper candor with a concern for appearances and their own interests to the detriment of the decisionmaking process.").

The NARA Defendants' citation to select quotes and alleged evidence justifying the Committee's fishing expedition fails to sve the Committee's overbroad request, as both the FBI and Senate have confirmed that there was no coordinated effort, including at the White House, to overturn the election on January 6. NARA Br. at 19-20. Simple recitation of alleged facts with no evidence of wrongdoing, no proposed legislative remedy, and no connection between the requested records and the Committee's overbroad request cannot justify the Committee's onerous probe, and certainly does not satisfy the Supreme Court's *Mazar's* framework.[5]

Plaintiff does not complain because the Committee's request might disclose some nonexistent wrongdoing. Rather, the objection arises because of the request's

---

[5] The Justice Department's positions in a brief filed after the Supreme Court remanded the *Mazars* case to the D.C. Circuit undermines the position it takes here. In its post-*Mazars* brief, the Department panned similar arguments to the ones made by the Committee. The Department called similar arguments "post hoc rationalizations," and argued that "the subpoena's dragnet for nearly a decade of financial records—most of which relate solely to the President's actions as a private citizen—is vastly overbroad." *See generally*, *Trump v. Mazars USA, LLP,* 940 F.3d 710 (D.C. Cir. 2019), brief for United States as Amicus Curiae supporting petitioners, 2020 WL 563912 (Feb 3, 2020).

abject failure to identify proposed legislation and why President Trump's information will advance such legislation, as well as evidence that the Committee's request has a prohibited law enforcement purpose and that its fundamental nature is plainly for law enforcement purposes. Congress is not "a law enforcement or trial agency," and congressional investigations conducted "for the personal aggrandizement of the investigators" or "to punish those investigated" are "indefensible." *Watkins*, 354 U.S. at 187 (cleaned up). The Committee's breathless innuendo and conjecture cannot sustain the broad scope of their request when there is no evidence of wrongdoing by President Trump and those in the White House.

### 4.   The Requests Exceed Congress's Investigatory Powers

The NARA Defendants also are adamant that the congressional request at issue here passes constitutional muster.[6] They claim that the request "plainly," "squarely," and "indisputably," falls within Congress's investigatory powers. NARA Br. at 19-20. Wrong again.

This case involves a congressional request for *presidential* records, implicating significant separation of powers concerns. *See Mazars*, 140 S. Ct. at 2035-36. The NARA Defendants' startling claim that "[t]he only relevant question is whether the Select Committee is seeking 'data to be used by the House or the Senate in coping with a problem that falls within its legislative sphere,'" is misguided. NARA Br. at

---

[6] It is curious that Department of Justice has submitted a brief in this case on behalf of the Archivist and NARA when those parties ostensibly have no interest in whether the records at issue here are disclosed or not. One can only assume that President Biden has endorsed the naked politicization of the Justice Department in the service of his own political ends.

19. At a minimum the Supreme Court's test in *Mazars*, and not some toothless test applicable to more general requests for information, provides the basis for determining the validity of an alleged legislative purpose that is applicable to this case.

### 5.    The House Did Not Authorize the Committee's Broad Requests

The NARA Defendants opine that Congress has somehow authorized the Committee to issue its broad request, which arguably include every digital communication in the White House on January 6, 2021. NARA Br. at 27-30. Congressional committees "must conform strictly to the resolution establishing [their] investigatory powers" for any request to be statutorily "valid." *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978); *see also Watkins*, 354 U.S. at 201. Nothing in the broad and murky language of H. Res 503 permits the Committee to promulgate such a broad request. That charter does not cite a single piece of proposed legislation, tie such legislation to the requested records, or explain the congressional need for those records, as required by *Mazars*. 140 S. Ct. at 2031 (cleaned up). Moreover, the NARA Defendants' claim that the Committee is entitled to information that may be "directly relevant to its investigation," NARA Br. at 19, is legally incorrect for the same reason: it ignores and fails the test laid out in *Mazars. Id.*

Absence of an express statement authorizing or even contemplating the Committee's request here should be decisive. "Out of respect for the separation of powers and the unique constitutional position of the President," H. Res 503 should not be interpreted to authorize requests for presidential records absent "an express

16

statement by Congress." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see also United States v. Bass*, 404 U.S. 336, 349 (1971). Nothing authorizes the Committee's sweeping request here, and thus it should be invalidated.

Without consulting President Trump, NARA prematurely described the documents being withheld and subject to privilege. *See* NARA Br., Exh. 1. The documents at issue include legal documents, call logs, schedules, and briefing materials that are plainly privileged and irrelevant for purposes of legislating regarding anti-terrorism laws, presidential transitions, or other legislation. The Committee has never explained how the President's schedule, call logs, legal documents, or other briefing materials will assist it in developing legislation to protect the United States or to ensure a peaceful transfer of power. The Committee further fails to explain how any documents pertaining to political information dating back to April would assist in developing such legislation. What the Committee appears to seek is a "precise reconstruction of past events," not because there are "specific legislative decisions that cannot responsibly be made without" it, but simply for the sake of the information itself. *Senate Select Comm.*, 498 F.2d at 731-33. This is plainly inappropriate and confirms that the congressional request at issue here serves no valid legislative purpose.

The NARA Defendants spend several pages of their brief arguing that Congress has somehow authorized the Committee to issue its broad request, which as discussed above includes a request that could be reasonably read to include every digital communication in the White House on January 6, 2021. NARA Br. at 27-30.

17

Nothing in H. Res 503 permits the Committee to promulgate such a broad request. Absence of an express statement authorizing or even contemplating the Committee's request here should be decisive. "Out of respect for the separation of powers and the unique constitutional position of the President," H. Res 503 should not be interpreted to authorize requests for presidential records absent "an express statement by Congress." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see also United States v. Bass*, 404 U.S. 336, 349 (1971). Nothing authorizes the Committee's sweeping request here, and thus it should be invalidated.

The NARA Defendants also argue for an unprecedented approach to records production in this case, effectively implying that a third party should comply with an unconstitutionally overbroad request and that President Trump can somehow scrutinize the request post-compliance. NARA Br. at 29-30. This is not how the Constitution works. Before any party complies with a request for records, Congress must carry its burden to show that the request serves a valid legislative purpose under applicable law, including the Constitution. Because the Committee's request here is overbroad and serves no valid legislative purpose, it should be invalidated, and the Archivist and NARA should not be required to comply with the voided request.

18

### D.  President Trump Has a Valid Claim of Privilege

Executive privilege has always been a key component of the presidency.[7] Indeed, presidents since George Washington have relied on confidentiality between the President and his advisers.[8] Like all communication privileges, however, it is only effective if the confidentiality survives its original circumstances. Weakening executive privilege by allowing it to expire with a president's term of office makes no more sense than allowing the attorney-client privilege to terminate at the end of a representation or marital privilege to end at divorce.[9] Instead, the presumption is always in favor of protecting confidential communication from disclosure indefinitely.

---

[7] To be clear, not every form of executive privilege extends to former presidents. For example, a former president retains the right to assert the presidential communications privilege, but not the state secrets form of executive privilege. *See GSA*, 433 U.S. at 447-49 (noting Nixon's concession that former presidents may not assert the state-secrets privilege). *But see* Exec. Order no.13,233, 3 C.F.R. 815 (2002), reprinted in 44 U.S.C. §2204 (2006) (declaring a right for former Presidents to assert the state-secrets privilege), revoked by Exec. Order no. 13,489, 74 Fed. Reg. 4669 (Jan. 21, 2009). The former president is likely the best situated to know if disclosure of documents from when they were in office will be against the public interest, while the current president is more likely to know which state secrets need to be protected.

[8] Executive privilege has been utilized by presidents since the dawn of this country. President George Washington resisted requests for information pertaining to diplomatic correspondence, losses of troops and supplies on expeditions, and commands given to subordinate officers. Miller Center, Executive Privilege: Mapping an Extraordinary Power, at 35 http://web1.millercenter.org/reports/mc-executive-privilege.pdf. President Jefferson refused to provide documents or information in response to both congressional and judicial requests during the investigation and trial of Aaron Burr for treason. *Id.* (*citing* 16 Annals of Cong., 1806-7: 336). President Eisenhower directed his staff not to testify during the McCarthy hearings or they would no longer have their jobs. *Id.* at 36.

[9] Should an attorney or a spouse be freed from their obligation to secrecy at the end of the relationship, the privilege would in essence be meaningless as the protection would be short-lived and come back to damage the speaker as soon as the relationship is ended. The nature of a communication privilege to engender free

The Parties agree; it is well settled that executive privilege survives the conclusion of a President's term of office. *Nixon v. GSA,* 433 U.S. at 439. Yet, the Congressional Defendants describe President Trump's interest as "generalized and diminished." Committee Br. at 27 and claim that executive privilege exists simply "to protect the Executive Branch." *Id.* at 2. In reality, it exists to protect the people of the United States who have an interest in a well-functioning government. *See Nixon v. GSA*, 433 U.S. at 447-49 (executive privilege "is not for the benefit of the President as an individual, but for the benefit of the Republic.")

The Government joins in by taking a curious position, arguing that the incumbent president's position regarding privilege "is accorded the greater weight." NARA Br. at 31. They ignore, however, the Court's admonition in *GSA*:

> Nevertheless, we think that the Solicitor General states the sounder view and we adopt it: This Court held in *United States v. Nixon* that the privilege is necessary to provide the confidentiality required for the President's conduct of office. Unless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic. Therefore the privilege survives the individual President's tenure.

---

communication must survive in order to truly encourage frank and free communication.

*Id.* (cleaned up). Notably, this argument was made by the Department of Justice and adopted by the Supreme Court. The Government was correct then and it need not run from that victory now.

True, executive privilege is qualified, not absolute. For that matter, neither is any other privilege. But the rights of former presidents are not as easily tossed aside as Defendants contend. And the categories of documents described in the Government's declaration supports an assertion of privilege here.

The Laster Declaration, DCD No. 21.1, at ¶¶ 30-35, explains that the Biden Administration is attempting to waive privilege regarding, among other things, legal documents, drafts of speeches, correspondence, remarks, presidential diaries, schedules, and call logs.  GOV Br. at 33. These are precisely the type of documents that the privilege is meant to protect. The current White House's blanket waiver of these documents is indicative of a political motive that should be corrected by this Court's review.

The Defendants' contention that the January 6 riot is a unique situation that justifies disclosure distorts the foundations of the executive privilege and turns the logic supporting it on its head. True, the president's executive authority expires with his term of office, yet the need of all presidents to receive candid and frank advice to fulfill their duties is unending. Moreover, presidents are most in need of full and frank advice in times of crisis. Often a crisis, whether at home or abroad, will be politically controversial. It is that immediate, honest, and candid advice is perhaps most important. In such scenarios presidents and advisers should not have to worry

21

that advice given, and communications exchanged, will be disclosed for political purposes if their political advisories win the next election. The chilling effect would be substantial, especially as these requests contain no appropriate limiting principle.

While the various interests must be weighed, it should be done thoroughly and intentionally. Importantly, that includes providing President Trump and his counsel with sufficient time to review the documents at issue. Moreover, it is critical that they be allowed to review the documents in full context before a privilege decision is finalized.

### E. President Trump is Entitled to Full Judicial Review of His Privileged Records Prior to Production to the Committee

Because the Supreme Court established the constitutional right of former presidents to challenge privilege waivers by their successors, *See GSA*, 433 at 447-55*, no statutory or regulatory scheme can compromise the right of a former president to judicially challenge an attempted waiver by his successor. Indeed, the Government correctly points out that PRA neither expands nor contracts the constitutionally rooted executive privilege. NARA Br. at. 38 (citing 44 U.S.C. § 2204(c)(2)). The incumbent does not have a blank check to waive the privilege of former presidents.

This judicial check on waiver ensures the predecessor a due process safeguard against the type of politically motivated privilege waivers by an incumbent president present here. Much to the chagrin of Defendants, that review does not provide for a broad rubber stamp of the incumbent's waiver. Instead, the former President enjoys the right to a meaningful review of the privilege asserted by the former President

over each specific document and communication. Any reading of a statutory or regulatory scheme to weaken that right would be unconstitutional.

President Trump acted in good faith in reviewing responsive documents and identifying only a subset as being privileged. President Biden, however, acted broadly, deciding to waive privilege to all documents identified. President Trump acted consistently with custom and practice while his successor took the unprecedented step of attempting a blanket waiver of privilege.

Thorough judicial review of President Biden's waiver determination, over President Trump's conflicting determinations, is a key aspect of that statutory and constitutional scheme. President Trump's "right to be heard" under *Nixon* requires far more than a cursory review of broad categories advocated by the Government. Instead, before the privilege is irrevocably waived, this court should review the documents *in camera* to be produced. *See Nixon*, 418 U.S. at 714.

Before the PRA was adopted, the law was clear: executive privilege survived the conclusion of a President's term of office, only to be invaded upon a judicial determination that disclosure is warranted after weighing the interests of the parties seeking disclosure with the need for and due consideration of confidentiality. *See GSA*, 433 at 447-55. The Defendants, however, invite this Court to read the PRA and its regulatory counterparts broadly, imparting more discretion on an incumbent's decision to waive his predecessor's privilege than the Constitution permits. Indeed, when the *GSA* Court allowed a production of a former President's records to career archivists, it was with the express expectation that the government officials would

23

maintain the confidentiality of the records. 433 U.S. at 455. Likewise, the *Nixon* Court allowed a district court to conduct a review of presidential records only on condition that the documents were reviewed *in camera*. 418 U.S. 706. Here, President Biden seeks to produce the privileged documents of his rival to a highly partisan congressional committee, where continued confidentiality will be impossible.

The level of deference sought by Defendants in the adjudication of this privilege invasion is unsupported by case law, the PRA, the relevant regulations, or E.O. 13489. Indeed, if any statute, regulation, or order was read so broadly as to give the type of unfettered discretion to the incumbent President sought by Defendants, it would render the scheme unconstitutional. This Court need not take the bait. Instead, the Court should employ the avoidance cannon, *Nw. Austin Mun. Util. Dist. No. One v. Holder,* 557 U.S. 193, 205 (2009), and interpret § 2204(c)(2) as it was intended to be read, as protecting the confidentiality of President Trump's privileged records unless the Court finds that any specific records should be produced to the Committee after employing the constitutional balancing test explained in *Nixon* and *GSA* and upon a careful *in camera* review of the relevant document.

## II. The Equities Heavily Favor Injunctive Relief; Plaintiff Will Suffer Irreparable Harm Absent an Injunction

The Committee claims the President cannot show that releasing the records would irreparably injure the Executive Branch; yet the very notion that creating such a precedent—that a sitting President can release any and all materials of his predecessor at a whim—would undoubtedly shake the foundations of presidential communications. Disclosure of a president's records by a sitting president of the

opposing party would harm all future presidents. Moreover, courts in this district have recognized that the disclosure of privileged information can constitute an irreparable harm because such information, once disclosed, loses its confidential and privileged nature. *See Council on American-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 76 (D.D.C. 2009). If such material is disclosed before the Court has an opportunity to hear Plaintiff and to determine the merits of his claim, the very rights Plaintiff seeks to protect will have been destroyed. *See In re Sealed Case* 98-3077, 151 F.3d 1059, 1065 (D.C. Cir. 1998) ("In this respect, petitioner is asserting something akin to a privilege insofar as 'once [the] putatively protected material is disclosed, the very right sought to be protected has been destroyed.'") (quoting *In re Ford Motor Co.*, 110 F.3d 954, 963 (3rd Cir. 1997)).

If this Court fails to grant a preliminary injunction before considering the merits, there is no going back. "Once the documents are surrendered," in other words, "confidentiality will be lost for all time. The status quo could never be restored." *Providence Journal Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979); see *PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *30 (N.D. Ill. 1996) ("[J]ust as it is impossible to unring a bell, once disclosed, . . . confidential information lose their secrecy forever"); *Metro. Life Ins. Co. v. Usery*, 426 F. Supp. 150, 172 (D.D.C. 1976) ("Once disclosed, such information would lose its confidentiality forever.").

## CONCLUSION

For the foregoing reasons, the motion for a preliminary injunction should be granted.

Dated: November 2, 2021                Respectfully submitted,

                                      /s/ Jesse R. Binnall
                                      Jesse R. Binnall (VA022)
                                      BINNALL LAW GROUP, PLLC
                                      717 King Street, Suite 200
                                      Alexandria, VA 22314
                                      Tel:  (703) 888-1943
                                      Fax: (703) 888-1930
                                      jesse@binnall.com
                                      *Attorney for Donald J. Trump*

26

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed with the Clerk of the Court using

the Court's CM/ECF system, which will send a copy to all counsel of record.

Dated: November 2, 2021

/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel:  (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
*Attorney for Donald J. Trump*

27