<pre>
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2


 3    DONALD J. TRUMP, in his capacity .
      as the 45th President of the     .
 4    United States,                   .
                                       .  Case Number 21-cv-2769
 5             Plaintiff,              .
                                       .
 6         vs.                         .
                                       .
 7    BENNIE G. THOMPSON, in his       .
      official capacity as Chairman of .
 8    the United States House Select   .
      Committee to Investigate the     .
 9    January 6th Attack on the        .  November 4, 2021
      United States Capitol, et al.,   .  11:05 a.m.
10                                     .
               Defendants.             .
11    - - - - - - - - - - - - - - - - - -

12                    TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE TANYA S. CHUTKAN
13                    UNITED STATES DISTRICT JUDGE

14    APPEARANCES:

15    For the Plaintiff:          JUSTIN CLARK, ESQ.
                                  JESSE BINNALL, ESQ.
16                                Binnall Law Group
                                  717 King Street
17                                Suite 200
                                  Alexandria, Virginia 22314
18

19    For the Defendants:         DOUGLAS LETTER, ESQ.
                                  ERIC COLUMBUS, ESQ.
20                                STACIE FAHSEL, ESQ.
                                  TODD TATELMAN, ESQ.
21                                U.S. House of Representatives
                                  Office of General Counsel
22                                219 Cannon House Office Building
                                  Washington, D.C. 20515
23

24                          -- continued --

25
</pre>

```
1   APPEARANCES (CONTINUED):

2   For Defendants:            ANNIE OWENS, ESQ.
                               MARY MCCORD, ESQ.
3                              Georgetown University Law Center
                               Institute for Constitutional
4                                 Advocacy and Protection
                               600 New Jersey Avenue Northwest
5                              Washington, D.C. 20001

6                              ELIZABETH SHAPIRO, ESQ.
                               U.S. Department of Justice
7                              Civil Division
                               Federal Programs Branch
8                              1100 L Street Northwest
                               Washington, D.C. 20530
9

10

11  Official Court Reporter:   SARA A. WICK, RPR, CRR
                               United States District Court
12                                for the District of Columbia
                               333 Constitution Avenue Northwest
13                             Room 4704-B
                               Washington, D.C. 20001
14                             202-354-3284

15

16  Proceedings recorded by stenotype shorthand.
    Transcript produced by computer-aided transcription.
17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1         (Call to order of the court.)

2         COURTROOM DEPUTY:  Your Honor, we have Civil Action

3  21-2769, Donald Trump versus Bennie Thompson, et al.

4      I will ask that counsel please identify yourselves,

5  starting with the plaintiff counsel.

6         MR. CLARK:  Justin Clark and Jesse Binnall for the

7  plaintiff.

8         THE COURT:  Good morning.

9      And for the defendants?

10         MS. SHAPIRO:  Elizabeth Shapiro from the Department of

11  Justice on behalf of the NARA defendants.

12         THE COURT:  Good morning.

13         MR. LETTER:  Good morning, Your Honor.  This is

14  Douglas Letter.  I'm general counsel at the House of

15  Representatives here representing the Select Committee.

16      With me, I've got Todd Tatelman, Eric Columbus, and Stacie

17  Fahsel from the General Counsel's Office and Mary McCord and

18  Annie Owens from the Institute for Constitutional Advocacy and

19  Protection at Georgetown University Law Center.

20         THE COURT:  Mr. Letter, I'm having trouble hearing

21  you, and I believe my court reporter is also having trouble.  If

22  anybody definitely needs to hear you, it is the court reporter,

23  because she is preparing the transcript.  If you could either

24  speak up or get closer to your microphone, that would be great.

1          MR. LETTER:  Is this loud enough, Your Honor?

2          THE COURT:  I can hear you.  Madam Court Reporter?

3     She's nodding.  So I think we're okay.

4      I haven't put time limits on you.  You are experienced

5     counsel, and I assume you will make your arguments succinctly.

6     I didn't want to limit you in case I had questioning that took

7     us beyond our allotted time.

8      First, Mr. Letter, are both defendants going to argue, and

9     if so, how are you dividing up your time?

10         MR. LETTER:  Yes, Your Honor, we are both going to

11    argue.  We didn't do any specific division of time.  If you have

12    a preference on who goes first, please let us know.  Otherwise,

13    Ms. Shapiro with the Justice Department will speak first for the

14    defendants, and I will go second.  But we will change that order

15    if you prefer.

16         THE COURT:  That's absolutely fine.  So Ms. Shapiro

17    will be arguing first; is that right?

18         MR. LETTER:  Yes, ma'am.

19         THE COURT:  Mr. Binnall, am I pronouncing your name

20    right?

21         MR. BINNALL:  It's Binnall, Your Honor, yes.

22         THE COURT:  Mr. Binnall, sorry.  I assume you will

23    want -- since you're the movant here, you want to have an

24    opportunity for rebuttal; is that correct?

25         MR. BINNALL:  Your Honor, yes, and Mr. Clark, who is

1    with me here, will be handling our argument, and we would like

2    to preserve as much time as the Court would allow us for

3    rebuttal.

4          THE COURT:  All right.  Well, I trust you will limit

5    rebuttal to any new points presented or unaddressed in the

6    defendants' response and confine your rebuttal to that.

7        At this point I'm not going to set strict time limits, but

8    I have blocked off more than two hours for this, and I'm hoping

9    to stay well within that.

10       All right.  Obviously, I've read all the parties'

11   briefings, and given that we are not in court, we're on a video

12   conference, I assume there's no objection from either side to

13   proceeding by video conference in this case?

14       MR. BINNALL:  No objection, Your Honor.

15       MR. LETTER:  No objection.

16       THE COURT:  All right.  Why don't I -- I'm going to

17   allow you, Mr. Clark, to begin.  I may -- Mr. Letter?

18       MR. LETTER:  Yes, Your Honor.  I've got a

19   technological issue.  I'm in a conference room where for energy

20   saving purposes the lights go out every now and again.  We have

21   been unable to fix that.  So if the lights go out, they will go

22   right back on as soon as Ms. Owens --

23       THE COURT:  I won't take that as an indication of the

24   strength of your argument, Mr. Letter.  I'm sure we all

25   appreciate any energy-saving measures that the government is

1    undertaking.

2            COURTROOM DEPUTY:  Judge, Mr. McClanahan has joined

3    us, and he wants to request to leave early.

4        Mr. McClanahan?

5            MR. MCCLANAHAN:  Good morning, Your Honor.  I have to

6    teach a class at GW this afternoon.  So if this hearing runs

7    past 12:30, I would like to leave and join by phone so I can

8    drive down to my class.

9            THE COURT:  All right.  You have filed an amicus brief

10   in this case.  I haven't permitted you to argue.  So you can

11   leave whenever you need to leave, if you could do so in the

12   least disruptive manner.  Thank you.

13           MR. MCCLANAHAN:  Yes, Your Honor.  I was just making

14   sure.

15           THE COURT:  Okay.  That's fine.

16       All right.  Because we are on video, only one person can

17   speak at one time due to the nature of the medium under which we

18   are operating.  I will try to -- if I have a question, I will

19   try to pose it at the time you're addressing the area in which I

20   have a question.

21       So why don't you go ahead and begin, Mr. Clark.

22           MR. CLARK:  Thank you, Your Honor, and I appreciate

23   that.  As I mentioned, my name is Justin Clark for the

24   plaintiff, and with me is Jesse Binnall.

25       The arguments in this matter have been well briefed and

1  joined by everybody.  We are here to discuss and review with the

2  Court today and make our argument.  But it's important to note

3  that this is not only a monumental case in the area of executive

4  privilege with respect to a former and incumbent president and

5  that relationship, but it's also a case of first impression for

6  this court and one that has a fact pattern that leads to kind of

7  the end of the slippery slope in any area when you're reviewing

8  a statute.  So it's not only just an important argument and a

9  monumental argument, but it also is one that is going to have

10  consequences down the line for generations potentially.

11          THE COURT:  Thank you for reminding me of that.

12          MR. CLARK:  I know I didn't need to remind you, Your

13  Honor, but I thought it was important to note.

14      So we're, obviously, here on a motion for preliminary

15  injunction, and the four factors there guide our argument, and I

16  want to use them to guide the discussion today.

17          THE COURT:  Hold on.  My court reporter is having a

18  very difficult time hearing.  Just a moment.  We are going to

19  pause.

20      (Pause.)

21          THE COURT:  So the court reporter is actually going to

22  go to her office and connect via Zoom.  So we will take a brief

23  recess.

24      (Recess taken from 11:11 a.m. to 11:18 a.m.)

25          THE COURT:  All right.  Sorry for the interruption,

but my court reporter informs me that the situation is 100 percent improved.  So as long as I can hear you now and you speak up, we should be okay.  And I will tell you, I am so looking forward to the end of Zoom hearings.

Mr. Clark?

MR. CLARK:  Thank you, Your Honor.

So the four prongs of -- to the PI today:  Likelihood of success on the merits, irreparable harm, balance of harms, favored interim relief and public interest argument.

So we will start with likelihood of success on the merits, where I think the meat of this argument is, and I think everyone can agree to that.  And plaintiff is likely to succeed on his arguments in large part due to *Mazars*.

The Court in *Mazars* really narrowed and recognized the rights of an executive, even a former executive, to have a narrowly tailored and narrowly drawn set of requests.

THE COURT:  Mr. Clark, let me stop you.  I note in your briefs, you do rely a great deal on *Mazars*.  But *Mazars* is an unusual -- had an unusual procedural history in that when *Mazars* first went to the Supreme Court, the plaintiff was a sitting president.  The Supreme Court emphasized that the case presented a separation of powers issue and remanded it to the District Court to refer four factors to consider.

When the District Court took the case again on remand, the plaintiff was no longer the sitting president, and the District

Court found -- applied, what do you call them, *Mazars lite* test.

Would you agree that the fact that the plaintiff here is no longer a sitting president does -- somewhat diminishes the applicability of the privilege issues you're arguing?

MR. CLARK:  It's a good question, Your Honor.  But no, I don't think it weakens it.  In *Mazars*, we were -- Congress was seeking nonexecutive privileged information.  Here, they're seeking information that is from the president's time in office and necessarily could be privileged information.

Therefore, the --

THE COURT:  But that privilege has been waived by the current president.  I mean, the distinction in *Mazars* and this case is that in *Mazars* -- well, at least the first go around, Congress is seeking private information from a sitting president.  And in this case Congress is seeking arguably public information, quintessentially information of a governmental nature from a former president, so that the situation is rather transposed.

So how do you square that difference?

MR. CLARK:  Well, I square that difference because of the heightened nature of the information that's being requested.  This is information that has a constitutionally based privilege, based in *Nixon* and *GSA*, that goes beyond -- that *Mazars* relies pretty heavily on.

I think that the level and the import of the documents

requested here are greater than the private information that was
requested in the original *Mazars* case.

But I would also say that Judge Mehta specifically, you
know, invoked the right of a former president to have some level
of protection in *Mazars* lite.  So I don't think the fact that
the president has left office makes us go to *Mazars* lite.  I
think that because of the nature of the information being
requested by the Congress, *Mazars* still applies here.  But even
if Your Honor -- if the Court doesn't think it does, *Mazars* lite
certainly still would apply.

THE COURT:  Do you think the factors *in Mazars* lite or
*Mazars* are -- how do I square that with the fact that Congress
here has not requested private information, that *Mazars* involved
banking records and lease documents involved in the lease to the
plaintiff of -- lease of a building before he became president?

These documents are sought to further Congress's oversight
into the events of January 6, and they only seek documents
concerning governmental activity and the former president's
contact with officials and his actions and statements on
January 6 or relating to that event, not private banking
information, the result -- the release of which didn't really
implicate any governmental activity.

MR. CLARK:  Well, Your Honor, I'd actually disagree
with you on your point that it only relates to information
related to January 6.  It seeks records from all the way back to

1    April 2020 regarding private polling data and communications

2    with campaign aides.  It's not just related to information

3    surrounding January 6.

4        That's one of the points under *Mazars* that we have a very

5    great concern about, is that it's an overly broad request.  I

6    would also --

7        THE COURT:  Let me ask you, with regard to your

8    privilege argument, one of the things -- some of the documents

9    described by the Director of the Archives, for example, visitor

10   logs, how are visitor logs -- especially since the current

11   president has waived any claim to privilege over those

12   documents, how would visitor logs, which reveal who came to the

13   White House on specific dates, how would those be privileged?

14   How would you assert a claim of privilege over that information?

15       MR. CLARK:  The theory behind executive privilege is

16   that presidents can obtain fair, honest advice from individuals

17   without the risk of that advice getting out and tainting things

18   later.  Even the act of meeting with an individual could be

19   privileged if that meeting could divulge some kind of

20   information.  So I think it could be privileged.

21       I would say, though, I think *Mazars* most importantly

22   is a threshold question before you even get to the privilege

23   argument.  And I hate to conflate those, because I think in

24   *Mazars* you really have to go to the legislative purpose on this.

25   I would note from the outset in H.R. 503 that Section 4(d)

specifically says, quote, no markup of legislation permitted. The Select Committee may not hold a markup of legislation.

That indicates to me that there's not going to be any legislation and no legislation is even intended from this committee.

THE COURT:  Are you saying, Mr. Clark, that there needs to be specific legislation underway before this material can be subpoenaed?  I mean, doesn't Congress -- can't Congress issue a subpoena for information on which it intends to legislate?  Are you saying that this Court should require Congress to have legislation underway or to delineate specific legislation for which they need the information?

MR. CLARK:  No.  What I'm saying is, there needs to be at least a legislative purpose behind a request.

Here, the legislation that is enumerated in the reply brief and in the amicus briefs, none of the information requested is necessary in order to legislate on any of those items that are brought up.

I'm not saying --

THE COURT:  Are you really saying that the president's notes, talking points, telephone conversations on January 6, for example, have no relation to the matter on which Congress is considering legislation?

The January 6 riot happened in the Capitol.  That is literally Congress's house.  They are charged with oversight to

determine, for example, just off the top of my head, whether

there need to be -- whether there needs to be legislation

altering or strengthening or in some way improving security

around the Capitol or appropriation for law enforcement or

creating -- creation of an executive agency with targeted goals.

In 2002, Congress passed the Homeland Security Act that

created the Department of Homeland Security following the 9/11

bombings.

I mean, are you saying that Congress has to specifically

say what legislation they're considering before I consider this?

MR. CLARK:  Your Honor, I'm saying there has to be a

purpose to it, there has to be a valid legislative purpose.  You

mentioned altering security around the Capitol or appropriation

to law enforcement.  I'm not sure, and I don't think anyone can

articulate how a memo from a campaign aide in April of 2020

would lead to any legislation around either of those issues.

THE COURT:  Well, it's not really your job or my job

to determine that, is it, Mr. Clark?  I mean, courts -- I'm

citing from *McGrain*, 273 U.S. at 178.  Courts are bound to

presume that the action of the legislative body was with a

legitimate object, so long as that object can be construed.

Is it really my role to require Congress to specify the

legislation that they are intending?

And furthermore, isn't it appropriate that Congress may not

know how much legislation or what kind of legislation is

1    required until they have completed their fact-finding process?

2    MR. CLARK:  I would say that under *Mazars* there needs

3    to at least be some connection between the request for

4    information and even potential or theoretical legislation that

5    could come out.  And the breadth of these requests doesn't lend

6    itself to any legislative purpose.

7    THE COURT:  I agree with you, Mr. Clark.  Some of

8    these requests are alarmingly broad, but some of them are very

9    specific and are specifically, you know, geared or targeting

10   events of January 6.

11   Are you saying that those requests, requests centered on

12   the day of the riots, are overly broad?

13   MR. CLARK:  Well, what I'm saying is that the Archives

14   currently has those overly broad requests, and the documents are

15   coming in piecemeal in varying forms, you know, not in any

16   necessarily order in terms of responsiveness, in terms of the

17   order of the request.

18   What I'm saying is, Congress needs to go back and narrow

19   their requests so that as these documents come out we're getting

20   a real breadth of documents that are consistent with *Mazars*,

21   that are consistent with those things.

22   That's what I'm saying here, Your Honor.

23   THE COURT:  I will let you resume.  I'm sorry.

24   MR. CLARK:  No, this is great.  I mean, this is --

25   these are good questions, and they're important questions.

1    So the second point in *Mazars*, I think, is the one that we

2  were just touching on, which is that the request can't be any

3  broader than reasonably necessary to support Congress's

4  legislative objectives.

5    You mentioned a few legislative objectives.  There are

6  others that were mentioned in the amicus and others in the

7  reply.  Here, the requests are unbelievably broad, as I said,

8  and they don't match up to any necessary legislative privilege.

9    Now, it's not our job to glean what Congress really needs

10  or wants.  It's not the Archivist's job to glean what they need

11  or want or the Court's job.  It's up to Congress to go back and

12  draft requests that are reasonable, that are not overly broad,

13  and that bear some resemblance to a legislative purpose that can

14  even exist.

15    And here, we don't have that.  I think that's a really

16  important factor to remember.  It's not anyone's job to utensil

17  these things.  It's not anyone's job to glean what Congress

18  needs to get to legislative intent.  There just has to be some

19  nexus between legislation and a request.

20    I would also note that a lot of these documents that exist

21  are available elsewhere, you know.  So many of these are from

22  people who are, you know, going to -- have been subpoenaed by

23  the January 6th committee, and those documents will be available

24  there.  Many of these --

25    THE COURT:  Wait a second, Mr. Clark.

1    First of all, I challenge your statement that these

2    documents are available elsewhere.  I'm not sure where else the

3    White House visitor logs or notes of your client or records of

4    phone calls of your client or talking points prepared for your

5    client could be obtained.

6    And the other point is that your client has instructed

7    others who have received subpoenas not to comply.  So I'm not

8    sure how the committee could obtain these documents from other

9    sources, and I'm not sure they're required to do so.

10    MR. CLARK:  Well, if they're available and a

11    not-privileged document, then that information can be obtained

12    in a manner that is not seeking records that are privileged

13    under executive privilege.  In *Mazars*, they had them.  I don't

14    believe -- I think that's the only path that they do have.

15    I would also say your focus on actual privileged documents

16    at the White House in terms of where those documents exist,

17    that's an analysis that the Court has to have and the Court

18    probably needs to have with respect to every question and every

19    document that comes out, to make sure that there's a

20    constitutionally based reason to either assert privilege or not.

21    THE COURT:  So what you're advocating is the Court do

22    a document-by-document in-camera review of every document that

23    the committee seeks to get from -- the Archives believes is

24    responsive to the requests?

25    MR. CLARK:  No.

1          THE COURT:  I mean, you're talking years, and you're

2   talking a level of involvement of this Court that's

3   unprecedented.

4          MR. CLARK:  No, I'm not actually suggesting that.

5       What I'm suggesting is that where the former president has

6   asserted a privilege and where the incumbent president has not

7   asserted privilege, when there's a dispute with respect to those

8   documents, because the Constitution is implicated under *GSA* and

9   *Nixon*, it's incumbent on the Court to make a constitutional

10  determination as to who is right and whether --

11         THE COURT:  I don't see that.  I've read *GSA v. Nixon*

12  or *Nixon v. GSA* several times, and I don't find any support in

13  that case for your argument.

14      Can you point me to language in that case that requires me

15  to do that?

16      I mean, the -- the Former President Carter had agreed, had

17  signed off on legislation.  I don't -- here, the sitting

18  president has waived privilege and agreed that the documents can

19  be turned over.

20      Isn't the person who is best able and in a position to

21  determine the executive privilege the executive?

22         MR. CLARK:  I don't agree with that, not the incumbent

23  executive.  I believe that, as they say in *GSA*, the former

24  president has rights -- and it's in the statute, has rights with

25  respect to asserting privilege.

1          THE COURT:  *Nixon v. GSA* also said that the former

2     president's rights are less significant because he is a former

3     president, and where the current president has waived privilege,

4     the Court must necessarily consider that waiver.

5          They're not -- these are not two equal parties here.  The

6     person best able to determine whether there is an executive

7     privilege would be, as I asked, the executive; right?

8          MR. CLARK:  I don't agree when you have an incumbent

9     president -- or you have a former president, I'm sorry, who has

10    a reliance interest, has a constitutional right to --

11         THE COURT:  All right.

12         MR. CLARK:  -- exert privilege over.  I would say --

13         THE COURT:  Can you point me to any language in

14    *Nixon v. GSA* that says that?

15         MR. CLARK:  The president -- the former president

16    has -- there's a constitutionally based privilege which the

17    former president can assert.

18         THE COURT:  Is that language taken directly from

19    *Nixon v. GSA*?

20         MR. CLARK:  Let me pull the quote for you, Your Honor.

21    I will grab that here.

22         Sticking to *Nixon v. GSA*, though, I think the important

23    thing for me is to remember that in both the *Nixon* cases we are

24    talking about documents that were going to be disclosed for

25    confidential review of these documents.  Here, we're talking

```
 1   about a broad document dump of executive documents of a

 2   preceding administration that drives a truck right through the

 3   constitutionally based privilege for a former president and

 4   turns it into a partisan exercise.

 5            THE COURT:  Mr. Clark, I'm going to ask you to dial

 6   down the rhetoric.

 7       The documents -- the Archives have described the documents

 8   at issue.  I'd hardly describe them as a document dump.  The

 9   separation of powers issue you keep talking about I find hard to

10   discern here.  In a rare instance, the executive branch and the

11   legislative branch are in agreement.  They both agree that the

12   documents should be turned over.  So I don't see where the

13   separation of powers argument that you are talking about exists.

14            MR. CLARK:  Well, it exists because that -- the

15   previous administration has a right, has a --

16            THE COURT:  But it's not a separation of powers.  It

17   may be a dispute between a former president and a current

18   president about what is privileged, if that may be a dispute.

19       But can you tell me what the separation of powers issue is

20   here?  There's only one executive.

21            MR. CLARK:  There is, but that executive exists in

22   perpetuity, and it just changes hands at times.

23       Those documents --

24            THE COURT:  Wouldn't the current executive be best

25   positioned to determine -- I mean, you're right.  The executive
```

1    privilege is not limited to one particular officeholder.  It

2    exists so that presidents now and in the future will have

3    unfettered, candid advice from advisors, from a wide range of

4    sources without fear of disclosure having a chilling effect.

5    That's the basis for the executive privilege.

6         But the fact that the current -- the current executive

7    asserts that privilege on behalf of the executive branch.  And

8    here, he has done so.  He has decided that there is no executive

9    privilege.

10        How should I weigh a previous president's assertion of a

11   privilege when the current president has said that there is

12   none?

13             MR. CLARK:  I think you need to weigh it by looking at

14   each document that's in dispute.  I think that's the only way to

15   do it.  I think under the Constitution and, frankly, under the

16   PRA the only way to do this effectively and to have the former

17   president's, you know, rights to executive privilege be heard is

18   to have a review by the Court of each document as it comes out

19   that's in dispute.

20             THE COURT:  Other than slowing down the process, what

21   would this -- and can you point to me a case that says that I'm

22   required to do that?

23             MR. CLARK:  No, I can't.  This is a case of first

24   impression, though.  We know it's a constitutional question; we

25   know it's a constitutional question.  And we know that only an

1    Article III Court is going to be able to say what the

2    Constitution says, and it has in the past.

3          THE COURT:  Let me ask you, Mr. Clark, you talk about

4    the executive privilege and the fact that this -- your client,

5    the plaintiff, retains an executive privilege, even though he's

6    no longer president, and that certainly is an argument you may

7    make.

8       But this Act, the Presidential Records Act, was signed by a

9    previous president and existed during the incumbency of your

10   client's term as president.  There was never an attempt to alter

11   it or change the terms of it.

12      Isn't that -- aren't you now -- isn't your client now bound

13   by that fact?

14         MR. CLARK:  I mean, to the extent that the

15   Presidential Records Act, and I believe it does, protects a

16   former president's interests in documents that are privileged

17   and the right to assert that -- and in fact, it does provide for

18   a former president to be able to file suit under this -- to the

19   extent they are, that constitutional right is encapsulated in

20   the Presidential Records Act.  To the extent that it grants no

21   rights to a former president, it still doesn't -- it's in

22   conflict with the Constitution.  That's why those documents that

23   are in dispute need to be reviewed by an Article III judge.

24         THE COURT:  See, the legislative and executive

25   branches agreed on the rules of the road when they enacted the

Presidential Records Act, which clearly established that an incumbent president can decide whether or not to uphold the former president's assertion of privilege.

That's what has happened here.  And here, again, I know, a rare instance of harmony between the branches, Congress and the executive agree that these records should be turned over.

So I'm not sure that I have found any language -- I don't see any language in the statute or any case that convinces me that where a previous president disagrees with the incumbent's assertion of privilege, that the Court is required to get involved and do a document-by-document review.

I mean, wouldn't that always mean that the process of turning over these records where the incumbent has no objection would slow to a snail's pace?

MR. CLARK:  I don't know, Your Honor --

THE COURT:  And wouldn't that be an intrusion by this branch into the executive and legislative branch functions?  I mean, the Court is very limited in its role here.

MR. CLARK:  Well, except in interpreting the Constitution, making sure that the statutes comport with the constitutional rights that were recognized in *Nixon* and *GSA*.

I would say this:  It is my understanding that this is the first time there's been a court dispute between a former president and an incumbent president with respect to executive privilege.  So I don't think this is a common circumstance.

1    So I also don't think we're talking about a huge volume of

2    documents right now, and I think as the release is ongoing of

3    documents, that it's not an unbearable burden for the Court or

4    for anyone to be able to do a review of documents, only the

5    documents that the incumbent president and the former president

6    disagree on with respect to executive privilege.

7            THE COURT:  Okay.

8            MR. CLARK:  Thank you, Your Honor.

9    So we've talked about *Mazars*.  We've talked about *Mazars*

10   lite a little bit.  Here, I think we just need to make sure --

11   and we've talked about the judicial review of documents.  So I

12   don't want to harp on any of the things that we've already gone

13   over here.  I just think it's really important on our end to

14   recognize -- to discuss the irreparable harm argument.

15   Here, we're talking about documents.  Obviously, if there

16   is a right for the former president to be heard, former

17   president to have input, and the former president to weigh in

18   with respect to executive privilege, if those documents are

19   released, they necessarily create irreparable harm because they

20   obviously can't be taken back.

21   Again, unlike in *Nixon* and *GSA*, we're not talking about a

22   confidential review of documents.  When the documents are out

23   the door and they go to Congress, they're out, and they're going

24   to be -- they're not necessarily under the control of the

25   archivist anymore.

1          THE COURT:  Let me ask you about your irreparable harm

2     argument.  Irreparable harm necessitates really two facts:  Harm

3     and the fact that it's irreparable.  I don't disagree that once

4     information is out you can't unring the bell.  It's out.  The

5     documents are out there.

6          But where is -- what's the harm?  Again, we're not talking

7     about banking records or personal, you know, business records of

8     your client before he became president.  We're not talking about

9     commercial proprietary information, leaseholder agreements all

10    relating to matters before your client became president.  We're

11    talking about documents that are quintessentially about

12    government business, are we not?

13         I mean, again, I come back to White House visitor logs,

14    notes of who your client called on January 6, notes of who he

15    spoke to as people were breaking windows and climbing into the

16    Capitol.

17         MR. CLARK:  Some of it that's requested is

18    governmental function, but as we've said, due to the breadth of

19    the requests, much of it isn't quintessentially government

20    function.

21         THE COURT:  Where's the -- tell me the harm.  Tell me

22    the harm that would accrue to your client if documents related

23    to who he -- I've heard your argument with regard to the

24    executive privilege, but where is the harm that would accrue to

25    plaintiff if documents responsive to the request were produced?

1          MR. CLARK:  The harm exists to the institution of the

2    presidency, and if you will let me --

3          THE COURT:  But the current president has said -- the

4    current president apparently disagrees.

5          Shouldn't I factor that in?

6          MR. CLARK:  I think it is a factor, and it is a factor

7    under the PRA.  But what I would suggest, Your Honor, is that at

8    the time whatever advice was given or whatever call was made,

9    there was a reliance interest by those in the executive branch

10   that the president would be able to receive honest, truthful

11   advice that would be private for a period of time.

12         THE COURT:  That goes to the executive privilege, and

13   I've heard you on that.  What I'm asking, you also say there's

14   irreparable harm to your client, to the plaintiff, if these

15   documents are released, separate from the harms that are

16   attendant in a violation of the executive privilege.

17         What is that harm?  How is your client harmed by a release

18   of White House visitor logs?

19         MR. CLARK:  Well, Your Honor, I would suggest that the

20   harm exists in the statute.  I mean, the ability to sue under

21   this grants a right of private action, which if there was no

22   harm to these documents being released -- you know, damages are

23   something you've got to prove in a case in order to not get

24   dismissed or get thrown out on summary judgment.

25         Here, that right exists for a reason.  The only thing we're

1    talking about are documents and communications.

2         This goes back to what I was suggesting before, though,

3    which is, this is exactly why the Court needs to review

4    documents when there's a dispute, because if there is a review

5    of a document and it is determined that it is not privileged and

6    there's no harm, well, then the Court makes a determination as

7    to whether or not that constitutionally based privilege is

8    properly waived or not.

9         THE COURT:  Mr. Clark, tell me, if you can, how your

10   client is harmed by a release of White House visitor logs.

11        MR. CLARK:  Specifically, you have the president's

12   specific interest in a former president that's before the

13   Supreme Court --

14        THE COURT:  That's an executive privilege arising out

15   of the Constitution.  I'm not asking about that.

16        MR. CLARK:  I understand where Your Honor is coming

17   from.  In terms of the specific facts of a specific document,

18   I'd have to actually look at the specific document in question

19   to be able to determine that.  I don't know off the top of my

20   head without seeing a document to be able to articulate a

21   specific harm that you're asking for.

22        I can tell you the harm to the institution.  I can tell you

23   the harm to the reliance interest of a president.  In terms of

24   the specifics of a specific document, I can't do that without it

25   in front of me.

1          THE COURT:  Are you suggesting that --

2          MR. CLARK:  I can see a situation where the call logs

3   of a former president could have a -- there could be a specific

4   harm to that individual.

5          THE COURT:  All right.  You can continue.

6          MR. CLARK:  Thank you, Your Honor.

7      Finally, I would just -- I can wrap up here, because I

8   think it's important.  When we're weighing public interests

9   here, I think it weighs in favor of upholding the rights of

10  executive privilege of a former president.  I think a ruling by

11  the Court to not grant this preliminary injunction opens up the

12  door for the partisanship of document requests and blows a hole

13  in executive privilege that should concern everybody.

14     I think we want to make sure that we have presidents and

15  executives that get free and fair and honest advice.  And if

16  this broad of a document request is allowed or the release of

17  documents with respect to it, then that two-step process of

18  first *Mazars* and then reviewing the privilege of each document,

19  then I don't think we have a privilege anymore, and I --

20         THE COURT:  Mr. Clark, you've accused the defendants

21  of making overbroad requests, and I take your point that some of

22  these requests are overbroad.  But isn't your assertion of

23  privilege here just as broad?

24     I mean, you've made a blanket assertion of privilege with

25  regard to some documents that have not even been produced yet.

1          MR. CLARK:  Your Honor, I would say this:  There have

2     been three or four tranches of documents that have come from the

3     National Archives.  Former President Trump's team has reviewed

4     documents, has called balls and strikes on each document, has

5     asserted privilege over some, not asserted privilege over

6     others.

7          If someone is being broad, it's the current administration

8     when they've waived it with respect to everything.  The

9     current -- President Trump has made a deliberative and honest

10    assessment of each document as it came in, and it's not -- has

11    made that assertion.  There are documents that we agree that

12    should be released.

13         So I can't stress that enough.  We've not made a broad

14    assertion of privilege.  We're just asking the Court to make a

15    determination in terms of disagreements with respect to these

16    documents.

17              THE COURT:  All right.  Thank you.

18              MR. CLARK:  Thank you, Your Honor.  That's all we

19    have.

20              THE COURT:  All right.  Ms. Shapiro?

21         MS. SHAPIRO:  Good morning, Your Honor.

22              THE COURT:  Good morning.

23         MS. SHAPIRO:  I would like to start where Mr. Clark

24    started, with his observation that this is a case of first

25    impression.  That is true, it is the first time in the history

of the Presidential Records Act that there's been a disagreement between the incumbent and the former president that has come to litigation.

But that does not mean that this is a difficult or even a particularly novel circumstance, because courts in this district are well practiced in assessing privilege.  In fact, I think this district has more pointed cases than any in the land, and weighing privilege is not something new to this court.

THE COURT:  You are sadly correct, Ms. Shapiro.

But let me ask you, what is the appropriate test here?

The plaintiffs say, Look to *Mazars* or *Mazars* lite.  What case do defendants believe is most helpful, and what is the limiting principle on your test?

MS. SHAPIRO:  The case that is most on point is *Nixon v. GSA*.  It addresses the circumstance.  And it very clearly assigns the greatest weight to the incumbent president.

Plaintiffs, still in response to Your Honor's question, do not acknowledge that that is what the Supreme Court has said.  But *Nixon v. GSA*, 433 U.S. at 446, and *Dellums v. Powell*, which is a decision of this circuit, 561 F.2d at 245, the Supreme Court said it must be presumed that the incumbent president is vitally concerned with and in the best position to assess the present and future needs of the executive branch.

There is no doubt that the incumbent president gets deference in terms of this balance, and the greatest weight

1    needs to be accorded to the incumbent.

2         So *Nixon v. GSA* basically spells out what courts do every

3    day when they assess privilege.  They take the privilege, and

4    they weigh it against the corresponding need for the

5    information, and they determine whether the need outweighs the

6    privilege claim.

7              THE COURT:  Ms. Shapiro, to what extent does the

8    former president maintain the ability to exert executive

9    privilege over government communications?

10             MS. SHAPIRO:  So *Nixon v. GSA* recognized a single

11   residual right for a former president to make a claim of

12   privilege, and that by statute, then, is assessed by the

13   incumbent president, who makes a determination of whether to

14   assert or uphold the former president's claim of privilege.

15        That is the way the statute operates, and that is the sole

16   residual right that is recognized in *Nixon v. GSA*.  And because

17   of that, we are quite confident that the *Mazars* test has no

18   applicability here.  We don't have -- the former president does

19   not have a freestanding right to challenge the entire

20   legislative venture.

21        And *Mazars*, as Your Honor already pointed out, concerns a

22   sitting president.  And even the *Mazars* lite test accords weight

23   to the incumbent president's view.  So in that respect, it's

24   similar to *Nixon v. GSA*.

25        So the test is really to do the normal balancing that

1    courts do, even for executive privilege, ascribing the

2    appropriate amount of weight to the incumbent's judgment that

3    the public interest in this case clearly outweigh the

4    confidentiality concerns underlying the executive privilege.

5        And I would add that for this Court to do otherwise would

6    be very odd indeed, because essentially what the plaintiff is

7    asking you to do is for the Court to superintend a sitting

8    president's decision not to assert privilege.

9        Presidents may decide not to assert privilege every day,

10    and there's no recourse to the courts and no recourse to a

11    former president.  For example, presidential communications are

12    often captured in agency records, and those agency records are

13    subject to FOIA.  A sitting president may decline to assert

14    exemptions by or otherwise uphold privilege with respect to

15    those presidential communications.  There is no challenge to

16    that decision.

17        It would be extremely unusual for courts to superintend the

18    daily decisions of the sitting executive as to whether or not to

19    assert privilege and the sitting president's assessment of the

20    public interest in that regard.

21        THE COURT:  One of the requests that the committee has

22    made is for plaintiff's communications with White House counsel

23    and deputy White House counsel concerning legal advice relating

24    to the constitutional process of certifying election results.

25        How does attorney privilege factor in in how I must weigh

1    this request?

2              MS. SHAPIRO:  I guess I would say two things.  One,

3    the attorney-client privilege in the governmental context would

4    be encompassed within executive privilege.  But two, the

5    documents that we have before you in the tranches that are ripe

6    for decision I don't believe involve those -- that particular

7    issue.  And so we're talking about sort of a speculative

8    wholesale attack on the scope of the request.

9         And with respect to, you know, the scope of the request,

10   we've explained in our papers why it's related to the

11   investigation of the Select Committee, but I'm sure Mr. Letter

12   will have more to say about that in terms of defending the

13   legislative piece of this.

14             THE COURT:  All right.

15             MS. SHAPIRO:  The other points I wanted to make with

16   respect to why this is actually not a particularly difficult

17   case is that presidential communications privilege is a

18   qualified privilege.  Plaintiffs concede that in their papers.

19   That's not in dispute.  It can be overcome.

20        And it's not only qualified, but the Presidential Records

21   Act means that all of these records will be public.  They are

22   not, as plaintiff asserts in his brief, in his reply brief,

23   going to be confidential forever.  They're restricted for 12

24   years from the general public.  But the PRA specifically

25   contemplates that all branches of government will have access to

these documents, even during the restricted period, the
judiciary, the current executive branch for its needs, and
Congress for its needs.  That's contemplated in the statute.

So these are not documents where privilege and
confidentiality will survive forever.  Far from it.

I also want to stress, Your Honor, that the former
president has no personal interest in these documents.  There is
no personal injury from their disclosure.  The only interest
that the former president claims is the interest in executive
branch confidentiality, which is a weighty constitutional
interest.  We agree with that.

But it is the very same interest that the incumbent
president is charged with protecting and which the incumbent has
determined should give way in the circumstance due to the
countervailing needs of Congress for its investigation into the
events of January 6.

I also want to note that this is not unusual, it's not
unusual for a sitting president -- or I should say, it has
happened, certainly, that a sitting president will decline to
assert privilege over presidential communications, even of the
most sensitive nature.  We set out in our brief prior examples
of where presidents have allowed their aides and documents
dealing with presidential communications to be provided to
Congress without an assertion of privilege, and that includes
this former president, who also allowed his presidential

communications with a number of people to be divulged to

Congress.

And I would add to the examples in our papers that former

President Trump did not sue to prevent, for example, the Acting

Attorney General Jeffrey Rosen from testifying about

presidential communications to this very same Select Committee.

So that apparently was not a monumental case that needed to be

litigated, but this one is.

Taking all of the elements that I've mentioned, the fact

that the privilege can be overcome, that it's not absolute, the

fact that the incumbent is entitled to great weight, the fact

that courts do this all the time, the fact that past presidents

have allowed it to happen and that this very same former

president has permitted it to happen, all of those factors come

into the balance.

And it should be quite clear that the events of January 6

create a congressional need that outweighs the confidentiality

in this instance and that President Biden's determination that

the public interest requires the production of records in this

case is not only entitled to deference, but it's eminently

rational.

THE COURT:  Ms. Shapiro, are you going to -- I can ask

you, but if you prefer, I can ask Mr. Letter.  What of

Mr. Clark's point that the documents at issue should be reviewed

by the Court to prevent a violation of privilege, because once

1    the documents are released, they can't be, you know, unreleased?

2    What of plaintiff's request for a Court review?

3         MS. SHAPIRO:  So I want to make clear, if Your Honor

4    wants to review documents, we're happy to supply documents.

5    However, it is completely not necessary in this case.  Privilege

6    is determined all the time in cases via privilege logs and via

7    descriptions of records.  And we've tried to provide that in the

8    NARA declaration so that you have a sense of the documents that

9    are at issue.

10        It is certainly not necessary for you to look at White

11   House visitor logs or call logs and determine and make an

12   individualized document-by-document decision.  That is --

13   there's no requirement anywhere in the case law, and courts all

14   the time -- courts would do nothing other than review documents

15   if all privilege disputes ended up in a document-by-document

16   review by the judge.  I'm sure no member of this court wants to

17   be engaged in that endeavor.

18        It also would, obviously, delay production of records to

19   the committee.  And as the Supreme Court has warned in *Eastland*

20   and elsewhere, that when there is an effort to halt the

21   activities of a branch of government, that the Court should act

22   as expeditiously as possible.

23        Your Honor mentioned White House visitor logs.  Those

24   visitor logs, there have been multiple presidents who have

25   voluntarily disclosed White House visitor logs as a matter of

policy, such that the notion that there is going to be an
extreme impingement of confidentiality interest in the
disclosure of White House visitor logs, I think, is
counter-indicated by the fact that White House visitor logs have
been released by numerous presidents.

        With respect to the irreparable harm allegation, I think
Your Honor essentially understands our arguments perfectly.  The
president has no personal interest in these documents.  They are
records of the United States per the Presidential Records Act in
Section 2202, and he is not personally injured by their
disclosure.  The only injury he claims is the injury to the
executive branch interest.  And the current sitting executive
has determined that the public interest lies in the production
of those records to Congress to further its investigation.  So
there is no irreparable injury to the plaintiff here.

        Also, the current schedule under the Presidential Records
Act is November 12th for the production of the first tranche of
documents.  The remaining two tranches that are ripe for review,
I believe, go out the week after that.

        And so we think, Your Honor, that there's ample time for
the Court to issue a decision without halting the PRA process,
which is, you know, underway and will continue to progress.

        THE COURT:  You and I have a very different view of
what ample time is, Ms. Shapiro, but I appreciate that.

        MS. SHAPIRO:  Yes.  I apologize for that, Your Honor.

1   I think responding to the preliminary injunction motion has

2   jaded my sense of time.

3        THE COURT:  I have another one; I have a hearing on

4   another preliminary injunction motion tomorrow.  I appreciate

5   that everything is relative.

6        MS. SHAPIRO:  It is.

7        The last thing to address is the balance of equities, and

8   here again, the equities lie heavily in favor of the public

9   interest and the interest in learning what led to the events of

10  January 6 and ensuring that they never happen again.

11       The public interest lies there.  It lies in the current

12  president's assessment that that interest outweighs any interest

13  in asserting executive privilege and the underlying

14  confidentiality concerns, and that should easily dispose of this

15  case.

16       I'm happy to answer any further questions, Your Honor.

17  Otherwise, with respect to the sort of, you know, legislative

18  aspect of the -- our briefing, I would leave that to the House

19  and Mr. Letter.

20       THE COURT:  Thank you, Ms. Shapiro.  I do have some

21  questions, but I think they're better posed to Mr. Letter.

22       Mr. Letter?

23       MR. LETTER:  I'm sorry, Your Honor.  The mouse froze.

24  Isn't modern life wonderful?

25       Your Honor, first of all, I just want wanted to start off

1    by saying we agree with all of the points that my colleague,

2    Ms. Shapiro, made.  So we adopt the arguments that she has made.

3        I did want to emphasize up front where Ms. Shapiro ended,

4    which is the Select Committee to Investigate the January 6th

5    Attack on the U.S. Capitol is expeditiously engaged in

6    investigation of what happened on January 6, what led up to it,

7    why did it happen, what can and should be done.  It's one of the

8    most important congressional investigations that -- in the

9    history of our nation that has ever occurred.

10        THE COURT:  Mr. Letter, is the Select Committee,

11    therefore, restricted -- and I don't mean to cut short your

12    emphasis on how serious an event the mass riots on January 6

13    were, because I have no disagreement with your characterization.

14        But is the Select Committee restricted to only seeking

15    information regarding the facts, circumstances, and causes of

16    the January 6 attack?

17        MR. LETTER:  No, not at all, Your Honor.  And this

18    goes to one of the points that my friend made at the beginning.

19    He said that the -- Mr. Clark, that the Select Committee doesn't

20    do markups.  But the Select Committee is specifically authorized

21    and the expectation is that they will be making

22    recommendations -- that's right there in Resolution 503 -- for

23    legislation.  No, it's not just about January 6 and focused on

24    that specific day.

25        THE COURT:  Let me ask you, Mr. Letter, some of the

requests seem fairly narrowly tailored, but some of them do strike me as very broad.  It's sort of a sliding scale.

For example, with regard to January 6 or the days immediately preceding it or even following it, there are requests regarding the president's communications and contacts with a number of individuals.  Those appear related to a specific event.

But there are requests seeking all documents concerning the president's communications with 40 individuals from April of 2020 to January 6.  That seems to me unbelievably broad.  And there are requests for documents concerning polling data and election issues, which I guess would tangentially relate to the president's claim that the election was stolen, which I don't think any -- not a single court has upheld.  But those requests seem really broad to me.

Can you justify them?

MR. LETTER:  Yes, Your Honor, and they are broad. Your characterization is correct.  I have several responses.

First, if I may, if you look at page 20 of our brief, that is where you will find Vice Chair Cheney, in remarks that were then adopted also by the Chairman, describe what the committee is looking into.  So you see there the breadth of it.

The key thing is, I think in response to your question right now, is part of the investigation about the influencing factors that fomented the attack -- as we know, this attack

didn't just come out of nowhere.  This wasn't just some
spontaneous thing that arose on the morning of January 6.  One
of the most important things that the committee has to look
into -- and again, this is emphasized by Ms. Cheney and -- Vice
Chair Cheney and Chairman Thompson, is we need to figure out
what was the atmosphere that brought this about.

So clearly, we go back to the many attempts that were made
before the election to try to build the nature of mistrust about
the election itself, which goes to undermine our democracy, so
that if President Trump did lose he would be able to say that
this is unfair and to generate lots of anger and rage that led
to January 6.  So that is exactly what the committee has to look
into and is looking into, because otherwise, we're just looking
at a very narrow focus.

If I may just note one thing that occurred to me last
night.  As many wise people have said, those who don't study
history are doomed to repeat it.  We want to make sure this
never happens again, and that means going way before January 6
itself.

So yes, we want to see who did President Trump talk to, who
was he consulting with, what were the various groups urging,
what types of claims were they thinking that he could make,
et cetera, what really led up to this.  I think it's both what
the House expects this committee to do, and also, it's what the
American people expect.

1          THE COURT:  But in April of 2020, Mr. Letter?  What's

2     going on in April of 2020 that might have a connection to

3     January 6?

4          MR. LETTER:  Your Honor, it's all -- we think maybe

5     this all ties in with -- you know, leading up to this, the

6     fomenting of it, the building a groundswell of feeling that this

7     election was going to be tainted.

8          THE COURT:  Okay.  I grant you that after the November

9     election this groundswell began, and even shortly before the

10    election, there's an argument to be made that the former

11    president was priming the pump for in case he lost.

12         But April of 2020?  How could those documents be connected

13    to what happened on January 6?

14         MR. LETTER:  Your Honor, because remember that there

15    was an election that was held that -- you know, later in which

16    there were major concerns, obviously, that Mr. Trump had that

17    started this whole line of well, the election is going to be

18    stolen, and it may reveal a plan to subvert the election.

19         And more important, this ties in with -- remember, there

20    was an entire impeachment about subverting the election.  So the

21    connection is noted.  The House impeached the president because

22    of concerns about Russian efforts to subvert the American

23    people's confidence in the election itself.

24         Now, I did want to make two other points about that, Your

25    Honor, because your questions are very serious ones.

1    Remember that Congress can investigate -- plenty of times

2    it may lead to blind alleys, plenty of times a quick evaluation

3    might lead one to say it's just not -- it turns out there's

4    nothing there.  But you've got to look to see it.

5        And my colleagues have just reminded me that the April 2020

6    date is when the president himself started tweeting about the

7    election coming up.  So this is something that he was raising.

8    He himself made this relevant.

9        But again, yes, we might run into, you know, blind alleys,

10   et cetera, in which case we will stop wasting time.  But that's

11   a determination for Congress to make.

12           THE COURT:  I understand.  And Congress certainly has,

13   you know, broad authority to determine the facts before it

14   decides what legislation to create or to enact.

15       But there has to be some limit, wouldn't you agree?

16           MR. LETTER:  Yes, Your Honor.

17           THE COURT:  And where is the line drawn?

18           MR. LETTER:  Your Honor, we could probably come up

19   with a batch of hypotheticals if the -- you know, that if the

20   committee asked about that would so clearly could have no

21   relationship whatsoever, certainly.

22       But remember, again, we're talking about a whole

23   groundswell.  Many of the people who were caught in the Capitol,

24   who were doing things in the Capitol, and who were thrown out of

25   the Capitol have said that it was because the president asked

them to come, the president asked them to save the democracy.

And so we want to know, when did that process start, who was involved in it, how did it come about.  And as far as legislation, yes, this is all tied to and is clearly appropriate for Congress to look into.

For example, should we amend the Election Counting Act. Should there be restrictions possibly on ways that federal officials can try to influence state officials to change election results.  Should we increase the resources of various committees and bodies who are gathering information.  Should we increase resources for, you know, something that I think has been done many, many decades, rebuilding the confidence of the American people in the election process and our democracy.

I remember any number of times, I think it started with Chief Justice Burger, who would distribute pocket copies of the Constitution.  The whole point was an effort to -- you know, sort of a civics lesson to the American people.

So we need to know, what are we confronting?  Clearly, we have major dangers with a significant percentage of the population thinking that these elections were stolen, even though, even though any number of judges said there's no evidence of that.  The committee is -- it's perfectly appropriate for them to say we've got a problem in United States that we need to address, we need to make people have more confident in the electoral process.

1      Again, in order to do that, we need to find out, why was

2  the president tweeting that early about already undermining the

3  confidence of the American people in the election.

4          THE COURT:  Mr. Letter, I'm not sure that there's an

5  answer to why the president was tweeting whatever he was

6  tweeting.  And I don't disagree that some of these requests seem

7  very narrowly tailored to me.

8      But for example, one of the committee's request is all

9  documents and communications within the White House on

10  January 6, 2021, relating in any way to plaintiff, Former Vice

11  President Pence, and over two dozen government officials.

12      Now, plaintiff argues that because this request is not

13  limited to communications about the facts, circumstances, or

14  causes of the January 6 attack, that these communications could

15  be about all sorts of unrelated things, including conversations

16  with foreign leaders, attorney work product, and discussion of

17  matters of national security.

18      And that question becomes even more compelling when we're

19  talking about communications, you know, in April or May.  And I

20  understand, you know, the president started tweeting about

21  issues in April.  But why is that not overbroad?

22          MR. LETTER:  Your Honor, we don't think it's overbroad

23  because the president was talking to lots of people.  Lots of

24  people were talking to each other.  And we want to know how much

25  of this was inside the White House, how much of it was with

members of Congress, how much of it was with outside groups such as the Proud Boys, et cetera, how long was this whole problem that we now face, where did it come from.

Now, and let me emphasize, Your Honor, one of the most important things I want to say is, if there are certain requests that are overbroad, there are a couple of things.  One is, President Trump can say specifically that particular request is overbroad.

The one question is, is he entitled to do that, since as Ms. Shapiro pointed out, these materials being sought are not his.  These are materials of the current administration and the United States government and the Archives.  These do not belong to President Trump.

And if I could, I just want to interrupt myself for a moment.  At one point, Mr. Clark, I think, said something about, you know, these are -- I forget what words he used, you know, personal, that they don't involve official duties.  If that's true, they're not covered by executive privilege.

And remember, that's what we're here about.  President Trump under this statute and under the Constitution is allowed to raise concerns about privileges.  Well, executive privilege doesn't cover the kinds of things that Mr. Clark was talking about.

So that's --

THE COURT:  What about attorney-client privilege?

1          MR. LETTER:  Yes, he could clearly claim

2     attorney-client privilege.  Now, White House counsel -- that

3     seems to be one of the privileges he could raise.  So a couple

4     questions about that.  One, I don't know what that has to do

5     with the chief of staff.  Two, there may be all sorts of

6     waivers.  Three, it's not at all clear that that even applies

7     against the Congress of the United States.  The House does not

8     recognize a, you know, common law claim like attorney-client

9     privilege.  That's not --

10         THE COURT:  Are you posing another novel area of first

11    impression for me to wade into, Mr. Letter?  I have enough on my

12    hands.

13         MR. LETTER:  Yes, you're right.  You do not need to go

14    into that.  But remember, as I think Ms. Shapiro said,

15    attorney-client privilege is merely a subset of executive

16    privilege.  It's not some different thing all by itself.  And as

17    Ms. Shapiro pointed out, President Trump has had all sorts of

18    his attorneys providing evidence and testifying.

19         But again, if he wants to say that particular request is

20    overbroad, then that is a plea that he can make, and that is

21    something that this Court could rule on if the Court finds that

22    that particular part is invalid.

23         That doesn't have anything to do with the broad nature of

24    the request, which is overwhelmingly -- there's just no

25    argument.  I think overwhelmingly the request is appropriate.

1    So there isn't some sort of notion that if one tiny thing is

2    wrong, overbroad, that that means the whole request falls.

3    That's just wrong.

4         And as Your Honor knows clearly from when you consider

5    privilege claims, if you find that, you know, there are claims

6    that five different items are privileged and you reject that

7    argument as to four, that doesn't mean that the whole request is

8    no good.  It just means whatever might be overbroad will be

9    tossed out.

10         But again, we don't think President Trump can make that

11    claim anyway.  That's up to --

12              THE COURT:  I want to ask you about that, Mr. Letter.

13    To the issue of overbreadth, is that issue one that I need to

14    consider, given that the current president has waived any claim

15    over -- any claim over release of the documents?

16              MR. LETTER:  No, Your Honor.  In fact, you have

17    anticipated the note that one of my colleagues just handed me

18    saying that exact thing.  If it's overbroad, that's for the

19    Department of Justice and NARA, the Archivist.  That's a

20    determination for those bodies to make.

21         But President Biden does not seem to believe that any of

22    these tranches thus far has a problem, because he has not raised

23    this.  Again, there's no reason why that would be something that

24    President Trump could raise.

25         And I did want to point out, too, remember that the

1    declaration from Mr. Lassiter (phonetic), I think it is, has

2    pointed out that there are a batch of documents that have been

3    set aside as nonresponsive.  Other documents have been set aside

4    for the moment.  The committee has agreed to have those set

5    aside so that we don't get bogged down in those.

6        Instead, let's deal with as quickly as possible the ones

7    that we've identified and that the Archivist has identified and

8    that President Biden has said are not covered by executive

9    privilege.

10       So that was a long-winded answer, Your Honor, of saying no,

11   they are not issues that -- overbreadth is not an issue.  If

12   ever the Archivist identifies some documents that are responsive

13   and President Trump says I just think those are overbroad, we

14   can deal with that then.  I suspect that's never going to

15   happen.

16           THE COURT:  Let me ask you, Mr. Letter, and this could

17   be equally posed to Ms. Shapiro, the Congress and the executive

18   branch are in agreement that the documents should be turned

19   over, and the executive branch has waived any claim to privilege

20   in the documents.  The previous president has said wait a

21   minute, there is a privilege to be asserted.

22       What factors -- what balancing test is appropriate in

23   weighing basically what is a disagreement between the current

24   president and a former president as to whether the privilege

25   exists?

1          MR. LETTER:  The balancing -- and I think Ms. Shapiro

2   did address this somewhat.  The balancing has already been done.

3   It's been done by President Biden.  The D.C. Circuit Court and

4   the Supreme Court said it's in the best position to determine

5   what is in the interest of the executive branch and the interest

6   of the president --

7          THE COURT:  So is that where I end?  Is that where I

8   start and begin?  Once a current executive, once a current

9   president says there's no privilege, that the former president

10  doesn't get a say?

11      Would you agree that if these were personal documents, that

12  that would be different?

13          MR. LETTER:  If they were personal documents, it's to

14  say they wouldn't be covered by executive privilege.  So I'm not

15  sure how that would tie in.

16      But Your Honor, I think the best way to answer what you

17  said is, on the one hand, yes, this is authority of the

18  president, current president.  You have only one president.  The

19  former president has had an opportunity to raise these claims.

20  He raised them to President Biden.  They were rejected by him.

21      Undoubtedly, we can think of hypotheticals where a court

22  would say, well, I think there still is an important residual

23  interest here and, you know, that it's bad faith or something

24  like that.  We can come up with hypotheticals.  Frankly, we've

25  had trouble coming up with ones that make sense.  None of them

1    have any relation to the current situation.  And so I don't want

2    to say there would never be any need to under the statute, I'm

3    not saying that, but certainly nothing that is raised by this

4    case, no.

5              THE COURT:  All right.

6              MR. LETTER:  As far as other points, I just had a

7    couple of things I wanted to mention.

8              THE COURT:  Oh, let me just ask you one more question

9    while we're on the question of -- the subject of the breadth of

10   the committee's requests.

11        The limiting principle on overbreadth is -- the committee

12   has authority to request information over areas where

13   legislation could be had.

14             MR. LETTER:  Yes.

15             THE COURT:  What is the relevance of summer 2020

16   polling data?  That's one of the areas of information that the

17   requests seek.  How is that relevant, polling data?

18             MR. LETTER:  Because what we would hope, what we may

19   find, is that that helps explain why President Trump started at

20   that time --

21             THE COURT:  He didn't want to lose the election.  I

22   mean, do you need polling data to determine that a president who

23   is up for reelection wants to win or may be worried that he's

24   not going to win?

25             MR. LETTER:  It might very well be, though, that it

1    will tell us -- the polling data, combined with the other

2    material that we're looking at, would help tell us, okay, he

3    decided at that point that the key thing to do was to start

4    stirring up the far-right armed militias, certain members of

5    Congress.

6         Polling data, remember, isn't just you're likely to be

7    reelected or you're not.  It's who's not going to vote for you,

8    who might vote for you.  And so you might then start --

9              THE COURT:  But isn't that kind of tangential?  I

10   mean, you have -- you sought information, and you have

11   information that the plaintiff did start doing these things.  I

12   mean, so polling data may show that he had every good reason to

13   be worried, but isn't the fact that -- is it really in

14   dispute -- don't you have plenty of information that he started

15   tweeting, that he started making these connections?  And aren't

16   there other requests you've made which would corroborate that?

17             MR. LETTER:  As to the other requests, we hope so, but

18   I think your question earlier helped us -- helps answer that

19   question, which is, at this point we don't know exactly who is

20   going to be cooperating with us, who is going to be providing

21   information, who instead is going to say President Trump --

22   former President Trump instructed me not to respond, so I'm not

23   going to.

24        As far as the polling data, if a report is issued, I

25   suspect there's some people out there who are going to attack

1    it.  And one of the things they will do --

2             THE COURT:  I think it's almost assured.

3             MR. LETTER:  Isn't it?  And they're going to say, oh,

4    they didn't look at this, the committee didn't look at that.

5             THE COURT:  But that's the nature of politics in this

6    town, which is why I'm a judge and not a politician.  I mean,

7    there's always going to be an attack from the other side.

8    You're never going to, you know, waterproof or make your report

9    completely airtight.  There's almost no limit to the information

10   you could be seeking, and some of these requests do seem very,

11   very broad indeed.

12            MR. LETTER:  They are broad, Your Honor, and that gets

13   into a separation of powers issue.  That's for Congress to

14   decide.  I think it would be a very startling thing.  And I

15   think a question you asked earlier showed that you fully

16   recognize this:  It would be a startling thing for you to,

17   either in an injunction or declaratory judgment or in an

18   opinion, tell Congress, I know better than you what you need,

19   you don't need that.

20            THE COURT:  Well, I think the question more is, I

21   think I would be on stronger footing doing something like that

22   if the executive branch disagreed with Congress, but they seem

23   to be in agreement here.

24            MR. LETTER:  Exactly, Your Honor.  That's exactly

25   right.  Therefore, if at some point the current administration

1    says, oh, come on, you're reaching too far into the White House,

2    I'm putting my foot down, obviously, that's something that the

3    president could do.

4         But this is not -- this apparently is not harming --

5    remember, what executive privilege is about is can the White

6    House function properly.  It's not is Congress asking too many

7    questions.  It's can the White House function properly, can the

8    president get the advice that he needs.

9         And not surprisingly, the current administration does not

10   think that Congress asking for polling data is going to harm the

11   operation of the presidency of the White House.

12        So we may be wasting some time.  Maybe the committee is

13   wasting some time.  Maybe we're wasting some of the Archivist's

14   time.  I don't think we are.  But even if we are, that's not in

15   this case.  That's not a question here.  That's something that

16   if Mr. Trump wants to raise with President Biden, he can do

17   that.  But it's not a question here for this Court.  It's not

18   what's being raised in this case.

19        What privilege would it be for President Trump to say, you

20   can't find out if I'm looking at polling data.  I don't know

21   what privilege would cover that.

22        So again, if we're wasting the taxpayers' money, President

23   Trump can argue about that, but that's not the issue before this

24   Court today.

25             THE COURT:  All right.

1          MR. LETTER:  Just -- I'm sorry.  Some of the

2     questions, some of the things in legislation that might come up,

3     things like, should there maybe be a hotline or ways for

4     Congress to be able so that there isn't that massive delay that

5     there was at the White House before requests were made for

6     National Guard troops to show up, should there be some standards

7     for when the D.C. National Guard is brought in.

8          And remember, here, there's a very key aspect to this,

9     because I'm sure that Mr. Clark there is saying, oh, oh, wait a

10    minute, that would interfere with the powers of the executive.

11    Remember, here, one of the things we're looking at is was the

12    president himself fomenting this attack on Congress.

13          THE COURT:  Are we once again to what did the

14    president know and when did he know it?

15          MR. LETTER:  I think we are, Your Honor.  I think that

16    is absolutely central to this inquiry.

17          I think that that covers the main things that I wanted to

18    cover.  Obviously, I'm happy to answer any other questions.

19    Really, the way I want to end is by saying that, you know, we

20    urge the Court to act with great dispatch.  We totally

21    understand how much you have on your docket.  We are very aware

22    that you have numerous criminal cases on your docket arising

23    from the riot.  Every time I talk to your colleagues, they

24    remind me of how many cases they have.

25          THE COURT:  We have a lot.

1          MR. LETTER:  You do, and we're very well aware of

2      that.  We deeply appreciated the fact that you set this hearing

3      so quickly.

4          But the committee also has essential work that we need

5      done, because we can't have this happen again, and that is

6      something that, fortunately, the Archivist and the current

7      president has insisted that the Archivist move fast.

8          And so as I say, we strongly request that you act with

9      dispatch here.

10          THE COURT:  Thank you, Mr. Letter.

11      Mr. Clark?

12          MS. SHAPIRO:  Your Honor, may I --

13          THE COURT:  Ms. Shapiro?

14          MS. SHAPIRO:  I'm sorry.  I just wanted to respond to

15      a few points of Mr. Letter before Mr. Clark so he has the

16      opportunity to respond to both of us.

17          THE COURT:  Okay.  Briefly.

18          MS. SHAPIRO:  So a few things that go to Your Honor's

19      concerns and, I think, are very important.  Mr. Letter alluded

20      to one of them, and that's the accommodation process.

21          The current executive has the constitutional mandate to

22      engage in accommodations with the legislative branch, and that

23      has been going on.  There have been, as spelled out in

24      Mr. Lassiter's declaration, there have been requests that have

25      been deferred because the executive branch went back to Congress

1     and said whatever it said to question whether those are

2     appropriately addressed at this time.

3          So there is that accommodation process, and the

4     accommodation process is typically how overbreadth issues get

5     resolved.  And those discussions, I want to underscore, are

6     going on in this very case.

7          Relatedly, it is not the case that President Biden has

8     wholesale waived privilege.  One, it hasn't been -- I wouldn't

9     call it a waiver.  It's a decision not to assert or uphold

10    privilege.

11              THE COURT:  I agree.  That's an important distinction.

12              MS. SHAPIRO:  And secondly, it hasn't been wholesale,

13    because there has been a careful review of the records, and

14    there has been some pushback and some accommodation, and there

15    have been records that the executive has gone back to NARA and

16    said these aren't relevant or they're not responsive.  And those

17    things get worked out in the accommodation process.

18         And the declaration spells out that for decades that

19    informal process of dealing with the representatives from the

20    former president, the representatives of the incumbent, and

21    NARA, that that process has worked informally for decades

22    without an issue.  And that pertains not only to the

23    accommodation process with respect to scope and breadth, but

24    also with respect to administrative burdens that the plaintiff

25    alluded to in their briefs.

1          There's another point that I wanted to make with respect to

2     Your Honor's question about polling data.  We need to remember

3     the definitions in the Presidential Records Act itself.  Section

4     2201(3)(c) defines materials related exclusively to the

5     president's own election to be personal records.  So those would

6     not even be appropriate for production and -- because they would

7     be deemed non-records.

8          So there are decisions all the time that NARA will be

9     making with respect to what's a presidential record and what

10    might be strictly personal or strictly campaign-related or

11    otherwise not falling within the definition of presidential

12    records.  That's all a part of the PRA process, the review, the

13    accommodation, and all of that is ongoing.

14         So I wanted to stress those points, Your Honor.

15              THE COURT:  Thank you for the clarification,

16    Ms. Shapiro.

17         Mr. Clark?

18              MR. CLARK:  Thank you, Your Honor.

19              THE COURT:  And Mr. Clark, I hate to jump right in

20    here, and I meant to ask you about this when you started your

21    argument.

22         You make a rather startling assertion in your reply brief

23    on page 2, where you say, "Notwithstanding their allegations and

24    insinuations of conspiracy, investigations by the FBI and the

25    Senate Committee on Government Affairs and Homeland Security

1    rebut their contentions of wrongdoing by Trump administration

2    officials."

3         What's your basis for that assertion?

4              MR. CLARK:  That's a public article from Reuters with

5    respect to the -- quoting the FBI.  The citation is right in

6    there.

7              THE COURT:  So you cite an article -- and by the way,

8    the article says the FBI has found scant evidence.

9         But I mean, the fact that something -- that's the only

10   support for that statement?

11             MR. CLARK:  The support's in the brief, Your Honor.

12        I think the bigger point here, though, is that, you know,

13   there's no limiting principle to these questions, and finding an

14   answer to that question may or may not be in Congress's purview.

15        And that's not what my point here is.  My point is, the

16   lack of the limiting principle on what they're asking for and

17   the lack of any balancing between a former president's assertion

18   of privilege and the current administration is really

19   revolutionary and breathtaking.

20        You asked me earlier with respect to where in *GSA* v. *Nixon*

21   we could point to that the former president had a right to

22   assert privilege.  They're very clear on pages 448 to 449, and

23   we cite it in our reply brief at page 21, that the privilege

24   survives the president's tenure.

25             THE COURT:  Absolutely.  I don't disagree with you,

1    and the case is pretty clear on that.  But is his right to

2    assert the privilege the same as a sitting president?

3         The current president has decided -- has declined, as

4    Ms. Shapiro says, has declined to assert privilege.  What

5    principle do I apply here when a former president says wait, but

6    I want to assert it?

7         They're not equal.  I mean, there's not a single case that

8    says a former president has -- you know, his assertion or her

9    assertion -- all of the former presidents were his, but his

10   assertion trumps the current executive.  What principle do I

11   apply?

12             MR. CLARK:  I think you have to apply the principles

13   in *Nixon* and *GSA* with respect to where we are with the PRA,

14   which does give a former president rights to --

15             THE COURT:  I'm not sure if that case is as helpful to

16   you as you think it is, Mr. Clark.

17             MR. CLARK:  Okay.  I mean, I would say that the way

18   that NARA currently reads the statute and applies it doesn't

19   balance anything.  All it does is just give a final say to the

20   executive, period, full stop.  And that reading is inconsistent

21   with what's in *GSA* v. *Nixon* and, frankly, what's in the text of

22   the statute.

23             THE COURT:  Wasn't the PRA enacted after *Nixon v. GSA*,

24   *GSA v. Nixon* was decided, and wasn't there a response to that

25   case?  And it's been signed off on by several administrations

since, and there was never an objection from your client's
administration about that act.

MR. CLARK:  Well, right, because it certainly didn't
overturn *Nixon v. GSA* or in any way take away the value of a
former president's ability to object to documents with respect
to privilege.

So there isn't a need to have objected to it, because the
rights that exist in *Nixon* and *GSA* and are codified in the PRA,
quite frankly, give the former president a right to balance it.
This Court needs to make that balancing test for them.  I mean,
that's what this is.

I would just like to address one more thing, Your Honor,
and it's a little bit off the beaten path of what we discussed.

I agree that the executive privilege rights are broader and
probably stronger than an attorney-client privilege, but there's
one really key distinction here.  With a private attorney, the
current administration holds no rights to waiving or not waiving
attorney-client privilege with respect to a private attorney for
a former president.  I just want to make sure that we all have
an understanding of that distinction.

THE COURT:  And are you claiming that there are
documents that are subject to production that involve
communications with the former president and his private
attorney?

MR. CLARK:  In a few of the document requests, there

1    are.  They're not in the identified documents right now, but I

2    just wanted to make sure that if the requests are read broadly,

3    there are communications that could be produced that were

4    private between a private attorney and his client, and that

5    right isn't -- there's no right to the current administration to

6    waive attorney-client privilege with respect to those documents.

7              THE COURT:  All right.

8              MR. CLARK:  That's all, Your Honor.  Thank you.

9              THE COURT:  Thank you very much.  Thank you to the

10   parties.

11        I know this case was put on a very short timeline because

12   of the deadline that we have of November 12th.  Everyone has

13   worked really hard to complete their briefings and submit their

14   materials on a very, very short deadline, and I appreciate the

15   work that's gone in and the preparation for the argument today.

16        I will issue my opinion and ruling expeditiously.  Thank

17   you very much.

18        (Proceedings adjourned at 12:44 p.m.)

19

20

21

22

23

24

25

```
1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7          Please Note:  This hearing occurred during the

8     COVID-19 pandemic and is, therefore, subject to the

9     technological limitations of court reporting remotely.

10

11

12    /s/ Sara A. Wick                   November 4, 2021

13    SIGNATURE OF COURT REPORTER        DATE

14

15

16

17

18

19

20

21

22

23

24

25
```