**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DONALD J. TRUMP**, <br><br> Plaintiff, <br><br> v. <br><br> **BENNIE G. THOMPSON**, *in his official capacity as Chairman of the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol, et al.*, <br><br> Defendants. | Civil Action No. 21-cv-2769 (TSC) |

Jus Tertii (Whitmore v Arkansas, Al-Aulaki v US, 15-1191 Sessions v. Morales-Santana (06/12/2017), US v Kozminski) Motion for Reconsideration (see Hearings, LEGAL IMPLICATIONS OF DECLASSIFICATION BY COMMITTEE VOTE) and FRCP Rule 44.1 foreign law (US v Fullard-Leo:  "*The rules under which the Hawaiian people lived under the monarchy or republic define, for the **sovereign of today**, the rights acquired during those periods.*"   "*The federal rights are partly dependent upon the Hawaiian law prior to annexation. Therefore, while the Hawaiian law, as it existed before the annexation of the Territory, is controlling on rights in land that are claimed to have had their beginnings then, the federal courts construe that law for themselves. The federal courts cannot be foreclosed by determinations of the Hawaiian law by the Hawaiian courts. They will lean heavily upon the Hawaiian decisions as to the Hawaiian law, but they are not bound to follow those decisions where a claimed title to public lands of the United States is involved.* "  ). See Duarte v Dade.


The Court erred in recognizing a right of disposition of President Trump's records by "the incumbent President", contrary to 36 C.F.R. § 1270.30 which expressly provides an incumbent may only release or "dispose of any Presidential records of ***their*** administration". https://history.state.gov/historicaldocuments/frus1945v06/d491 , https://history.state.gov/historicaldocuments/frus1945v06/d490 "Specific instructions concerning the matter of Japanese archives and diplomatic property."

 "*Since General MacArthur anticipates that the Japanese would contest their obligation under the Potsdam Declaration[50] to turn over archives and diplomatic*

*property if instructed to do so by him, it is considered important that the whole question of his authority be clarified as well as his being instructed on the question of the diplomatic property and archives.[91]*

*This report and the recommended messages clarify beyond a doubt that our relations with Japan do not rest on a contractual basis but on an unconditional surrender. Also that though the statement of intentions in the Potsdam Declaration will be given effect this will not be because we consider ourselves bound in a contractual relationship but because the Potsdam Declaration forms part of our policy stated in good faith with relation to Japan and the peace and security of the Far East."*

https://history.state.gov/historicaldocuments/frus1945v06/d494

*General MacArthur has inquired of the Joint Chiefs of Staff whether there is objection to the publication of the instructions and powers of the Supreme Commander contained in the directive approved by SWNCC,[95] with which the Secretary is familiar. (This directive defines the Supreme Commander's authority toward the Japanese Government under the Potsdam Declaration.)*

*On August 12 SWNCC approved publication of the directive on the understanding that Presidential approval be obtained and that the Soviet, British and Chinese Governments be informed prior to its publication.*

And see Shirakura v Royall 1 and 2. Japanese Government v Commercial Insurance, Duarte v Dade.

- SCAPIN-189: TRANSFER OF CUSTODY OF DIPLOMATIC AND CONSULAR PROPERTY AND ARCHIVES (1945/10/25, GB.)
  Directs transfer to representatives of Allied Powers all Japanese diplomatic and consular property and archives. See also SCAPINs 299, 413, 449 and 974.

- SCAPIN-449: TRANSFER OF CUSTODY OF DIPLOMATIC AID CONSULAR PROPERTY AND ARCHIVES (1945/12/15, GS.)
  Directs the Japanese Government to extend, application of SCAPIN 189 to its mission to the Vatican, following the procedure set forth therein relative to missions to neutral countries.

- [SCAPIN-523: JAPANESE ARCHIVES AND PROPERTY IN CANADA](#) (1945/12/31, GS.)
  Directs the Japanese Government to promptly deliver to SCAP a request addressed to the Swiss Government instructing its representatives in Canada, as representative of the Allied Powers, all Japanese archives and property in that country. See also SCAPIN

- [SCAPIN-754: JAPANESE ARCHIVES AND PROPERTY IN CANADA](#) (1946/02/18, GS.)
  No objection offered to transfer from Swiss representatives to Canadian Property Custodian. See also SCAPIN 523.

MILITARY SITUATION IN THE FAR EAST
FRIDAY, JUNE 1, 1951
Committee on Armed Services and
the Committee on Foreign Relations,
United States Senate,
Washington, D. G.

LEGAL IMPLICATIONS OF DECLASSIFICATION BY COMMITTEE VOTE
Let us assume now that when we get through with the discussion of this issue this committee votes to release this document to the public over the protestations of the State Department.
It seems to me that if we do that, we are then likely to find ourselves in a position where the State Department in the future may wish to fall back upon 'whatever legal rights it may have in the premises in respect to future documents and take the position that when we request a secret document for the inspection of the members of the committee, the State department runs the risk if it supplies the document of having it not only submitted to the committee for the executive hearings and inspection of the individual members of the committee, but runs the risk by a majority vote of the committee of its being inspected by the world, and therefore the State Department would have to make a decision under those circumstances as to whether or not it wants to rely upon whatever powers it has as an arm of the executive branch of the Government to deny to this committee future documents.

The committees met, pursuant to adjournment, at 10:06 a. m. in room 212. Senate Office Building, Senator Richard B. Russell (chairman, Committee on Armed Services) presiding.

Present: Senators Russell (chairman. Committee on Armed Services), Connally (chairman, Committee on Foreign Relations), Wiley, George, Smith (New Jersey), Hickenlooper, MeMahon, Lodge, Fulbright, Tobey, Sparkman, Gillette, Brewster, Bridges, Byrd, Saltonstau, Johnson (Texas), Morse, Fefauver, Knowland, Hunt, Cain, and Stennis.

Also present: Mark H. Galusha and Verne D. Mudge of the committee staff of the Armed Services Committee; William H. Darden, clerk, Committee on Armed Services; Francis O. Wilcox, chief of staff, and Carl M. Marcv, staff associate, Committee on Foreign Relations.

Chairman Russell. The committee will come to order.

Gentlemen of the committee, our witness today is Secretary of State Dean G. Acheson. Mr. Acheson has headed the State Department during one of the most trying periods in the history of the United States. He has grappled with problems of a colossal magnitude, some of which had never been encountered in our country's prior history. As Secretary of State he has participated in all of the decisions of recent years which have determined America's global policies. It is fair to say that he is one of the principal architects of the North Atlantic Treaty Organization. He is probably in as good a position as any man to answer many of the questions this committee has on international relations, particularly in regard to the Far East.

Mr. Secretary, the committee has directed me to administer the oath to all witnesses. Will you please rise and raise your right hand? The evidence which you will give this committee upon all matters asked of you on this inquiry will be the truth, the whole truth, and nothing but the truth, so help you God?

Secretary Acheson. So help me God.

Chairman Russell. Do you have a prepared statement, Mr. Secretary?

procedural matter of releasing state department instructions

Senator Knowland. Mr. Chairman, a procedural matter. My understanding was that the first order of business when the Secretary appeared was going to be the procedural matter of to release or not to

1663

release to the public the document of December 23, 1949, and I merely suggest that under that order, that rather than having the Secretary proceed to a general statement, unless he was going to speak on this specific issue, we should take up the procedural matter first.

Chairman Russell. That is a matter that addresses itself to the committee. The Secretary advised me he had a statement about 18 minutes in length. I did not know whether it related to the procedural matter or to a general statement.

Senator Knowland. Well, I understood if the record will be checked that we had a unanimous consent agreement that the first order of business would be the procedural matter, and I consented to the vote going over until today with that understanding.

Chairman Russell. I think the Senator is essentially correct.

Senator McMahon. Mr. Chairman, I would like to be heard on this matter.

Senator Johnson. Mr. Chairman, I would like to say, if I may be recognized, that Senator Knowland correctly states the modified motion the other day, and I want to read from the Senator's own statement:

As far as I am concerned, if the committee will agree to take it up at the— when the Secretary of State appears as the first order of business so that we can get it out of the way when the Secretary is before us and not at the end of some questioning, I would be willing to consent so far as I have any control over the situation to postpone the matter until the Secretary appears, provided it is the first order of business.

And the committee accepted that unanimously.

Chairman Russell. Senator McMahon.

HEARING ACHESON FIRST

Senator McMahon. Mr. Chairman, you appointed me a member of the subcommittee along with the senior Senator from California to consider the matter of the declassification of documents that were to be produced here, and one of them is this document.

The Senator from California has been seeking the declassification of this document as I understand it for about a year and a half. • There have been parts of it that have been released by the United Press out of Tokyo. The release came

Senator Brewster. We do not hear very well.

Senator McMahon. The release came from Tokyo of this document. I proceeded to examine the document, and after examining it, I told the Senator from California, in my opinion, that the Secretary or some one of the subordinates ought to be heard on that matter before it was put in the record. The Senator from California, as 1 recollect it, did not either disagree or agree at that point. I left it with him on Tuesday, about noon, as I recall it, at that point; and I had to leave the city to go to a speaking engagement which had been made many weeks before.

The next day was Memorial Day.

I had no notice from the Senator from California that he was going to bring this matter to an issue in my absence. I would have appreciated being advised that he intended to bring it before the committee.

The committee decided to sit, with which I do not disagree, but I would have appreciated the courtesy of having the matter brought up in my presence.

Senator Knowlahd. Would the Senator yield?

Senator McMahon. No; I will not yield at this point.

We have here a question, a procedural matter regarding one of probably a thousand documents that may well be considered in the course of this investigation.

We have the Secretary of State here, I presume, to make a general statement on the general scope of his testimony; and then, to be sub-nutted to the questioning of the committee.

I just wish to register my protest at taking up this matter, at this time, before the Secretary has a chance to make his general statement. If the Senator from California wishes to bring it up after he has finished with it, I have no objection at all; but I do think the orderly way to proceed about it, and certainly the way I would have urged and insisted, if I had been here, and if I had known this was coming up. should be followed.

Senator Knowland. Mr. Chairman.

Chairman Russell. Senator Knowland.

Senator Knowland. Since the Senator has mentioned my name, I think that the record ought to be very clear on the situation. I did

take the matter up with my colleague from Connecticut, who is a
member of the subcommittee. We discussed it; I asked him to consult
with the Department of State. This was several days ago, the exact
date of which I do not recollect.

He did, I understand, consult with the State Department, because
on the following day, which I think was the day before Memorial
Day, I again talked to him and told him I was anxious to get this docu-
ment made available before Admiral Sherman was finished and before
the Secretary came on the stand.

I understood him to say that the State Department still felt that
the matter should not be declassified and that they wanted to be heard
on the matter. I have alwavs agreed that on any of these cases the
department concerned should be neard.

The night before, and I think before the Senator left for Connecti-
cut. I did again in the record ask that somebody, some representative
from the State Department, be present and on Memorial Day, which
was a hardship on all Senators who had to meet on that day—and
I have canceled out many engagements in my own State and elsewhere
in order to attend these meetings—Mr. Fisher, the counsel, as I un-
derstand, of the State Department, was here, presented his views.
The record is very clear that I wanted and I insisted that the State
Department be heard before the committee take any action.

Several motions were then made. I moved, after hearing Mr.
Fisher, that the document be made a part of the public record. Sen-
ator Johnson of Texas quite properly moved that the matter go over
until today. That was defeated, this substitute motion, by a vote of
7 to 7.

At that point I suggested that as a compromise and due to the fact
that the Senator from Connecticut was away, that if the committee
would agree that this would be taken up as the first order of business,
I thought it would be perfectly agreeable to me, and I would not press
a vote at that time for the several reasons that we have indicated.


DISPOSING OF PROCEDURAL MATTER FIRST

Now, I think this is a very important matter to be settled. I think
we have a gentleman's agreement, as well as a unanimous agreement,
that it will be disposed of first. I think it is entirely proper that

before a vote is taken, if the Secretary of State himself desires to
express reasons why the document should not be made available, that
in the general discussion on this matter he be heard to that point; but
1 do not believe the committee, under the unanimous consent agreement
and under the gentlemen's understanding, should proceed to a general
statement of the Secretary until we have disposed of this procedural
matter.

Senator Wiley. What is the document?

Senator Knowland. The document is the Department of State Special Guidance No. 28, dated December 23, 1949, policy information paper, relating to **Formosa**, in which the Department of State advised certain of its representatives overseas that the island of **Formosa** had no strategic value.

Chairman Russell. The Senator from California is undoubtedly
correct. The committee did agree to take this matter up this morning.
As I understood his request, it was before any questions were asked,
but I shall not haggle over that point. If he desires to insist that we
proceed with this before the Secretary makes his brief statement, why,
it is my judgment that is certainly covered within the intent of the
agreement ot the committee on Wednesday.

Senator McMahon. Mr. Chairman, does the record show that it is
before questions or before a statement is made?

Chairman Russell. The literal statement, as I believe was—well, I
shall read it again:

In view of the statements thnt have been made of the situation and because I
feel that this is a matter in which as large a membership of the committee as
possible should be present, so far as I am concerned, if the committee will
agree

to take it up when the Secretary of State appears as the first order of business,
so that we can get it out of the way when the Secretary is before us and not at
the end of some questioning, I will be willing to consent, as far as I have any
control over the situation, to postpone the matter until the Secretary appears,
providing it is the first order of business.

The Chair then stated:

I think that is a very reasonable position on the part of the Senator from
California, and I hope no one will except to it.

That is the pertinent record with respect to this matter.

In view of that record, and the Senator from California insists upon

taking this matter up, the matter of the declassification of the document prior to hearing the statement of the Secretary of State. I shall sustain his position so far as the Chair is concerned with a ruling. If the Secretary of State deals with the declassification of this matter, however, if he thinks it is wise. I feel he should be permitted to make a statement, and proceed as to the declassification of the document involved.

Mr. Secretary, do you desire to make any statement with respect to the classification imposed by the State Department on this document?

MILITARY SITUATION IN THE FAB EAST **1667**
TESTIMONY OF HON. DEAN 0. ACHESON, SECRETARY OF STATE, ACCOMPANIED BY ADRIAN S. FISHER, LEGAL ADVISER
Secretary Acheson-. Yes, sir; I should like to do that.
Chairman Russell. Very well.
Secretary Acheson. I will have to postpone my prepared statement because that statement does not deal with the classification of the document in question. I trust at some proper time I shall be permitted to make that general statement.
TEXT OF DOCUMENT AT ISSUE
Senator Salton stall. Mr. Chairman, if it is in order and I may ask it, would either the Secretary or yourself describe as accurately as it is possible or proper to describe what the statement is, and what is allegedly in it, and what the issue before this committee is.
Senator Knowland. Mr. Chairman, might I suggest as a procedural matter, because these documents are not—except in the yellow bound books are not—available, might I suggest that one of the clerks of the committee—it will not take long—read the document so that all members will have the information.
Chairman Russell. If there is no objection, the document at issue will be read.
Mr. Darden (reading):
Department of State
public affairs area—policy advisory staff
(Special guidance No. 28, December 23, 1940)
Policy Information Paper—Formosa
/. Problem

To formulate information policy which will minimize damage to United States prestige and others' morale by the possible fall of Formosa to the Chinese Communist forces.

//. Background

A. Comment on Formosa is on the increase as the Communist advances on the Chinese mainland leave the island as the last substantial part of China under Nationalist control. Attention is focused by three principal elements:

1. Communists, world-wide, who charge the United States with conspiring to build the island into a fortress to be taken over by the United States (if it do»>s not already control it), thereby trying to brand the United States with the

mark of aggressive imperialism, and also hoping to get us involved in a risky and unpromising venture;

2. Pro-Nationalists (principally in the United States) who consider Formosa a redoubt in which the Government could survive, and who tend to create an impression the United States is delinquent if it fails to "save Formosa";

3. Groups in the United States who are inclined to be critical of the United States for failure to act to prevent loss of the island to the Communists, largely because of mistaken popular conception of its strategic importance to United States defense in the Pacific.

B. Loss of the island is widely anticipated, and the matter in which civil and military conditions there have deteriorated under the Nationalists adds weight to the expectation. Its fall would threaten:

1. Loss of United States prestige at home and abroad to the extent we have become committed in the public mind to hold it;

2. Damage to the morale of other nations, particularly in the Far East, which are disturbed by the Communist gains and fear its possible further advances.

C. Formosa, politically, geographically, and strategically, is part of China in no way especially distinguished or important. Although ruled by the Japanese (as "Taiwan") for 50 years, historically it has been Chinese. Politically and militarily it is a strictly Chinese responsibility.

It is true that the technical status of the Island remains to be determined by the Japanese peace settlement, but the Cairo agreement and Potsdam declaration and the surrender terms of September 2, 1945, looked to its return to China

and the United States facilitated its take over by Chinese troops shortly aftei VJ-day.

Even the small United States military advisory group sent there at Chinese

Government request was completely withdrawn a year ago. Merely a handful of military attach^ personnel with diplomatic status remains. The United States

never has had military bases there, and never has sought any special concessions

there.

ECA work done on the island, particularly through the Joint Commission on Rural Reconstruction, has been of purely economic and technical nature for assistance in Improvement of conditions, and no quid pro quo has been sought.

D. United States public opinion has concerned itself primarily with the question of the island's strategic importance; there has been insistent demand from

a few sources for military action by the United States, but it has not assumed significant proportions. Rather public opinion obviously is divided and uncertain,

and there Is no apparent consensus for a particular course of active intervention.

777. Treatment

A. If rising public interest warrants it, gradually increasing attention may be paid Formosa, to establish, publicly the facts indicated below. Overseas use should be made of unofficial materials in public analysis and comment appearing

both at home and abroad, as well as official statements as they may appear. Label conflicting public statements properly as "individual expressions of opin-

ion," as "unofficial," etc.

B. All material should be used best to counter the false impressions that:

1. Formosa's retention would save the Chinese Government;

2. The United States has a special interest in or "designs on" the island or any military bases on Formosa;

3. Its loss would seriously damage the interests of either the United States or of other countries opposing communism;

4. The United States is responsible for or committed in any way to act to save Formosa.

C. Without evidencing undue preoccupation with the subject, emphasize an appropriate any of the following main points:

1. Formosa is exclusively the responsibility of the Chinese Government:

(a) Historically and geographically a part of China:

(6) Tho national government has run the island's affairs since the take-over and is responsible for present conditions there;

(c) The United States has assumed no responsibilities or obligations, actual or moral. _^

2. Formosa has no special military significance:

(a) It is only approximately 100 miles off the China coast;

(6) Other potential objects of Communist aggression are closer to points on the Chinese mainland than to Formosa;

(c) China has never been a sea power and the island is of no special strategic advantage to the Chinese Communist armed forces.

3. Economic assistance in Formosa has been for economic and social purposes,

has been consistent with demonstrated United States concern for the welfare of

the Chinese generally, and has involved no thought of special concessions for the

United States.

4. In areas of insistent demand for United States action, particularly in the United States itself, we should occasionally make clear that seeking United States

bases on Formosa, sending in troops, supplying arms, dispatching naval units, or taking any similar action would:

(a) Accomplish no material good for China or its Nationalist regime;

(6) Involve the United States in a long-term venture producing at best a new area of bristling stalemate, and at worst possible involvement in open warfare;

(c) Subject the United States to a violent propaganda barrage and to reaction against our "militarism, imperialism, and interference" even from friendly peo-

ples, and particularly from Chinese, who would be turned against us anew;

(d) Eminently suit purposes of the U. S. S. R., which would like to see us '•substantiate" its propaganda, dissipate our energies and weaken effectiveness

of our policies generally by such action.

 In reflecting United States unofficial demands for action of various kinds in Formosa, avoid giving; them prominence unwarranted by their limited (usually

individual) source, and make clear that the total of such demands evidences

con-

ivrn and frustration iu some quarters but does not add up to a consensus on any

particular position different from that officially taken.

I>. Avoid:

1. Speculation which would show undue concern with whether Nationalists can hold the island or when Communists may take it;

2. References which would indicate important strategic significance, or that the island is a political entity;

3. In output to China, any emphasis on bad conditions in Formosa under the Nationalists, although to other areas reference can be made among reasons why

Nationalists are vulnerable there as elsewhere:

4 Statements that Formosa's final status still is to be determined by the Japanese peace treaty;

5. Name "Taiwan"; use "Formosa."

TEXT OF LETTERS OF TRANSMITTAL

There is also the letter of transmittal.

Would you like for me to read it?

Chairman Rissell. I don't think that is necessary, unless some of the committee members desire it.

However, I think it will be well to read it.

Mr. Darden. April 26, 1951.

My Dear Senator Know-land

Chairman Russell. I mean the one transmitting the document, with respect to classification.

Mr. Dakden. Here is a letter from the Secretary of Defense, dated May 22, 1951:

Deab Mr. Chairman: Enclosed herewith are documents which I have received today from the Secretary of State, and the Secretary of State's letter which accompanies them.

Faithfully yours,

Robert Lovett.

Senator McMahon. Who signed that?

Mr. Darden. Robert Lovett, Under Secretary of Defense.

Chairman Russell. I want the letter from the State Department, transmitting it to the Defense Department.

Mr. Darden. All right, sir. [Reading:]

Department of State,

Washington, D. C, May 22,1951.

Hon. Georoe C. Marshall,

Secretary of Defense.

JIy Dear Secretary Marshall: I have your letter forwarding a letter of
Senator Russell, dated May 7, 1951, requesting that certain documents specified
by Senator Knowland be furnished for use in the investigation now being con-
ducted by the Committee on Armed Services and the Foreign Relations Com-
mittee of the United States Senate.

Senator Knowland, in his letter of April 17, 1951, made six requests; replies
to the first four requests follow:

L '"The Wedemeyer report on Korea submitted to the President under date
of September 19, 1947, along with the report on China which has been published
in the so-called China White Paper."

The Wedemeyer report has already been made available to the committees.

2. "The memorandum issued by the State Department on December 2!!, 1949,
circulated among United States diplomatic missions abroad stating anions; other
things that 'Formosa has no special military significance.' Also please furnish
the names of the group or committee in the State Department who participated
in the formulation of this document as I shall desire some, or all of them to be
called before the combined committee."

Attached is a copy of Special Guidance No. 28 issued on December 23, 1949,
by the Policy Advisory Staff of the Office of the Assistant Secretary of State
for Public Affairs, Department of State. This copy is transmitted with the
understanding that, as a classified document, it will not be ninde a part of the
public record of the hearings now going on before the Armed Services Com-
mittee and the Foreign Relations Committee of the Senate. The series of in-
formation policy papers, of which No. 28 is one item, is designed primarily
for the purpose of providing the necessary background and guidance to assist
United States Government information media and United States missions abroad
in interpreting major developments affecting United States foreign policy.
Such guidance is necessary in order that the Government's information media
may contribute effectively to the achievement of United States foreign policy

objectives. Making information policy guidance public would adversely affect the conduct of the foreign relations of the United States. Revelation of the detailed methods by which the United States conducts its foreign information program would be of assistance to the Soviets not so much in advising them of what our techniques are, but more in permitting them to take an information directive and use it for extensive counter-propaganda. Iiy its very nature an information policy guidance paper has to include descriptions of the various

attitudes on questions and instructions on emphasis and the attitude to take in answering questions. If a copy should be made public, the U. S. S. R. could use it to discredit the information program of the United States by arguing that the Voice of America is not interested in portraying truth, but rather thinks up its arguments (and by implication, its facts) as they may be necessary to support a preconceived foreign policy.

For the foregoing reasons, the Department of State cannot authorize the declassification for inclusion in the public record of the document in question. In this general connection I invite your attention to my reply of April 2(>, 1951, to Senator Knowland's original letter, a copy of which is attached.

The following paragraph in my letter of April 26 constitutes the response to the second portion of Senator Knowland's second request:

"As to its preparation, you will recall that I stated to the Appropriations Committee that I considered it unwise and contrary to the public interest to indicate which officers In the Department participated, other than to state that 10 different officers in four offices within the Department participated in the draft-

ing and clearing of this document. It must be recognized that papers of this kind

are always the result of a give-and-take of views among the various persons on the working levels. If the names of the people who participated in drafting documents were to be made public, the inevitable tendency would be for each to keep a careful record of his precise contribution or nttitude on any controversial subject. A department in which officers on the working level are busily engaged in making records against one another would, of course, not function as efficiently as one in which the principle of effective responsibility of the top officials is recognized."

In December 1949, Mr. Rowland H. Sargeant was Acting Assistant Secretary for Public Affairs.

3. "Confidential document No. 84 dated November 27, 19,r)0, from the

American

Minister at Taiwan (Formosa) to the State Department relative to the visit of the undersigned to Formosa."

Attached is confidential dispatch No. 84 of November 27, 1950, from Taipei, which is transmitted with the understanding that, as a classified document. it will not be made a part of the public record of the present hearings. Because of the special circumstances surrounding these hearings, the Department is, in this one Instance, submitting a confidential document concerning prominent

personalities, but this action is not to be considered a precedent to be followed in normal circumstances.

4. "Directive issued to the commander of the United Nations forces in Korea lelative to United Nations policy regarding Republic of Korea officials being restricted from going north of the thirty-eighth parallel."

On October 12, 1950, the Interim Committee of the United Nations Commission

for the Unification and Rehabilitation of Korea, established in accordance with the General Assembly Resolution of November 7, 1950, passed a resolution advising the unified command to take over temporarily "all responsibilities for the Government and civil responsibilities of these parts of Korea which had not been recognized by the United Nations as being under the effective control of the Government of the Republic of Korea at the outbreak of hostilities and which may now come under occupation by United Nations forces, pending consideration by the United Nations Commission for the Unification and Rehabilitation of Korea of the readministration of those territories." Following consultation between the Departments of State and Defense, and with General MacArthur, there was transmitted to General MaeArthur on October 29, 1850, a directive for the occupation of Korea north of the thirty-eighth parallel. This directive was approved by the Secretary of Defense, the Secretary

of State, and the President. A copy of that directive is attached.

Following discussions between representatives of the Departments of State and Defense, the Joint Chiefs of Staff, on November 2, 1950, transmitted a telegram to General MacArthur which had the full concurrence of the Department of State, to the effect that it was the understanding in Washington that be was prohibiting, for all practical purposes, the utilization of South Korean personnel in civil affairs matters in North Korea. The telegram informed General MacArthur that it was not intended so to restrict him; rather it should

be emphasized that he should make use of South Korean personnel in the administration of North Korea.

With respect to paragraphs 5 and 6 of Senator Knowland's letter, a further examination of the files is required to determine what material is available on the two points and what reply should be made to Senator Russell. These two points will be covered in a subsequent communication.

The Department of State appreciates Senator Russell's assurance that the classified documents forwarded herewith will be "subject to the same security provisions that controlled the classified documents which the Department of Defense has previously provided for examination by members of the committee."

Sincerely yours,

Dean Acheson.

The letter bears the classification of confidential.

Chairman Ktjsseij,. Mr. Secretary, if yon desire to make any statement now we will be glad to hear from you.

Secretary Acheson. Mr. Chairman, I should like to address myself to the question of this document. It deals with information to be given out over the Voice of America to minimize the damaging effects to the United States of the possible fall of Formosa.

Senator Wilet. We do not hear you, Mr. Secretary.

Secretary Acheson. I was just describing, Senator, what the document was about.

UNITED STATES POLICY TOWARD FORMOSA, OCTOBER J948 TO JUNE 1950

In discussing the document which, obviously, relates to the policy of the United States, I have, first, to state, what the policy of the United States Government was in regard to Formosa, and I should like to deal with the period from October 1948 to January 25, 1950. Throughout that period there was one policy, and one policy only, which was adopted by the Government, and Avith the exception of one point in that policy, which I shall describe later on, a point which arose on the 27th, 28th, and 29th of December 1949, this policy was unanimously recommended to the President of the United States by til the departments concerned, and was approved by him.

You see, therefore, that it originated during the administration of the State Department by my predecessor, and was carried on by me, so far as the State Department participation is concerned.

That policy was as follows: First of all, it was understood and agreed that Formosa had strategic importance so far as the United States was concerned.

The second point was that that strategic importance related to keeping Formosa out of the hands of a power which would be hostile to the United States, and did not concern occupying or using Formosa by the United States.

The third element of the policy, which never varied from October 1948 to January 25, 1950, was that, in the existing condition, and strength of the Armed Forces of the United States, it was not possible to commit or promise to commit any forces whatever, Armed Forces of the United States, to the defense of Formosa.

The next element of the policy was that the State Department should, to the best of its ability, by diplomatic and economic means try to keep Formosa from falling into hands which would be hostile to us.

Those are the main outlines of the policy.

I, in August 1949, as Secretary of State, reported that I could no longer guarantee that economic and diplomatic means would be successful in keeping Formosa out of the hands of a power which might be hostile to us, and I may say that this policy was reviewed very frequently during the whole time that I was there.

Senator Smith. Pardon me; what was that, Mr. Secretary?

Secretary Acheson. I was saying that this policy was reviewed frequently during the period.

Senator Smith. I thought you gave a date.

Secretary Acheson. I gave the wrong date, I am sorry to say. The period was October 1948 to June 25, 1950, when I reported that what I have just stated, that it was reviewed again.

BACKGROUND OF 1'REPARATION OF INSTRUCTIONS OF DECEMBER 1949

While we were in this condition which I have just described, the Department of the Army, which was represented on the interdepartmental group which coordinated the information policies, suggested to the Department of State, the, suggestion coming from General Wedemeyer, who was Assistant Chief of Staff, to Assistant Secretary Allen, who is in charge of our Voice of America, that it might be very important to use the Voice of America and our international

techniques to minimize any damage which might occur to us in event of the fall of Formosa.

The State Department said it was grateful for that suggestion and would go to work on the matter.

The Department did go to work on the matter.

First of all, there were two studies made, in September and October, as to the imminence and danger of this fall.

Those studies unanimously reported that the fall would occur, and would occur probably in the year 1950.

It was also unanimously understood in these policies, and reported, that, without American military support, support by our own Armed Forces, the island could not be held by those on it against serious attack from the mainland.

In the light of those studies, and those conclusions of probable fact, this document which you have liefore you was prepared, and, as the heading indicates, the purpose of the document was to solve the problem, if possible, of formulating policy which would minimize damage to the United States prestige and others' morale by the possible fall of Formosa to the Chinese Communist forces.

MEANING OF VARIoU8 PARTS Or THE DOCUMENT

Now, I should like to explain to you the document which you have heard read.

The document falls into three parts, the first part being entitled "Background."

That is information solely for those men who are preparing any broadcasts or public information which is to be put out through our Voice of America. All that part of the document has nothing to do with what that person has to say.

This part of the document which begins with "Background," and goes up to the subheading "Treatment," tells the officer working on this matter what is the importance of this question, and why do we want something said about it.

It also tells him what others are saying about this subject, so that he will know the information environment into which he is about to enter.

That covers all that part of the document.

Under the heading "Background," up to the point where we come to "Treatment," that is covered, and this, as I say, is solely for the

information of the officers operating the Voice of America, or its various subdivisions, and is so understood.

When we come to "Treatment," the purpose of that section is to tell him the attitude that he should take and the things that he should stress.

The final section of the paper is headed "Avoid," and that tells him things that he should not say.

Now under the heading of "Treatment," I will not bore the committee by reading that all over again.

There is very little, I think, that anyone would find to quarrel with in that part of the document, with one exception, and that is—in two places it says, "All material should be used to counter the false impressions that" and one of them is that "Its loss would seriously damage the interests of either the United States or other countries opposing communism."

Another place in the document is headed, under "Treatment," "The attitude shall be 'Formosa has no special military significance'," and it gives the reason why.

Now, it may be argued—and undoubtedly will be argued—that the policy of the United States, as I have described it, is not as stated in the parts that I have referred to.

MINIMIZING IMPORTANCE WHEN IN ADVERSITY

The answer to that, the reason that we adopt this attitude, is that it is the only attitude which will have the desired effect, which is to minimize the damage to the prestige of the United States and to the morale of others should Formosa fall.

It is a very common attitude in dealing with all matters of information, whether in the public or foreign information field, or in any other field. It is familiar to members of this committee that if a captain in command of a company finds that the companies on either side of him are falling back and taking punishment, what he says to his men is, "Don't give it a thought. It doesn't matter at all. You are doing fine. Dig in. Hold it. It is all right."

You are all familiar with Mr. Churchill's great statement in 1940 that the British would fight on the beaches, fight in the streets, and fight in the hills. I don't think any of you thought that that was a scientific report on the military programs of the British General Staff.

This was an attitude and statement which had great effect.

In the field of politics we are quite familiar with statements which are made about the Gallup poll's report that this or that candidate or party is behind, that candidate or party says, "Why, it doesn't mean anything; I haven't started my campaign yet; wait until I get going."

Those are common attitudes. I don't know any other attitude which would be sounder to take if you believed, as we did believe—and rightly believed—that an event was going to happen which would be damaging to our prestige, than to say, "Keep your chin up; it doesn't matter; this isn't important; we will go ahead and deal with it in some other way."

That is what is behind this whole document.

QUESTION OF CLASSIFICATION

I come now to the question of classification.

It is classified as confidential; it has been ever since it was written.

In the letter to Senator Russell I told him that we could not agree to declassify it. It would have a very damaging effect, I hope you will agree, to take a document of the sort which I have described, which is a confidential instruction to your own officers as to how they shall deal with a situation which may develop, which fortunately did not develop, and make this public.

All those who are hostile to the United States will use it for purposes which are very obvious, and which I described in the letter to Senator Russell.

Making it public has no bearing on any issue before these two committees, and 1 hope that you will not make it public.

There is one matter in fairness, having mentioned it, I think I should say to the committee, which has no bearing on this question at all, but you must know the whole question of Formosa policy.

DISAGREEMENT ON MILITARY ASSISTANCE TO FORMOSA IN DECEMBER 194*

I stated that at the closing days of December 1949 there was a point at which recommendations were not unanimous, and that point had to do with a proposal put forward by the Defense Establishment, that a mission, military mission, should be sent to Formosa, and that some military assistance in addition to the $125,000,000 program, which was in the Appropriations Act of 1948, should be different. That proposal

was made by the Defense Department. It was disagreed with by the State Department. We took the attitude that since the very statement of our problem indicated that this could not be successful and that only the interposition of armed forces of the United States could save the island, what we would be doing would be making an effort here which was by hypothesis ineffective, and we would involve ourselves with further damage to our prestige and to our whole position in the Far East.

Those conflicting views—and this was not a matter of bitter or heated controversy—those views were laid before the President and the President decided to continue the policy as I have stated it before.

Senator Knowland. Mr. Chairman.

Chairman Russell. Just one moment. In the early part of your remarks you said January 25, 1950.

Secretary Acheson. I meant June 25, 1950.

Chairman Russell. 1948 through

Secretary Acheson. October 1948 until June 25, 1950. That is the period that I am covering.

Chairman Russell. Senator Knowland.

UNITED PRESS STORY ON THE INSTRUCTIONS

Senator Knowland. Mr. Chairman, I think in order that the committee may have the full background of this situation, I should give some background to it. On January 3, 1950, there was carried by the United Press with a Tokyo date line the following article, and I i-ead:

The United States State Department has notified its attaches that the loss of Formosa, island redoubt of the Chinese Nationalists, to the Communists was

to be anticipated.

The Department said the public must be sold on the idea that the island is of no strategic value in order to prevent the loss of prestige at home and abroad. A document containing the Department's instructions on how to erase the "false impressions" of those pro-Nationalists interested in a "save Formosa" drive has been circulated here, it can be disclosed today.

The document was prepared by the State Department's public affairs area policy advisory staff, and was dated December 23. The word was sent to members of the Department and of some other Government offices.

The document said there are "pro-Nationalists" (principally in the United States) who consider Formosa a redoubt in which the Government could

survive,

and who tend to create an impression that the United States is delinquent if it fails to 'save Formosa.'"

It said there are groups in the United States "who are inclined to be critical of the United States for failure to act to prevent the loss of the island to the Communists.*' This is "largely because of a mistaken popular conception of its strategic importance to the United States defense in the Pacific," the document

added.

"The loss of the island is widely anticipated, and the manner in which civil and military conditions there have deteriorated under the Nationalists adds weight to the expectation," it said.

The fall of Formosa, it continued, would threaten a loss of prestige by the United States at home and abroad "to the extent that we have become committed

in the public mind to hold it."

The fall, it continued, also would threaten damage to the morale of other nations, "particularly in the Far East, which are disturbed by Communist gains

and fear its possible further advances."

The document said Formosa, politically, geographically, and strategically, is a part of China and "in no way especially distinguished or important."

"Politically and militarily it is a strictly Chinese responsibility," the docu- ment said. "It is true that the technical status of the island remains to be determined by the Japanese peace settlement, but the Cairo agreement and Pots-

dam declaration and [Japanese] surrender terms of September 2, 1945, looked to its return to China, and the United States facilitated its take-over by Chinese

troops shortly after VJ-day.

"United States opinion has concerned itself primarily with the question of the island's strategic importance; there has been an insistent demand from a few sources for military action by the United States, but it has not assumed significant proportions."

83797—51—pt. 3 2

The document said all available material should be used "to counter false impressions" that the retention of Formosa would save the Chinese Government,

and that its loss would damage seriously the interest of either the United States
or of other countries opposing communism.
"Without evidencing undue preoccupation with the subject," it continued,
"emphasize as appropriate any of the following main points.
"Formosa is exclusively the responsibility of the Chinese Government. Formosa has no special military significance."

CORRESPONDENCE WITH STATE DEPARTMENT ON DOCUMENT

Mr. Chairman, when that item appeared on the printer in the outside room to the Senate, I immediately went to my office and under date of January 3 addressed the following letter to the Secretary of State:

Dear Mr. Secretary: I understand that under date of December 23 or thereabouts the State Department issued a memorandum to various military attaches
and others, indicating that Formosa could not be held for long and to do everything possible to prepare the public for the loss of the island and to stress the fact it was not needed for the strategic defense of the United States.

As a member of the Senate Armed Services Committee and the Senate Appropriations Committee, I desire to have a copy of this memorandum at the earliest
possible date.

With best personal regards, I remain

Sincerely yours,

William F. Knowland.

On January 7,1950,1 addressed the following letter to the Secretary of State:

Dear Mr. Secretary: I called the State Department this morning to request the names of the committee which had been responsible for drafting the December 23 memorandum advising the State Department personnel that Formosa had
no strategic value.

I first attempted to get Mr. Peurifoy in the Personnel Division, but he was out of the city and I talked with Mr. Bryan and made the request of him. He said he had to take it up with higher authority. At about 11: 15 this morning, I received a call from Mr. George Kennan who stated both Secretary Acheson

and Under Secretary Webb were out of the city. However, he stated that the State Department itself assumed responsibility for any such information sent out

and that he felt that he must decline to give me the names of the persons constituting the committee which drafted the document.

I emphasized to him that I felt that as a Member of the Senate of the United States I was entitled to this information and that while there might be some basis for the Department's position to decline to release a document which they

themselves had classified, I could see no excuse for not furnishing a Member of

Congress the names of such committee.

Sincerely yours,

» William F. Knowland.

In reply to that on January 17 I received a letter from the Secretary of State reading as follows:

My Dear Senator Knowland: I have your letter of January 7 in which you refer to your effort to obtain the names of those responsible for drafting the December 23, 1949, memorandum, and to your conversation with Mr. George F.

Kennan who advised you that he felt he could not furnish you with the information.

I fully agree with the position taken by Mr. Kennan that it would be inappropriate to release the names of the officials who participated in the drafting of this

paper. I feel that I, as Secretary of State, have responsibility for this particular document, in my opinion, rests with me and secondary responsibility rests with

Mr. Howland Sargeant, Acting Assistant Secretary of State in charge of Public Affairs.

I hope you will agree with the position I have taken in this matter. The responsibility is mine and I fully accept it.

IMPORTANCE OF DOCUMENT IN UNITED STATES POLICY

Now, Mr. Chairman and members of the committee, I place an entirely different aspect on this document than the Secretary of State does. I think it is a key document of the foreign policy of this country, which led up to the situation, the statement of the President on January 5, that the United States would give no further military aid

10 Formosa, and which many of us, at least, believe led up to the
situation where the United States Government was prepared, both to
recognize the Communist regime of China and ultimately to turn
Formosa over to them.

I call your attention to the fact that in the background information
they tried, I believe, to undermine and to cast reflection upon those
who may disagree with the policy, which would have led to the fall of
Formosa, by saying in subparagraph 2:

Nationalists, principally in the United States, who consider Formosa a redoubt
in which the Government would survive, and tend to create an impression that
the United States is delinquent if it fails to save Formosa.

Mr. Chairman, I have felt that way for a number of years. I have
stated it publicly on the floor of the Senate of the United States; I am
pleased to say that in the hearings before this committee, the Secretary
of National Defense, Mr. Marshall, General Marshall; the Chairman
of the Joint Chiefs of Staff, General Bradley; each member of the
Joint Chiefs, General Collins, General Vandenberg, and Admiral
Sherman, all testified to the fact that in their military judgment it
would be detrimental to the interests of this Nation to let Formosa fall
into enemy hands.

I call the attention of the committee to the fact that General Mac-
Arthur, in his testimony before this committee, and in his statement
before the two Houses of Congress, feels precisely the same way
about it.

At no time did General MacArthur nor did any other person who
felt that way, so far as I know, advocate that the United States seize
Formosa or that we ask for bases on Formosa, but we have felt for a
long time that it would not be to our national interest to permit
Formosa to fall into unfriendly hands.

ANALYSIS OF DOCUMENT

Now in the second section, B, which is more or less for the guidance
and, I think, to be put out at proper places by the representatives of
the State Department, they have this to say:

The loss of the island is widely anticipated and the manner in which civil
awl military conditions there have deteriorated under the Nationalists adds
weight to the expectation. It's fall would threaten—

Now, first of all, I wish to say that I think there were representatives
on Formosa at that time who were following a studied course to under-

mine the position of the Government of the Republic of China and
had consistently sent back reports that the island could not hold out
for a period of 90 days, perhaps. I believe that that was misinforma-
tion being sent to the Government of the United States, and I think
in the Army we would call it false official reports.

Now you go on to paragraph 3. subsection 3. under "Treatment"
and here is what it says:

All materials should be used best to counter the false impressions.

Now let nie read you this. This is what they were to do, to put
out to counter what the State Department says was false impressions:

1. Formosa's retention to save the Chinese Government.

Mr. Chairman. I say that is a false statement, because the last strong-
hold of the Republic of China has been on Formosa and, if the island
fell, obviously the Government of the Republic of China would fall at
that point.

2. The United States has a special interest in or design on the island or any
military bases on Formosa.

I admit we have no design on the island or desire no military bases,
but I do submit that the evidence before this committee is clear that
our responsible military people in the Defense Establishment believe
that it would not be in the national interests of this country to liave
Formosa fall into enemy hands.

In paragraph 3 it says:

Its loss would seriously damage the interests of either the United States or
other countries opposing Communism.

Mr. Chairman, the information before this Committee is clear that
it most seriously would damage the interests of the United States if
the island should fall, and if this defeatist attitude of the Department
of State, had finally prevailed.

Now in subsection 3 it says:

Without evidencing undue preoccupation with the subject, emphasize as
appropriate any of the following main points.

Then subparagraph 2:

Formosa has no military significance.

Mr. Chairman, this is contrary not only to the advice that we have
received since then but, in my Judgment, it can be shown that it was
contrary to the judgment of the competent military opinion prior to
the time the December 23 document was put out.

I call your attention further on that it says:

In areas of insistent demand for United States action, particularly in the United States itself, we should occasionally make clear that seeking United States bases on Formosa, sending in troops, supplying arms, dispatching naval

units, or taking any similar action would, (a) accomplish no material good for China or its national regime.

I admit it would accomplish no material good for Communist China; I deny that it would accomplish no good for the National Government of the Republic of China, which we then recognized, which we now recognize, and which is a permanent member of the United Nations.

In subparagraph E it had this to say:

In reflecting United States unofficial demands for action of various kinds In Formosa avoid giving them prominence unwarranted by their limited, usually individual, source and make clear that the total of such demands evidence concern and frustration in some quarters, but does not add up to a consensus on any particular position different from that officially taken.

In other words, anyone who questioned this fatal polity, which I believe the State Department had clearly outlined in this document, was frustrated and was not speaking for any considerable body of American public opinion.

Now, Mr. Chairman and members of the committee, this is not only contrary to the best military advice in this Nation, but I want to read tc you from a State Department official bulletin put out on June 3, 1945, the following language from page 1019, United States Department of State bulletin. It reads as follows:

8TBATEoIC CONSIDERATIONS

Strategic factors greatly influence the problem of Formosa. With the exception of Singapore no location in the Far East occupies such a controlling position.

Formosa is separated from the continent of Asia by 100 miles, from the main island of the Philippines by 200 miles, and from Kyu hu, the nearest home island

of Japan, by 700 miles. Flying distance from military airports in Formosa is 559 miles to Canton, 428 miles to Shanghai, 1,290 miles to Tokyo.

Formosa, larger than the State of Maryland, stands in a strategic relation to the China coast comparable for the United States to an imaginary island of

such

size 100 miles off the coast of North Carolina, 400 miles from New York City. Every point of the entire coast of China falls within a radius of 1,100 miles. A radius of 2,000 miles includes Burma, Singapore, Borneo, Guam, and Japan, including Hokkaido.

IMPORTANCE OF DOCUMENT AND ITS DECLASSIFICATION

Now, Mr. Chairman and members of the committee, I submit that here in the face of the State Department's own document saying that with the single exception of Singapore the island was the most strategic location in the Far East, in face of the testimony before this committee that the island has great strategic value and under no conditions should be allowed to fall into Communist hands, I submit that this is a basic document, not merely a guidance of those overseas, but a basic revelation of the defeatist attitude of the Department of State in being prepared to let Formosa fall into unfriendly hands.

I do not believe that the Secretary has made a case that this in any sense violates the security of our troops operating in Korea today, largely because, I believe, of this misguided policy. It does not in any sense threaten or undermine the cryptographic security of this Nation. I again submit, Mr. Chairman, the document should be made a part of our public record so that the Congress and the Nation may have a better understanding of the events which led up to the war in Korea.

I think it is far better if the State Department would frankly acknowledge they made a serious mistake in the document and start out fresh, as Mr. Rusk has indicated in his speech the other night. But if that is not to be done, I think that now is the time and here is the place for us to get a clear understanding of just what policies have led to the Korean war.

Senator Wiley. Will the Senator yield?

Senator Knowland. Yes; I yield.

Senator Wii.ey. Would you tell me what the date of that newspaper release was?

Senator Knowland. January 3, 1950, which was 2 weeks after the December 23 document of 1949.

Senator Wiley. And does not that release itself substantially tell the contents of the document?

Senator Knowland. I think that it does, except that I think there

is more information in the document itself, and I think it is better, in fairness to the Department and otherwise, to have the full document made available rather than merely extracts from it. Otherwise a person might think that the extracts were taken out of context.

I think that the extracts fairly represented at least the spirit of the document, but I think that it woud be better to have the entire background made available.

PRESS REPORTS OF DOCUMENTS

Senator Wiley. Was that release published generally in the American papers—what services?

Senator Knowland. Yes.

Senator Wiley. Under whose authority was it published?

Senator Knowland. I do not know. There were many articles run through the country based on that, and subsequent articles which have been published.

Senator Wiley. You got it out of a Washington paper?

Senator Knowland. I have gotten clippings out of the Washington papers. That particular thing I read from was the original dispatch which came in over the ticker. You know we have a United Press and Associated Press report right off the Senate floor, and as soon as it came in I tore it off, and went over to my office and wrote this first letter of January 3, which was the same date that the dispatch came off the printer.

Senator Wiley. That was my question—it came over the UP and AP?

Senator Knowland. That is right; that is my recollection.

Senator Wiley. Thank you.

Secretary Acheson. Mr. Chairman, may I make a comment?

Chairman Russell. Certainly.

Secretary Acheson. I would like to make three points.

AVAILABILITY OF DOCUMENT BEFORE NOW

I would not want the committee to believe, and I am sure Senator Knowland did not wish the committee to believe, that the State Department had ever attempted to keep this document from Senator Knowland. If my recollection is right, I believe I showed Senator Knowland the entire document and he read it in my office.

Senator Knowland. Mr. Chairman, would you mind'! I had not seen this document before. I understand that you did submit it

to some committees but I have no recollection of ever having read the entire document.

Secretary Acheson. My recollection is different. I thought you and Senator Smith, or you alone, called on me in my office and I showed you the document. However. I may be wrong about that. The next point that I should like to make is that the State Department

Senator Smith. Mr. Chairman, I might say there. I do not ever recall seeing this document. Senator Knowland did ask to see it when we were there, but I am sure we did not see it.

Secretary Acheson. My recollection is quite possibly wrong about it.

NO STATE DEPARTMENT LEAK

The next point that I should like to make is that the State Department had nothing whatever to do with the leaking of this guidance paper to the press. This paper, in addition to being sent to State Department officers who run the Voice of America, is furnished to people m the military service who have the same sort of service in Germany and in Japan. That is one of the reasons why there is a group representing the services which coordinate information.

In due course it was sent in, among other places, to Tokyo, and the leak occurred there, and the people in Tokyo are not under the jurisdiction of the State Department.

EXTENT OF DIFFERENCES ON FORMOSA POLICY BEFORE JUNE 195 0

The last point that I should like to make is that you might have gotten the impression from what Senator Knowland said that during the period I have been discussing, which is October 1948 to June 1950. that there was some difference in this regard between State Department policy and that of our military services.

With the exception which I have already mentioned to you, that is not the case. It was the clear unequivocal recommendations of the military services that we could not employ any of our forces for the defense of Formosa.

That policy was unanimously changed at the meetings which occurred on the 25th, 26th, and 27th of June 1950, following the attack in Korea.

During the time we are discussing here, there was absolutely no difference on that point.

Senator Knowland. Would the Secretary mind a question? Wasn't that our same policy in regard to Korea prior to June 25 also, that we would not become involved? Did we not feel that was no place to become involved in war?

Secretary Acheson. I don't think there was any formulation of policy. We had withdrawn our forces from it. Our attitude toward Korea was fundamentally based on the charter of the United Nations, and in my speech on the 15th of January 1950 I pointed out that while there was no American commitment outside of the areas that I have discussed in that speech, there were United Nations obligations and that those had not proved in the past to be weak reeds for countries who wanted to so defend themselves.

But in connection with the appraisal of the situation, I mentioned sometime ago that there was a joint study made by all the departments concerned as to what the fact was going to be, or was likely to be; what the conclusion was likely to be, regarding the fall of Formosa. and that conclusion was that it was estimated that no amount of United States aid, short of military occupation and control, would insure Taiwan's indefinite survival as a non-Communist area.

It was concluded, therefore, that even with extensive United States support, short of major armed intervention, involving the use of United States combat forces, none of the non-Communist regimes in China could survive beyond 1950, except on Communist sufferance. Without United States military occupation and control, Taiwan, like the rest of China, probably would be under the Communist Chinese control by the end of 1950.

Senator Hunt. May I ask the Secretary a question?

Secretary Acheson. May I just finish my statement?

Senator Hunt. I should like to ask the Secretary, he speaks of the fact that this was the policy of all interested departments as of that date. Do you include the military department in that statement?

Secretary Acheson. Yes, sir.

Chairman Russell. All right, Mr. Secretary.

Secretary Acheson. I was just ending up by saying that, therefore, this paper that you have before you is not a paper at which you can look to prove that the State Department attitude or policy was different from that of the other branches of the Government; it was not.

This paper here was an information paper; a paper taking an attitude in the event of a contingency, which was to occur.

It must be judged, I submit, on that ground. Xow, it may be that if you were in my place, you would not have attempted to try to minimize the effect of the fall of Formosa by such information as we have been discussing; maybe that, in your judgment, wasn't the right thing to do; maybe if you had tried to do it you would have done it differently.

But the paper relates to the wisdom and the propriety of what was attempted to be done, which was to minimize the fall, which everyone had agreed was inevitable, rather than as an exposition of United States policy or State Department policy. That is all, Mr. Chairman.

Chairman Russell. Mr. Secretary, the Senator from Wisconsin has a question.

EFFECT OF DECLASSIFICATION IN VIEW OF PREVIOUS PRESS REPORTS

Senator Wiley. Mr. Secretary, there is one question that occurs to me—rather, two questions that relate to this controversy.

The first is, now that the AP and UP have given out this rather formidable text, what is the difference between that and the harm that is going to be done—if there is any harm—by declassifying it?

Secretary Acheson. Senator Wiley, some harm has been done by this leak in the stories which grew out of it, but there is a vast difference between a story which rests on what some reporter says and an official statement by the Government of the United States that this is an official document.

Senator Wiley. Let me get. that, Mr. Secretary. Don't I understand that the gist of this document is simply this: At that time the evaluation of your Department, and, as I understand you to say, the other departments, of the situation in the Far East, was that Formosa was liable to fall, and in order to minimize the fall, you thought it advisable to put out these statements. Now, isn't that the sum and substance of the purpose and the objective, and would have been the result if Formosa had fallen?

Secretary Acheson. Well, it is not what I have said, Senator, that we thought it advisable to print this document. We thought it advisable that that statement should be made along the line, as described, under treatment in the document to minimize the effects of

the fall.

RESPONSIBILITY FOR FORMULATING DOCUMENT

Senator Wilet. Now, the second question is that, in the request for the names of those who formulated it, is there some special reason why their names should not be given?

Would it damage the public interest, or would it be in the nature of a state secret? It seems to me that the very withholding of those names lends some suspicion that they might not even be there.

I just wondered what the reason for that was?

Secretary Acheson. I stated the reason, Senator Wiley, in the letter to Senator Russell.

There is no state secret involved in the matter at all.

I think there is an important matter of sound administration. If, every time there is a dispute about some action which was taken, instead of putting the responsibility on the responsible officers who are in charge, and that is myself and my senior assistants, we bring out the names of every individual, no matter how unimportant to the Department, who had anything to do with it, you will very easily destroy the morale of the Department and people will be building records to defend themselves, rather than throwing themselves into the work of the Department.

These people involved are not senior officers. They are not people who can defend themselves in matters of public controversy.

There, has already developed in the Department a most unfortunate reluctance of many people to work in those areas of the Department which are highly controversial, because they believe, and I am afraid, rightly believe, that even though they serve the best interests of the United States, and do their work faithfully, they are apt to be accused, and have a great deal of trouble made for them.

Therefore, it seems to me that sine* I am the officer responsible, and do not. in any way attempt to duck that responsibility; and since Mr. Sargeant, who is the senior officer under me, is responsible and does not attempt to duck his responsibility, that whatever you want to know, you can get from us.

There is no name here, which, in and of itself, I would not be quite willing to give you; no one is involved here that you are suspicious of: but just as a matter of sound administration, I think it is a matter that should not be pressed.

Senator Morse. Mr. Chairman?

Chairman Russell. Senator Morse.

Senator Morse. I ask to be heard

Senator McMahon. Louder, please.

Senator Morse. I wish to be heard for just a minute on a legal prob-
lem that concerns me, in regard to this particular issue.

WISDOM OF DECLASSIFYING DOCUMENT

May I say, as I indicated the other day before the committee, Mr.
Chairman, that I think this is somewhat of a tempest in a teapot, in
that I see no reason why this document should not have been declassi-
fied by the State Department, in view of the fact that its contents are
pretty well known anyway, as a result of the leak from Tokyo; and
furthermore, I think the State Department can make clear, if it is a
fact, that the document does not represent State Department policy,
on the issues that are raised in the document, but what the document
really is, in fact, is a rationalization of America's position in the field
of world diplomacy, as a result of the contemplated loss of Formosa,
which did not come to pass.

But, be that as it may, Mr. Chairman, let us assume, hypothetically,
that the State Department wishes to hold to its view that the document
should not be declassified, for whatever reasons it wishes to lay down
in support of the view, I call the committee's attention to these facts
which I think—these are the facts:

COMMITTEE PROCEDURE FOR OBTAINING DOCUMENTS

That when this committee organized itself for this investigation,
and it agreed upon a policy that the chairman, upon written request
of the members of the committee, should request of the various depart-
ments the submission of certain secret documents for the inspection
of the committee, or committee members.

The Chairman, as far as I know, without exception, has cooperated
with each member of the committee, as he has received our letters,
by writing a letter to the department concerned, whether it was the
Defense Department, State Department, or any other department,
for the submission to this committee, for its inspection, of secret
documents.

Chairman Russell. Pardon me, Senator.

I have forwarded every request, undoubtedly; but I have handled
them, as a matter of procedure, through the Defense Establishment.

If any material from the State Department were requested, for
example, I have requested the Department of Defense to obtain it
for us.

With the exception of that portion of the statement, you are correct.

Senator Morse. I am glad to have the chairman's explanation of
the procedure he has followed.

My conclusion is, however, still accurate, namely, that the chair-
man has seen to it that the request of any member of this committee
for inspection of the secret documents has been properly transmitted
to the officials concerned through, as the chairman now explains, the
Secretary of Defense.

And, as far as I know, and there may be exceptions to this, but as
far as I know, the committee has received from the departments con-
cerned, their fullest cooperation, including, in this instance, for exam-
Ele, the submission to this committee of a document of the State
•epartment which has it classified, apparently, as "Confidential."

Now, I would like to raise two or three legal questions, Mr. President.
I have not changed my view, or my feeling that this ought to be
declassified, but I think the committee has to give very careful con-
sideration to the precedent that it establishes, by way of procedure,
at this point in our hearing.

LEGAL IMPLICATIONS OF DECLASSIFICATION BY COMMITTEE VOTE

Let us assume now that when we get through with the discussion of
this issue this committee votes to release this document to the public
over the protestations of the State Department.

It seems to me that if we do that, we are then likely to find our-
selves in a position where the State Department in the future may
wish to fall back upon 'whatever legal rights it may have in the
premises in respect to future documents and take the position that
when we request a secret document for the inspection of the members
of the committee, the State department runs the risk if it supplies
the document of having it not only submitted to the committee for
the executive hearings and inspection of the individual members of
the committee, but runs the risk by a majority vote of the committee
of its being inspected by the world, and therefore the State Depart-
ment would have to make a decision under those circumstances as to
whether or not it wants to rely upon whatever powers it has as an
arm of the executive branch of the Government to deny to this com-

==mittee future documents.==

I think that is a rather serious procedural controversy for us to get into, if we can work out an arrangement short of it, because I am still of the opinion, Mr. Chairman, that this committee would not have the power to subpena from the State Department a document which in the opinion of the State Department is a highly secretive ■document.

Therefore, if we proceed just because we have physical possession of a document to release it, as we would be able to do if we wanted to exercise that power, we ought to consider at this time what our future relationship is going to be with the State Department in getting other documents for our secret inspection, with the State Department in turn running the risk of having those documents released by a majority vote of this committee.

In my opinion, there is a fundamental legal question raised by this controversy about which constitutional lawyers could debate ad infinitum, and I only express my present legal conclusion—namely, we do not have the power to subpena such documents in the first instance if the executive branch of the Government doesn't want to release them to us.

In the second place, the chairman called my attention yesterday— and he can raise it in greater detail, but I think it ought to be mentioned—the chairman called to my attention yesterday a section of the Espionage Act, which I think ought to be very carefully considered by the members of this committee, before they declassify this document, if they decide to declassify it, as to whether or not at least the chairman or this committee and I am not so sure, Mr. Chairman, but every member of the committee that might vote for the declassification of this document and its release to the public, might be guilty of a crime under the Espionage Act if the State Department does not give consent to its declassification.

In other words, I think now is the time to raise the flag of legal caution, Mr. Chairman, in this controversy. I think we ought to be certain that we are on absolutely sound ground legally before we vote here to overrule the State Department—and that is what our vote to declassify will constitute—because I think, as a lawyer, all of our colleagues ought to be forewarned that you are dealing here with a very serious matter ==when you move to declassify a secret document==

in view of the language of the Espionage Act.

https://babel.hathitrust.org/cgi/pt?q1=1667;id=mdp.39015005249118;view=pla
intext;start=1;sz=10;page=root;size=100;seq=35;num=1685

PLEA TO DEPARTMENT OF STATE TO DECLASSIFY DOCUMENT

Therefore, I close, Mr. Chairman, with the plea to the State De-
partment that I think under the circumstances that have developed,
the contents of this document pretty well known the world around
right now, and under those circumstances we had better consider the
bowl of milk has been spilled, the Humpty Dumpty is off the wall, you
can neither get the milk back in the bowl or Humpty Dumpty put
together again; so you had better declassify this and move on to the
next issue.

I do think, Mr. Chairman, that we ought to also make clear to these
departments that if we are going to ask for secret documents, it ought
to be upon the gentleman's understanding that we are not going to
get those documents into our physical possession and then publicize
them, because if I were Secretary of Defense or Secretary of State
under those circumstances, with the obligations that those men have
under the separation-of-powers doctrine to the executive branch of
the Government, I wouldn't release a document in the first instance,
if I couldn't rely upon the committee not to release it to the public
without the approval of the department concerned.

Senator Knowland. Mr. Chairman.

Chairman Russell. Senator Knowland.

OTHER LEAKS AND DECLASSIFICATIONS

Senator Knowland. Apropos of the remarks made by the Senator
from Oregon, in the first place it seems to me that in view of the fact
that the State Department itself, at its own discretion, in order for
what many people honestly believe was an effort to undermine the
Government of the Republic of China, declassified large numbers of
documents in the so-called China white paper, but many of us be-
lieved did not declassify all the documents relating to the situation
and particularly some which might have thrown a different light upon
the subject; in view of the fact that the question of the Espionage Act
has been raised—and I shall not be personally intimidated on that
situation—I call your attention to the fact that there is a prima facie
violation of the espionage laws by the release of the Wake Island
document to the New York Times when it was still classified, not con-

fidential, but top secret, and when the information released not only includes the material which finally was declassified and made available, but includes some of the material which is still in the document in its classified state in our security room.

So that if there are to be any prosecutions under the Espionage Act, the No. 1 business of the executive branch of this Government should find out who of the 44 or 50 people who have a copy of the Wake Island notes released a copy of those notes while still classified as top secret, and why was it done, Mr. Chairman? Because it was felt that that would bolster the case of the people who had removed General MacArthur.

Now I hope that out of these hearings there will come an area of agreement in which we can get a substantial number of the members of this committee, regardless of their partisan affiliation, to finally unite on a report, but I say that that will not l>e augmented in my judgment if in a document which some of us feel does have material value in these hearings and is a part of the examination that we want to make of numerous witnesses that will come before us, if that is still held under these circumstances.

Now I think the Depannent would be well advised as suggested by the Senator from Oregon, I would much prefer not to have this situation forced to be done over their protests, but I think that we are entitled to some cooperation from the Department and the executive branch of the Government in this regard.

EFFECTIVENESS OF CENSORSHIP ARRANGEMENTS

I think this committee has been outstanding in that with the censorship which we ourselves set up, the subcommittee and the committee itself has been in complete agreement with the amount deleted by the censor, with I think only three exceptions.

On one of those, after discussing the matter with Admiral Davis, the subcommittee and the full committee fully agreed with the admiral in the deletion. On the other one, it was only a question of possibly endangering the cryptographic code.

On that the admiral fully agreed that if it could be put into a paraphrase, there was no reason why that should not be released, and it was released.

And the third dealt with the town of Kashin, and on that the committee was in disagreement with the admiral, but finally the admiral

took the matter up with the Defense Establishment and they agreed finally that it would be advantageous and better at least for the name of that city to be released.

NO HARM IN DECLASSIFICATION

Now with the thousands of words of testimony, we have worked in such complete harmony and understanding that we have not had a major issue arise that has not been amicably settled, and in view of the fact that this is a year and a half old, there is no charge that in any slightest degree it involves crypotographic code. It does not involve our fighting troops in Korea.

A substantial part of it has been published, and published a year and a half ago. I would think, Mr. Chairman, that the Department, of its own motion in this case and without setting a precedent to the future, because each case would have to stand upon its own, they themselves would say that under all those circumstances the document should be made a part of our public record with such explanation as they might want to make giving their point of view.

Senator Hunt. Mr. Chairman.

Chairman Russell. Senator Hunt.

LEGAL SITUATION ANALYZED

Senator Hunt. The position taken by the Senator from Oregon is substantially the same position that I took on Wednesday, I believe it was the result of which was postponing until today the final settlement of th is particular point,

I still am in hearty agreement with the position we took at that time Here we are a joint committee, 26 Members of the Senate, a big group. We could possibly direct that this paper be made available to all of the people.

I say to you, however, a lone committee taking the same action, it could be a forerunner of simply the subcommittee taking a similar action. The only possible wav we could force the Secretary of State in case he did not care to comply with our request, would be to cite him for contempt before the Senate. That would be the ultimate result of this situation.

It can't be circumvented. I think we are establishing, if we demand of the State Department that they deelassifv a secret state paper, that we are doing something that is ill-advised, doing something that is not for the good of our country, and something that each and every

one of us possibly we would see the day that we would regret the action taken.

I am heartily in accord with the legal position taken by the Senator from Oregon.

Senator Bridges. Mr. Chairman.

Chairman Russeia. Senator Bridges.

PREVIOUS RELEASES AND LEAKS OF CONFIDENTIAL DOCUMENTS

Senator Bridges. Senator Knowland, I think, has- outlined the crux of this thing when he goes back to the Wake Island conference which was not as confidential as this document was, but a top-secret document which was released by someone.

If there has been any violation of any law against our country. it was that release of a top-secret document. In questions of the Defense Department, officials who testified here that even if it was top secret, that is the highest secret you can get in our country, that they have made no endeavor yet to find out who released it.

Now if we are fioing to get into these things, then we ought to find out who released it, who violated the laws of our country on a thing of that kind, and I think you might find it was people rather high up in our country, and it would present a very serious problem for our committee and for the Department of Justice as to what they propose to do on the violation of a top-secret document.

This is merely a confidential document which has had general publicity.

INTERPRETATION OF PREVIOUS STATE DEPARTMENT WITNESS ON CLASSI-

FICATION OF THE DOCUMENT

Now as I understand the issue made by Mr. Fisher the other day, the legal adviser to the State Department, was that he did not object to the body of the thing, but what he objected to was the introductory sentence or two, the paragraph where it said that it was giving a direct slant to the information given out by the Voice of America on this thing, and he pointed out that Russia would give then formal acknowledgment that we were slanting our news.

Of course I think we would be foolish if we do not slant our information on this thing, and I haven't any doubt but what the Russians know that, but could this matter be settled and will the Secretary agree to releasing this if the few top sentences objected to by Mr.

Fisher be eliminated?

Senator Kefatjver. Mr. Chairman, I did not understand Mr. Fisher to make

Chairman Russell. I did not understand Mr. Fisher to take that position.

Senator Bridges. I would like to have his testimony read then. I have got two ears and I listened very carefully. He went all over the lot but that was his conclusion.

Chairman Russell. I did not understand that that was his position.

Senator Kefauver. I thought, Mr. Chairman, he very definitely said if we took out the top sentences, then the rest of it would be not correctly stating the position of the State Department and it might be interpreted that way.

Senator Bridges. He did that when he objected to that, but the first part of his argument was only on the slant it would give.

Senator Brewster. Mr. Chairman, do you want to read that?

Chairman Russell. No; I am not going to read the record. If the Senator wishes to, he may.

EFFECT OF DECLASSIFYING DOCUMENT ON THE VOICE OF AMERICA

Senator Brewster. I more or less agree with the Senator from Oregon this is sort of a tempest in a teapot, having read the document before, but as I understand it the Secretary contends that this was simply an example of whistling to keep our courage up.

Wasn't that the essence of your idea, that this document was put out for that reason, a well-recognized practice that people, if they think they are going to get in trouble, they whistle a little to keep their courage up?

Secretary Acheson. It is a question of whose courage. It wasn't our courage but it was to minimize the effect of this in other areas.

Senator Brewster. And the disclosure of your action in that regard it seems to me can surprise no one including the Russians. That is the only aspect of the matter that surprises me a little, is that you think the Russians or anybody else would be surprised to find that you were trying to put the best face we could on the situation. That is all the publication of this document will reveal.

I would subscribe very earnestly to the others who hope that you might see it in that light and release it to avoid any difficulty. We have crossed every bridge so far, and I hope we get over this one.

Secretary Acheson. Senator, it is not that this would surprise the
Russians, it is that it gives them an official document
Senator Brewster. Yes.
Secretary Acheson. Which they will use to the best of their ability
to discredit the Voice of America in the areas in which it is effective.
Senator Brewster. Do you think there is anybody in the world
doubts that?
Secretary Acheson. Doubts what?
Senator Brewster. Doubts that we are using the Voice of America
in the most effective way we can to maintain our case. What else does
anyone suppose we are doing with it?
Secretary Acheson. Well, as I say, it would be very harmful to the
Voice to have this official document of the Government put in the
hands of those who will use it in the most destructive way against us.
Senator Brewster. That is very difficult for me to understand.
Socrates said that the penalty of being a liar was not to be believed
when you told the truth, and that is the wisdom of trying to make
all your statements conform to the facts and so forth. But if in the
diplomatic field a different practice prevails, I am sure it is not
peculiar to America.
Senator Stennis. Mr. Chairman, a parliamentary inquiry.
Chairman Russell. Senator Stennis.
Senator Stennis. What is the matter before the committee? Is
there a motion to release this?
Chairman Russell. Yes, sir; a motion from Senator Knowland, as
I understand it, that this matter be declassified by the committee
action.
Senator Knowland. Be made a part of the public record.
Chairman Russell. Mr. Secretary, I have a question or two I want
to ask. I wish to make a prefatory statement.

STATE DEPARTMENT UNDERSTANDNG IN SUPPLYING DOCUMENT TO
COMMITTEE

When this letter from Mr. Lovett, conveying the letter from the
Secretary of State to me, reached me, it was handed me here in the
committee room. I did not read it carefully, I glanced through it
very hurriedly, and then either handed it to Senator Knowland my-
self or requested that whoever, whichever member of the staff handed
it to me, hand it to Senator Knowland. I mean he is the man who

requested the matter, and he would primarily interested.

I wish to read this letter that I forwarded Secretary Marshall.

Hon. George C. Marshall,

Secretary of Defense, Washington, D. C.

Dear Mr. Secretary: I am enclosing a copy of a letter I have received from Senator Knowland requesting that certain documents be furnished the committee

by the Secretary of State. I shall thank you to transmit this letter to the Secretary of State with the request that he furnish this material subject to the same security provisions that control the classified documents which the Department

of Defense has previously provided for examination by members of the committee.

I notice you quote part of that statement in the last paragraph of your letter. I shall read that to complete the record:

The Department of State appreciates Senator Russell's assurance that the classified documents forwarded herewith will be "subject to the same security provisions that control the classified documents which the Department of Defense has previously provided for examination by members of the committee."

I would like to ask you, Mr. Secretary, what you understood by that language.

Secretary Acheson. I understood, Mr. Chairman, that I was furnishing the document under the security provisions which you have set up; that is, that the documents are kept under custody; that they are available to be read by the members of the committee, but that they are not to be put into the public record, since this was a classified document. That is the basis under which I furnished it.

Chairman Rusbeix. Were you wholly without knowledge that the committee has assumed the power in the event a majority decided to do so, to declassify any of the documents?

Secretary Acheson. I assumed that the committee could do that if it wished to do it; yes, sir.

Chairman Russexx.. You assumed that it could?

PERSONAL ATTITUDE OF WITNESS

Secretary Acheson. Now, there has been a statement about my attitude, and I think, perhaps, I should make it clear, I believe that the classification of this document as confidential is correct, and it is necessary to maintain it.

I have believed that ever since the document was first talked about, and since parts of it, quotations—alleged quotations—were made from it. That is my belief.

The dutv is mine, the responsibility is mine. I have to deal with it individually in accordance with my own conscience and my own oath. I cannot, to be agreeable, do something which I think is wrong and not in accordance with my duty. So far as the power of the committee is concerned, I am not challenging the power of the committee, and I will not do anything to thwart it.

If, despite what I have said, the committee votes to release it, or votes that it wishes to release this, so far as the State Department censor is concerned, I shall direct him not to try to thwart the will of this committee; but I cannot change my own conviction, and I must perform mv duty in accordance with it.

Senator Bridges. Mr. Chairman?

Chairman Rdsseix. Senator Bridges.

Senator Bridges. Mr. Fisher, in his testimony

Senator Knowland. What page?

Senator Bridges. I am reading from 4100 first:

PREVIOUS STATE DEPARTMENT WITNE8S STATEMENT ON CLASSIFICATION

The document in question is a document designed to inform the information or propaganda people of the Department of State as to the line that should be taken in certain circumstances. I will give you the best evaluation of its purpose

by reading from its first paragraph:

"'Problem: To formulate information policy which will minimize damage to United States prestige and others' morale by the possible fall of Formosa to the

Chinese Communist forces.'

"In other words, the purpose of this document is, to put it crudely, give the Voice of America people the line they should follow because of an anticipated development.

"N'ow. it is probably known to the Soviets that we do give them—give the people the lines to follow on various possibilities. They undoubtedly suspect it. '"The question is can they prove it, and if this document were to be released, what propaganda use would they make of it, not as a leak but as an official United States document in which we tell our broadcasters, 'Play up this; play

down that.'

"Now, I don't believe that that is an improper thing to do. Anyone who knows the problems of a propaganda war realizes there has to be some central direction, but for counterpropaganda use, the exposure of that type of central direction

?ives the Soviets something that I think they would very much like to have for the purpose of destroying the credibility of the Voice of America, which we have

all been working so hard to build up. That is, I think, a brief statement of the reasons, Mr. Chairman."

Sow, later, on page 4115, Senator George says:

As I understand you, Mr. Fisher, it is not a question whether these statements here are true or untrue, whether the Secretary of State will come along and admit that they were facts or unrealistic; it is that if this document is now made

public, that then the Russian propagandists will be able to trace it right back to

83797—51—pt. 3 3

your directive and say, "Here. This is the source of it" and everything they say is simply put out over there in this way. Is that your position?

Mr. Fisher. That is the position ou the classification issue, Senator.

Then, down at the bottom of that page:

Senator Kefauver. As I understand Mr. Fisher, you, I don't believe, were even counsel for the State Department when this was written, and you are not trying to pass on whether it is a good directive, whether it should have been put out, or anything else about that. You are just talking about the damage that the publication of it right now might do to the program of the Voice of America ; is that correct?

Mr. Fisher. That is correct. I was with the State Department when it was written. I was up in Ottawa trying to settle the Colonial Air Lines matter at the time and did not know of it myself. But the subsequent issue that you state is entirely correct.

Then, over here, on page 4118, I asked the same question, after all this build-up along this line, I asked him—

Senator Bridges. I want to make one question.

Mr. Fisher, your whole argument is on the first two or three sentences there. Supposing we should agree to eliminate those two or three sentences and release the rest, would that remove your objection?

Mr. Fisher. No, sir; I don't believe so.

Senator Bridges. That is your argument.

Mr. Fisher. That would put the rest in entirely different context without those first sentences. If they were not made public, the remainder would appear as a statement of United States policy, not as a statement of background and general attitudes to be taken.

The point I make is that Mr. Fisher, coming up here the day before yesterday, argued along one line, and one line only; and that when he was asked that question of eliminating the thing that he pointed out was the danger, he did not agree with it.

All I was doing was repeating the same question to the Secretary which, based upon the argument made by Mr. Fisher the other day, whether or not he would be willing to release the document, if the first two or three sentences were eliminated—which seemed to be the thing that Mr. Fisher was objecting to, then

Chairman Russell. I did not intend to offend my friend from New Hampshire when I said I did not get the impression from Mr. Fisher's testimony that he would be willing for it all to be released if those three lines were taken out, but I did not get that impression, and my understanding is sustained. It is just a difference of opinion, sustained by what the Senator has read.

Senator Bridges. He built up his whole case on that, and when the question is put to him, then he takes the other position. I want to point out from my questioning, and that of Senator George, from his own statements, that he had reason to believe that.

Senator George. Mr. Chairman, may I make just a very brief statement?

Chairman Russell. Yes, sir, Senator; you may just make any statement you desire.

GERMANENESS OF DOCUMENT TO INQUIRY

Senator George. I would be most reluctant to vote to relieve a confidential entry made on this paper supplied by the State Department if I did not think it was material in this whole inquiry. I think it is; material, and its materiality may depend entirely upon what is subsequently shown or what is subsequently presented to the committee. But, at this stage of it, it does seem to me to be material, because while I have never been quite certain about the scope of this inquiry, what we were expected to find here by this committee, among other

things, of course, there was the relief of General MacArthur out in the Far East, and to put it in a way that I do not think it need make any controversy, the question of whether or not there was anjr very definite and certain far eastern policy which we were pursuing is involved in this case; and this strikes me as having a material bearing upon that,, subject to the explanation, of course, that accompanies this document that the State Department puts down; and, I, therefore, would have to vote, if it is going to be forced to a vote, to relieve the ban of secrecy upon this document.

Senator Hickenlooper. I could not understand you. Did you say "relieve"' or "leave"?

Senator George. Relieve the ban.

Chairman Russell. The Senator from Washington is recognized.

THE UNITED PRESS STORT ON THE DOCUMENT

Senator Cain. I should like, Mr. Secretary, to pose three brief questions. Does the Secretary of State agree that the United Press release of January 3, 1950, which was read by the Senator from California, Mr. Knowland, accurately represents the substance of the State Department policy guidance directive which was written and released some time in December of 1949?

Secretary Acheson. I don't think I have it sufficiently in mind.

Senator Cain. It presumes to be, sir, an accurate series of quotes from that document, and I should like to know if you agree.

Senator Wiley. Is that the same as Senator Knowland read?

Senator Cain. Precisely.

If you wish to check that a little further, Mr. Secretary, I would ask my second question. Does the Secretary of State agree that the United Press release is a public document and therefore can be used in any way which anyone wishes without any legitimate criticism of anv kind from the Department of State?

Secretary Acheson. Well, of course, the UP story that you have is a public document. There is no doubt about that.

Senator Cain. Then in a minute we will establish through your study as to whether or not it is an accurate resume of what the State Department put out.

My third question, Mr. Secretary: Did the State Department institute an investigation to discover by what means a State Department confidential directive was released without authorization? And if

that investigation was conducted by the State Department, what were the results of it, sir?

Secretary Acheson. In answer to your first question, Senator Cain, I have here a copy of the Special Guidance 28, which indicates, various parts of which were quoted and various parts of which were not—■ the ones underlined were not.

Senator Cain. I would imagine, Mr. Secretary, that some member of your staff many months ago examined that United Press statement minutely in order to determine to what extent it was a literal recitation of portions of your policy guidance statement.

Secretary Acheson. The paper which I have here, showing the portions not used, is somewhat different from the one you have given me, but roughly speaking, not very different.

As far as I can see from this, perhaps a third of the paper has been used in the story.

Senator Cain. I raised the question, Mr. Secretary

Chairman Russell. Just a minute.

Secretary Acheson. I do not believe that the story gives an accurate resume of the paper for two reasons. One of them is that it makes it appear that what is being told in the story is the State Department policy, whereas that is not what the document is. The document is a statement of what the broadcasters, the attitudes which they should take. So in that most important respect the story is not accurate. So far as the content of the paper is concerned, quoting a third of the paper and picking out certain items, I think gives it a somewhat distorted view.

Senator Cain. I raise the question, Mr. Secretary, because I have sat here as one who is relatively uninformed on this question and listened very carefully. What I am getting at is this: If that United Press statement does not say anything which your policy guidance statement did not say, or said only those things which were said in that policy guidance statement, then I should think we could release the United Press statement to the public as a pretty accurate and fair evaluation of your State Department policy statement.

Senator Saltonstall. Mr. Chairman, may I ask a question?

Chairman Russell. Yes.

Senator Saltonstall. I would like to ask Secretary Acheson—this is material given to the Voice of America. How often does this con-

fidential type of material go out to the Voice of America?

Secretary Acheson. It goes out quite often.

Senator Saltonstall. And is this the first time that the question has come up as to whether or not this should be released to the public?

Secretary Acheson. Yes, sir.

WISDOM OF DECLASSIFICATION

Senator Saltonstall. Mr. Chairman, might I make this comment, and I say it most respectfully to the Secretary because it seems to me he is directly involved in this question and his attitude of mind. The harm that will come from this, as I see it, it will give the Russians, on what Secretary Acheson said, propaganda material. Now they have it now substantially, unofficially.

Now the good it will do in its release is to give a background to the whole public on which this committee may make the decision on the question of the far-eastern policy.

Now great harm will be done if this is voted out over the objection of the State Department, and there is almost as much publicity that will be given to it if it is refused because of the State Department's objection, and they can go back to the UP press item.

Now the Secretary stated a minute ago that he felt that under his oath he could not release this statement. Now it seems to me that the trouble has come, if you want to call it the trouble, that the State Department ever showed this to any members of this committee or to the Members of Congress if they felt it was of such top secret importance, and now having shown it to Congress, it seems to me that is water over the dam; that if these memoranda are to be sent out as top secret, the issue may well then come between the departments of the Government as to whether the Executive should turn over these papers. But now having turned these papers over, it seems to me, Mr. becretary, that under your oath—and I most respectfully say this to you because you have put it on a personal basis of your oath—that what is for the most good of the country, and under the circumstances, the most good of the country is to let this propaganda article out, if you will, without the objection of the State Department, or if you will refuse it, have it refused by this committee and have the public think there is some sort of a document being concealed here on which the good of the Far Eastern policy may be based.

Therefore, I say to you most respectfully, on your oath it seems to
me what is best for the country should be considered by you, and it
seems to me the best for the country is to let this out with the approval
of the committee and with the approval of the State Department.
I say that to you most respectfully because I know you value your
oath as we value ours.

Senator Morse. Mr. Chairman?

Chairman Russell. The Senator from Oregon.

Senator Morse. Before I ask a couple of questions of the Secretary,
I would like to base those questions on a reply to my good friend from
Massachusetts, because I think he has raised a very fundamental issue
involved in this controversy.

LEGAL OBJECTIONS TO DECLASSIFICATION

If I understood his argument right, it was that in view of the fact
that the Departemnt of State has made this document available to this
committee, it ought to consider itself now legally estopped from any
objections to its release to the public; if it wanted to object to its
release to the public, it should not have released the document to the
committee in the first instance.

I think what the Senator's argument really boils itself down to is
really the setting up of an insurmountable barrier between these com-
mittees and the various departments in regard to an inspection on an
executive basis of secret documents. Because if we followed the Sen-
ators argument, then I respectfully say that he is the one who is
estopping the Department, by his argument, from ever making avail-
able for executive inspection of any congressional committee secret
documents, because the departments would then release those docu-
ments for secret inspection at the departments' risk. I think what
we have to keep in mind here is the basic right of these departments
not to make available to us for secret inspection secret documents.
What we are trying to work out is a relationship of cooperation
between two equal, coordinated independent branches of the
Government.

Then, each department has to respect the constitutional rights of
the other, and I think you simply create an impossible situation, I
say most respectfully, if you are going to place these department Sec-
retaries at the risk of disclosing secret information within their pur-
view, to a congressional committee, and have that secret information

released to the public.

EFFECT OF DECLASSIFICATION OX EXECUTIVE-LEGISLATIVE RELATIONS

So, I wanted to ask the question of the Secretary of State, rather, these two questions:

First, Mr. Secretary, when you sent this document to Secretary Marshall for transmittal to this committee, did you contemplate that this committee would publicize to the public that document?

Secretary Acheson. Senator, I did not think that the committee would; but I knew that it might.

Senator Morse. Mr. Secretary, if the committee does, in effect, declassify this particular document, will that act on the part of the committee necessarily be given careful consideration by you in answering future requests of this committee as to whether or not you shall make available in the future other secret documents to this committee?

Secretary Acheson. I shall do my best in the future, as in the past, to cooperate fully with the committee.

I had not thought about the factors which you raised, and when you raised them; but I shall try to cooperate to the fullest of my ability.

Senator Morse. One further question, Mr. Secretary:

If, on the basis of any precedent established by this committee, in respect to the instant document, whereby the committee releases it, you. in respect to a future request, are fearful that the committee might release a particular document then being requested for the committee, would you not consider it your duty, if you are to keep faith with your obligation under your oath, in regard to which you have already testified, to deny to the committee what you considered to be a highly secret document, in view of the proven risk of releasing it to the committee?

Secretary Acheson. That is hard to answer, Senator Morse.

If I were convinced that in all probability the committee would release a document of a highly secret nature, which I felt would be very damaging to the country, I think I should have to take the attitude you state.

Senator Morse. That is all, thank you.

Senator Lodge. Mr. Chairman.

Chairman Russell. Senator Lodge.

STATE DEPARTMENT ATTITUDE ON CENSORSHIP AND COMMITTEE

POWERS

Senator Lodge. I understood you to say, Mr. Secretary, that while you did not feel this document should be released, that nevertheless, if the committee had voted to do so, you would interpose no objection toward it being released, is that correct?

Secretary Acheson. Would I direct the State Department censor not to try and cut it out?

Senator Lodge. Yes.

Secretary Acheson. In other words, here are two coordinate branches of the Government. You have your powers and duties, and I should not attempt to prevent you from exercising them.

Senator Lodge. My second question is that if you felt that the release of this document would seriously endanger the security and welfare of the United States, you would not relieve the State Department censor of the obligation to censor that document, would you t

Secretary Achesox. I think I should probably take the same atti-tude, because to tell the censor to cut out something which the com-mittee believed and voted should be given out, would only get us into fruitless wrangling. The committee has other ways of putting it out. I don't think that reflects much on my attitude.

Senator Lodge. Well, following up the question from Senator Morse, if you had felt that the release of this document was going to seriously endanger the security of the United States, you probably never would have sent it up here in the first place, would you?

Secretary Acheson. It is not at all that I think this endangers the security of the United States. It endangers the effectiveness of the Voice of America. That is why it is confidential.

Senator Hickenlooper. Mr. Chairman.

Chairman Russell. Senator Cain.

responsibility for leak of document in TOKYO

Senator Cain. Mr. Secretary, you were prevented by an interrup-tion—I think it was mine—from answering my third question posed to you a few minutes ago.

I asked whether or not the State Department had conducted an investigation to determine how your confidential document was leaked or illegitimatelv or unwarrantedly released to the press and what the results of that investigation have been.

Secretary Acheson. We did not conduct the investigation. We

asked the Defense Department to look into it, since this occurred in Tokyo. They did look into it, and as I recall the report, it was that this came out by inadvertence. It was not intended by the officer who let it out to let it out, but he did it by accident.

Senator Cain. Does that mean you know who the officer was who inadvertently let it out?

Secretary Acheson. No, sir.

Senator Cain. The investigation only said one of your employees inadvertently let it out?

Secretary Acheson. No; this occurred in Tokyo.

Senator Cain. Yes, sir.

Secretary Acheson. In the Departmenfrof the Army. It had nothing^ to do with the State Department.

Senator Cain. A military man inadvertently released a State Department confidential document?

Secretary Acheson. Yes, sir.

Senator Cain. I thank you.

Secretary Acheson. He did not release it. He allowed it to be seen by mistake.

RECESS FOB CONFERENCE REPORT ON MANPOWER BILL

Chairman Russell. The conference report on the universal military training and military manpower bill is up on the floor of the Senate. My presence there has just been requested. It therefore will be necessary for me to go to the Senate, and I ask Senator Connally to take over.

Senator McMahon. Mr. Chairman, I think that I shall have to go to the floor of the Senate if this bill is under consideration. This is a most important bill and I think we all have got to go over there.

Chairman Russell. Senator, I certainly would not quarrel with you about the importance of the bill. It is a bill of tremendous importance.

However, I thing that the conference report, I might say that while it is important in the legislative process, that the report be adopted, I do not think that any of the issues that are raised by the conference report are as greatly different from the bill as it passed the Senate to justify on my own motion recessing this committee, but a number of questions have arisen with respect to the bill. I did not expect to be on the floor more than 30 minutes yesterday afternoon. I was

there for the better part of 3 hours.

Senator Morse. Mr. Chairman.

Chairman Russell. Senator Johnson, who was chairman of the subcommittee that wrote the bill, and is also one of the conferees, also should be over in the Senate.

Senator Morse. Mr. Chairman, I think a conference report on the bill involves the drafting up to 5,000,000 young Americans is of such great importance to the Senate of the United States that it would be a great mistake for this Committee to remain in session while that conference report is being adopted, and therefore I move you that we recess until 2: 30.

Senator Hickenlooper. Mr. Chairman, would the Senator withhold his motion for just a moment? I do not care to pursue any questions if the committee desires to adjourn. I have some questions I want to pursue on this matter.

Chairman Russell. The motion to recess is not debatable.

Senator Hickenlooper. I understand.

Senator Hunt. I should like to amend the motion of the Senator from Oregon by saying that we recess until such time as the conference committee report is disposed of.

Senator Morse. Well, if it is disposed of before 2: 30, we would not come back until 2: 30. If it is not disposed of until after 2: 30, we come back at a reasonable time after its disposition. I think it will be disposed of by 2: 30.

Chairman Russell. The motion is not debatable.

Senator Morse. Stand on the wording.

Chairman Russell. Those who favor the motion will say "aye."

(Chorus of "ayes.")

Chairman Russell. Those opposed will say "no."

(No response.)

Chairman Russell. The "ayes" have it. We will stand in recess until 2:30.

(Whereupon at 12:15 p. m. the hearing was recessed to reconvene at 2: 30 p. m. this same day.)

AFTERNOON SESSION

Present: Senators Russell, Connally, Wiley, George, Smith (New Jersey), Hickenlooper, McMahon, Lodge, Fulbright, Sparkman. Gillette, Brewster, Bridges, Byrd, Saltonstall, Johnson (Texas), Morsii,

Knowland, Hunt, Cain, and Stennis.

Chairman Russell. When the committee recessed this morning the question was on the motion of Senator Knowland that the committee release to the public the instructions from the State Department of December 1949 with which you are all familiar.

Mr. Secretary, as a rule to spare mutual embarrassment, the witness is not in the room. If you will be kind enough to go out to the security room, unless you have some further statement

Secretary Acheson. No, sir; I would be delighted to do whatever you say.

Senator Hickenlooper. Mr. Chairman, I have some questions I wanted to ask to clear up this.

Chairman Russell. I am sorry, if they have a bearing on this point, Senator Hickenlooper; yes.

Senator Hickenlooper. I had asked Mr. Fisher to get some information during the noon hour.

Chairman Russell. I had no knowledge of that.

Senator Hickenlooper. I thought I made clear just before the motion to recess was made that I had some questions which I would not attempt to ask at that time, but I would when we reconvened after lunch.

Chairman Russell. I did not understand that. I knew you sought recognition, but I thought you wanted to make a statement of some kind.

Senator Hickenlooper. I said I would not attempt to ask the questions at that time if it was the desire of the committee to recess.

Chairman Russell. Very well.

STATE DEPARTMENT CLASSIFICATION REGULATIONS

Senator Hickenlooper. Mr. Secretary, the question of classification is interesting to me in this matter. I asked Mr. Fisher during the noon hour to get the classification regulations, that is, what constitutes "confidenial," what constitutes "secret," and "top secret" information in the State Department's classification. As I understand it, the Armed Forces classification may be slightly different, or the reasons for it.

I wonder if you can tell me what the various degrees of classification of important documents are in the State Department regulations; that is, the military has "top secret," "secret," "confidential," and

soon.

Secretary Acheson. Yes, Senator Hickenlooper. The categories
of classified material are at the top "top secret," then there is "secret,"
then there is "confidential," then there is "restricted," and finally,
unclassified.

Senator Hickenlooper. Yes.

Now, does the State Department recognize such a classification
over "top secret" as "for eyes only," for instance, or "destroy upon
reading' ; that is the officer to whom it is directed shall destroy upon
reading?

Secretary Acheson. Well, that

Senator Hickeneeooper. I say that because I understand in some
departs there are those two classifications on top of "top secret."

Secretary Acheson. We have "eyes only" messages. I think that is
not a degree of classification but is a procedure that "eyes only"
messages go only to those people.

Senator Hickenlooper. It was my understanding that an "eyes
only" message was a message that under no circumstances could be
reproduced for files or anything else by the officer to whom it was
directed, and who was reading it.

Secretary Acheson. I just cannot answer that.

Senator Hickenlooper. It may be immaterial. It is another
classification.

Now, do you have a definition of what constitutes confidential

Secretary Acheson. Yes, sir.

Senator Hickenlooper (continuing). Material in the State Depart-
ment classification?

Secretary Acheson. Yes, sir. That is under the regulation, the
security regulations, of the Department of State, section 191.23:

Confidential: Classification confidential shall apply to information or material
which, if disclosed, without authorization, would prejudice the national
interest
or the work of any Government agency by hampering development and
carrying
out of an important policy and negotiations in progress or might result in un-
warranted injury to an individual. A majority of material should be classified
no higher than confidential.

PERSONS AUTHORIZED TO CLASSIFY

Senator Hickenlooper. Now, Mr. Secretary, who has the authority to place a confidential classification on a document of the State Department, that is below the Secretary of State, who can classify any degree he wants to—in other words, the lowest officer in the State Department who can classify confidential?

Secretary Acheson. That is regulation 191.3, "Determining the classification of documents."

General provisions: The originator of a document shall be responsible for determining its proper security classification. Only one security classification shall be assigned to a single document or device.

Well, I think you have the answer.

It goes on

Senator Hickenlooper. I may suggest—what I am trying to get at—in the Military Classification Manual, it says that: "Confidential and restricted documents

Secretary Acheson. Let me give you-

Senator Hickenlooper. "Can be classified by authority of any commissioned officer in the Army."

I wondered what the degree of authority must be, in the State Department, or what the level of authority must be, the lowest level of authority for classification of "Confidential"?

Secretary Acheson. In regard to "Confidential," regulation 191.42 says:

Any originator of official material may classify material "Confidential" or "Restricted," as warranted by the contents.

DISTRIBUTION OF DOCUMENT IN QUESTION

Senator Hickenlooper. How many copies of this confidential document of December 23, 1949, under discussion were promulgated by the Department?

Secretary Achesoi*. I think I have that here. To missions abroad there were 234. In the Department of State, 150. To other agencies, 72.

Senator Hickenloopeb. What in general would be the nature of the other agencies? Would that include the military?

Secretary Acheson. National Defense, 42; this interdepartmental committee the initials of which are IFIS, which coordinates information, 8; the CIA, 20, the ECA, 2.

Senator Hickenloopeb. That would be something in excess of 350.

Senator Saltonstall. Four hundred and fixty-six.

Secretary Acheson. I think the total is 456.

Senator Hickenloopeb. Four hundred and fifty-six. Now, did copies go to all of our missions abroad?

Secretary Acheson. I cannot say. I have got South America, 40; Europe, 90; the Far East, 40; Germany, 4; the Near East 60—Near East and Africa.

Senator Hickenloopeb. Mr. Secretary, isn't it reasonable to believe that with that dissemination or promulgation of that number of copies of these documents, that this document has fallen long since into the hands of the Soviet?

Secretary Acheson. I would not know. I should hope not.

Senator Hickenlooper. I think, with the apparent thoroughness with which the Soviet operates, that it might well be argued that it possibly might have dropped into their hands long since and that they have a complete copy of the document and a full knowledge of it. But did copies go to our diplomatic people in Tokyo?

Secretary Acheson. The only diplomatic person we have in Tokyo is an officer who is on the staff of SCAP, his political advisor. There is no indication here that it went to him.

EFFECT OF RELEA8ING DOCUMENT IN QUESTION

Senator Hickenlooper. Have you or does the Department or the Voice of America have knowledge that the Soviet used this document or referred to it or the article published in the newspapers in January with reference to this document, that is January 1950? Have they used it as propaganda in any way so far as any knowledge you or the Department or information that you or the Department received?

becretary Acheson. We can ascertain that. I don't know it.

Senator Hickenloopeb. I understood you to say just before we adjourned that the publication of this document would not effect the security of the United States or the security of our troops or forces in Korea, but that it would cause embarrassment to one of our departments, namely the Voice of America. Am I correct in my understanding of that statement?

Secretary Acheson. I think the first part of your statement is correct. I do not think I said it would cause any embarrassment, I think it would impair the effectiveness.

ABUSE OF POWER TO CLASSIFY

Senator Hickenloopeb. Impair the effectiveness. May I ask your view on this one proposition, and that is if the theory that has been argued to some extent or advanced here this morning, that simply because a department or an officer of a department sees fit to classify a document, does it necessarily follow that the document is in fact a document that should be so classified?

In other words, the power to classify in my judgment in whatever experience I have had in the past has on occasions been used to prevent publicity for embarrassing situations or embarassing decisions.

I do not mean to say this is done very frequently. I do not mean that at all. But to follow that argument to a logical conclusion and to say because per se or because a document was actually classified by some employee of a department, there is no power here to be exercised—to exercise judgment as to whether or not it was in fact a document that should be classified—do you think the mere fact of classification should put the veil of secrecy on all documents that are so classified unless the particular department involved approved its declassification?

Secretary Acheson. Senator, I do not think I ever suggested that the committee did not have power to take the step which it is considering. If a document is classified, then it means that under the regulations, based upon an act of Congress, it is that sort of a document.

Senator Hickenlooper. Yes.

Secretary Acheson. Now we are quite aware that very often documents are overclassified, and in fact our regulations caution officers against doing that. These particular directives to the Voice of America clearly must be classified as confidential because we cannot have those documents printed in the newspapers.

Senator Hickenlooper. If I may just illustrate

Chairman Russell. Just a moment, on a procedural question. Gentlemen, under the rules we adopted the limitation of 30 minutes applying to the examination of the Secretary of State. I assume that the committee intended that to apply to collateral matters such as now is under consideration. The Senator from Iowa has now been a little longer than 15.

Senator Hickenlooper. I did not understand it applied to dis-

cussions on procedural matters. I understood this is a procedural matter, but I will be willing to abide if that is the will of the chairman.

Chairman Russell. I merely made the statement so there will be no confusion about it, sir. I am assuming this 30-minute rule applies to these procedural matters also. You nave exhausted 15 minutes.

Senator Hickenlooper. What I am trying to get at, Mr. Secretary, is to give you an illustration of a letter which I have in my file in reply to a letter that I wrote to a department asking for certain information. I got back this kind of a letter, and it had no more information in it than this. It said:

Dear Senator Hickenlooper: Your letter addressed to so and so of such and such a date has been received in this offlcp. The information which you seek will

he investicated, and such information as we can give you will be sent to you in due

course.

Very truly yours—

and it was signed by the head of the department.

That was stamped "Confidential." It did not even refer to the subject matter that I had inquired about. It was purely a letter of acknowledgment, and it was marked "Confidential," under the theory, I suppose, I would be prevented from releasing the letter if I had occasion to release it. I have not, because somebody had used a red stamp on it; and that was what I meant by the question of good judgment and common sense in connection with the seriousness of the degree of classification, and which, I should think, should be open to some probing from time to time.

That is all I have to ask, Mr. Chairman.

Chairman Russell. Mr. Secretary, if you will retire I think you winll find a chair in that room.

Chairman Connally. Mr. Chairman, I want to say a word.

Chairman Russell. You will have an opportunity to make a statement, Senator. Do you want to ask any questions?

Chairman Connally. No.

(Secretary Acheson and Mr. Fisher retired from the committee room.)

Chairman Russell. Senator Connally is recognized.

DANGERS IN PRECEDENT TO DECLASSIFY

Chairman Connally. Mr. Chairman, I want to state, briefly, I am
very much opposed to this motion. I doubt very seriously, and chal-
lenge the authority of this committee to declassify this paper.

If that is possible, if that is the law, I see nothing to prevent us from
bringing up anything we want to, out of the departments, and de-
classifying it and publishing it to the world.

These are executive documents. They don't belong to us. It is
true we are part of the Government, but these are executive docu-
ments and I don't think that we have any authority to do it.

In the second place, you are cutting off your nose to spite your face.
If you adopt this sort of a provision, the departments will quit sending
you documents on request. I would, if I were a Secretary, and they
demanded something I thought they were going to put in the paper
and publish, I wouldn't send it.

Now, those are very serious considerations, it seems to me, and you
are not helping yourself a bit on earth.

This matter has already largely been published, and there is no
reason why jrou should make a great precedent of this affair, when
it has already been leaked and scattered all around over the Pacific
Ocean, as well as in the United States: and I think it is a very serious
blunder for us to take action declassifying this material.

And, I hope that the committee won't vote for any such revolution-
ary procedure.

That is all.

Senator Knowland. May I ask for a roll call, Mr. Chairman?

Senator Wiley. I would like to be heard, Mr. Chairman.

Chairman Russell. Senator Wiley is recognized.

Senator Wiley. I think there is a lot to be said on both sides of
this matter, at this time of the proceedings.

advantages from declassification

I hate to see a step taken that would result in the Department
taking the attitude that this committee is not entitled to documents;
but I listened very carefully and intently when the Senator from
Oregon inquired of the Secretary what his position was.

I rather got the idea that he would not commit himself to the
answer that was sought, which was that he would not send these
papers, if we wanted them.

I feel that this is a matter for the committee.

In fact, the Secretary has said so twice on direct questions—the power is here.

Now, for the life of me, I have been trying to understand from all the facts as they have developed why the Department should not declassify this in order that the people could get the facts, get the truth about this very thing.

It is contended and will be contended undoubtedly by many folks that there was some other purpose, gotten out by people who had some other objectives than what the Secretary said.

Now, he has given his explanation, which in substance is that it was a direction to the Voice of America how to proceed at that time when there was thought that we might lose Formosa.

Now, the news release that has gone out from his viewpoint doesn't give that impression. I should think he would want the whole instrument to go out so that the people themselves could weigh which is correct.

Now, I don't consider this as a precedent, Mr. Chairman. I think that every instance that conies before this committee where it is a question of whether we should disagree with the Department as to whether or not it should be released is a matter that we must determine on the facts with our responsibility as Members of this great body.

I do not think that we should be dictated to by the other branch of government; neither should Ave trj7 to dictate to it.

I feel, as Senator George intimated he felt, that in view of all the facts that have been developed, we should take the appropriate action and declassify it, if that is the word, ourselves.

Senator Morse. Mr. Chairman.

Senator Fulbhiuht. Mr. Chairman.

Chairman Russell. The Senator from Oregon.

Senator Morse. I want to take a half minute to correct an impression my good friend from Wisconsin left in the record that I asked a question this morning seeking some particular answer. I asked the question this morning seeking whatever answer the Secretary of State wished to give to the question.

I want to assure the Senator from Wisconsin that I did not ask any ?uestion in order to elicit an answer from the Secretary of State avornble to any private point of view the Senator from Oregon might have.

The record will speak for itself as to the fairness of the question.

Senator Wiley. I agree the record will speak for itself.

Chairman Russell. The Senator from Arkansas.

Senator Fulbrioht. Mr. Chairman, I do not want to take any time, but simply to say my position has been well stated by the Senator from Texas and the Senator from Oregon this morning, and I associate myself with those remarks, and I will not take the time of the committee to reiterate them.

Senator Hickenlooper. Mr. Chairman, I asked some questions a moment ago of the Secretary of State. My experience in the Senate has not been as long as a great many Members, but I have never served on a committee in the Senate where the question of national security was involved in a document where the committee did not respect the presentation of the reasons why national security was involved and preserve that document so far as the committee was concerned in secrecy.

I know of no committee, none that I have served on has ever arbitrarily violated that rule. This committee has gone down the line respecting censorship where national security is involved. We have not overridden a single line of censorship where the national security is considered to be involved in the testimony.

Xow by the Secretary's own testimony here before lunch and his testimony or his confirmation of that testimony since lunch, he says that the release of this information will not affect the national security, either the general national security or the security of our situation in Korea, so that national security is not involved in this operation.

What is involved? I understood him to say just before lunch—and I stand to be corrected in my understanding, not having looked up the record—I understood him to say it would be embarrassing to the Voice of America if this were released.

He said that I had misunderstood, that was not what he said. That it would hamper the Voice of America in his opinion in its operations.

Now I want to call attention to the statement that the chairman has made at the outset of these hearings, and I think on one or perhaps two occasions during these hearings, that censorship, the policy of censorship as he understood the committee's intent was not to save anyone embarrassment but to protect the national interest or

the national security.

Chairman Kussell. If the Senator will pardon me, I have used that expression twice, not to prevent any individual from being embarrassed, any individual. I remember that very well.

Senator Hickenlooper. I take it that the Department is no stronger than an individual. I do not care to dispute that point, but the key to secrecy here is the national security, and that has been taken out of the picture by the Secretary's own testimony.

In addition, this matter has been given widespread publicity for almost 2 years, a year and a half anyway. The curiosity is great about it, I think it has been promulgated, 456 copies sent all over the world of this document.

Xow I do not mean to say that we have a great sieve of leaky information all over the world, but past events that have been proved in the last 2 or 3 years indicate to me that without any doubt the Soviet has one copy or maybe a dozen copies of this surreptitiously obtained on one way or another checked up on if it is a matter of any interest to them.

That news story published in January in 1950 alone would certainly «"het their appetites for it if it were an important thing for them. I think that other nations know it. I think the Soviet knows it and everybody but the American people know what the actual contents of this document are.

National security is not involved, and I think that we are thoroughly justified in this case in voting this matter as a public document.

In any document where national security is involved, if there is any scintilla of evidence on the national security phase, I will stand up just as much as anybody to keep it secret and preserve it. I have not asked that a single other document that in any way involves national security in this hearing or in any other committee that I have ever sat on be released to the public.

But with national security out, then only embarrassment remains, and I submit that this might embarrass the Voice of America a little bit, but the Voice of America, as various committees have shown time and again on their public releases has embarrassed the American people on a good many occasions because of their proven distortion of messages which they have sent out over that network.

Senator McMahon. Mr. Chairman?

Chairman Russell. I will recognize the Senator from Connecticut.

Senator McMahon. There is an old saying in the law that hard cases make bad law.

I personally feel that, after weighing all of the factors with regard to this particular document, if I were in the Secretary's place, after weighing all the factors, I think I would have declassified it.

Senator Brewster. What was it you said?

Senator McMahon. I would have declassified it.

DANGER OF ESTABLISHING A PRINCIPLE

I am troubled by this situation: We are faced today with the obligation, nay, the necessity of operating a government under circumstances that we have never had to engage in before. The committees of Congress can only function in collaboration with the executive departments as we are able to be told of matters of vital significance to the operation of the Government.

I have been impressed with this time and time again, when I have seen leaks out of committees, and I have felt that the Senators were operating against the exercise of their own powers when they leaked information which came to them in excutive session, and we all know that has happened time and time again.

Now, it seems to me that if we take the step of declassifying a document which the Secretary, whose responsibility it is, has said would prejudice the operation of the Voice of America, we will have been substitutiong our judgment for that of the executive officer who is charged with the operation of that Department.

The fact that I, as Secretary, would act differently than he has in this particular case, if I were Secretary, does not change the fundamental principle involved, which is the right of this committee to make that adjudication.

I think, along with the Senator from Oregon, that we would be establishing a very dangerous principle.

Senator Hickenlooper. Mr. Chairman, will the Senator yield?

Senator McMahon. Not at this point; just a minute.

If the information is furnished—let us assume it was a top-secret document, and we were to substitute our judgment for the release of the information in that document, as the Senator from Texas has pointed out, we would mitigate against the committees of Congress getting that kind of information.

It is a very troublesome question. Undoubtedly, I do not think there is a man that will disagree with the statement that the Secretary or his subordinates had the right to classify this document when it was sent out, and should have classified it as confidential. The leak in Tokyo, by whomever it was made, was not right. The fact that that leak has occurred, and that the document has been published in an abbreviated form does not give to that document the air of authority that it will get if it is given out now as the formal release of a document of this Government.

Just one more point. The Senator has said that the security of our Government is not involved in this paper. Well, that is a question of relativeness. Anything that impairs the operation of the Voice of America and lessens its value and its use, would seem to me to be striking a blow at the security and the country, because obviously that is one of the ways that we have of telling the people of the world what our program is, and what we stand for.

That other things have occurred, according to the Senator from Iowa, which have lessened the value of the Voice, I presume that is so. We are never going to get in the operation of any institution, human institution, perfection. But the Secretary lias appeared, and he has stated in his opinion and in the opinion of his Department this would lessen the value of the Voice of America, if it is given out. I would have come to a different conclusion; but I cannot say that I would substitute my judgment for his judgment in this matter.

Senator Hickjexloopek. Will the Senator yield for a question?

Senator McMahon. I will yield.

SUBSTITUTING LEGISLATIVE JUDGMENT FOR EXECUTIVE

Senator Hickenlooper. I would like to hear the Senator discuss this: The Senator says we should not substitute our judgment when the Secretary says that the operation of some department would be impaired.

I submit to the Senator, for whatever observation he wants to make, this suggestion, that in practically every committee of the Congress, in every appropriation bill, in almost every action, you will find repeated instances where department heads—they may be military, they may be otherwise—frequently come before the committees and say, "If I don't get certain tilings done, if I don't get certain operations, it will impair the effectiveness of my department," and yet the Congress has

been elected to exercise judgment on those matters.

We are the fountainhead of authority on these operations, and we do exercise in the committees and on the floor of Congress not daily, but repeatedly, every session, we exercise discretion where the heads of the departments say they will be impaired unless thus and so happens; and Congress in its judgment and the committees in their judgment very often say, "In our opinion, you can't have it."

Senator McMahon. Mr. Chairman, my answer to that is that if the Senator doesn't see the difference between what he has suggested and this question, there is nothing I can say that can explain it to him. I yield to the Senator from Texas.

83707—51-

Chairman Connally. If we act simply because this thing has been published surreptitiously and illegitimately, doesn't that offer a reward in the future that if anybody can smuggle out a statement, why, then, we will come along and O. K. it and give it official standing by publishing the original document? It seems to me that is a very practical situation.

Senator McMahon. That occurs every day. There are statements in magazines that the United States has so many atomic weapons. Well, nobody denies it, nobody confirms it in authority. So it is left in the air for them to guess at.

Of course, if there is a release from you or from me or from Senator Hickenlooper, that has a note of authority, and of course, would bo accepted; and, of course, that is true.

Senator Brewster. Mr. Chairman.

Chairman Russell. Senator Brewster.

SECURITY IN COMMITTEES

Senator Brewster. I always have been concerned about this matter of confidences in the committees, and I do not like an attitude, which is more or less popularly accepted, that Senators can never keep a secret.

As the most conspicuous and most successful illustration of that there is probably the most significant secret that was ever possessed here in Washington during the war under the jurisdiction of the Senator from Connecticut, and that was the development of the atomic bomb, which was known to at least 20 Senators, if not more, and was one of the best kept secrets of the war.

Senator McMahon. And known to the Politburo.

Senator Brewster. As a result of treason, not as a result of Senators.

Senator McMation. That is right.

Senator Brewster. I always like to emphasize that in our own self-respect.

>.ow, there is a matter which has not been mentioned here at all, but in the previous difficulties of this character which have been faced in committees of which I have been a member we generally recognize that if this gets to the highest level of security, and peculiarly in this field, it is possible by resort to the President to solve it.

President Koosevclt repeatedly did that in conspicuous cases. He would impound a document, and the members of commissions—they weren't even members of departments—who had formulated the document would simply say, "It is in the hands of the President"—period. And that was an answer to the thing.

So that if, in this instance, we elect to act, as I hope we may, in releasing the document, as seems to me wise, under these circumstances it doesn t mean at all that the State Department or any other departments are deprived of security. I recognize that it is the twilight zone of the powers of the President in this field, which are evolving and will continue, but nobody has ever been able to subpena the President successfully, and to get documents out of him, and that is one of the practical answers to this. I hope this will be censored and taken out, because I don't want to suggest to these executive departments how they can get away from us.

The whole decision is political, as to whether or not the President in office abuses the powers of that office, and if he does, I think that the American people will rebuke him eventually, if he is going beyond what seems essential, in the popular mind, in the exercise of essential security measures for the security of our country, and our government. That is one reason I fairly wanted to see this matter go forward.

I think, particularly after what Secretary Acheson has said, that it is entirely wise not to establish a precedent that will necessarily wreck our Government.

Chairman Russell. Gentlemen, this issue has troubled me very greatly, and I desire to make a brief statement with respect to it, before the vote is had.

PENAL CODE PROVISION ON* HANDLING CLASSIFIED DOCUMENTS

The Senator from Oregon referred this morning to a section of the
Penal Code.

It was called to my attention by General Mudge, and is found on
page 1281 of the Military Laws of the United States, which purports
to come from volume 18, United States Code, section 703.

Inasmuch as the Senator from Oregon mentioned it, I think I
should read it to the committee. I shall not read all of it, just the
two last paragraphs:

Whoever, lawfully or unlawfully having possession of, access to, control over,
or being entrusted with any document, writing, code book, signal book,
sketch,

photograph, photographic negative, blueprint, plan, map model, instrument,
ap-

pliance, or note relating to the national defense, willfully communicates or
transmits or attempts to communicate or transmit the snme to any person not
entitled to receive It, or willfully retains the same and fails to deliver It on de-
mand to the officer or employee of the United States entitled to receive it; or
Whoever, being entrusted with or having lawful possession or control of any
document, writing, code book—

I shall not read all of that descriptive matter—

relating to the national defense, through gross negligence permits the same to
be removed from the proper place of custody or delivered to anyone in
violation

of his trust, or to be lost, stolen, abstracted, or destroyed » • *

Shall be fined not more than 1?10.000 or imprisoned not more than 10 years,
or both.

Inasmuch as the Sentor from Oregon had mentioned that, I thought
I would read it to the committee. I would be less than frank if I did
not say that I do not believe that section of the law applies to Mem-
bers of the Congress, for under the Constitution we are not responsible
for anything said on the floor of the Senate and I think that the same
privilege very clearly applies to a member of the committee.

I do read it to the members of the committee to refresh their recol-
lection as to the vigor with which we have legislatively approached
the handling of classified documents on the part of employees of the
Government.

Senator Hickknlooper. Will the Senator yield for a question?

Chairman Russell. Yes, sir.

Senator Hickenlooper. Do you interpret under the language you read that applies to this document which the Secretary of State says in no way impairs national defense?

Chairman Russell. Well, I am not going to get into debate as to whether or not this involves the defense of the United States. I know this: If any person employed by the State Department were to take this identical document here and go out and deliver it to any unauthorized person, that they would certainly be subject to prosecution.

WISDOM OF DECLASSIFICATION

I am not going into the degree of this document, if the Senator will excuse me. I am not concerned as to the contents of this document. I think it ought to be declassified. It seems to me it would help the Department of State greatly in its operations to have this document released, because the portion that was released in the newspaper article was, if I understand the newspaper article from the reading of it by the Senator from California, announced this paper as being the policy of the Government of the United States. We are told here now that it was never the policy of the Government of the United States, but it was merely an instruction to those who seek to influence public opinion all over the world to leave the impression that we did not care whether or not Formosa was lost; in other words, to minimize its importance, if I understand the testimony that has been given us here.

I am not impressed with the argument that if it is published we should release it, because frequently we see matters that are published in the magazines and newspapers that we know from our own relationship with the Government are true, but they are not attributed to any official source, so no one will know as to whether or not that is official.

Sometimes there is great conflict there and that would cause confusion.

I hope, I might say, that because there are 45G copies of this publication, it does not necessarily mean that the Soviet have control of it because I am confident there have been innumerable instances where more than 456 copies of highly vital information have been in circulation, and I would dislike very much to think that because there were that number that the Soviet had them all in their control.

Now, of course, this committee has probably had more highly classi-
fied material than any committee that has ever operated here in Wash-
ington. I doubt very much whether any committee has ever had
access to as many of the highly secret and private papers of the execu-
tive department of the Government as this one has.

I am very loath to vote as I expect to, to declassify this document,
because I am very sure that it is going to dry up a source of informa-
tion not only for this committee but for committees in the future,
but there has been so much discussion about this particular document,
there has been so much speculation on it, the people feel that it is
something that involves great issues here in Washington that to me
are not involved, that I feel that the declassification of this document,
despite all of the handicaps that it will impose on this committee and
committees in the future, is in the public interest, and while I am very-
reluctant to do so, because there are not only questions of law but
questions of ethics involved in it, when the roll is called I expect to
vote to declassify this document.

SIGNIFICANCE OF THE DOCUMENT

Senator Knowland. Mr. Chairman, I just very briefly want to say
this in regard to the matter. It is true that the Secretary of State
indicated in his testimony that from his point of view he did not feel
that this was a policy statement. I merely do not want the record to
stand that that is necessarily so.

Chairman Russell. I did not state it as a fact, Senator.

Senator Knowland. No, no, the Secretary of State said that, but
I do not want the record to stand that that is necessarily so because I
believe that this document clearly outlined the policy that was fol-
lowed by the Government of the United States from at least late in
1948 if not mid-1948 clear through to the 25th day of June after the
outbreak of hostilities in Formosa.

I think it is a most significant revealing document as to our policy,
and I think that the President's statement on January 5 wherein he
said that no further aid would go to Formosa was based fundamentally
upon the policy which the Department already had in hand.

Now the Department sent Dr. Jessup out to the Far East in late
1949, presumably to develop a policy when the fact of the matter is
that they had already determined that no further help would be given
to Formosa and in their judgment Formosa had no strategic value.

EXECUTIVE HANDLING OF OTHER DOCUMENTS

I do not want to argue the point any longer except to say that we did have the situation with the Wake Island document where someone high in the executive branch of the Government purposely leaked that document to one newspaper and the story was later picked up by others at a time when it was still classified as a top-secret document, without even going through the process of first declassifying it.

For a period of 4 years the Wedemeyer document on Korea was withheld despite votes of committees of the Congress and appeals by members of the Congress.

Now I think that we have a Government in which the legislative branch also has a responsibility. I submit that the State Department was apparently laying the groundwork for Formosa being passed into other hands, and passing out that information to 456 people abroad without taking the trouble to discuss that as a basic American policy with the Congress of the United States.

Chairman Russell. I want to make just a brief statement here with respect to that. Of course we have our very definite legislative responsibility under the Constitution, but I should like very much to find in the Constitution power which would enable us to bring documents of this kind before the committee if the executive branch does not desire to give it.

While the Wake Island document has been discussed and the Wedemeyer report has been discussed—I think that I had some little part to play with the declassification of the Wedemeyer report—I would not have this record leave even the most vague idea that I had voted to declassify this document because other documents had been handled improperly in the executive branch of the Government.

I cannot think of a poorer reason which would motivate a Member of the Congress to do something that he might not be persuaded was in the national interest than to fall back on some error of the executive branch of the Government. If we did, it would destroy our Government because if you had an executive branch of the Government that did improper things, then of all times the Congress should arise to the fullest of its responsibilities, and in the discharge of its duties, and not use the errors or dereliction of the executive branch of the Government as an excuse for our failure to discharge our own responsibilities.

Senator Lodge. Mr. Chairman?

Chairman Russell. The Senator from Massachusetts.

Senator Lodge. It seems to me it would be well to make the observa-
tion that the legal and Constitutional aspect of this question is not the
central one. The area of doubt as between the powers of the executive
and the legislative branch in this field has existed for 150 years, and
it is going to go on as long as this Government goes on.

We are not going to settle it here today. Moreover, I do not think
what we are doing here today, means that we are establishing a bind-
ing precedent, because each of these cases is different.

The case of General Bradley was, for example, an entirely distinct
one from this case; and if it comes up again, it will probably be in
another form.

I feel very much as the Chairman does. This is a document which
does not endanger the national security, and we have that on the
definite and formal declaration by the Secretary of State himself,
which he volunteered without being really required or put under any
pressure to make. That is the first point, which I think, is a very big
point because I cannot imagine that I would have voted to make public
a document which did jeopardize the national security.

Then, I think, it is clear from what has been said, that the releasing
of this document to the press is not going to dry up the gathering 01
information in the future. That is something which we always have
to consider, and if I thought that for us to release this document would
mean that the executive department would no longer send us up any
more documents, that would have some weight with me. But it seems
obvious that if the Secretary of State or if any Cabinet officer thought
that the release of a certain document jeopardized the national se-
curity he would never send it up here, in the first place.

So, I do not think this is going to seriously affect our ability to get
information in the future.

I am always sorry when these questions come up because they raise,
they introduce, a legalistic atmosphere into something which is much
better settled on the basis of comity; but as it has been raised, I should
vote to make this document public.

Chairman Russell. The clerk will call the roll.

Chairman Russell. Senator George asked me to vote him in the
affirmative.

The Clerk. Mr. Green?

Chairman Connally. No. I have a proxy; Senator Green gave me a general proxy. He did not specify this particular matter, but he

PRACTICAL ASPECTS OF SITUATION

said to vote him like I did on all these matters. I want the committee to understand that.

The Clerk. Mr. McMahon?

Senator McMahon'. No.

The Clerk. Mr. Fulbright?

Senator Fulbright. No.

The Clerk. Mr. Sparkman?

Senator Sparkman. No.

The Clerk. Mr. Gillette?

Senator Gillette. No.

The Clerk. Mr. Wiley?

Senator Wiley. Aye.

The Clerk. Mr. Smith?

Senator Smith. Aye.

The Clerk. Mr. Hickenlooper?

Senator Hickenlooper. Aye.

The Clerk. Mr. Lodge?

Senator Lodge. Aye.

The Clerk. Mr. Tobey?

(Xo response.)

The Clerk. Mr. Brewster?

Senator Brewster. Aye.

The Clerk. Mr. Chairman Connally?

Chairman Connally. No.

The Clerk. Mr. Byrd?

Senator Byrd. Aye.

The Clerk. Mr. Johnson?

Senator Johnson. Aye.

The Clerk. Mr. Kefauver?

Senator Hunt. No.

The Clerk. Mr. Hunt?

Senator Hunt. No.

The Clerk. Mr. Stennis?

Senator Stennis. Aye.

The Clerk. Mr. Long?

(Xo response.)

The Clerk. Mr. Bridges?

Senator Bridges. Aye.

The Clerk. Mr. Saltonstall?

Senator Saltonstall. Aye.

The Clerk. Mr. Morse?

Senator Morse. No.

The Clerk. Mr. Knowland?

Senator Knowland. Aye.

The Clerk. Mr. Cain?

Senator Cain. Aye.

The Clerk. Mr. 'Flanders?

Senator Saltonstall. Senator Flanders' office authorized me to vote his proxy. Senator Flanders is away and did not give it to me himself, but his office gave me his proxy. I want to make that clear. I vote Senator Flanders "aye," if I am permitted to vote that way.

The Clerk. Mr. Chairman?

Chairman Russell. Aye.

The Clerk. Senators recorded in the affirmative are Messrs. George, Wiley, Smith, Hickenlooper, Lodge, Brewster, Bvrd, Johnson, Stennis, Bridges, Saltonstall, Knowland, Cain, Flanders, the Chairman. Senators recorded in the negative are Messrs. Green, McMahon, Fulbright, Sparkman, Gillette, Chairman Connally, Kefauver, Hunt, and Morse.

Chairman Russell. The ayes are 15 an the nays are 9. The motion, therefore, prevails.

Now, gentlemen, I assume we are ready to start the hearing now. Will someone please request the Secretary of State to come in the room?

Senator Brewster. Is all the discussion declassified?

Chairman Russell. It is every bit declassified.

(Secretary Acheson and Mr. Fisher entered the room at this point.)

Chairman Russell. Mr. Secretary, on occasion in this committee we have procedural delays. We had one item that took up almost 3 days, so you were really not kept waiting as long as other witnesses have while we solved a procedural problem.

I believe you stated this morning you had a brief statement you desired to make.

Secretary Acheson. Yes, sir; I have a general statement.

Chairman Russell. You may proceed to make that.

Chairman Connally. We should tell the Secretary what happened in his absence.

Chairman Russell. Well, yes. The committee, by a vote of 15 to 9, voted in their opinion the material contained in the document at issue should be released.

Secretary Acheson. Yes, sir.

PEACE OR WAR

Mr. Chairman and gentlemen, the real issues in the discussion before us are peace or war, and the survival of human freedom.

It is not just a difference as to method which is now under examination. What is challenged is the bedrock purpose of our foreign policy, and of what we have been trying to do. That is the place I would like to start in this brief statement.

The foreign policy of the United States has a central and dominant objective—to protect the Nation and to safeguard the future of its people. We stand ready to defend our future by force of arms if that necessity is forced upon us. But we seek to deter war if we can. Another world war would be destructive beyond experience; it would not solve problems, but multiply them. Therefore, it is part of our fundamental purpose to prevent, by all honorable means, the outbreak of another general war.

Even before the last World War was over, while our young men were storming the beaches at Normandy and Saipan and dozens of other places now engraved in our memories, the resolution was forming among our people that future wars must be prevented.

IDEAL oF COLLECTIVE SECURITT

Their conviction grew that the best way to protect the security of our Nation and of our people was to prevent war, and that the way to go about it was through an international system of collective security.

The Four Freedoms, the Atlantic Charter, the United Nations—■ these were not cynical slogans. They represented the idea which our people felt in their hearts was worth righting for.

It has been the purpose of our foreign policy to keep faith with that idea.

The attempt to build a collective-security system on the basis of the cooperation of all the great powers broke down because of the policies of the Soviet Union. But Soviet ambitions have not been able to obstruct our determined efforts.

"Within the framework of the Charter of the United Nations we have been building a collective-security system based on the cooperation of those nations who are dedicated to peace.

The united and determined effort of our people to build effective instruments for keeping the peace is recorded in a series of vigorous and farsighted actions: the United Nations Charter itself, the Rio Treaty, the Greek-Turkish aid program, the Marshall plan, the North Atlantic Treaty, and the mutual defense assistance program.

We have been building our strength, together with our allies. We must be strong enough to keep the peace.

Side by side with these programs there is another basic element in our foreign policy—to assist the hundreds of millions of people who were acquiring their independence after the war, so that they might be free to develop in their own way, and to join in an international system for preserving the peace.

Our hopes for peace required us to understand the changes which were in motion among vast populations of the Middle East and Asia, and to help peoples who had just gained their independence from losing it again to the new imperialism of the Soviet Union.

Those are the big central ideas that express what we have been trying to do in the world.

CHALLENGE OF KOREA

The attack on Korea was a blow at the foundation of this whole program. It was a challenge to the whole system of collective security, not only in the Far East, but everywhere in the world. It was a threat to all nations newly arrived at independence. This dagger thrust pinned a warning notice to the wall which said: "Give up or be conquered."

This was a test which would decide whether our collective-security system would survive or would crumble. It would determine whether other nations would be intimidated by this show of force.

The decision to meet force with force in Korea was essential. It was the unanimous view of the political and military advisers of the President that this was the right thing to do. This decision had the

full support of the American people because it accorded with the principles by which Americans live.

As a people we condemn aggression of any kind. We reject appeasement of any kind. If we stood with our arms folded while Korea was swallowed up, it would have meant abandoning our principles, and it would have meant the defeat of the collective security system on which our own safety ultimately depends.

What I want to stress here is that it was not only a crucial decision whether or not to meet this aggression; it was no less important how this aggression was to be dealt with.

WAYS IN WHICH AGGRESSION WAS MET

In the first place, the attack on Korea has been met by collective action. The United States brought the aggression in Korea before the United Nations, not only because the Charter requires it, but also because the authority and even the survival of that organization was directly involved.

The response of some members of the United Nations, in terms of their capacities and their other security responsibilities, has been generous and wholehearted.

The total action is admittedly an imperfect one, as might be expected of beginning steps in a collective-security system. But the development of this system requires us to take into consideration the dangers and interests of those associated with us, just as we want them to take into consideration our dangers and interests.

In the second place, our response to the aggression against Korea required a careful estimate of the risks involved in the light of the total world situation.

There was the risk that the conflict might spread into a general war in Asia, a risk that the Chinese Communists might intervene, a risk that the Soviet Union might declare itself in.

We take it for granted that risk of some sort is implicit in any positive policy, and that there is also a risk in doing nothing.

The elements of risk and the means of reducing that risk to us and to the rest of the free world quite properly influenced our policy in Korea.

It has been our purpose to turn back this Communist thrust, and to do it in such a way as to prevent a third world war if we can.

This is in accord with one of the most fundamental tenets of our

policy—to prevent, insofar as we can do so, another world war. It is against this basic purpose that the operation in Korea, and the plans for carrying it to a conclusion, need to be considered.

WHAT THE DEFENSE OF KOREA HAS ACCOMPLISHED

The operation in Korea has been a success. Both the North Koreans and the Chinese Communists declared it to be their purpose to drive the United Nations forces out of Korea and impose Communist rule throughout the entire peninsula. They have been prevented from accomplishing their objective.

It has been charged that the American and allied forces fighting in Korea are engaged in a pointless and inconclusive struggle. Nothing could be further from the fact. They have been magnificent. Their gallant, determined, and successful fight has checked the Communist advance and turned it into a retreat. They have administered terrible defeats to the Communist forces. In so doing, they have scored a powerful victory.

Their victory has dealt Communist imperialist aims in Asia a severe set-back.

The alluring prospect for the Communist conspiracy in June 1950— the prospect of a quick and easy success which would not only win Korea for the Kremlin but shake the free nations of Asia and paralyze the defense of Europe—all this has evaporated.

Instead of weakening the rest of the world, they have solidified it. They have given a powerful impetus to the military preparations of this country and its associates in and out of the North Atlantic Treaty Organization.

We have doubled the number of our men under arms, and the production of materiel has been boosted to a point where it can begin to have a profound effect on the maintenance of the peace.

The idea of collective security has been put to the test, and has been sustained. The nations who believe in collective security have shown that they can stick together and fight together.

New urgency has been given to the negotiation of a peace treaty with Japan, and of initial security arrangements to build strength in the Pacific area.

These are some of the results of the attack on Korea, unexpected by—and I am sure most unwelcome to—the Kremlin.

HOW THE FIGHTING CAN BE BROUGHT TO AN END

The objective of our military operation in Korea is to end the aggression, to safeguard against its renewal, and to restore peace. There is wide agreement on this objective in the domestic discussions of this issue.

Both the administration and its critics have said that the object of the courses they propose is to end the aggression and restore peace. Both are willing—indeed desire—to end the fighting by an honorable settlement which will end the aggression, provide against its renewal and restore peace.

Neither will purchase a settlement by allowing the aggressors to profit by their wrong. Neither believes that the destruction or unconditional surrender of the aggressor is necessary to attain the goal.

General Marshall, General Bradley, and the Joint Chiefs of Staff have given you, in detail, the reasons why they believe that the Chinese Communists will be defeated in Korea and must abandon their purpose.

They report that our forces are in excellent shape, that their morale is high and that they are in a good supply position.

They report not only that the mass attacks launched by the enemy have failed to break through the firepower of United Nations forces, but that the offensives of the enemy have been broken and thrown back with enormous enemy casualties.

These defeats in Korea, together with other consequences of this campaign, present grave problems for the Communist authorities in China.

While the manpower resources of China are vast, its supply of trained men is limited. They cannot cover up their casualties. They cannot gloss over the draft of more and more men for military service. The Chinese Red leaders have betrayed their long-standing pledge of demobilization and the military demand for manpower has, instead, been increased.

Peiping has also broken its promises of social and economic improvement. In the great cities, dependent on imported materials, unemployment increases. The regime has not lightened the burdens of the people. It has made them heavier.

All of this is reflected in a sharp increase in repressive measures, and in propaganda to whip up the flagging zeal of their own people.

In the light of all these factors, I believe that the aggression can

best be brought to an end with a minimum risk and a minimum loss, by continuing the punishing defeat of the Chinese in Korea. This is being done.

No one can predict when the fighting will stop and when the aggression will end. It is also true that no one could have foretold exactly what would happen when we undertook action to end the Berlin blockade, but we did what we thought was right and the blockade was ended.

No one could have foretold how the aggression in Greece would be terminated, but again we took those measures which our best judgment and sense indicated were the right ones and the aggression ceased.

While the outcome of every course of action in the foreign-policy field cannot be predicted with certainty in advance, it is our responsibility in taking action to apply our best judgment on the basis of the best information at hand.

I think it is fair to say that all of the President's advisers believe the course we are now following gives us the best chance of stopping hostilities and ending the aggression in Korea.

THE ALTERNATIVE PROPOSAL

I should like briefly to address myself to the alternative course which was placed before this committee. This course would seek to bring the conflict in Korea to an end by enlarging the sphere of hostilities.

I will not try to review the military considerations involved in this proposed course, since these have been thoroughly discussed by the previous witnesses before your committees.

It is enough to say that it is the judgment of the President's military advisers that the proposed enlargement of our military action would not exercise a prompt and decisive effect in bringing the hostilities to an end. To this judgment there must be added a recognition of the grave risks and other disadvantages of this alternative course. Against the dubious advantages of spreading the war in an initially limited manner to the mainland of China, there must be measured the risk of a general war with China, the risk of Soviet intervention, and of world war III, as well as the probable effects upon the solidarity of the free world coalition.

The advocate of this program make two assumptions which require

careful examination. They assume that the Soviet Union will not necessarily respond to any action on our part. They also assume that in the build-up of strength relative to the Soviet Union and the Communist sphere, time is not necessarily on our side.

As to Soviet reactions, no one can be sure he is forecasting accurately what they would be, but there are certain facts at hand that bear on this question.

Page 2295

DRAFTING OF WEDEMEYER's DIRECTIVE

The first point was introduced by Secretary of Defense Marshall. The Secretary was describing to the members of the committee those events that led up to my mission to China and Korea in 1947. The record shows that on May 8, 1951, Secretary Marshall testified, and I quote:

I thought I would just send hirn out to look over the ground for me and come back and tell me what he thought; hut his idea, and I think it was right, was—he

needed as much prestige as possible in what he was doing, and therefore he needed a Presidential directive; and my recollection is he drew up most of the directive himself.

With reluctance, gentlemen, because my recollection of these events is quite different from that of Secretary Marshall, I submit the following:

1 would never express concern about a position involving my prestige or my rank. I did not, therefore, suggest that I required a Presidential directive.

After 2 years' close association with the Chinese, and limited contacts with Koreans, I felt confident that I enjoyed their respect and that I would receive their friendly cooperation. Secretary Marshall requested that I draft my directive. I did so and submitted it to him for approval.

2296 MILITARY SITUATION IN THE FAR EAST

A day or so later it was returned to me without any changes and" over the signature of President Truman. A copy of that directive is embodied in my report to the President, the China Report of 1947. Actually I think that a member of Secretary Marshall's staff, a Colonel Carter, suggested the Presidential directive and also ambas-

sadorial rank for me in the effort to be helpful. I think also that the members of this committee are entitled to know that the idea of sending me to China in an investigative role had its genesis in Congress. I believe that Congressman Walter Judd recommended such, action to Secretary Marshall.

WEDEMEYEr's VIEWS PERTAINING TO **FORMOSA**

The second point that has been developed in the course of the investigation here pertains to the testimony of Secretary of State Acheson as recorded on June 1,1951. The Secretary associated my name with certain policies and actions pertaining to the island of **Formosa**. May I state categorically that at all times, at all times I felt that the Nationalist Government could resist successfully the Communist attacks against **Formosa**. In discussing the State Department's informal memorandum on **Formosa** dated December 23, 1949, Secretary Acheson conveys the erroneous implication that I not only agreed with the State Department's pessimistic views concerning the future of **Formosa** but that I even suggested the probable fall of that area to the Communists.

In August 1949 it was my definite understanding that the State Department was on record to the effect that **Formosa**^ fall was probable. I read many official communications emanating in the btate Department to that effect.

Although the Joint Chiefs of Staff recommended action to avert sucli a catastrophe, I was not sure at the time that the State Department would adopt those recommendations. This feeling was based upon the existing policy toward **Formosa** which, as I recall it, was to attempt to prevent the fall of **Formosa** by economic and diplomatic measures only.

Assuming that the State Department's attitude and pessimistic conclusions concerning **Formosa** continued, I felt it would be necessary to take constructive steps to insure the strengthening of the over-all United States position among far eastern peoples and nations. I, therefore, suggested action in the psychological warfare field. Employment of psychological warfare is standard procedure among all modern nations and in all fields of strategy under such circumstances. In the event that Formosa's fall became a fact, I recommended the employment of the Voice of America and any other informational means which might minimize the effect upon Far Eastern

peoples, and I should like to repeat, minimize.

I had no intention, gentlemen, that there should be falsification of the military importance of **Formosa** or of the policy pertaining to that strategic area.

STATE DEPARTMENT POLICY MEMORANDUM ON **FORMOSA**

I want to say to you, gentlemen, I would not have been so much concerned about this point, that is about the association of my name with the **Formosa** memorandum on the part of the Secretary of State, Acheson, had he not resisted the efforts of the members of this committee to obtain the names of the individual or individuals of the State Department who prepared the final policy memorandum which, by the way, was never referred to me.

I believe it was never coordinated with the Department of Defense prior to its dissemination. I made the effort to determine this point and was unsuccessful. I was at that time—this was in 1949, gentlemen, in August—the Deputy Chief of Staff for Plans and Operations in the Department of the Army. It is possible that this **Formosa** memorandum may have been prepared subsequent to my departure for my new assignment in the west coast which occurred in September 1949. The date on the memorandum that was actually disseminated was December 23, 1949.

I have inquired in the Department of the Army and have been informed that the memorandum was never coordinated even in my former office, that is with my successor there.

To summarize, I have never accepted the State Department's pessimistic view with reference to the future of **Formosa**. I have consistently and repeatedlv recommended American supervised aid to the Chinese Nationalist Gfovernment, presently located in **Formosa**, in order to stop the advance of communism in the Far East.

MAC ARTHUR-SPRUANCE-WEDEMEYER RADIOGRAM

A third and final point that I should like to present to you gentlemen:

On June 6, 1951, Secretary of State Acheson testified that MacArthur, Spruance, and Wedemeyer were all in agreement in the winter of 1945 with reference to future United States policy in China. His testimony indicates that he derived that information from an official radiogram dated December 7, 1945, dispatched from MacArthur's headquarters in Tokyo after MacArthur, Spruance, and Wedemeyer

had conferred concerning projected United States assistance to the
Nationalist Government in China.

The Secretary quoted a paragraph of that radiogram as follows—•
this is the last paragraph of that particular radiogram, gentlemen,
and I quote:

It is suggested that the United States assistance to China, as outlined above,
be made available as a basis for negotiation by the American Ambassador to
bring together and to effect a compromise between the major opposing groups
in

order to promote a unified democratic China.

The Secretary of State, Acheson, laid great stress upon the fact
that this above-recommended action was the policy which General
Marshall was sent to China to try to effectuate.

The foregoing unquestionably would lead to the interpretation that
I concurred in, and in fact recommended, the formulation of a coali-
tion government in China involving the Nationalists and Communists.
This interpretation is absolutely incorrect. I never believed such a
government possible. The paragraph quoted by Secretary Acheson
was taken out of context from a message which recommended courses
of action to be taken to consolidate and strengthen the position of
the Nationalist Government in China.

These recommended courses of action, which are included in the
message quoted by Mr. Acheson, covered essentially the plans and
necessary arrangements for the repatriation of approximately 3 mil-
lion Japanese who were in China at the end of the war. Of these
3 million Japanese, about 1,200,000 were military, many of whom
were occupying and controlling focal points of communications, lines
of communications and production areas—particularly in north China.
With the evacuation of so many Japanese soldiers, vacua would be
created, and I proposed to fill those vacua as rapidly as possible with
Chinese Nationalist forces to insure (a) that order would be main-
tained in those critical areas, and (b) that the Nationalist Govern-
ment troops would have the opportunity to control those areas instead
of the Chinese Communist troops.

I should like to repeat, gentlemen, there was not, in my mind, at
least, any idea that the message quoted out of context by Secretary
of State Acheson—there was no idea that that message conveyed my
approval of any suggestion that a coalition government should or could

be accomplished in China.

That is all I have, sir.

Prayer for Relief

1. Grant reconsideration jus tertii.

2. Declare that the President has a proprietary interest in his Presidential records.

3. Recognize that the Supreme Court has under submission state secrets, executive privilege, and Article II inherent powers and rights cases in FBI v Fagaza and US v Al-Zubaydah, and judicial modesty and prudence warrants holding the instanter matter in abeyance for 90 days or such time as needed pending release of the decisions therein.

Respectfully submitted,

Dr. Paul Maas Risenhoover, Dr. Rel. Couns., J.D.

Executive Director, Robin Hood International Human Rights Legal Defense Fund

Tainan, Formosa, USA 22 CFR 120.13

SovereignNationsOfFormosa@gmail.com

Certificate of service by email: the Court and
jesse@binnall.com, eric.columbus@mail.house.gov, owen.dunn@arnoldporter.com,
stacie.fahsel@mail.house.gov, james.gilligan@usdoj.gov,
douglas.letter@mail.house.gov, kel@nationalsecuritylaw.org,
mbm7@georgetown.edu, jm3468@georgetown.edu, ao700@georgetown.edu,
Elizabeth.Shapiro@usdoj.gov, todd.tatelman@mail.house.gov,
anne.tindall@protectdemocracy.org

**Jesse R Binnall**

BINNALL LAW GROUP

717 King Street

Suite 200

Alexandria, VA 22314

703-888-1943

jesse@binnall.com

*Assigned: 10/18/2021*

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

representin
g

**DONALD J.**

**TRUMP**

*(Plaintiff)*

**Eric Randal Columbus**

OFFICE OF GENERAL COUNSEL

District of Columbia

5140 O'Neill House Office

Building

Washington, DC 20515

202-225-9700

eric.columbus@mail.house.gov

representin
g

**UNITED STATES**

**HOUSE SELECT**

**COMMITTEE TO**

**INVESTIGATE**

**THE JANUARY**

**6TH ATTACK ON**

**THE UNITED**

*Assigned: 10/21/2021*

**STATES CAPITOL**

*LEAD ATTORNEY*

*(Defendant)*

*ATTORNEY TO BE NOTICED*

**BENNIE G.**

**THOMPSON**

*(Defendant)*

**Owen Dunn**

ARNOLD & PORTER KAYE

SCHOLER LLP

601 Massachusetts Ave., NW

**FORMER**

Washington, DC 20001

representin

**MEMBERS OF**

202-942-6461

g

**CONGRESS**

owen.dunn@arnoldporter.com

*(Amicus)*

*Assigned: 10/28/2021*

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Stacie Marion Fahsel**

UNITED STATES HOUSE OF

REPRESENTATIVES

Office of General Counsel

5140 O'Neill House Office

Building

Washington, DC 20515

202-590-0585

stacie.fahsel@mail.house.gov

*Assigned: 10/21/2021*

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

representin

g

UNITED STATES

HOUSE SELECT

COMMITTEE TO

INVESTIGATE

THE JANUARY

6TH ATTACK ON

THE UNITED

STATES CAPITOL

(Defendant)

BENNIE G.

THOMPSON

(Defendant)

**James J. Gilligan**

U.S. DEPARTMENT OF JUSTICE

representin

g

NATIONAL

ARCHIVES AND

| | |
|---|---|
| Civil Division, Federal Programs | **RECORDS** |
| Branch | **ADMINISTRATIO** |
| 1100 L Street, NW | **N** |
| Room 11200 | *(Defendant)* |
| Washington, DC 20005 | |
| (202) 514-3358 | |
| (202) 616-8470 (fax) | |
| james.gilligan@usdoj.gov | |
| *Assigned: 10/21/2021* | |
| *LEAD ATTORNEY* | |
| *ATTORNEY TO BE NOTICED* | |
| | **DAVID S.** |
| | **FERRIERO** |
| | *(Defendant)* |

| | | |
|---|---|---|
| **Douglas N. Letter** | | **UNITED STATES** |
| | representin | |
| U.S. HOUSE OF | | **HOUSE SELECT** |
| | g | |
| REPRESENTATIVES | | **COMMITTEE TO** |

| | | |
|---|---|---|
| Office of General Counsel | | **INVESTIGATE** |
| 219 Cannon House Office | | **THE JANUARY** |
| Building | | **6TH ATTACK ON** |
| Washington, DC 20515 | | **THE UNITED** |
| (202) 225-9700 | | **STATES CAPITOL** |
| douglas.letter@mail.house.gov | | *(Defendant)* |
| *Assigned: 10/19/2021* | | |
| *LEAD ATTORNEY* | | |
| *ATTORNEY TO BE NOTICED* | | |
| | | **BENNIE G.** |
| | | **THOMPSON** |
| | | *(Defendant)* |
| **Kelly Brian McClanahan** | | **GOVERNMENT** |
| NATIONAL SECURITY | representin | **ACCOUNTABILIT** |
| COUNSELORS | g | **Y PROJECT** |
| 4702 Levada Terrace | | *(Amicus)* |
| Rockville, MD 20853 | | |

(301) 728-5908

(240) 681-2189 (fax)

kel@nationalsecuritylaw.org

*Assigned: 10/31/2021*

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**GOVERNMENT**

**INFORMATION**

**WATCH**

*(Amicus)*

**NATIONAL**

**SECURITY**

**COUNSELORS**

*(Amicus)*

**HEIDI**

**KITROSSER**

*(Amicus)*

JASON BARON

*(Amicus)*

LOUIS FISHER

*(Amicus)*

MARK J. ROZELL

*(Amicus)*

MITCHEL A.

SOLLENBERGER

*(Amicus)*

NORMAN EISEN

*(Amicus)*

| | | |
|---|---|---|
| **Mary B. McCord** | | **UNITED STATES** |
| GEORGETOWN UNIVERSITY LAW | | **HOUSE SELECT** |
| CENTER | representing | **COMMITTEE TO** |
| 600 New Jersey Ave, NW | | **INVESTIGATE** |
| Washington, DC 20001 | | **THE JANUARY** |

(202) 661-6607

(202) 514-8779 (fax)

mbm7@georgetown.edu

*Assigned: 11/03/2021*

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

6TH ATTACK ON

THE UNITED

STATES CAPITOL

*(Defendant)*

BENNIE G.

THOMPSON

*(Defendant)*

**Joseph Wilfred Mead**

GEORGETOWN UNIVERSITY LAW

CENTER

Institute for Constitutional

Advocacy and Protection

600 New Jersey Ave NW

Washington, DC 20001

202-662-9765

representin

g

UNITED STATES

HOUSE SELECT

COMMITTEE TO

INVESTIGATE

THE JANUARY

6TH ATTACK ON

THE UNITED

jm3468@georgetown.edu

*Assigned: 11/02/2021*

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**STATES CAPITOL**

*(Defendant)*

**BENNIE G.**

**THOMPSON**

*(Defendant)*

**Annie L. Owens**

GEORGETOWN UNIVERSITY LAW

CENTER

Institute for Constitutional

Advocacy and Protection

600 New Jersey Avenue, NW

Washington, DC 20001

(202) 662-4036

ao700@georgetown.edu

*Assigned: 11/01/2021*

representing

**UNITED STATES**

**HOUSE SELECT**

**COMMITTEE TO**

**INVESTIGATE**

**THE JANUARY**

**6TH ATTACK ON**

**THE UNITED**

**STATES CAPITOL**

*(Defendant)*

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**BENNIE G. THOMPSON**

*(Defendant)*

| | | |
|---|---|---|
| **Elizabeth J. Shapiro** | | |
| U.S. DEPARTMENT OF JUSTICE | | |
| Civil Division, Federal Programs | | |
| Branch | | **NATIONAL** |
| 1100 L Street, NW | | **ARCHIVES AND** |
| Washington, DC 20530 | representin | **RECORDS** |
| (202) 514-5302 | g | **ADMINISTRATIO** |
| (202) 616-8470 (fax) | | **N** |
| Elizabeth.Shapiro@usdoj.gov | | *(Defendant)* |

*Assigned: 10/19/2021*

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

DAVID S.

FERRIERO

*(Defendant)*

**Todd Barry Tatelman**

U.S. HOUSE OF

REPRESENTATIVES                              **UNITED STATES**

Office of General Counsel                    **HOUSE SELECT**

219 Cannon House Office                       **COMMITTEE TO**

Building                                      **INVESTIGATE**

                        representin
Washington, DC 20515                          **THE JANUARY**
                        g
(202) 225-9700                                **6TH ATTACK ON**

(202) 226-1360 (fax)                          **THE UNITED**

todd.tatelman@mail.house.gov                  **STATES CAPITOL**

 *Assigned: 10/21/2021*                       *(Defendant)*

 *LEAD ATTORNEY*

 *ATTORNEY TO BE NOTICED*

BENNIE G.

THOMPSON

*(Defendant)*

Anne Harden Tindall

PROTECT DEMOCRACY PROJECT

2020 Pennsylvania Avenue, NW

#163

Washington, DC 20006                    **FORMER**

(202) 856-9191          representin  **MEMBERS OF**

(929) 777-8428 (fax)     g           **CONGRESS**

anne.tindall@protectdemocracy.          *(Amicus)*

org

 *Assigned: 10/29/2021*

 *LEAD ATTORNEY*

 *ATTORNEY TO BE NOTICED*