IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR No. 1:21-cr-00537-TJK-1

v.

                                  Washington, D.C.
RYAN SAMSEL,                       Thursday, October 28, 2021
                                   10:30 a.m.

          Defendant.
- - - - - - - - - - - - - - - - x

_____

TRANSCRIPT OF STATUS CONFERENCE
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    April N. Russo, Esq.
                          Danielle S. Rosborough, Esq.
                          U.S. ATTORNEY'S OFFICE
                          Appellate Division
                          555 Fourth Street, NW
                          Washington, DC 20001
                          (202) 252-1717

For the Defendant:        Stanley E. Woodward, Jr., Esq.
                          BRAND WOODWARD LAW
                          1808 Park Road, NW
                          Washington, DC 20010
                          (202) 996-7447

                          Juli Z. Haller, Esq.
                          LAW OFFICES OF JULIA HALLER
                          601 Pennsylvania Avenue, NW
                          Suite 900
                          S. Building
                          Washington, DC 20036
                          (202) 352-2615

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1              **P R O C E E D I N G S**

2            THE DEPUTY CLERK:  We are on the record in

3    criminal matter 21-537, United States of America v. Ryan

4    Samsel.

5            Present for the Government are April Russo and

6    Danielle Rosborough; present for the defendant are Stanley

7    Woodward, Jr., and Julia Haller; present from Northern Neck

8    Regional Jail is Captain Luna; present from the U.S.

9    Marshals Service is Deputy Derek Haywood; the defendant is

10   not present.

11           THE COURT:  All right.  Well, good morning to all

12   of you, and apologies for the late start this morning.

13           I did want to have you all here, and it seems that

14   this is at least one thing both the Government and the

15   defense agreed on which was so we wouldn't have to wait all

16   the way until our next scheduled status conference at which

17   the defendant would be present to get some clarity as to

18   where things are with the defendant's medical condition and

19   to see if we can't make sure that the defendant's counsel

20   has access to all the medical records that counsel believes

21   is necessary.  That's really the main reason why I wanted to

22   schedule this, sort of, interim status conference even

23   though we wouldn't have the defendant present, because of

24   the fact that the representations of both parties has been,

25   for whatever reason, that the defendant has had numerous

```
 1     incidents.  Even since the last time we were all together,
 2     there have been -- the defendant, for one reason or another,
 3     has suffered additional injury.
 4          So why don't I start -- whoever from Government --
 5     I'll -- certainly am going to hear from the representatives
 6     we have here from Northern Neck and the marshals.  But is
 7     there anything Government counsel wants to represent as far
 8     as -- I think the best thing -- the first and most important
 9     thing to do is for us to focus on what Mr. Samsel's
10     condition is right now to the best we know it and whether
11     there's any urgent -- the -- how his condition might be
12     characterized in terms of whether there is any urgent need
13     for care.  The one thing, I think, we hopefully can all
14     agree on is that he needs to get the appropriate care
15     regardless of the causes of his injuries, and I want to do
16     everything in my power to make sure that happens, and I
17     think the starting point here is to just -- for -- I'll
18     start with Government counsel, whether they can make -- and
19     then move to others who have may -- who may have more
20     specific information.  But what can the Government tell me
21     about what we know about Mr. Samsel's condition right now?
22          MS. RUSSO:  Judge, I do -- I know the defendant
23     couldn't be here and we all wanted this hearing prior to it.
24     There was a prior hearing where Mr. Samsel could not attend,
25     and we tried to do this hearing in front of Judge Faruqui
```

1       and he later complained about the fact that he was not

2       there.  I don't know if it's possible to ask the defense if

3       he would waive his presence for the limited purpose of

4       discussing the urgent issues that we can't get him here for,

5       but I am a little concerned about discussing things without

6       him here.

7               THE COURT:  That's fair, and I'm happy to do that.

8       Again, I don't want to go into -- there are other, you know,

9       issues for me to decide, but the main reason I wanted to be

10      here today, as I indicated, was just really out of concern

11      for his moment-to-moment health.

12              So Mr. Woodward, what's your take on that?  I'm

13      not going to discuss today -- I know there are other issues

14      that the parties have in front of me in terms of setting a

15      trial date, Speedy Trial Act, and all the rest.  I think it

16      makes sense to, sort of, table those until he can be

17      present.  But I did want to discuss just the current state

18      of his medical condition as best everyone here may know one

19      way or the other and perhaps the state of his medical

20      records and why they may or may not have all been provided

21      to you.  But at least for those limited purposes, are you

22      comfortable, Mr. Woodward, proceeding without your client

23      present?

24              MR. WOODWARD:  So Judge, what I can share is that

25      my client -- I share Ms. Russo's concerns.  My client is

1   extremely frustrated that he is not here.  The Court,

2   obviously, ordered us to appear, and so here we are, and to

3   the extent that this proceeding can result in our getting

4   access to his medical records, my hope would be that

5   Mr. Samsel will appreciate that progress, but if I were to

6   represent anything other than that he is frustrated that he

7   cannot be here today, I would be misleading the Court.  He

8   is extremely frustrated that he's not here.

9            THE COURT:  Well, given that, Ms. Russo, what are

10  you comfortable with me doing today?  That's not a -- and,

11  maybe, I should just, then, limit it to what you all can

12  tell me about just getting a report as to his current status

13  in terms of his health and treatment and just simply

14  emphasize to the facility in -- where he's being held and

15  the marshals, those responsible for his safety and

16  wellbeing, that we're all very concerned about it and

17  emphasize, obviously, the need for all of them to do their

18  jobs.  I don't know what other -- those seem to be, I think,

19  at the minimum -- again, getting a report on his current

20  status and emphasizing those things may be the only thing

21  that I can comfortably do today.

22            What say you, Ms. Russo?

23            MS. RUSSO:  I think that makes sense, Judge.  I

24  think -- given the concerns that have been expressed in the

25  recent filings, I think it's important to do that.  And so I

1    think that makes sense.

2          I can tell you that the Government doesn't have

3    much of an update.  Most of the information that we have

4    been receiving has been from defense counsel about his

5    status, and then we usually follow up with the Marshals

6    Service and ask them to follow up with the facility.  We do

7    know that the defense has a direct contact with the

8    superintendant of Northern Neck, and I know there's someone

9    from Northern Neck here on the line who can speak to, maybe,

10   the condition -- the current condition better than we can,

11   but there have been pretty frequent emails between defense

12   counsel and the superintendant of the facility that we've

13   been copied on concerning, you know, his access to a phone

14   and access to folks to call, and also, some of the medical

15   issues.

16          THE COURT:  All right.  I mean, I appreciate

17   especially you advising me as to that history because that

18   happened before the case was assigned to me.  And so I

19   wouldn't have known that the issue of him being present for

20   these hearings has already been a concern -- a flash point

21   for the parties.  So I think, at a minimum, it seems to me

22   that for the purposes -- again, really just because we're

23   talking about his medical condition and we all want to be

24   sure that he's getting the treatment that he needs, I'm just

25   going to inquire, then, as to -- get a report from both the

1    marshals -- I'll start with the representative from the

2    marshals and then the folks at Northern Neck and leave it at

3    that and see what's reported to me and then, obviously, we

4    have -- the next available date, I believe, that we were all

5    -- that we could possibly have Mr. Samsel and all of you

6    present is -- whatever it is -- the 9th.  So about, you

7    know, a little more than -- about two weeks from today.

8         So let me hear from the representative of the

9    marshals.  If you would just, again, repeat -- I know

10    Ms. Harris indicated -- I think it's Deputy Haywood.  If you

11    could just state your name for the record.  And what I'm

12    interested in, sir, is, again, just getting as much

13    information I can as to his -- Mr. Samsel's current physical

14    condition and what the plan is for him to receive treatment

15    for those conditions.

16         DEPUTY HAYWOOD:  For the record, Deputy United

17    States Marshal Derek Haywood is here.

18         Judge, to my knowledge, the defendant -- this is

19    his fourth facility.  To my knowledge, Northern Neck is

20    doing a good job in maintaining his -- maintaining him.

21    He's getting his meals.  The superintendent, Ted Hull, has

22    done a good job with stepping in and addressing any concerns

23    that the two separate attorneys that Samsel has hired on his

24    case that -- and we just -- and we found that out not too

25    long ago; didn't know that they were not working together to

1    -- simultaneously, but that he's getting everything he's

2    supposed to have.  When there are questions from the

3    attorneys, I pick my phone up 2:00, 3:00 -- I mean, 8:00

4    o'clock at -- 8:00, 9:00 o'clock at night, and a lot of

5    times, there's messages.  They're very urgent.  And when we

6    check it at the facility, things happen, but a lot of times,

7    I think it's taken out of context.  So that, I guess, just

8    to, (inaudible) -- I answer your question, sir, he's getting

9    everything that every other inmate is getting at a facility.

10              THE COURT:  Do you -- all right.  And, again,

11   we're not here to discuss the cause of whatever injuries he

12   may have.  My concern at the moment and for the purposes of

13   our status conference today is just to make sure that

14   whatever medical treatment he needs, he's getting.  So I

15   guess my question is -- and before I turn to the folks at

16   Northern Neck -- do you have any more specific information

17   about his condition as of right now in terms of, is he

18   suffering from -- what injuries or conditions he may be

19   suffering from?

20              DEPUTY HAYWOOD:  No, I don't.

21              THE COURT:  All right.  Let me, then, turn -- I

22   mean, that's, kind of, our focus here.  So let me turn -- is

23   it Ms. Luna from Northern Neck?

24              CAPTAIN LUNA:  Good morning, Your Honor.  This is

25   Captain Luna from Northern Neck.

1          THE COURT:  Captain Luna.  Sorry.

2          CAPTAIN LUNA:  It's okay.

3          THE COURT:  Please proceed.

4          CAPTAIN LUNA:  Yes, Your Honor.

5          So in regards to Mr. Samsel's medical care here at

6    Northern Neck, he was last seen by our doctor on Friday,

7    October 22nd.  He did an assessment of him.  He is currently

8    scheduled for two appointments.  One is for his seizures and

9    the other one is for his pain in his shoulder.  So we have

10   those two scheduled for him.  I will also note that

11   Mr. Samsel has been refusing his seizure medication and,

12   basically, what he's told our medical department is that his

13   attorneys are telling him to refuse, and he has signed

14   refusal forms stating that.

15          Also, just to note, Your Honor, we have a request

16   form process here at the jail for any -- anytime they're

17   having a medical issue or any medical concern, they can

18   write a -- our medical department so they can be seen and

19   their issue can be addressed.  For the record, he has not

20   wrote any request forms noting any medical concerns.  The

21   only request that he has wrote has been for a special diet

22   due to his religious beliefs.  So he has not noted anything.

23   Everything has come from concerns from the attorneys, but

24   nothing from him.  He has not directed -- or followed the

25   process here at the jail for any medical care.

```
 1              THE COURT:  All right.  And is -- so as far as
 2      you're aware, when are the two appointments scheduled for?
 3      You said there's one for seizures and one for pain in his
 4      shoulders.
 5              CAPTAIN LUNA:  Your Honor, I have the dates.  If
 6      we could just keep this confidential for safety and security
 7      reasons?  We do not like --
 8              THE COURT:  Well --
 9              CAPTAIN LUNA:  -- like to --
10              THE COURT:  Well, I don't want you to -- we're --
11      we have a -- this proceeding is not under seal at the
12      moment.  So I'll just ask, are they in the -- are you
13      comfortable saying in public whether they're in the next
14      week?
15              CAPTAIN LUNA:  We have one in the next week and
16      then the next one is later in November.
17              THE COURT:  All right.  And are those going to be
18      -- are they with physicians that are on-site there or are
19      they off-site?
20              CAPTAIN LUNA:  It's off-site scheduled.
21              THE COURT:  All right.  And so as far as you know,
22      again, at the moment, you don't -- you're not aware that
23      he's in any serious ongoing -- you -- he doesn't -- he's --
24      he doesn't have a condition or an injury that's in need of
25      urgent medical care at the moment?
```

1          CAPTAIN LUNA:  As far as I'm aware, no, he is not.

2     Basically, when he was seen by the doctor on Friday, he was

3     assessed and the doctor actually cleared him.  I -- he had

4     been in our medical department under observation for the

5     past week-and-a-half since the 13th.  So he has been in our

6     medical department; doctor has seen him; he has not voiced

7     any concerns.  Recently, I know the attorneys emailed my

8     superintendent and requested that he be COVID tested because

9     he was experiencing COVID symptoms.  He was tested and he

10    was negative.

11          THE COURT:  All right.  And -- all right.  Well, I

12    think as far as his immediate condition, then, that is good

13    news to hear.

14          Let me ask this.  There's -- the other issue that,

15    I think, it's fair for me to inquire about and for us to try

16    to make a little headway with here today is regarding his

17    medical records.  His lawyers in this case, I think,

18    reasonably -- and I actually think that, as I recall, the

19    Government has no objection to this either -- thinks, very

20    reasonably, that he should have -- the lawyers should have

21    access to those medical records for a variety of reasons.

22    And I see Government counsel nodding, I'll note for the

23    record.  So can you -- is there any reason why -- and I

24    understand that sometimes there are medical records -- if,

25    for example, a defendant is seen at an outside facility, you

 1    -- I don't know your practices there, but certainly to the

 2    extent he's -- he is seen in-house for a medical condition,

 3    you would have medical records that are relevant to his

 4    condition.  So is there any reason in the world why those

 5    records -- and let me just say, the -- counsel has been

 6    requesting -- they've represented to me that they've

 7    requested -- I can't recall the exact representations, but

 8    from the Government, to include the U.S. Attorney's Office,

 9    the Department of Justice, and any facility that Mr. Samsel

10    is -- in which he's being held, they've requested the

11    records as to these incidents and as to his conditions while

12    incarcerated.  Is there any reason that you know of why

13    those records can't, in their entirety, be provided on an

14    ongoing basis to counsel upon request?

15              CAPTAIN LUNA:  Your Honor, as far as the request,

16    I am not aware of it, but I will say any U.S. Marshal inmate

17    -- federal inmate, we will provide that -- those records to

18    the U.S. Marshals and to Supervisor Haywood, and if he wants

19    to give them to the counsel, to whoever, we would -- he can

20    do whatever he wants.  So we can get those to the U.S.

21    Marshals, whatever medical records are requested, and then

22    go from there.

23              THE COURT:  All right.  Well, I think it's fair to

24    say that, given the issues in this case, I don't think I'm

25    -- let me put it this way.  The lawyers on either side can

```
1    step in and correct me if I'm wrong, but I think it's fair
2    to say that defense counsel is interested in, you know, on a
3    rolling basis, any records -- any medical records that you
4    all generate with regard to Mr. Samsel, given the history
5    here.  And so I think it -- I don't see a -- because they've
6    been requested, I think it makes sense for you to go ahead
7    and collect those records, and if your process is to provide
8    them to the marshals and the marshals turn around and
9    provide them to the prosecutors and the prosecutors will
10   turn them around -- turn around and provide them to
11   Mr. Samsel's attorneys, I think that's what you all should
12   start planning on doing, because I think it's very evident
13   that there have been a request for those records, they're --
14   all the attorneys agree they're entitled to the records, and
15   it's important that they have them for a variety of reasons,
16   but most obviously, simply to make sure that Mr. Samsel's
17   health and wellbeing are being taken care of.  So you don't
18   have any problem I assume, then, Captain Luna, doing that.
19           CAPTAIN LUNA:  No, Your Honor.  We'll get them to
20   Supervisory [sic] Haywood before the end of business today.
21           THE COURT:  All right.  And, Deputy Haywood,
22   that's -- is that the process that -- as you understand it?
23   If any particular defendant is being held in a facility like
24   Northern Neck or a non-federal facility, if there -- the
25   records should flow through the Marshals Service?
```

1          DEPUTY HAYWOOD:  Yes, sir, but just to -- for the

2     record, I just want to bring it to your attention that --

3          THE COURT:  Please.

4          DEPUTY HAYWOOD:  -- I think -- I have went above

5     and beyond trying to get records to the two attorneys.

6     There was some confusion.  And I'm only bringing this up so

7     you can see the position that -- at first, I wasn't aware

8     that the two attorneys were separate.  So that caused --

9     that did cause some confusion because, at times, I would

10    take a phone call from one attorney and say, Hey, I'll

11    provide you this or any information and check on the

12    facility, and then in another hour, I'll talk to another

13    attorney and I'll say, Hey, did you talk to this attorney?

14    I just gave them an update.  And then that's when I would

15    find -- that's when I found out that, Well, no, we're on the

16    same case, but we're working totally separate.  So

17    information wasn't flowing between the two attorneys.

18         THE COURT:  Well, I think that -- that's fair for

19    you to raise that.  I suppose -- and I know -- let me put it

20    this way.  I know that there was -- these attorneys are

21    relatively new on the case in general and there were prior

22    attorneys and, reading the submissions of the parties over

23    the last few weeks, it's evident there was -- there might

24    have been confusion in the past about exactly who was

25    representing Mr. Samsel, but I don't think -- but let --

 1   maybe, Mr. Woodward can -- I -- let me put it this way.

 2   It's -- I don't think you should have to provide two sets of

 3   the records.  It seems to me -- he's got attorneys.  I don't

 4   know what it means to work together or not together.  I

 5   think anyone -- let me put it this way.  If two attorneys

 6   are on a case and they're representing a common party, they

 7   have an obligation to be working together and sharing

 8   information.

 9         So Mr. Woodward, do you want to just clarify for

10   me.  It seems to me, if we're talking about medical records,

11   it -- the marshals should be able to produce them.  Whether

12   they produce them directly to you or through the

13   prosecutors, they don't have to -- they should be able to

14   produce them to either you or Ms. Haller.  It doesn't matter

15   to me.  Perhaps you want to clarify.  But they should have

16   to, basically, produce them to one of you and that would be

17   sufficient.

18         MR. WOODWARD:  Yeah, I -- yes, Your Honor.  I'm

19   not sure what Deputy Haywood is talking about.  We are two

20   attorneys who work at two different firms.  We -- that is

21   not an uncommon event for the representation of defendants.

22   I honestly cannot fathom what Deputy Haywood is talking

23   about.  I do have a list of records, Your Honor, that we

24   have not received and I'd like to go through at the

25   appropriate time.

1           THE COURT:  All right.  And I -- well, I -- I'll

2    put it this way.  So Deputy Haywood, just to be clear,

3    they're in -- they're two -- in two different firms, but

4    they're representing the same client, and while there may

5    sometimes be, you know, the usual human confusion about one

6    thing or the other that they haven't shared with each other,

7    to the extent you're providing medical records, however

8    those records flow, they only have to flow to one of them

9    and not to both of them and they will, as they would be

10   required to do with a -- with representing someone, share

11   those records between them.  So I think, you know -- they

12   are working together, it sounds like, even if they are at

13   different law firms which, as Mr. Woodward said, is not

14   uncommon.  But I don't want you to think you have some sort

15   of -- you're doing double duty here.  If you produce the

16   records to one lawyer, you've produced them to both of them.

17   Does that make sense?

18           DEPUTY HAYWOOD:  Yes, sir.

19           THE COURT:  Okay.

20           DEPUTY HAYWOOD:  And also, to my knowledge,

21   working with U.S. Marshal Headquarters Medical Nurse

22   Hamilton [ph], to my knowledge, I believe we submitted

23   records from the last facility he was at of CVRJ and, I

24   believe, Rappahannock, and I think, maybe, the attorney is

25   trying to get records from, maybe, D.C. Jail, but I thought

1    as far as CVRJ was concerned, the last facility he was at,

2    we supplied as much -- or records we had at the time, and I

3    had --

4              THE COURT:  Well --

5              DEPUTY HAYWOOD:  -- Nurse Hamilton [ph] --

6              THE COURT:  Go ahead.  Go ahead.

7              DEPUTY HAYWOOD:  I had Nurse Hamilton [ph] step in

8    and reach out to the medical superintendant who in turn, I

9    believe, sent the records to everybody.  And as the -- as

10   far as the process, sir, this is unusual.  Granted, if there

11   is -- if there's any major issues, I will step in and I will

12   solicit the facility and say, Hey, can you take care of this

13   or that?  Can you provide me some documentation?  But I

14   don't make it a habit to sit at my desk and, every

15   appointment, collect information and provide it, and I think

16   I was trying to explain that to the attorney, but if that's

17   what you want in this case and now that we have all the

18   parties online, I will do that.  It's just -- and I think

19   Captain Luna could tell you, too.  Some of it's security

20   issues.  We're not going to -- by -- I mean, it may be hard

21   to receive medical documentation until after appointments

22   are done --

23             THE COURT:  Sure.

24             DEPUTY HAYWOOD:  -- because we don't -- definitely

25   don't want to disclose what times or days appointments are.

1      Those are still sensitive issues and definitely, you know,

2      for security purposes.  So I think, at times, it's -- it

3      takes some time to get stuff, you know?  A lot of times, it

4      might be after the appointment and --

5              THE COURT:  Sure.  Well, it doesn't even make

6      sense.  I mean, obviously, I don't -- my guess is that his

7      attorneys -- and let me back up first and say this.  I get

8      that this is unusual, but the facts that are being presented

9      -- or even if we take -- put aside -- Mr. Samsel has claimed

10     on various occasions that he's been assaulted by

11     correctional facility personnel.  That's unusual, number

12     one, but let's put that aside.  I mean, that's an

13     allegation.  That's really not at the core of why we're

14     having this discussion.  Put that aside.  I, you know --

15     that's something he claims.  It may or may not be true.  But

16     the point is, I think even putting that aside, the evidence

17     I have in front of me one way or the other -- and I include

18     when we -- when Mr. Samsel was before me showing me the

19     injury that he had at the time while we were in a hearing

20     and while he was on camera -- I think the nature of the

21     injuries that he has been claiming, and for which there has

22     been some evidence that doesn't depend on his veracity and

23     has nothing to do with how he acquired them, is unusual.  So

24     I agree with you.  This is unusual.  I wouldn't suggest that

25     this procedure be employed in every case, nor, I'm sure,

1    would you have the manpower to do that.  And so we're -- I

2    agree with you, this is unusual, but I think, given the --

3    given what's been before me, I think it makes sense to do

4    this mostly to make sure that Mr. Samsel is, in fact,

5    getting treatment for the injuries that he has and the

6    conditions he has.

7            So I do -- and now, to address your other point

8    about timing, I think we all might understand that there

9    would -- there's going to be some delay.  I don't think it

10   makes sense -- for example, like you mentioned, it wouldn't

11   be until after the appointment.  I think that makes perfect

12   sense.  I don't think Mr. Woodward is -- I don't think it

13   will be very interesting to him to get something that says

14   your client has a, you know -- an appointment in five days

15   and it's going to be with Dr. So-and-so.  What he wants to

16   know is after that, you know -- after -- what the records

17   that flow from that appointment are and what the doctor says

18   about whatever injuries or conditions Mr. Samsel -- he

19   observes on Mr. Samsel.  So I get it that it wouldn't be

20   until after the appointment; I get it that there's going to

21   be some kind of administrative delay, but he's made a

22   request for these records, he's entitled to them, and so I

23   think you all are going to have to provide them in a, you

24   know -- in a reasonable way, building in the fact that I

25   know there is going to be some reasonable administrative

1    delay in that.

2           And, you know, again, I understand the Marshals

3    Service is not generating those records.  You have to

4    acquire them from the doctors that conduct the appointments.

5    And, you know, if -- let me put it this way.  If there are

6    issues that I need to address with some of those providers,

7    you all can bring that to my attention and we'll have a

8    conference like this.  Here, we have someone -- either the

9    provider or the -- what I really mean is the specific

10   facility.  Now, perhaps Mr. Samsel's going to be in Northern

11   Neck going forward and you'll be dealing with them going

12   forward, but, obviously, he's bounced around a number of

13   facilities and his counsel are interested in the records

14   that providers generated when he was held in those other

15   facilities.

16          So again, we don't have them here.  I'm not going

17   to burn any more time talking about that.  But, Deputy

18   Haywood, if you have -- if -- I think the crux of this is

19   that Mr. Woodward, in going through the records -- and

20   Ms. Haller -- have identified places where, from their

21   reading of the records they do have, it appears there are

22   other records that exist that they don't have.  And so I'm

23   not going to -- I know Mr. Woodward volunteered to go

24   through all the records.  I don't think it would be

25   productive to do that while we're all on -- in this hearing.

```
1    But it is fair for -- I mean, if he has -- if the records he

2    does have suggest that there are outstanding records that he

3    doesn't, he has a right to those records, and you are going

4    to have to -- you or the prosecutors -- someone representing

5    the Government is going to have to interface with him, let

6    him identify those records, and then figure out how best to

7    get them in his hands if they are in the hands of a facility

8    that Mr. Samsel was held in over the last few months.

9           I suppose that doesn't answer the question of what

10   happens -- for example, what happens if Mr. Samsel is seen

11   by an outside -- a provider outside a facility.

12          I guess, Captain Luna, what -- so these upcoming

13   appointments we're talking about, does your facility get a

14   copy of a record if it's -- if a particular defendant is

15   seen by an out-, you know -- at an off-site facility?

16          CAPTAIN LUNA:  Yes, Your Honor --

17          THE COURT:  Okay.

18          CAPTAIN LUNA:  -- (inaudible) those records and

19   put them in his file -- his medical --

20          THE COURT:  All right.

21          CAPTAIN LUNA:  -- file.

22          THE COURT:  All right.  So it shouldn't be this --

23   when the Marshals Service is interacting with these other

24   facilities, they should simply -- they should have -- if

25   indeed -- I know I -- it's not fair to ask you to speak to
```

1     other facilities, but if that is the common practice, if he

2     saw some off-site medical personnel in those other

3     facilities, if they have the same policies you do anyway,

4     those records would find their way into the file at that

5     particular facility.

6              (Brief pause.)

7              All right.  Well, I think we've probably exhausted

8     the issues that we can go into today without the defendant's

9     presence, although I'll certainly -- if counsel thinks

10    that's not right, I'm happy to hear from you.  But assuming

11    that is correct, I think, you know, the -- what has to

12    happen now on the medical records -- it sounds like

13    Mr. Samsel -- at least as far as the best information

14    everyone on this call has is that he's not in any immediate

15    danger in terms of whatever he's suffering from right now.

16    He's got some appointments lined up.  And it sounds like

17    there is a game plan to make sure, Mr. Woodward, that you

18    get the records you need, and I think it just makes sense

19    for you to sit down with the Government and walk through

20    what -- walk through why you believe other -- additional

21    records exist from other facilities that you think you're

22    entitled to, and perhaps I will, after this call -- after

23    we're done with our conference here today, just ask the

24    parties to file a joint status report, frankly, just to save

25    us time on the 9th because we do have a line -- we do have a

1    limited amount of time with a detained defendant, to provide

2    me the day before a, sort of, update as best you all can on,

3    kind of, where things stand so I can read that and we won't

4    have to burn time on our conference updating me as to where

5    things are with Mr. Samsel's health, to the extent the

6    parties know; updating me as to where things are on the

7    medical records front; and any other developments so that we

8    don't have to burn time while we're using and burning a line

9    into the jail.

10                I'll hear from you in a second, Mr. Woodward.

11                But, Ms. Russo, does that make sense to you?

12                MS. RUSSO:  Yes, it does, Judge.  I'm wondering if

13   it would also make sense -- it just was so helpful to have

14   everyone in the same room today -- if, for the November 9th

15   hearing, we could also have someone from the facility and

16   from the Marshals Service at that hearing in case there's

17   issues that still have to be addressed.

18                THE COURT:  I think that makes perfect sense.  And

19   if there's -- well, let's put it this way.  If we really

20   want to nail all of this down, if, prior to that hearing --

21   I mean, not just the day before, but sometime before then --

22   there are other facilities that you think it makes sense for

23   me to order you, Ms. Russo, candidly, to ensure that a

24   representative from those other facilities is present at

25   that November 9th hearing, you can inform -- if you copy

1    defense counsel and simply -- you could do that by email to

2    chambers, copying, of course, Mr. Samsel's attorneys, and

3    just let me know if there's anyone else -- if there's any

4    other facility you think it would be helpful to have a

5    representative be present, again, just on the chance that

6    something comes up and we need to work out some detail.

7            MS. RUSSO:  And the only other thing I wanted to

8    mention, Judge, is, on this body cam and video footage and

9    incident reports regarding these two incidents, the one at

10   CVRJ and the most recent one at Northern Neck, Judge, I

11   don't know if the Court even has a mechanism to do this or

12   what's appropriate, and that's why we didn't weigh in on it.

13   It's not that we have a technical objection to it, but there

14   is an ongoing investigation, certainly, of the Northern Neck

15   incident, and I don't want to interfere with that -- we just

16   don't know what the appropriate thing is, but I do have a

17   concern about these materials being preserved at least.

18   And, again, I don't know if the Court has authority to order

19   preservation for both sets of body cams and videos at CVRJ

20   and Northern Neck or if the Government has authority to do

21   anything with respect to that, but if there is a way to

22   request that those materials at Northern Neck and CVRJ at

23   least be preserved, that is a concern that the Government

24   does have.

25            THE COURT:  Isn't there -- but if they're under --

1   if there's a separate investigation into those, obviously,

2   there are all sorts of investigative tools that the

3   Government has as part of that function that it could employ

4   to request that those be preserved; isn't that fair?

5          MS. RUSSO:  Well, so for CVRJ, I don't know what,

6   you know -- that incident -- at this time, I don't know that

7   the defendant has alleged an assault by corrections officers

8   with respect to that incident.  The Northern Neck incident,

9   the defendant has specifically alleged that, and so there is

10  an investigation, but I do not know that -- I mean, at this

11  stage, it would be with the FBI, is my assumption, and I

12  don't know exactly how that works.  I just --

13         THE COURT:  Right.  I mean --

14         MS. RUSSO:  I just thought, you know --

15         THE COURT:  Go ahead.  Go ahead.

16         MS. RUSSO:  I just thought in, like, the abundance

17  of caution --

18         THE COURT:  Right.

19         MS. RUSSO:  -- if there's a way to make sure those

20  materials are preserved.  It is the separate thing from AUSA

21  Rosborough and myself, but it is something that we just want

22  to make sure happens, even though we don't necessarily have

23  control over it.

24         THE COURT:  Right.  All right.  Well, why don't we

25  -- why don't -- is this something -- maybe, I missed it.  Is

1    this something you -- the parties have raised on paper to

2    me?

3             MS. RUSSO:  I think the defense was requesting an

4    evidentiary hearing on the next date about the two

5    incidents --

6             THE COURT:  Right.

7             MS. RUSSO:  -- and requesting the production of

8    those materials --

9             THE COURT:  Right.

10            MS. RUSSO:  -- in this case.

11            THE COURT:  So that, I didn't miss.  That, I

12   didn't miss, but I -- maybe, I didn't see, as part of that,

13   he'd asked for --

14            MR. WOODWARD:  If I can clarify, Your Honor,

15   the --

16            THE COURT:  Yeah.

17            MR. WOODWARD:  -- U.S. Marshals Service advised us

18   that those records would only be provided if we issued a

19   subpoena.

20            THE COURT:  Right.

21            MR. WOODWARD:  And for us to do that under the

22   criminal rules, we need an evidentiary hearing so that we

23   can subpoena the records to the hearing.  That was the

24   request for the evidentiary hearing.

25            THE COURT:  And that's -- but -- and so that's not

1    medical records.  That's this other category of material

2    that doesn't, you know, bear directly on his medical

3    conditions; is that fair?

4         MR. WOODWARD:  We respectfully disagree with the

5    Government about how medical records are being characterized

6    in the case, because to the extent that what's being

7    conveyed to the medical professionals is inconsistent with

8    the -- what's happened, then it's difficult to provide

9    accurate medical advice.

10        THE COURT:  Right.  But I mean, just in terms of

11   the pieces of paper we're talking about or videos or

12   whatever, we're talking about body-worn -- what exactly are

13   you talking about -- other than medical records -- straight

14   medical records, which we all understand what those are,

15   what specifically, Mr. Woodward -- I mean, other --

16   Ms. Russo just mentioned body cam.  I get that.  What other

17   -- what is -- how would you describe the other forms of

18   evidence that you would seek to preserve or --

19        MR. WOODWARD:  I don't -- yeah, I don't know,

20   Judge, because I don't know what I don't know, and part, you

21   know -- this is, sort of, emblematic of the problem that

22   we're having in which we don't receive medical records after

23   there is an incident, but the Marshals Service has advised

24   us that it is customary for an incident report to be

25   generated, which would include photographs, for example.  We

```
1    also, of course, all know that jails are routinely
2    videotaped and that there would be video evidence of any
3    incident that occurred.  And so there is a sliding scale
4    here.  Photographs of what happened immediately after the
5    time of the event at the medical unit at the jail, those
6    seem to me to be an easier case, but in this instance when
7    the representatives of the jail and of the Marshals Service
8    are advising the Court that Mr. Samsel is fine, you know, we
9    just respectfully disagree.  In fact, we would submit that
10   the NNRJ is actually not in possession of any of
11   Mr. Samsel's prior medical records.  So it's --
12             THE COURT:  Right.
13             MR. WOODWARD:  -- unclear to us how they would
14   know what his condition is or what treatment that he needs.
15   I understand that he's been seen by a medical professional,
16   as Captain Luna represents, as recently as October 22nd and
17   that, you know, as Your Honor described, he's not in any
18   imminent danger or distress, but Your Honor is also well
19   aware that there are very serious injuries that have been
20   documented and in -- and referenced in the pleadings for
21   which Mr. Samsel has not received treatment now in over a
22   month.  And so the last time we were before you, the goal of
23   having the medical records provided to us was to enable us
24   to make requests of the Marshals Service, of the facilities
25   so that the treatment would be provided and, as I stand
```

1    before you today, I remain unclear about exactly the injury

2    and the -- that Mr. Samsel has sustained and the treatment

3    that is thus medically necessary.  I hear you that you don't

4    want me to go through a litany of records, and yes, we're,

5    of course, happy to speak to the Government and to the

6    Marshals Service, but suffice it to say there's a lot that

7    we don't know.

8            THE COURT:  Right.  And -- well, and your -- the

9    way you just laid that out there impresses upon me -- and we

10   do have Captain Luna here.  So this is important.  It seems

11   to me, Mr. Woodward, obviously, the records you're obtaining

12   are going to be, one way or the other -- they may be helpful

13   for other reasons, but to the extent the value of you

14   obtaining the records is for you to be able to turn around

15   and say to the folks currently -- who are currently in

16   charge and responsible for Mr. Samsel to say, Look at these

17   other -- I mean, you would want, it seems to me in a perfect

18   world, to provide them all to Captain Luna to say -- and the

19   doctors there to be able to say, Look, look at -- here is

20   his -- essentially, his history before he came to your

21   facility.  And so you may want to have your doctors be

22   looking at A and B and C to make sure he's okay.

23           MR. WOODWARD:  Exactly right, Your Honor.  Are

24   there lingering injuries that are not now being treated

25   because --

```
 1              THE COURT:  Right, right.

 2              MR. WOODWARD:  -- Captain Luna and his facility is

 3    unaware of the conditions --

 4              THE COURT:  Sure.  No, no.

 5              MR. WOODWARD:  -- with which he's presenting?

 6              THE COURT:  Right, right, right.  So I suppose --

 7    so -- all right.  We have a good -- it sounds like we're all

 8    on the same page as far as Northern Neck goes, but the

 9    question is the prior facilities and how to make sure those

10    documents -- obviously, I guess, again, Mr. Woodward, to the

11    extent you obtain those, you would want to turn around and

12    provide them to Northern Neck and -- just as we just

13    discussed, but I still think, again, in the first instance,

14    it's you sitting down with the Marshals Service and the

15    prosecutors and then them -- and ideally with the -- sort

16    of, Captain Luna's, you know, analog at these other

17    facilities and you walking through why you believe -- here

18    is proof that this medical record exists, here's proof that

19    that medical record exists, and going ahead and trying to

20    get those obtained and, when you do, providing them on to

21    Captain Luna to make sure their physicians are aware of

22    that.

23              So I think we're all hopefully on the same page as

24    far as how that will proceed.  Let me -- so I mean, I -- and

25    I, you know -- and I hear you, and hopefully -- and that
```

1     will proceed and I'll -- I'm going to get a report before we

2     are back on the 9th.  I'll ask the parties to file something

3     jointly on the 8th, the day before, that just lets me

4     know -- kind of, updates me as to where all these things

5     stand.

6           Ms. Russo, you're -- but the other -- the related

7     -- the separate question -- the related question of -- I

8     guess it's materials that don't necessarily fall within the

9     traditional -- maybe, put it this way: things that might not

10    be considered medical records but that still might bear on

11    how Mr. Samsel became injured and the nature of those

12    injuries is another question.  I'm going to just take the

13    parties' -- I -- Ms. Russo, you started by saying you

14    weren't sure if there was a legal basis to make that request

15    or for me to order it, and I appreciate your candor.  I'm

16    going to -- let me just take that under advisement while

17    this is going on and perhaps I'll be able to address it on

18    the 9th, but hopefully on the 9th we're going to be much --

19    I mean, we've got a number of weeks here -- between here and

20    there.  It seems to me -- on at least the core medical

21    records issues, I hope we're going to see a lot of movement

22    between then and now.

23          And hopefully, again, to the extent, Mr. Woodward,

24    you collect those records, you provide them to Northern

25    Neck, they'll be more well aware of Mr. Samsel's status.

1           But I'm going to decline for now to make the 9th

2     an evidentiary hearing.  I think we've got a process in

3     place.  And we'll have all of us back here on the 9th,

4     including perhaps, if appropriate, representatives from the

5     other facilities where Mr. Samsel has been held, and we'll

6     see where things are and I will consider the request about

7     these other materials and what should be done about those.

8           And as for, I guess, the other matters that we

9     talked about at the beginning, speedy trial and trial dates

10    and all the rest, I think it is wisest to take those up when

11    Mr. Samsel is with us next on the 9th.

12          Anything further, then, Ms. Russo, as far as

13    things you think I should address here today?

14          MS. RUSSO:  Nothing from me, Your Honor.  I just

15    want to check with my co-counsel.

16          THE COURT:  Okay.

17          MS. ROSBOROUGH:  (Indicates negatively.)

18          MS. RUSSO:  Nothing from us, Your Honor.  Thank

19    you.

20          THE COURT:  I see Ms. Rosborough shaking her head.

21    So -- shaking her head no.

22          Mr. Woodward, same question to you.

23          MR. WOODWARD:  Your Honor, I just would be remiss

24    not to express Mr. Samsel's frustration that we seem to be,

25    frankly, kicking the can down the road again to the 9th.

```
 1    When we were last before you, there was a clear directive
 2    from this Court that records were to be provided and that --
 3    our appearance before you has been delayed several times.
 4    Some of that was beyond anyone's control.  And I fear that
 5    when we submit a status report on the 9th -- in fact, I
 6    suspect that when we submit a status report on the 9th -- we
 7    will, again, be portraying very different pictures of the
 8    current status of Mr. Samsel and, you know, that nothing
 9    seems to happen unless we're directed to come before Your
10    Honor.
11              THE COURT:  Well, that's why -- I mean, I -- and,
12    look, I appreciate you putting that on the record,
13    Mr. Woodward, and I don't begrudge you one bit -- you or
14    your client one bit for feeling that way.  I think that's
15    why, in particular, I've told -- I mean, I can't -- let's
16    put it this way.  As of right now, I really don't know
17    whether anybody -- if I thought that being -- if I thought
18    that anybody we had on the line here today was responsible
19    for this delay, I guess I would say so and I would be a
20    little more forceful in terms of making sure they understood
21    that the records were to be provided.  I think part of the
22    problem is that it may be that the culprits, if you will,
23    here -- the main culprits are the other facilities, and it
24    didn't -- here we are and we don't have those
25    representatives here and there's nothing I can do to change
```

1    that, but it sounds like the core records you're looking for

2    and you don't have yet are those from the prior facilities.

3           So that's why I say, look -- that's why I said to

4    Ms. Russo -- and I know it's frustrating.  If I had

5    anticipated this issue, I -- we would have had them here

6    today and, maybe, we would have had a more productive

7    session, but -- and that's why I say to Ms. Russo and

8    Ms. Rosborough, if, after your -- Mr. Woodward, your dialog

9    with them and with Deputy Haywood, it appears as what you're

10   looking at are records that are being held from these other

11   facilities, we're going to have them -- we'll have them here

12   on the 9th, and the reality is if they haven't complied with

13   providing you those records to your satisfaction, they're

14   going to have a very, very unhappy judge to report to.

15          So I would say to Ms. Russo, Ms. Rosborough, and

16   Deputy Haywood that it makes sense to -- if indeed that's

17   where we wind up, that the folks representing those other

18   facilities should understand that I ordered these records to

19   be provided quite a while ago and that they need to comply

20   with that because this defendant is entitled to these

21   records.

22          I think -- Mr. Woodward, I think it's fair for

23   your client to be very frustrated, but I also think we, I

24   think, had a productive meeting of the minds hopefully here

25   today, and I expect -- I don't see why -- I mean, there's

```
 1    going to be a delay go-, you know -- going forward.  If a --

 2    if the particular appointment happens on day one, you're --

 3    I -- you're not going to get the record on day two, and I'm

 4    sure you don't expect to get the record on day two, but as

 5    far as some of these other records were concerned, again,

 6    it's the other facilities that are not present today.

 7    There's no reason in the world why those wouldn't be in your

 8    hands by the time we come back, it seems to me.  So we'll

 9    see where we are on the 9th and we'll go from there.

10              Anything further you want to --

11              MR. WOODWARD:  Thank you, Your Honor.

12              THE COURT:  -- put on the record, Mr. Woodward?

13    Absolutely.  Anything further you want to put on the record?

14              MR. WOODWARD:  No.  Thank you, Your Honor.

15              THE COURT:  All right.  Very well.  We'll see you

16    all on the 9th.  I'll make sure I have enough time allotted

17    if we have to slog through and have some other providers on

18    the line with us and we'll address speedy trial and the rest

19    of it at that time.

20              Until then, the parties are dismissed.  And,

21    again, I'd ask the parties to submit a joint status update

22    -- a joint report that updates me and, basically, just as a

23    timesaving mechanism.  I know it won't save time for you,

24    actually, but it would save time for me and time for us on

25    -- when we're all together to have an update from both
```

1    parties as to where things stand on these key issues so I

2    can, sort of, hone in on things and we minimize the amount

3    of time that we all have to be on the line.

4            Until then, the parties are dismissed.  We'll see

5    you all on the 9th.

6            MS. RUSSO:  Thank you, Your Honor.

7            (Proceedings concluded at 11:41 a.m.)

8                    * * * * * * * * * * * *

9            **CERTIFICATE OF OFFICIAL COURT REPORTER**

10       **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby**

11   **certify that the above and foregoing constitutes a true and**

12   **accurate transcript of my stenographic notes and is a full,**

13   **true and complete transcript of the proceedings to the best**

14   **of my ability, dated this 3rd day of December 2021.**

15       **Please note:  This hearing occurred during the COVID-19**

16   **pandemic and is, therefore, subject to the technological**

17   **limitations of court reporting remotely.**

18                            **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                             Official Court Reporter
19                           United States Courthouse
                             Room 6722
20                           333 Constitution Avenue, NW
                             Washington, DC 20001

21

22

23

24

25