

FILED

NOV 3 0 2021

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

IN THE MATTER OF THE SEARCH OF:

    (a) THE PERSON OF PAUL RUSSELL
        JOHNSON
    (b) THE PERSON OF ▇▇▇▇
    (c) ▇▇▇▇▇▇▇▇▇ LANEXA
        VA
    (d) MOBILE DEVICES IN POSSESSION
        OF PAUL RUSSELL JOHNSON
    (e) MOBILE DEVICES IN POSSESSION
        OF ▇▇▇▇▇▇

**FILED UNDER SEAL**

Case No. 3:21-sw- **47**



FILED

APR 1 2 2021

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

### I.   Introduction

Your Affiant, ▇▇▇▇ Maldonado, being first duly sworn, does hereby depose and state as follows:

1.   I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since January 2019.  I am currently assigned to the FBI Norfolk Division Joint Terrorism Task Force ("JTTF") and am tasked with investigating both international and domestic terrorism.  As a Special Agent with the FBI, I have participated in and conducted investigations of violations of various federal and state criminal laws and participated in the preparation and/or execution of search, arrest, and seizure warrants, all in violation of Title 21 and Title 18, United States Code.  As part of my duties as an FBI Special Agent, I investigate criminal violations relating to racially motivated and anti-government extremist groups.  These violations can be any violation committed by individuals supporting the use of violence, committing violence, or attempting to commit violence in support of their extremist ideologies.  Currently, I am tasked with investigating criminal activity in and around the U.S. Capitol grounds on January 6, 2021.  As a Special Agent

of the FBI, I am authorized by law or by a government agency to engage in or supervise the prevention, detection, investigation, or prosecution of a violation of federal criminal laws.

## II.    Reason for Affidavit

2.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.    This affidavit is made in support of an application for a search warrant for the following location:

a.    **The person of PAUL RUSSELL JOHNSON (or hereinafter "P. JOHNSON'S PERSON")**, as further described in Attachment A, and any electronic devices located on the person of **P. JOHNSON**. The items to be seized are described in the following paragraphs and in Attachment B.

b.    **The person of** ▇▇▇▇▇ ▇▇▇▇▇▇▇ (or hereinafter "▇ ▇▇▇▇ PERSON")**, as further described in Attachment A, and any electronic devices located on the person of ▇▇▇▇ The items to be seized are described in the following paragraphs and in Attachment B.

c.    **P. JOHNSON and** ▇▇▇▇▇ **residence located at** ▇▇▇▇ ▇▇▇▇ ▇▇▇ **(or hereinafter "the SUBJECT RESIDENCE")**, as further described in Attachment A, as three structures on 13.76 acres which include a white siding, two-story farmhouse, a detached garage, and a white single-story, double wide trailer, as observed

in surveillance.   The items to be seized are described in the following

paragraphs and in Attachment B.

    d.   **Mobile device(s) in the possession of P. JOHNSON and** ▆▆▆▆▆▆▆

        **(or hereinafter "the SUBJECT DEVICES"),** which is further described

        and depicted in Attachment A.   The items to be searched and seized are

        described in the following paragraphs and in Attachment B.

    4.   Based on the information set forth herein, your Affiant has probable cause to

believe that **P. JOHNSON** engaged in violations of Title 18, United States Code, § 111(a)(1) and

(b), Title 18 United States Code, § 231(a)(3), Title 18 United States Code, § 1512(c)(2) and 2,

Title 18 United States Code, § 1752(a)(4), and Title 40 United States Code, § 5104(e)(2)(F); that

▆▆▆▆▆▆▆   engaged in violations of Title 18, United States Code, § 1752(a)(1), (2) and Title

40 United States Code, § 5104(e)(2)(D), (G), and that evidence, fruits and instrumentalities related

to these violations, as further described in Attachment B, may be found on **P. JOHNSON'S**

**PERSON,** ▆▆▆▆▆▆▆ **PERSON,** at the **SUBJECT RESIDENCE,** and on the **SUBJECT**

**DEVICES.**

    5.   This affidavit is based upon information that I have gained from my investigation,

my training and experience, as well as information gained from conversations with other law

enforcement officers.   Since this affidavit is being submitted for the limited purpose of securing a

search warrant, I have not included each and every fact known to me concerning this investigation.

I have set forth only the facts that I believe are necessary to establish probable cause to believe

that evidence, fruits, and instrumentalities (more precisely described in Attachment B) of

violations of Title 18, United States Code, § 111(a)(1) and (b), Title 18 United States Code,

§ 231(a)(3), Title 18 United States Code, § 1512(c)(2) and 2, Title 18 United States Code,

§ 1752(a)(1), (2), and (4), and Title 40 United States Code, § 5104(e)(2)(D), (F), and (G) are located on P. **JOHNSON'S PERSON,** ▉▉▉▉▉▉ **PERSON,** at the **SUBJECT RESIDENCE,** and on the **SUBJECT DEVICES** (as further described in Attachment A).

6.    This investigation involves evidence, fruits, and instrumentalities of offenses within the jurisdiction and proper venue of the United States District Court for the Eastern District of Virginia, as more fully articulated herein.

### III.    Pertinent Federal Criminal Statutes and Definitions

7.    This investigation concerns alleged violations of:

   a. 18 U.S.C. § 111(a)(1) and (b), which makes it a crime to forcibly assault, resist, oppose, impede, intimidate, or interfere with any person designated in 18 U.S.C. § 1114 as an officer or employee of the United States while engaged in or on account of the performance of official duties. Persons designated within section 1114 include any person assisting an officer or employee of the United States in the performance of their official duties. Subdivision (b) provides for enhanced penalties when bodily injury is inflicted.

   b. 18 U.S.C. § 231(a)(3), which makes it unlawful to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function. For

purposes of Section 231 of Title 18, a federally protected function means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof. This includes the Joint Session of Congress where the Senate and House count Electoral College votes.

c. 18 U.S.C. §§ 1512(c)(2) and 2, which makes it a crime to obstruct, influence, or impede any official proceeding, or attempt to do so. Under 18 U.S.C. § 1515, congressional proceedings are official proceedings.

d. 18 U.S.C. § 1752(a)(1), (2), and (4), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of government business or official functions; (4) knowingly engage in any act of physical violence against any person or property in any restricted building or grounds, or attempt or conspire to do so. For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

e. 40 U.S.C. § 5104(e)(2)(D), (F), and (G), which makes it a crime to willfully and knowingly (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; (F) engage in an act of physical violence in the grounds or any of the Capitol Buildings; and (G) parade, demonstrate, or picket in any of the Capitol Buildings.

## IV.    Background of the Investigation and Probable Cause

8.    U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

9.    At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple

terraces at each floor. On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and off limits to the public on January 6, 2021.

10.    The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

11.    On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

12.    On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST). Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

13.    As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

14.   At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

15.   At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.   Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

16.   Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."   I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

17.   At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement.   The crowd advanced to the exterior façade of the building.   The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.   At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.   Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

18.   Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.   Publicly available video footage shows an

unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your Affiant believes was a reference to "taking" the U.S. Capitol.



19.   Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber. As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

20.   At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows

and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

21.   Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

22.   At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

23.   At around 2:47 p.m. EST, subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



24. After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?" Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



25. One subject left a note on the podium on the floor of the Senate Chamber. This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



26.   During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs. Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals are expected to be taken into custody.





27.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

28.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

29.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

30.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

31.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or

weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

32.   Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

33.   Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

34.   Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

35.   During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

36.   Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

37.   Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of

themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

38.   Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot. In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



---

1       https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/





2    https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1

3    https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

### Facts Specific to this Application

39.     Your Affiant has obtained multiple videos depicting an individual, later identified as **P. JOHNSON**, assaulting a U.S. Capitol Police Officer, and videos of **P. JOHNSON** and ▮ ▮▮▮▮ engaging in disruptive and disorderly conduct on Capitol grounds.

40.     Video footage shows that at approximately 12:45 p.m. EST on January 6, 2021, as preparations for the proceedings described above were underway in the House and the Senate, a large crowd gathered to the west of the U.S. Capitol around the Peace Monument, located in the Pennsylvania Avenue, NW, and 1st Street, NW, roundabout, that was commonly referred to as "Peace Circle" by U.S. Capitol Police Officers.



*Figure 1. Aerial imagery of U.S. Capitol grounds, with the restricted perimeter outlined in red.*

41.     The crowd then moved southeast along the sidewalk that connects Peace Circle to the U.S. Capitol Building, commonly referred to as the "Pennsylvania Ave Walkway" by U.S. Capitol Police Officers.  Several rows of metal barricades had been erected by U.S. Capitol Police Officers in order to keep the public away from the Capitol building and the Congressional proceedings underway inside.  The first line of barricades was erected just off the roadway of Peace Circle, and was intended to maintain a buffer zone between the road and the perimeter fence delineating the restricted area of the U.S. Capitol grounds.

42.     At approximately 12:50 p.m., a crowd of people can be seen in open source video walking over and around the first line of barricades.  As the crowd approaches a second line of barricades being guarded by uniformed U.S. Capitol Police officers, a male individual—later identified as **P. JOHNSON**—can be seen holding a black megaphone and shouting profanities toward the U.S. Capitol Police, including "Let's go!  Fuck this shit.  We pay your bills, you back the fuck off."



*Figure 2. **P. JOHNSON**'s megaphone as he approaches uniformed U.S. Capitol Police officers standing guard at a second line of metal barricades.*

---

[4] Untitled video published by Instagram user "slightlyoffensive.tv" on January 6, 2021, available at ███████████████████████ downloaded by FBI on March 25, 2021).

43.     The second line of barricades consisted of metal bike rack barriers, physically linked end-to-end, and reinforced with dark-colored plastic mesh safety fencing affixed behind the metal bike racks.  The fence line was clearly marked with large white "AREA CLOSED" signs in bold red lettering.  (See Figure 3, below.)



*Figure 3.*

44.     Upon approaching the second line of barricades, **P. JOHNSON** immediately became confrontational with the U.S. Capitol Police Officers guarding the barricade.  **P. JOHNSON** can be heard saying through a megaphone, "It's our house.  We pay your bills.  We pay for this . . . that's some bullshit." (Figures 4 and 5.)

---

[5] *Id.*



Figure 4. *P. JOHNSON confronting uniformed U.S. Capitol Police Officers.*



Figure 5. *P. JOHNSON using a megaphone while confronting U.S. Capitol Police Officers.*

45.        As **P. JOHNSON** continues berating the U.S. Capitol Police officers guarding

the metal barricade, a ███████ later identified as ████████ ███████████ ████████████

can be seen standing behind **P. JOHNSON**.  (Figure 6.)  ████████████  can be seen with light

brown hair, wearing a red beanie with sunglasses on top of ██ beanie.

---

[6] *Id.*
[7] *Id.*



*ng behind **P. JOHNSON** at the metal barricade.*

46.      As others in the crowd begin pushing and pulling on the barricades, **P. JOHNSON** turns around, says "Hold my backpack," and proceeds to pass his backpack and megaphone to an unknown individual off camera (whom your Affiant believes to be ███ ███ as if to prepare for a physical altercation. When **P. JOHNSON** turns around, he can be seen wearing a black flat billed hat with a white diamond-shaped logo.



*Figure 7. **P. JOHNSON** asking an unknown individual,*
*believed to be ███████ to hold his backpack.*

---

[8] *Id.*
[9] *Id.*

47.     When **P. JOHNSON** re-enters the camera's view, he is not wearing the black backpack visible in Figures 4 and 7, nor is he carrying the megaphone visible in Figures 2 and 5. Upon re-joining the crowd, **P. JOHNSON** begins forcibly pushing and pulling the barricades. (See Figures 8 and 9, below.)



*Figure 8.* **P. JOHNSON** *pushing and pulling on barricades.*

48.     As **P. JOHNSON** continued lifting and pushing the metal barricades to the ground, **P. JOHNSON** and others knocked over a U.S. Capitol Police Officer (hereinafter "O-1"), causing O-1 to fall and hit her head on the stairs behind her, resulting in a loss of consciousness. (See Figures 9 and 10, below.)  Hours later, while arresting a rioter, O-1 blacked out and collapsed in the booking area and had to be transported to the emergency room at a local hospital, where she was assessed to have suffered a concussion.

---

[10] *Id.*



*Figure 9. **P. JOHNSON** forcibly pushing the metal barricade into uniformed U.S. Capitol Police officers.*



*Figure 10. Officer O-1 on stairs after being knocked down.*

49.      After dismantling and knocking over the line of metal barricades, **P. JOHNSON** can be seen running up the steps and further onto the restricted grounds, in the direction of the U.S. Capitol building.  (See Figure 11, below.)

---

[11] *Id.*

[12] *Id.*



13

*Figure 11.* **P. JOHNSON** *advancing past the barricaded police line toward the U.S. Capitol.*

50.    In a different open source video recorded on January 6, 2021, **P. JOHNSON** can be seen standing on a ledge bordering the Lower West Plaza facing out toward the West Lawn of the U.S. Capitol building.  **P. JOHNSON** appears to be holding a cell phone in his right hand, as he shouts "Let's go," while waving other rioters onto the plaza.  (See Figure 12, below.)

---

[13] *Id.*



*Figure 12.* **P. JOHNSON** *shouting "Let's go" as he waves rioters onto the Lower West Plaza of the U.S. Capitol building.*

51.    At one point in the video, **P. JOHNSON** crouches down behind him and appears to retrieve the megaphone from ▌▌▌▌▌▌ who is standing beneath **P. JOHNSON** and can be identified by ▌▌ red beanie.  (See Figure 13, below.)

---

[14] Untitled video published by Facebook user "Wysiwyg TV," available at ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ (downloaded by FBI on April 7, 2021).



*Figure 13.*

52.      ██████████ is then seen holding what appears to be two cell phones -- one in each hand -- as ██ walks away from the ledge where **P. JOHNSON** is standing.  (See Figure 14, below.)  ██████████ is also seen wearing a black backpack with what appear to be patches on the front pocket.  (See Figure 15, below.)

---
[15] *Id.*



*Figure 14. ███████ holding two cell phones on the Lower West Plaza.*



*Figure 15.*

---

[16] *Id.*
[17] *Id.*

53.     Later that evening, on January 6, 2021, a YouTube user posted a livestream video showing **P. JOHNSON** recounting the events that took place outside the Capitol earlier in the day.  **P. JOHNSON** can be seen wearing a black flat billed hat with a white diamond-shaped logo, resembling the hat depicted in Figure 7, above.



*Figure 16. **P. JOHNSON** describing the events of January 6, 2021.*

54.     Your Affiant has reviewed this video and has determined that **P. JOHNSON** and the ███ believed to be ███████ made the following statements while speaking to a group of individuals gathered outside the Hilton Garden Inn Hotel at 815 14th Street NW, Washington D.C. 20005.  These statements begin at approximately time stamp 1:37:35 of the YouTube video, and end at approximately time stamp 1:38:46.

> **P. JOHNSON***: Yeah, we're like we're going, we're going to the fucking Capitol.*
>
> ███████ (off camera): *Yeah, I was like, "They're voting, I gotta go." I put it on my phone and I was walking, listening.*

---

[18] "Police Encircle Trump Supporters at Their Hotels," streamed live by YouTube user "Millennial Millie" on January 6, 2021, available at ███████████████████████████████ (downloaded by FBI on March 25, 2021).

**P. JOHNSON**: *So we get to the Capitol and when we get to the street, you know where that uh statue is? At the street? Where the circle roundabout is? Way the fuck away from the Capitol. They had gates at that end, alright?*

*Me and this other guy Collins (gestures as if Collins is also at the hotel), he's in here with us. And I didn't know that he was . . . we didn't know each other for shit. I looked. I'm sitting at the gate and I've got my hands on him and there's cops. You know there's five cops standing up the way a little bit. Beyond them is a lot of cops. So me and him look at each other, we already knew what time it was . . . we started pulling the gates apart. And we started bum rushing. Cops start hightailing to the fucking Capitol, right?*

*We get to the next gate. There's three sets of gates before you get to the stairs of the Capitol. Alright? We get to the next gate. There's probably . . . there's a shit load of cops up there then. Second wing, we breached, pulled up, starts throwing shit. I mean we're fu-, we're we're fighting cops and shit. I have video where I'm slinging one around . . . .*

*So we get to the third gate, they're all hightailing to the top of the Capitol. We get up on the steps. It's bolted down to the ground, the gate was. A black gate. So we grab it, we start doing this number here. The next thing you know it's bear mace, the whole front row, dude.*[19]

55.    Throughout the YouTube video, a ▓▓▓ believed to be ▓▓▓ is seen wearing a black Harley Davidson hooded sweatshirt standing near **P. JOHNSON**. (See Figure 17, below.) ▓▓▓ sweatshirt appears to be the same black Harley Davidson sweatshirt that **P. JOHNSON** is seen wearing in Figures 8, 9, 11, 13, and 15, above.

---

[19] These statements are a summary, and are not intended to be a verbatim account of **P. JOHNSON'S** words. A Twitter user, @SeditionHunters, has attempted to transcribe **P. JOHNSON'S** statements as well. *See* Untitled video published *by Twitter user @SeditionHunters, available at* ▓▓▓▓▓▓▓▓ *(downloaded by FBI on March 25, 2021).*



*Figure 17.*

56.    Also throughout the YouTube video, **P. JOHNSON** is seen holding and using

a cell phone.  (See Figure 18, below.)



*Figure 18. **P. JOHNSON** holding a cell phone outside the Hilton Garden Inn Hotel in
Washington, D.C. on January 6, 2021, standing next to* ▮▮▮▮▮▮

---

[20] *Id.*
[21] *Id.*

*Identification of P. JOHNSON and* ▓▓▓▓▓▓▓

57.    On January 11, 2021, the FBI published a "Be On The Lookout" (BOLO) flyer with the following image:



Photograph #49-AFO

*Figure 19.*

58.    On January 11, 2021, the FBI received a tip from a witness (W-1) who recognized the man depicted in Figure 19 as **P. JOHNSON**. W-1 has been friends with ▓ ▓▓▓▓▓▓ for approximately 15 years and recalls ▓▓▓▓▓▓ posting photos and/or videos from the U.S. Capitol building on ▓▓ personal Facebook page on or about January 6, 2021.[23] W-1 also recalls meeting **P. JOHNSON** in person once or twice approximately ten years ago. W-1 has seen multiple pictures of **P. JOHNSON** on ▓▓▓▓▓▓ Facebook page, including the photo depicted in Figure 20 below, which W-1 sent to the FBI. (See Figure 20, below.) In this photo, **P. JOHNSON** can be seen wearing the same black flat billed hat with a white diamond-shaped logo as seen in Figures 7, 12, and 16-18, above.

---

[22] On January 20, 2021, FBI updated the original BOLO poster with a new photo of **P. JOHNSON**. W-1 recognized **P. JOHNSON** from the original BOLO poster, as depicted in Figure 19.

[23] According to W-1, the photos/videos from the Capitol have since been deleted or removed from ▓▓▓▓▓▓ Facebook page.



*Figure 20.*

59.    On April 7, 2021, W-1 positively identified the ▮▮▮▮ depicted in Figure 21 wearing the red beanie with sunglasses as ▮▮▮▮▮▮▮



*Figure 21.*

60.    On January 20, 2021, another witness (W-2) provided a tip to the FBI that **P. JOHNSON** was inside the U.S. Capitol building during the riots.  W-2 reported receiving a text message from **P. JOHNSON** on January 6, 2021 stating, "We got in the Capitol."

32

61.     On March 19, 2021, the FBI sent W-2 the following photo of a man believed to be **P. JOHNSON** obtained from Twitter user @SeditionHunters. (See Figure 22, below.) W-2 has previously done business with **P. JOHNSON** and last saw **P. JOHNSON** in person in February 2021. W-2 stated that he was nearly 100% sure that the individual depicted in Figure 22 is **P. JOHNSON**.



*Figure 22.*

62.     The FBI has reviewed the available information for the cell phone numbers associated with **P. JOHNSON** and ███████████ in law enforcement databases in order to determine whether there was any evidence that devices associated with those cell phone numbers were inside the U.S. Capitol Building on January 6, 2021. Agents did not locate **P. JOHNSON** or ███████████ cell phone numbers in the available information.

### P. JOHNSON'S PERSON

63.     A warrant to search the person of **P. JOHNSON** is requested because **P. JOHNSON** may be found wearing or carrying clothing, eyewear, or other evidence related to the charged offenses listed herein. **P. JOHNSON** may also be carrying on his person electronic devices, including one or more mobile phones, which are also the subject of the requested search warrant.

### ████████ **PERSON**

64.    A warrant to search the person of ████████ is requested because █
████████ may be found wearing or carrying clothing, eyewear, or other evidence related to the
charged offenses listed herein. ████████ may also be carrying on ███ person electronic
devices, including one or more mobile phones, which are also the subject of the requested search
warrant.

### The **SUBJECT RESIDENCE**

65.    Open source database queries provided ████████████
████ as a possible address for **P. JOHNSON**. According to the New Kent Real Estate
Records, the property located at ████████████████ is owned by **P.
JOHNSON** and ████████ The purchase date was January 28, 2021.

66.    According to property records from York County, Virginia, **P. JOHNSON**
previously owned a residence located at ████████████████.
Ownership of this residence was transferred from **P. JOHNSON** to ████████ on
January 14, 2021.

67.    On March 23, 2021, FBI agents conducted surveillance at the **SUBJECT
RESIDENCE**, located at ████████████ and observed two vehicles
at the residence bearing Virginia license plates. The first vehicle observed was a red Toyota
4Runner bearing Virginia license plate ████. Law enforcement databases revealed the red
Toyota 4Runner bearing Virginia license plate ████ was registered to **P. JOHNSON**. The
second vehicle observed was a black Ford truck bearing Virginia license plate ████ Law

enforcement databases revealed the black Ford truck bearing Virginia license plate ███ was registered to **P. JOHNSON**.[24]



      68.    On March 23, 2021, a local law enforcement agency made contact with a ███ resident at ████████████ According to the law enforcement agency, the ███ appeared to be in ██ mid-30s. Your Affiant believes the ███ was ██ ████

      69.    On March 25, 2021, FBI agents conducted surveillance and observed the same red Toyota 4Runner registered to **P. JOHNSON**, previously seen on March 23, 2021.

      70.    On April 7, 2021, FBI agents conducted surveillance and observed **P. JOHNSON** leaving the **SUBJECT RESIDENCE** located at ████████████ ███ in a white 4200 International box truck with an unknown license plate.

      71.    I know, based on my training and experience, that people who spend time at a particular address also store their belongings and devices as part of their daily lives at that address. Relatedly, people routinely re-wear clothing and accessories and store these items in their homes. Clothing and accessories consistent with those worn by **P. JOHNSON** (including a black flat billed hat with a white diamond-shaped logo with the word "TREES" written in the center of the logo; a black and white bandana; an American flag patterned bandana; a black and grey Harley Davidson sweatshirt; a navy blue zip-up hoodie; and camouflage pants) and ██ ████ (including a red beanie; brown plastic sunglasses; and a red, white, and blue fringed scarf with the year "2020" printed at the bottom of the scarf worn) constituted evidence of their commission of the offenses discussed herein, in that **P. JOHNSON** and ████████ can be visually identified as the individuals in the photographs and videos discussed above, in part

---

[24] These vehicles are registered to **P. JOHNSON**, but are associated with his prior residence, ████████████ Williamsburg Virginia.

through the distinct attire and accessories worn that day. Accordingly, your Affiant submits there is probable cause to believe that a search of the **SUBJECT RESIDENCE** will reveal additional evidence of the subject offenses.

72.     Moreover, because **P. JOHNSON** and ▓▓▓▓▓▓▓ traveled to Washington, D.C. from Virginia, and likely stayed at the Hilton Garden Inn Hotel, there is also probable cause to believe that **P. JOHNSON** and ▓▓▓▓▓ would have obtained receipts from their travels and hotel receipts. Accordingly, your Affiant submits there is probable cause to believe that a search of the **SUBJECT RESIDENCE** will reveal additional evidence of the Subjects' motive, planning, coordination, intent, and travel to Washington, D.C.

73.     Your Affiant is aware that individuals commonly take photographs and videos utilizing personal wireless telephones. As referenced in the aforementioned video, **P. JOHNSON** stated he had video of himself "slinging one around" when he was talking about fighting cops outside the U.S. Capitol on January 6, 2021. **P. JOHNSON** is also seen at the riot holding a cell phone while standing on the ledge bordering the West Lawn and the Lower West Plaza of the U.S. Capitol building. (See Figure 12, above.) Finally, **P. JOHNSON** is seen holding and using a cell phone outside the Hilton Garden Inn Hotel in Washington, D.C. the evening of January 6, 2021. In addition, ▓▓▓▓▓ is seen in open source video holding two cell phones on the Lower West Plaza of the U.S. Capitol Building. ▓▓▓▓▓ can also be heard in an open source YouTube video describing how ▓▓ turned on ▓▓ phone and began listening as "they" (which your Affiant believes to be Congress) started voting. Finally, W-1 recalled ▓▓▓▓▓ posting photos and/or videos from the U.S. Capitol on ▓ Facebook page. Therefore, your Affiant believes that there is probable cause to believe that there exists physical

and/or electronic evidence of the commission of the above-described offenses at the **SUBJECT RESIDENCE.**

## SUBJECT DEVICES

74.     As referenced in the aforementioned video, **P. JOHNSON** stated he had video of himself "slinging one around" when he was talking about fighting cops outside the U.S. Capitol on January 6, 2021. **P. JOHNSON** can also be seen at the riot holding a cell phone while standing on the ledge bordering the West Lawn and the Lower West Plaza of the U.S. Capitol building. (See Figure 12, above.) Furthermore, **P. JOHNSON** texted W-2 on January 6, 2021 saying "We got in the Capitol." Finally, **P. JOHNSON** is seen holding and using a cell phone outside the Hilton Garden Inn Hotel in Washington, D.C. the evening of January 6, 2021.

75.     As referenced above, ▮▮▮▮▮▮ is seen in open source video holding two cell phones on the Lower West Plaza of the U.S. Capitol Building. ▮▮▮▮▮▮ can also be heard in an open source YouTube video describing how ▮ turned on ▮ phone and began listening as "they" (which your Affiant believes to be Congress) started voting. Finally, W-1 recalled ▮▮▮▮▮▮ posting photos and/or videos from the U.S. Capitol on ▮ Facebook page.

76.     Your Affiant is aware that individuals commonly take photographs and videos utilizing personal wireless telephones. Information from wireless telephones may also be saved or backed up on computers, mobile storage devices, or other electronic devices; and those other electronic devices may contain independently derived evidence, fruits, and instrumentalities of the crime in question. For example, I know based on my training and experience that such devices may contain evidence of internet searches, communications, and media indicative of motive, planning, coordination, intent, travel, and/or the purchase of clothing or other items of evidentiary value.

77.     Based on my training and experience, the term "wireless telephone," also known as a mobile telephone, cellular telephone, or smartphone, means a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Other mobile and home computing devices feature similar technologies and capabilities.

78.     Your Affiant submits that there is probable cause to believe that there exists physical and/or electronic evidence related to the commission of the offenses listed above on the mobile telephones and other electronic devices used by **P. JOHNSON** and ███████ including photographic, video, and other electronic evidence indicative of **P. JOHNSON** and █ ███████ movements, location, motivation, planning, and communications related to the offenses listed herein, and the identities of co-conspirators and other individuals violating federal law during their entry into the U.S. Capitol, among other things.

## DIGITAL DEVICES, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

79.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the **SUBJECT DEVICES**, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the **SUBJECT DEVICES** for at least the following reasons:

a.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

b.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods

of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

80.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the **SUBJECT DEVICES** were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the **SUBJECT DEVICES** at issue here because:

    a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are,

as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the **SUBJECT DEVICES**, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and

correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.       A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.       The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.       Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

81.       Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was

being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and

innocuous file in a process called "steganography."   For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

       e.      Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same

sophisticated AES-256 encryption for all data stored within the database in the mobile device.

    f.  Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your Affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

82.  In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

    a.  The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

    b.  The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains

and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

       c.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the **SUBJECT DEVICES** will be specifically chosen to identify the specific items to be seized under this warrant.

## BIOMETRIC UNLOCK OF DEVICES SUBJECT TO WARRANT

      83.     I ask that the search warrant, to the extent it authorizes the seizure and search of electronic devices, authorize the use of the biometric unlock features on any such devices, based on the following, which I know from my training, experience, and review of publicly available materials.

      84.     The make and model of the **SUBJECT DEVICES** is unknown to this Affiant.  I know from my training and experience, as well as publicly available materials, that encryption systems for mobile phones and other electronic devices are becoming ever more

widespread. Such encryption systems protect the contents of these devices from unauthorized access by users and render these contents unreadable to anyone who does not have the device's password. As device encryption becomes more commonplace, the encryption systems implemented by device manufacturers are becoming more robust, with few—if any—workarounds available to law enforcement investigators.

85. I also know that many digital devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

86. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

87. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on

an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

88.     Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **P. JOHNSON** and ▮▮▮▮▮ thumb-and/or fingers on the device(s); and (2) hold the device(s)in front of **P. JOHNSON** and/or ▮▮▮▮▮ face with his/her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

### V.     Conclusion

89.   Based on the facts set forth above, your Affiant respectfully submits that there is probable cause to believe that **P. JOHNSON** and ▮▮▮▮▮ engaged in violations of Title 18, United States Code, § 111(a)(1) and (b), Title 18 United States Code, § 231(a)(3), Title 18 United States Code, §§ 1512(c)(2) and 2, Title 18 United States Code, § 1752(a)(1), (2), and (4), and Title 40 United States Code, § 5104(e)(2)(D), (F), and (G). Furthermore, there is probable cause that evidence, fruits and instrumentalities of these violations (described with more specificity in Attachment B to this affidavit) are presently located on **P. JOHNSON'S PERSON**, ▮▮▮▮▮ **PERSON,** at the **SUBJECT RESIDENCE,** and on the **SUBJECT DEVICES** as depicted in Attachment A to this affidavit.

90.   Accordingly, your Affiant respectfully requests that the Court issue a search warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure authorizing FBI agents and representatives of the FBI, with assistance from representatives of other law enforcement agencies as required, to search **the person of P. JOHNSON, the person of** ▮▮▮▮▮ **P. JOHNSON and** ▮▮▮▮▮ **residence located at** ▮▮▮▮▮ ▮▮▮▮▮ **and mobile devices in possession of P. JOHNSON and** ▮▮▮▮▮ (more

precisely described in Attachment A), for evidence, fruits, and instrumentalities (more precisely

described in Attachment B).

Maldonado
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this **12** day of April 2021 at Richmond, Virginia.

/s/

Elizabeth W. Hanes
**United States Magistrate Judge**
UNITED STATES MAGISTRATE JUDGE

50

## ATTACHMENT A

### ITEMS/PERSONS/LOCATIONS TO BE SEARCHED

1.   **P. JOHNSON'S PERSON:** The person to be searched is the person of **PAUL RUSSELL JOHNSON**, including any clothing, mobile telephones, digital devices, personal effects, backpacks, wallets, briefcases, and bags that are on **P. JOHNSON'S** person or within **P. JOHNSON'S** immediate vicinity and control at the location where the search warrant is executed. Photographs depicting **P. JOHNSON**, a Caucasian male who resides in Lanexa, Virginia, with date of birth      1985, are shown below.

 

2.   ▮▮▮▮▮▮▮     **PERSON:** The person to be searched is the person of ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ including any clothing, mobile telephones, digital devices, personal effects, backpacks, wallets, briefcases, and bags that are on ▮▮▮▮▮▮▮▮ person or within ▮ ▮▮▮▮▮▮▮ immediate vicinity and control at the location where the search warrant is executed. Photographs depicting ▮▮▮▮▮▮▮ a ▮▮▮▮▮▮▮ who resides in Lanexa, Virginia, with date of birth ▮▮▮▮▮ are shown below.



3.      **The SUBJECT RESIDENCE:** The premises to be searched is **P. JOHNSON** and ▮ ▮▮▮▮▮▮▮▮ property located at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which is further described as three structures on 13.76 acres which include a white siding, two-story farmhouse, a detached four-car garage, and a white single-story, double wide trailer.  The **SUBJECT RESIDENCE** is depicted in the following images:

2.     **SUBJECT DEVICES:** The devices to be searched are mobile phones in the possession of **P. JOHNSON** and ▮▮▮▮▮▮▮▮ or mobile devices located at the **SUBJECT RESIDENCE** available for use by **P. JOHNSON** or ▮▮▮▮▮▮▮▮

## ATTACHMENT B

### ITEMS TO BE SEIZED

1.    The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 1512(c)(2) (obstruction of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 1752(a)(1), (2) and (4) (unlawful entry on restricted buildings or grounds); and Title 40 U.S.C. Section 5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds) (the "Target Offenses") that have been committed by **P. JOHNSON** and ▮▮▮▮▮▮ ("the Subjects"), and other identified and unidentified persons, as described in the search warrant affidavit; including, but not limited to:

a.    Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

b.    Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

c.    Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

d.    Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

e.    Evidence concerning the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

f.    Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

g.    Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

h.    Evidence of any conspiracy, planning, or preparation to commit those offenses;

i.   Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

j.   Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law-enforcement, such as pepper spray or smoke grenades;

k.   Evidence of communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

l.   Evidence of the state of mind of the subject and/or other co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

m.   Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

2.   Records and information that constitute evidence of identity, including but not limited to:

a.   clothing worn by **P. JOHNSON**, to include a black flat billed hat with a white diamond-shaped logo with the word "TREES" written in the center of the logo; a black and white bandana; an American flag patterned bandana; a black and grey Harley Davidson sweatshirt; a navy blue zip-up hoodie; and camouflage pants;

b.   clothing worn by ▮▮▮▮▮▮▮ to include a red beanie; brown plastic sunglasses; and a red, white, and blue fringed scarf with the year "2020" printed at the bottom of the scarf;

c.   clothing and other articles that reflect evidence of having participated in the unlawful activity at the U.S. Capitol, including evidence of pepper spray or other non-lethal crowd control remnants;

d.   Other paraphernalia used by or associated with the Subjects, to include a black megaphone and a black backpack with white patches on the front pocket.

3.   Records and information—including but not limited to documents, communications, emails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements—relating to:

a.     Any records and/or evidence revealing the Subjects' presence at the January 6, 2021, riot;

b.     Any physical records, such as receipts for travel, which may serve to prove evidence of travel of to or from Washington D.C. from December of 2020 through January of 2021;

d.     The Subjects' (and others's) motive and intent for traveling to the U.S. Capitol on or about January 6, 2021;

e.     The Subjects' (and others's) activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021;

3.  The **SUBJECT DEVICES**, as described in the Affidavit and Attachment A;

4.  For the **SUBJECT DEVICES**:

a.     evidence of who used, owned, or controlled the **SUBJECT DEVICES** at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b.     evidence of software, or the lack thereof, that would allow others to control the **SUBJECT DEVICES**, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.     evidence of the attachment to the **SUBJECT DEVICES** of other storage devices or similar containers for electronic evidence;

d.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the **SUBJECT DEVICES**;

e.     evidence of the times the **SUBJECT DEVICES** was used;

f.     passwords, encryption keys, and other access devices that may be necessary to access the **SUBJECT DEVICES**;

g.     documentation and manuals that may be necessary to access the **SUBJECT DEVICES** or to conduct a forensic examination of the **SUBJECT DEVICES**;

h.     records of or information about Internet Protocol addresses used by the **SUBJECT DEVICES**;

i.     records of or information about the **SUBJECT DEVICES'** Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

During the execution of the search of the **SUBJECT PREMISES, P. JOHNSON'S**

**PERSON,** and ████████ **PERSON**, as described in Attachment A, law enforcement

personnel are also specifically authorized to obtain from **P. JOHNSON** and ████████

(but not any other individuals present at the **SUBJECT PREMISES** at the time of execution

of the warrant) the compelled display of any physical biometric characteristics (such as

fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any

**SUBJECT DEVICES** requiring such biometric access subject to seizure pursuant to this

warrant for which law enforcement has reasonable suspicion that the aforementioned

person(s)' physical biometric characteristics will unlock the **SUBJECT DEVICES**, to include

pressing fingers or thumbs against and/or putting a face before the sensor, or any other

security feature requiring biometric recognition of:

a.     any of the **SUBJECT DEVICES** found at the **SUBJECT PREMISES**,

b.     where the **SUBJECT DEVICES** are limited to those which are capable of

containing and reasonably could contain fruits, evidence, information, contraband, or

instrumentalities of the offense(s) as described in the search warrant affidavit and warrant

attachments, for the purpose of attempting to unlock the **SUBJECT DEVICES'** security

features in order to search the contents as authorized by this warrant.

While attempting to unlock the **SUBJECT DEVICES** by use of the compelled

display of biometric characteristics pursuant to this warrant, law enforcement is not authorized

to demand that the aforementioned person(s) state or otherwise provide the password or

identify the specific biometric characteristics (including the unique finger(s) or other physical

features), that may be used to unlock or access the **SUBJECT DEVICES**. Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any **SUBJECT DEVICES**, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any **SUBJECT DEVICES**, the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, FBI agents may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

If the government identifies seized materials that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents is established. The Filter Team will have no future involvement in the investigation of this matter. The Filter Team

will review seized communications and segregate potentially protected materials, i.e. communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its review. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel/counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team. This investigation is presently covert and the government believes that the subjects of the search are not aware of this warrant.

Your Affiant requests the search warrant for the aforementioned items to include the opening and searching of any locked safes, boxes, and compartments.