**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 21-cr-537-JMC-3** |
| | : | |
| **PAUL RUSSELL JOHNSON,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT PAUL RUSSELL JOHNSON'S
REPLY AND SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION TO SUPPRESS ELECTRONIC EVIDENCE OR, IN THE ALTERNATIVE,
TO APPOINT A SPECIAL MASTER**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully files its opposition to defendant Paul Russell Johnson's

Reply in Support of Motion to Suppress Electronic Evidence Or, in the Alternative, to Appoint a

Special Master (ECF No. 97) (hereinafter, "Reply Brief"), and Supplemental Brief in Support of

Motion to Suppress Electronic Evidence Or, in the Alternative, to Appoint a Special Master (ECF

No. 98) (hereinafter, "Supplemental Brief").  The defendant raises three new arguments in his

Reply and Supplemental Briefs.  First, the defendant claims that the Government executed the

search warrant at the wrong address.  Second, the defendant argues that the walkie-talkies should

be suppressed because they were seized from a locked safe.  Third, the defendant claims to have

standing to challenge the seizure and search of Person-1's cell phone.  All of these arguments are

meritless, and are either incorrect as a matter of fact, immaterial as a matter of law, or both.

Moreover, none of the suppression issues raised in the defendant's motion hinge on the resolution

of these disputed facts.  Accordingly, the Court should deny the defendant's Motion to Suppress

Electronic Evidence or, in the Alternative, to Appoint a Special Master (ECF No. 96) in its entirety and should further deny the defendant's request for an evidentiary hearing.[1]

## PROCEDURAL BACKGROUND

On November 19, 2021, defense counsel served undersigned counsel with a copy of the defendant's sealed Motion to Suppress Electronic Evidence Or, in the Alternative, to Appoint a Special Master (hereinafter, the "Motion to Suppress").  (Case No. 21-cr-332-JMC, ECF No. 57).[2] The Motion to Suppress sought the suppression of a Lenovo IdeaCentre desktop computer, two Explore One HD cameras, and four walkie-talkies from the defendant's residence.  The Motion to Suppress also sought the appointment of a special master to review the electronic devices for potentially privileged materials.  The Motion to Suppress did not allege, much less suggest, that FBI agents searched the wrong address or violated the Fourth Amendment by opening a locked safe at Johnson's residence.

On December 3, 2021, the Government filed its Opposition to the Motion to Suppress. (Case No. 21-cr-332-JMC, ECF No. 63).  On December 7, 2021—one week before the scheduled suppression hearing—the defendant served subpoenas on twelve Federal Bureau of Investigation ("FBI") employees, seeking their testimony at the upcoming suppression hearing.  On December 8, 2021, defense counsel requested that the Government make the twelve subpoenaed FBI employees available on December 9, 10, and 13 for a 15-minute meeting.  On December 9, 2021,

---

[1] This opposition adopts and incorporates the Government's Opposition to Defendant Paul Russell Johnson's Motion to Suppress Electronic Evidence Or, in the Alternative, to Appoint a Special Master (ECF No. 99) (hereinafter, "Government's Opposition").  While this opposition focuses principally on the new arguments raised in the Reply and Supplemental Briefs, it does briefly address some of the arguments from the Motion to Suppress.  *See infra* Sections III(C) & V.

[2] A redacted, unsealed version of the Motion to Suppress was filed on December 9, 2021. (Case No. 21-cr-332-JMC, ECF No. 66).

the Government filed a Motion to Convert Hearing on December 14, 2021 to a Status Conference ("Motion to Convert Hearing") because the defendant had not alleged any material factual disputes whose resolution would affect the disposition of the Motion to Suppress.  (Case No. 21-cr-332-JMC, ECF No. 64).

The defendant filed his opposition to the Government's Motion to Convert on December 10.  In his response, the defendant indicated that he intended to raise three new bases for the suppression of seized evidence that he did not raise in his Motion to Suppress: (1) whether the Government executed the search warrant at the wrong house; (2) whether the Government obtained the four walkie-talkies at issue by opening a locked safe without a warrant; and (3) whether Mr. Johnson has a privacy interest in Person-1's phone.  (Case No. 21-cr-332-JMC, ECF No. 69).  The defendant further indicated that he intended to submit an affidavit "further amplifying the above-listed disputed facts."  (*Id.* at 3).

A few hours later, the Government filed a reply in support of its Motion to Convert Hearing, noting that the defendant had waived these new arguments by failing to raise them in his initial Motion to Suppress.  (Case No. 21-cr-332-JMC, ECF No. 70, at 2 (citing *United States v. Ford*, 183 F. Supp. 3d 22, 38 (D.D.C. 2016) (Friedman, J.)))   That evening, the Court issued a Minute Order vacating the December 14, 2021 motions hearing.

On December 14, 2021, the Court issued a Memorandum Opinion and Order setting forth its reasoning for vacating the motions hearing.  (Case No. 21-cr-332-JMC, ECF No. 72).  In its Memorandum Opinion and Order, the Court agreed with the Government that the defendant had raised three new arguments in his reply brief: "As the United States notes . . . Mr. Johnson did not raise any of these bases for suppression of the seized evidence in his motion to suppress and instead raised them for the first time in his reply."  *Id.* at 2.   The Court further acknowledged that

"[t]ypically, the Court would not consider Mr. Johnson's arguments raised for the first time in reply because they have been waived." *Id.* at 3.   Nevertheless, the Court found that these new arguments were "important" and merited fuller briefing.  The Court's Memorandum Opinion and Order also stated that Johnson's new arguments "raise[d] factual disputes that will require testimony in order for the Court to resolve Mr. Johnson's motion to suppress." *Id.*  Accordingly, the Court ordered the parties to file a joint status report with an agreed upon briefing schedule and the names and number of witnesses required for a suppression hearing. *Id.*

Pursuant to the Court's December 14, 2021 Memorandum Opinion and Order, the parties filed a Joint Status Report on December 23, 2021.  (Case No. 21-cr-332-JMC, ECF No. 73).  The Joint Status Report indicated the parties' disagreement about the necessity of *government* witness testimony.  Specifically, the Government maintained that "no factual witnesses, aside from Mr. Johnson, are needed to resolve the new legal issues raised in the Defendant's Reply," and specifically requested that the Court resolve, prior to any hearing, the necessity of government witness testimony. *Id.* ¶ 3.  That same day, the Court issued an Order adopting the parties' proposed briefing schedule and setting a motions hearing for March 4, 2022, at 10:00 a.m., via Zoom.  (Case No. 21-cr-332-JMC, ECF No. 74).  The Order made clear that witness testimony may not be necessary to resolve Johnson's Motion to Suppress: "[P]rior to the hearing and after reviewing the parties' briefing, the Court will decide whether witness testimony will be necessary to resolve Mr. Johnson's motion to suppress." *Id.* at 2.

On January 6, 2022, this case was reassigned to the Honorable Jia M. Cobb.  (Case No. 21-cr-332-JMC, ECF No. 75).  On January 12, 2022, the Government filed a Notice Under Local Criminal Rule 40.5(b)(3) of Related Cases and Intent to Supersede Indictment.  (Case No. 21-cr-332-JMC, ECF No. 76).  On January 13, 2022, the Government filed a superseding indictment in

*United States v. Ryan Samsel*, 21-cr-537-JMC, adding Johnson as the third-named defendant in a five-defendant assault case involving the breach of the metal barricades near the Peace Circle Monument on January 6, 2021.  That same day, the Court issued a Minute Order in the preexisting two-defendant assault case continuing the hearing for Johnson's motion to suppress to March 17, 2022.

On January 21, 2022, the defendant filed his Supplemental Brief in the preexisting two-defendant assault case.  (Case No. 21-cr-332-JMC, ECF No. 77).  The Supplemental Brief repeats many of the arguments raised in the defendant's Reply Brief except that Johnson now calls for the suppression of "all evidence" taken from the defendant's trailer, not just the electronic devices that were the focus of the original Motion to Suppress and the Reply Brief.  *Id.* at 2, 15.

The defendant was arraigned on the superseding indictment in the five-defendant case on January 27, 2022.  Following the arraignment, the Court instructed the parties to re-file the Motion to Suppress briefs on the docket for the five-defendant case.  The parties re-filed their briefs that same day, and the Motion is now properly before this Court in the five-defendant assault case.  (*See* Case No. 21-cr-537-JMC, ECF Nos. 96, 97, 98, 99).[3]

## **FACTUAL BACKGROUND**

The Government's Opposition to the Motion to Suppress contains a fulsome discussion of the relevant facts of this case.  *See* ECF No. 99, at 1-5.  The additional facts set forth below are provided in response to the defendant's new arguments regarding the address of the location searched and the seizure of the walkie-talkies.

---

[3] For purposes of this Opposition, all references to ECF docket entries refer to Case No. 21-cr-537-JMC unless otherwise specified.

I.      **The Search Warrant's Description of the Address to Be Searched**

On April 13, 2021, FBI agents searched the property listed on the search warrant: Address-1. Attachment A of the Affidavit in support of the search warrant defines the property to be searched as the "SUBJECT RESIDENCE," and describes it as follows:

> The premises to be searched is P. JOHNSON and [Person-1's] property located at [Address-1],[4] which is further described as three structures on 13.76 acres which include a white siding, two-story farmhouse, a detached four-car garage, and a white single-story, double wide trailer. The SUBJECT RESIDENCE is depicted in the following images: . . . .

Attachment A then depicts three images—one of the trailer, one of the farmhouse, and one of the detached four-car garage.[5] The Affidavit also sets forth probable cause to believe that Johnson is a co-owner of Address-1 and that he resides there permanently. Specifically, paragraph 65 of the Affidavit states that "According to [County-1][6] Real Estate Records, the property located at [Address-1] is owned by P. JOHNSON and [Person-1]. The purchase date was January 28, 2021." *See* ECF No. 96-2 ¶ 65. The Affidavit further details the surveillance conducted at Address-1 between March 23 and April 7, 2021, during which law enforcement repeatedly observed vehicles registered to Johnson parked outside the residence, and even observed Johnson leaving the residence at Address-1. *Id.* ¶¶ 67-70.

The Affidavit also sets forth probable cause to believe that the items sought in Attachment B of the search warrant are likely to be found at Address-1. Specifically, the affidavit states that,

---

[4] For purposes of consistency, the Government has adopted the naming conventions used by the defendant in his Motion to Suppress, Reply, and Supplemental Briefs.

[5] These images are redacted in the Affidavit appended to the defendant's motion, *see* ECF No. 96-2, at 52, but are identical to images contained in property records that have been filed under seal as Exhibit A to this opposition.

[6] The government will refer herein to the county where Address-1 is located as "County-1" in order to protect the defendant and his family's privacy.

based on the affiant's training and experience, "people who spend time at a particular address also store their belongings and devices as part of their daily lives at that address," including articles of clothing, travel receipts, and personal wireless telephones. *Id.* ¶¶ 71-73. Thus, because Johnson owned the property located at Address-1, and because surveillance of Address-1 revealed that both Johnson and Person-1 resided at Address-1, there was probable cause to believe that Johnson and Person-1 would store their personal belongings at this property.

## II.    The Search of Address-1 on April 13, 2021

According to the FBI 302 submitted as Exhibit 3 to the defendant's Motion to Suppress, the search of Address-1 began at approximately 6:00 a.m. with the Norfolk SWAT team knocking and announcing their presence at Johnson's trailer (also referred to in the FBI 302 as the "residence"). ECF No. 96-3, at 2-3.[7] By approximately 6:40 a.m., the SWAT team had finished securing the three buildings identified in Attachment A of the search warrant—the trailer, the farmhouse, and the detached garage—as well as two outbuildings behind the residence. *Id.* at 3-4. After the residence was secured, FBI SWAT team leader Special Agent Grabarcyzk briefed Special Agents Maldonado and Sullivan, and informed them that there were several guns located in an open safe and under the bed in the master bedroom, as well as a long gun located in one of the children's rooms near the window.[8] *Id.* at 4. At approximately 6:58 a.m., the search team entered the premises and began photographing and seizing items from two of the buildings—the trailer and the detached garage. *Id.* Though not included as part of the FBI 302, the "Evidence Collected Item Log" from the search indicates that only three walkie-talkies were seized from

---

[7] These page numbers correspond to the page numbers from the ECF header, not the page numbers listed in the top right corner of the FBI 302.

[8] These guns were not seized. *See* ECF No. 96-3, at 5.

inside the safe in Johnson's bedroom in the trailer.  The fourth walkie-talkie was seized from a black backpack in the defendant's bedroom closet.  The search concluded at approximately 9:20 a.m.

## ANALYSIS

### I.      Law Enforcement Searched the Correct Address

For the first time in his Reply Brief, Johnson argues that FBI agents searched for and seized items from the wrong address.  Specifically, Johnson claims that the trailer and farmhouse on his property have different house numbers, and that the house number listed in the search warrant— Address-1—applies only to the farmhouse, not the trailer.  Johnson is incorrect.  Address-1 is the correct address for all three structures on Johnson's property, including the trailer.  But even if it were not, the search warrant still satisfies the Fourth Amendment's particularity requirement.

#### A.      Address-1, the address listed on the search warrant, encompasses all three structures on Johnson's property, including his trailer.

According to certified County-1 real estate property records, Address-1 consists of three structures: a single-story double-wide trailer, a two-story farmhouse building, and a detached garage.  *See* Exh. A.  All three structures are pictured and described with particularity in the County-1 property records.  *Id.*  The descriptions and pictures from the County-1 property records match the description and pictures contained in Attachment A of the search warrant.  *See* ECF No. 96-2, Att. A, at 52.   Further, according to a notarized declaration from the Commissioner of the Revenue for County-1, there is no real estate property record for Address-2—the address that the defendant claims is assigned to his trailer.  Rather, the trailer is specifically included as a structure on Address-1.  Accordingly, Address-1 is the correct address for the defendant's trailer, and the search warrant specifically authorized the search of all three structures located at Address-1.

The only evidence that Johnson proffers in support of his baseless argument is an unauthenticated Geographic Information System ("GIS") map of unknown provenance.  *See* ECF No. 97-1.  The map contains the following disclaimer:

> DISCLAIMER: This drawing is neither a legally recorded map nor a survey and is not intended to be used as such.  The information displayed is a compilation of records, information, and data obtained from various sources, and [County-1] is not responsible for its accuracy or how current it may be.

Reply Ex. 1.  Thus, by its own terms, this unauthenticated GIS map is not an accurate public record and cannot be relied upon as such.

While the defendant does not indicate where or how he obtained this map, it is assumed that he obtained the map from the following website: https://parcelviewer.geodecisions.com/ NewKent/.[9]  If one were to search either Address-1 or Address-2 at the above-mentioned URL, one would see that both addresses are located on a land parcel, highlighted in yellow.  When a user clicks anywhere within the yellow, highlighted parcel, one sees that the parcel is associated with the same tax number listed in County-1 property records for Address-1, and that the owner is listed as "JOHNSON PAUL R" with a property address of Address-1.  *See* Exh. B.  Accordingly, even the defendant's own evidence shows that Address-1 is the proper address for the three structures located on Johnson's property.

---

[9] It bears noting that in order to access the GIS feature of this website, a user must first check a box confirming his understanding that the "[i]nformation shown on these maps . . . does not replace a site survey and is not warranted for content or accuracy.  [County-1] does not guarantee the positional or thematic accuracy of the GIS data.  The GIS data are not a legal representation of any of the features which are depicted.  Any implied warranties, including warranties of merchantability or fitness for a particular purpose, shall be expressly excluded."

### B.     Even if There Were a Descriptive Error in the Address, the Search Warrant Is Sufficiently Particular as to the Place to be Searched

As explained above, there was no error in the address listed on the search warrant.  But even if there had been, "listing the wrong address does not automatically invalidate a search warrant."  *United States v. Abdalla*, 972 F.3d 838, 845 (6th Cir. 2020) (quotation marks and citation omitted).  The Fourth Amendment requires that a warrant particularly describe the place to be searched.  U.S. Const. amend. IV.  The test for determining the validity of a warrant is whether the warrant describes the place to be searched with sufficient particularity to enable law enforcement officers to locate and identify the premises with reasonable effort, and whether any reasonable probability exists that the officers may mistakenly search another premise.  *United States v. Johnson*, 437 F.3d 69, 73 (D.C. Cir. 2006).  "The necessary specificity of the description will differ as between urban and rural areas and depends heavily upon the factual circumstances of each case."  *United States v. Williams*, 687 F.2d 290, 293 (9th Cir. 1982).  "The practical accuracy rather than the technical precision governs in determining whether a search warrant adequately describes the premises to be searched."  *Id.* at 292

Courts consider several factors in assessing whether a search warrant that contains a technically incorrect address nevertheless satisfies the Fourth Amendment particularity requirement.  Those factors include: (1) whether the warrant contained a physical description of the premises to be searched; (2) whether any nearby homes met the warrant's detailed description; (3) whether the address in the warrant was reasonable for the location intended; (4) whether the warrant was executed by an officer who had participated in applying for the warrant and who personally knew which premises were intended to be searched; (5) whether the house had been under surveillance before the warrant was sought; (6) whether the premises that were intended to be searched were those actually searched; and (7) whether the warrant specified the names of the

property's occupants.  *See United States v. Mann*, 389 F.3d 869, 876-77 (9th Cir. 2004); *Johnson*, 437 F.3d at 73; *Moore v. United States*, 461 F.2d 1236, 1238 (D.C. Cir. 1972).

The search warrant in this case satisfies all of these factors.  The warrant contains a physical description and accompanying photograph for each structure to be searched.  *See* ECF No. 96-2, Att. A, at 52.  The photographs from the Attachment A resemble the photographs taken of the three structures during the execution of the search warrant on April 13, 2021, thereby confirming that the premises that were intended to be searched were those actually searched.  *See* Exh. C.  There is no suggestion that any nearby homes met the warrant's description.  In fact, there are no other homes near Johnson's residence; his property spans 13.76 acres and, according to the GIS aerial map proffered by the defendant, there do not appear to be any other homes in the immediate vicinity of Johnson's property.  *See* ECF No. 96-2, Att. A, at 52; ECF No. 96-1 (aerial map of Johnson's property showing no nearby properties).  The search warrant specifies the names of the property's occupants, and was executed by an officer—Special Agent Maldonado—who also served as the affiant for the warrant and who personally knew which premises were intended to be searched.  *See* ECF No. 96-2, Att. A, at 52; ECF No. 96-3 (listing Agent Maldonado as one of the agents who was present for, and who participated in, the execution of the search warrant).  Finally, the premises had been under surveillance before the warrant was sought.  Indeed, as set forth in the Affidavit, which is incorporated by reference in the search warrant, law enforcement agents began surveilling Johnson's property three weeks before the warrant was sought.  ECF No. 96-2 ¶¶ 67-70.  During this period of surveillance, law enforcement observed at least two vehicles registered to Johnson parked at the residence, and observed Johnson leaving the residence.  *Id.* ¶¶ 67, 69.  In sum, based on the totality of these factors, the search warrant described the premises to be searched with sufficient particularity to enable law enforcement officers to locate and identify

11

the premises with reasonable effort, and there was no reasonable probability that law enforcement would mistakenly search another premise.  *Johnson*, 437 F.3d at 73.

Finally, the defendant asserts that even if the search warrant had listed the correct address, the warrant is still invalid because it lacks "averments pertaining to each of the structures listed in its definition of 'Subject Residence,'" and because it lacks "averments that the items that the government sought to search for and seize . . . were likely to be found in each of the buildings that the government includes in its overbroad definition of the Subject Premises."  Supp. Br. at 9. Defendant is, once again, incorrect.

"When a structure is divided into more than one residential unit, or where two residences are located on a single parcel of property, there must be cause to search each unit.  But a warrant may authorize a search of an entire street address while reciting probable cause as to only a portion of the premises if they are occupied in common rather than individually, if a multiunit building is used as a single entity, if the defendant was in control of the whole premises, or if the entire premises are suspect."  *United States v. Whitten*, 706 F.2d 1000, 1008 (9th Cir. 1983); *see also United States v. Alexander*, 761 F.2d 1294, 1301 (9th Cir. 1985).  Here, the defendant, as the owner of the property, was in control of the whole premises.  Thus, so long as there was probable cause to believe that the defendant resided in at least one of the structures located at Address-1, then there was probable cause to search all the structures on the property.

## II.   The Question of Whether Johnson's Safe Was Locked or Not Does Not Affect the Resolution of Whether to Suppress the Walkie-Talkies in this Case

Johnson claims that four[10] walkie-talkies seized from a safe in his bedroom should be suppressed because "nothing in the Search Warrant or Affidavit authorized the FBI agents to open

---

[10] In fact, as discussed above, only three walkie-talkies were seized from the safe in Johnson's bedroom.  The fourth was seized from a black backpack in Johnson's bedroom closet.

the safe—or gave them probable cause to believe that the items they were searching for would be found inside." ECF No. 98, at 10. Johnson's argument misunderstands the law. It is a bedrock principle of Fourth Amendment doctrine that officers executing a search warrant may open a locked container where the container might reasonably contain the items to be seized under the warrant. The warrant need not specifically authorize the opening of a locked container, nor are agents required to obtain a separate search warrant each time they encounter a locked container while executing a search warrant. Agents also do not need probable cause to believe that items sought under the warrant are actually located in a specific locked container before opening the container; it is sufficient that the locked container could reasonably contain the items to be seized.

**A.   Officers executing a search warrant are authorized to open a locked safe when the safe might reasonably contain items to be seized.**

A warrant to search a specific premises for certain items authorizes government agents to break open locked containers which may contain the objects of the search. As explained by the Supreme Court in *United States v. Ross*, 456 U.S. 798 (1982):

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. . . . When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers . . . must give way to the interest in the prompt and efficient completion of the task at hand.

*Id.* at 820-21 (footnote omitted). "This rule applies equally to all containers." *Id.* at 822. "A container that may conceal the object of a search authorized by a warrant may be opened immediately; the individual's interest in privacy must give way to the magistrate's official determination of probable cause." *Id.* at 823.

13

Applying *Ross*, courts have routinely upheld the search of locked safes on fixed premises. *See e.g.*, *United States v. Smith*, 363 F. App'x 629, 632 (10th Cir. 2010) (citing *Ross* and affirming district court's refusal to suppress evidence recovered from a locked gun safe within the residential area of a defendant's building); *United States v. Lengen*, 245 F. App'x 426, 434 (6th Cir. 2007) ("[J]udicial authorization to search a home for contraband drugs, money associated with drug trafficking, and drug paraphernalia would clearly justify the opening of doors, closets, drawers, safes, and other places where the listed items could be hidden.  Consequently, the police . . . were not required to obtain a separate warrant to look in the safe found in the closet of the defendant's bedroom."); *United States v. Pringle*, 53 F. App'x 65, 72 (10th Cir. 2002) (quoting *Ross* and holding that the word "container" includes "a locked safe where the items in the search warrant were likely to be found therein"); *United States v. Jackson*, 120 F.3d 1226, 1228-29 (11th Cir. 1997) ("[A] warrant to search a specific area for a certain class of things authorizes government agents to break open locked containers which may contain the objects of the search." (footnote omitted)); *United States v. Snow*, 919 F.2d 1458, 1461 (10th Cir. 1990) (citing *Ross* and affirming district court's denial of motion to suppress evidence from a locked safe because "[t]he locked safe was a likely source for the specified documents and could therefore be opened"); *United States v. Johnson*, No. 1:21-CR-26-HAB, 2021 WL 4059860, at *8 (N.D. Ind. Sept. 7, 2021) (denying motion to suppress evidence recovered from a locked basement room, reasoning that "because the objects of the search could clearly be concealed inside the room, it mattered not a whit that the room was locked"); *United States v. Jordan*, 485 F. Supp. 3d 664, 671 (E.D. Va. 2020) (no Fourth Amendment violation where locked safe could have reasonably been expected to hold a number of the items identified in the search warrant); *United States v. Frost*, No. 07-CR-113-GKF-TLW,

2011 WL 13300566, at *5 (N.D. Okla. Feb. 28, 2011) (refusing to suppress ammunition seized from a safe because "[a] locked safe is certainly a 'likely' place to hide ammunition").

Here, the defendant suggests that it was "unreasonable to believe that any of the items that were the subject of the Search Warrant were likely to be found" inside the safe. ECF No. 98, at 11. But given the size of the safe—55 inches tall, 29 inches wide, and 20 inches deep—it was not unreasonable for officers to believe that the safe could contain incriminating items, including the walkie-talkies listed in the warrant. *Cf. Smith*, 363 F. App'x at 632 (recognizing that defendants "will often keep mementos of their crimes" and that if such mementos could fit in a safe, the safe may be opened). Finally, insofar as the defendant asserts that it was unreasonable for officers to search the safe when they were not authorized to seize "firearms, cash, or other items that are typically stored in a safe," this argument is contradicted by the defendant's own affidavit, in which he acknowledges that safes can be used to store a variety of items, not just items of value. *See* ECF No. 97-2 ¶ 12 ("Because my family and I had recently moved to a new home, I was storing various items in the safe until we could fully unpack our things.").

In sum, the law is clear that FBI agents would have been authorized to open Johnson's safe, if needed, in order to search for and seize any of the items identified in the search warrant.

**B.  Johnson's safe was unlocked on April 13, 2021.**

As explained above, this Court need not reach the issue of whether Jonson's safe was locked or not on April 13, 2021 because the law plainly would have authorized officers to open Johnson's safe. Nevertheless, if this Court concludes that it is necessary to its resolution of the Motion to Suppress to determine whether the safe was locked or not, the government would be prepared to offer law enforcement testimony that the safe in Johnson's bedroom was, in fact, open on April 13, 2021.

Just as a matter of common sense, though, if the safe had not already been open on April 13, 2021, then the search would almost certainly have taken longer than two hours and twenty minutes to complete. Without the passcode to the safe—which Johnson has confirmed he did not provide, *see* ECF No. 97-2 ¶ 16—law enforcement would have needed to either physically break open the safe or otherwise retain the services of a professional locksmith to assist in cracking it open. The fact that Johnson is still able to use his safe, as evidenced by Exhibit 4 of his affidavit— a picture of the safe that is not part of the Government's discovery and was likely taken by the defendant or a defense investigator—counsels against any finding that FBI broke open the safe on April 13, 2021. Moreover, the fact that the entire search took just over two hours to complete counsels against any finding that FBI had to retain the services of a professional locksmith in order to crack open the safe. Finally, the lack of any documentation of officers breaking open a safe reinforces the common sense conclusion that Johnson's safe was not locked on January 13 2021.

## III. Johnson Has Failed to Establish a Reasonable Expectation of Privacy in Person-1's Phone

### A. Johnson's affidavit fails to establish a subjective expectation of privacy in Person-1's phone.

Notwithstanding the new facts alleged in Johnson's affidavit, Johnson has still failed to demonstrate that he had a subjective expectation of privacy in Person-1's phone or that such an expectation would be recognized by society as reasonable. As explained in the Government's Opposition, a defendant who brings a motion to suppress must prove by a preponderance that he has standing, that is, that the evidence he seeks to suppress was obtained in violation of *his* Fourth Amendment rights. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1973). A defendant can do this by demonstrating that he had an actual, subjective expectation of privacy in the place being searched or items being seized, and that this expectation of privacy was objectively reasonable. *Smith v.*

16

*Maryland*, 442 U.S. 735, 740-41 (1979).  In assessing whether a defendant has a reasonable expectation of privacy sufficient to contest the validity of a search, courts will consider several factors, including:

> whether the defendant has a property or possessory interest in the thing seized or the place searched, whether he has a right to exclude others from that place [or the thing seized], whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy, and whether he was legitimately on the premises [or legitimately in possession of the thing seized].

*United States v.* Finley, 477 F.3d 250, 258-59 (5th Cir. 2007) (quoting *United States v. Cardoza-Hinojosa*, 140 F.3d 610, 615 (5th Cir. 1998)) (original alterations and quotation marks omitted).

Johnson asserts seven facts as evidence of his subjective expectation of privacy in Person-1's phone: (1) Johnson is married to Person-1 (ECF No. 97-2 ¶ 3); (2) he pays the monthly bill for Person-1's cell phone (*Id.* ¶ 4 & Ex. 1); (3) Person-1 has access to Johnson's private information through her phone, including Johnson's social security number, Johnson's privileged communications; and the usernames and passwords to several of Johnson's medical records and banking accounts (*Id.* ¶ 6); (4) Johnson and Person-1 have installed software called If This Then That ("IFTTT"), which they have programmed to enable Person-1 to receive, on her phone, communications that are sent to Johnson's phone (*Id.* ¶ 7); (5) Johnson's personal and business emails are "permanently logged in" on Person-1's phone, and Person-1 will "sometimes" use her phone to write personal and business emails on Johnson's behalf (*Id.* ¶ 8); (6) photographs taken on Johnson's phone are backed up to a cloud account that can be accessed through Person-1's phone (*Id.* ¶ 9) ; and (7) when Johnson's phone is broken, he will carry with him and use Person-1's phone (*Id.* ¶ 10).

Fact (1) is misleading, since the defendant, though recently married to Person-1, was not married to Person-1 when Person-1's phone was seized.  Fact (2) is irrelevant, since "a person has

no standing to challenge a search or seizure of property that was voluntarily abandoned or conveyed to another." *United States v. Beaudion*, 979 F.3d 1092, 1099 (5th Cir. 2020) (internal quotation marks and citation omitted). Thus, even if the defendant bought Person-1's phone (which he does not actually attest to in his affidavit) and even if he continues to pay Person-1's monthly phone bill, he has voluntarily gifted that phone to Person-1, and cannot establish that he retains a property interest in it. The defendant also cannot establish that he had a possessory interest in Person-1's phone because the phone was in Person-1's possession when it was seized by law enforcement. *See* ECF No. 96-3, at 2. Fact (7) further underscores the defendant's lack of a possessory interest in the phone, because it proves that the defendant does not, as a matter of course, use or carry Person-1's phone.

Facts (3), (4), (5), and (6) reduce to a claim that Johnson voluntarily shares personal and confidential information with Person-1 and stores this information on Person-1's phone. It is well-established that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979). This is so, "even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *United States v. Miller*, 425 U.S. 435, 443 (1976).

Here, even if Johnson shared his private information with Person-1 on the assumption that it would be used only for a limited purpose and that his confidence would not be betrayed, he abandoned any expectation of privacy when he began sharing this information with Person-1.

The Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), does not change this analysis. In *Carpenter*, the Supreme Court declined to extend the third-party doctrine to cell-site location information ("CSLI"). But *Carpenter* is of no help to Johnson.

*Carpenter* did not disturb the third-party doctrine. *See Carpenter*, 138 S. Ct. at 2220 ("We do not disturb the application of *Smith* and *Miller*."). Rather, it reiterated that two primary rationales underlie the third-party doctrine: the nature of the information sought and the voluntariness of the exposure of that information to third parties. *Id.* at 2219-20. Based on these rationales, the Court refused to apply the third-party doctrine to CSLI because unlike ordinary business records, the collection of CSLI by cell carriers is "inescapable and automatic" once one decides to carry a cell phone. *Id.* at 2223. The rare combination of automated disclosure and "deeply revealing" location information prompted the Court to conclude that cell phone users have a reasonable expectation of privacy in CSLI even when it was held by a private third party (a cell phone company). *Id.* at 2223. The Court also emphasized how cell phone location information is "not truly 'shared' as one normally understands the term," given how "indispensable" cell phones are to an individual's participation in modern society, and how the recording of cell-site information occurs "without any affirmative act on the part of the user beyond powering up." *Id.* at 2220.

By contrast, Johnson has voluntarily taken affirmative steps to share his private information with Person-1. Unlike the cell phone users at issue in *Carpenter*, Johnson has complete control over the type and scope of information shared with Person-1. For example, Johnson intentionally downloaded IFTTT and programmed it so that he could automatically forward communications received on his phone to Person-1's phone. *See* ECF No. 97-2 ¶ 3. Thus, the "mirroring" of Johnson's communications on Person-1's phone is a function of Johnson's voluntary and deliberate decision to share information with Person-1.

Even if the third-party doctrine did not apply, Johnson would only arguably be able to establish a subjective expectation of privacy in the information that he shared with Person-1. That is not the same as establishing a subjective expectation of privacy in the place to be searched. Put

differently, just because Person-1's phone contains private information pertaining to Johnson does not mean that Johnson has established a subjective expectation of privacy in the entirety of Person-1's phone.

In sum, even accepting everything in Johnson's affidavit as true, Johnson has failed to establish standing to challenge the seizure and search of Person-1's cell phone. Johnson does not have a property or possessory interest in Person-1's phone; he has not alleged, much less shown an ability to exclude others from Person-1's phone; and while he shared and stored some private information on Person-1's phone, he did so voluntarily, and there is no indication that he took any precautions to maintain the privacy of that information on Person-1's phone.

**B.      Even if Johnson could demonstrate a subjective expectation of privacy in Person-1's phone, this expectation of privacy is not one that society is prepared to recognize as reasonable.**

Assuming, *arguendo*, that Johnson could demonstrate a subjective expectation of privacy in Person-1's phone, which he cannot, this expectation is not one that society is prepared to recognize as reasonable. Voluntarily choosing to store some private information on Person-1's device does not give Johnson the power to exclude others from Person-1's device. Nor does it render Johnson a primary or even a co-user of Person-1's device. So too with respect to Johnson's payment of Person-1's phone bill. Paying a monthly phone bill does not give Johnson the authority to dictate how Person-1 uses her cell phone, what she stores on her cell phone, or with whom she shares her cell phone.

In *Beaudion*, the Fifth Circuit held that a defendant who purchased his girlfriend's physical phone, who had permission to use her phone, who accessed his Facebook account from the girlfriend's phone, and who used the phone to capture intimate videos of himself and his girlfriend did not have a reasonable expectation of privacy in his girlfriend's phone or location data.

*Beaudion*, 979 F.3d at 1059.  In so holding, the court noted that there was no indication that the defendant ever used or possessed the phone outside of his girlfriend's presence.  *Id.*  Rather, the record showed that the girlfriend was the "primary user" of the phone, in part because she had the phone number long before she met the defendant, she maintained possession of the phone throughout the day of the arrest, and her parents paid her phone bill.  *Id.*

Similarly, in this case, there is no indication that the defendant uses or possesses the phone outside of Person-1's presence, except when his phone is broken.  Nor is there any record evidence about how, if at all, the defendant uses Person-1's phone.  The defendant says, for example, that Person-1's phone contains his usernames and passwords to financial accounts, but he does not say that he personally uses Person-1's phone outside of Person-1's presence to access these or any other accounts.  There is also no evidence that the defendant personally uses the phone to conduct his business.  The affidavit provides that Person-1 will sometimes use her phone to write personal and business emails on Johnson's behalf, but it does not state that Johnson will himself use the phone to do so.  In sum, even if Johnson could establish a subjective expectation of privacy in the phone, this expectation would not be reasonable.

### C. Even if Johnson had a reasonable expectation of privacy in Person-1's phone, law enforcement still had probable cause to seize and search Person-1's phone.

If this Court were to conclude that Johnson had a reasonable expectation of privacy in Person-1's phone, such a finding would not entitle Johnson to the outright suppression of Person-1's device.  The Court would still need to address the defendant's merits challenge to the search of Person-1's cell phone—that is, whether the search warrant is sufficiently particular with respect to the items to be seized from Person-1's cell phone.  For the reasons set forth in the Government's Opposition, this Court should reject the defendant's particularity challenge to the search warrant

as it pertains to the search of electronic devices, including Person-1's cell phone. *See* ECF No. 99, at 21.[11]

## IV.    The Defendant is Not Entitled to An Evidentiary Hearing on His Motion to Suppress.

Johnson is not entitled to an evidentiary hearing on his motion to suppress.  "A defendant is entitled to an evidentiary hearing on his motion to suppress 'only upon factual allegations which, if established, would warrant relief." *United States v. Law*, 528 F.3d 888, 903-04 (D.C. Cir. 2008) (quoting *United States v. Thornton*, 454 F.2d 957, 967 n.65 (D.C. Cir. 1971)).  Put differently, evidentiary hearings are "only required where the question of whether to suppress evidence hinges on the resolution of a disputed material fact." *United States v. Harris*, Crim. No. 19-358 (RC), 2021 WL 1167263, at *4 (D.D.C. Mar. 26, 2021).  Here, while the parties dispute several facts relating to the search in this case, these factual disputes are immaterial to the question of whether to suppress evidence in this case.

First, the parties dispute whether Address-1 was the correct address for the three structures located on Johnson's property.  As a preliminary matter, the Court need not hear testimony from any witness to resolve this factual dispute.  Certified real estate property records from County-1

---

[11] In his Reply Brief, the defendant restates his argument that in order to satisfy the Fourth Amendment's particularity requirement, the government must have "separate probable cause to search each of the different types of data and information stored on or accessible through a cell phone." ECF No. 97, at 9 n.7.  Courts in this district have rejected this argument, and have also rejected the argument that *Riley v. California*, 573 U.S. 373 (2014), requires that the breadth of a warrant be narrowly tailored to specific categories of data. *See United States v. Smith*, Criminal Action No. 19-324 (BAH), 2021 WL 2982144, at *8-*10 (D.D.C. July 15, 2021).  A warrant authorizing the search of electronic data is sufficiently particular if its scope is limited to evidence pertaining to a specific crime. *Id.* at *8.  Read in a commonsense way, the search warrant here is limited to the crimes repeatedly referenced throughout the search warrant and in the introduction to Attachment B. *Cf. United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018) (explaining that warrant "need not meet the rigors of Roget, Merriam, Webster, Strunk, and White," and that a "commonsense contextual reading usually suffices").  Overall, a "warrant [is] not overbroad or insufficiently particular by not being restricted to specific file types." *Smith*, 2021 WL 2982144, at *9.

show that Address-1, which is owned by Johnson, consists of the same three structures that FBI searched on April 13, 2021. These property records confirm that Address-1 is the correct address for all the structures on the defendant's property, including his trailer. But even if the address listed were erroneous, the search warrant would still be valid because it describes the three structures with sufficient particularity to enable the executing officers to locate and identify the premises with reasonable effort, and there is no reasonable probability that another place might mistakenly have been searched.

Second, the parties dispute whether Johnson's safe was locked prior to it being searched on April 13, 2021. Even if the safe was locked, law enforcement would have been authorized to open it. Thus, this Court need not hear testimony from any witnesses in order to decide whether the walkie-talkies seized from the safe should be suppressed.

Finally, the parties dispute whether Johnson had a reasonable expectation of privacy in Person-1's cell phone. But the question of Johnson's standing is only relevant if the Court determines that the search warrant was insufficiently particular with respect to the items to be seized from the defendant's cellular phone. In that scenario, the parties would likely need an evidentiary hearing in order to probe whether the defendant had a subjective expectation of privacy in Person-1's phone. Alternatively, the Court could, as explained above, accept all of the defendant's statements in his affidavit as true and still conclude that the defendant has failed to establish a subjective expectation of privacy in Person-1's phone. In that scenario, an evidentiary hearing is not required.

## V. The Filter Procedures Set Forth in the Warrant Adequately Protect the Defendant's Privileged Communications.

The Government's Opposition to the Motion to Suppress already explains why the appointment of a special master to review the seized electronic devices in this case is neither legally

mandated nor warranted.  ECF No. 99, at 21-29.  In his Reply Brief, the defendant accuses the Government of overlooking case law that, according to the defendant, counsels against the use of a filter team.  *See* ECF No. 97, at 12.  The cases the defendant cites are inapposite, since they all involve searches of law offices, which raise unique concerns that are not implicated by the search of Johnson's cell phone.  *See United States v. Gallego*, No. 18-01537-001-TUC-RM (BPV), 2018 WL 4257967 (D. Ariz. Sept. 6, 2018) (government executed a search warrant at the defendant's law office and seized documents, computers, and other items); *United States v. Kaplan*, No. 02 CR. 883(DAB), 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) (government seized evidence from the defendant's law office pursuant to a search warrant); *United States v. Stewart*, No. 02 Cr. 395 (JGK), 2002 WL 1300059 (S.D.N.Y. June 11, 2002) (government seized boxes of materials, computers, hard drives, and floppy disks from an attorney's law office); *In re Search Warrant for Law Offices Executed on Mar. 19, 1992*, 153 F.R.D. 55 (S.D.N.Y. 1994) (involving the seizure of twenty cartons of material seized and/or subpoenaed from the law firm).  Accordingly, and for the reasons set forth in the Government's Opposition, this Court should deny the defendant's request for appointment of a special master to review Johnson's devices for attorney-client privileged material.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendant's Motion to Suppress Electronic Evidence Or, in the Alternative, to Appoint a Special Master.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Hava Mirell*
HAVA MIRELL
Assistant United States Attorney, Detailee
CA Bar No. 311098
555 Fourth Street, N.W.
Washington, DC 20530
(213) 894-0717
Hava.Mirell@usdoj.gov

**<u>Certificate of Service</u>**

I hereby certify that on February 11, 2022, I caused a copy of the foregoing memorandum

to be served on counsel of record via electronic filing.

<div style="margin-left:40%">

*/s/ Hava Mirell*
HAVA MIRELL
Assistant United States Attorney

</div>