**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Case No. 1:21-cr-00537-JMC** |
| **v.** ) | |
| ) | |
| **RYAN SAMSEL,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

<u>**MOTION FOR REVIEW AND REVOCATION OF DETENTION ORDER**</u>

Pursuant to section 3145(b) of Title 18 of the United States Code, Mr. Samsel, by and through the undersigned counsel, respectfully moves this Court for an Order revoking the pretrial detention of Mr. Samsel ordered by Magistrate Judge Robin M. Meriweather on February 19, 2021.

Mr. Samsel has been detained since his arrest on January 30, 2021 – for more than fourteen (14) months now.  No January 6 defendant has been held in solitary confinement longer, nor transferred between as many facilities, nor suffered as serious of injuries as has Mr. Samsel. It is undisputed that Mr. Samsel has been involved in three separate incidents with correctional officers that required his being transported to an emergency medical facility for treatment. Following these incidents, Mr. Samsel has been deprived the medical care prescribed by his medical records, and even those, he has had difficulty accessing.

Most recently, the Court ordered Mr. Samsel's temporary release from the custody of the U.S. Marshal's Service because, "on the entire record here, there is reason to believe that Defendant requires medical treatment that may be more readily available at the Pennsylvania facility."  Order (Nov. 29, 2021) (ECF No. 65).  Unfortunately, Mr. Samsel's temporary release did not fully restore his access to proper medical care.  Following his transfer, there was a delay

in the release of his medical records – a persistent problem for Mr. Samsel throughout his pre-trial detention – and ultimately the Pennsylvania Department of Corrections and Parole Board concluded they had no basis upon which to further detain Mr. Samsel.  He has now been detained at SCI Lewisburg for nearly three (3) weeks – again in the custody of the U.S. Marshal's Service – where he has yet to receive the medical treatment necessitated by the injuries he has sustained during his pre-trial detention.

Importantly, the government's purported justification for Mr. Samsel's continued detention appears to be based largely upon the complaints of former girlfriends concerning conduct occurring over ten (10) years ago and wholly unrelated to the conduct with which he is now charged.  The government has failed to provide any factual foundation, let alone clear and convincing evidence, for its assertion that Mr. Samsel presents a danger to the community or any other individual (and it cannot be disputed that he presents any risk of flight).  Moreover, there are a number of conditions, including placing Mr. Samsel on home confinement, that will assure Mr. Samsel does not present any danger to the community or any other individual.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On January 29, 2021, Defendant Ryan Samsel was charged by complaint with various offenses related to the allegation that he was present outside the Capitol – and there is no allegation that Mr. Samsel entered the Capitol – during the violence that occurred there on January 6, 2021.  Complaint (January 29, 2021) (ECF No. 1).  On January 30, 2021, Mr. Samsel was arrested and on February 19, 2021, he made his initial appearance before Magistrate Judge Robin M. Meriweather, where Mr. Samsel did not contest pretrial detention and we was subsequently remanded to the custody of the U.S. Marshal's Service.  Minute Entry (Feb. 19,

2021).  A preliminary hearing was set for April 1, 2021 (but later continued).[1]  *Id.*  Since that

time, Mr. Samsel has been injured in altercations with correctional officers on three occasions,

has been denied follow up medical care and has had limited access to medical records

prescribing such care.

On or about March 21, 2021, Mr. Samsel was viciously assaulted while detained in

"administrative segregation" by the District of Columbia Department of Corrections.  He was

taken to Howard University Hospital the next day, on March 22, 2021, where was admitted and

treated for injuries including, but not limited, head strike and loss of consciousness, bilateral eye

ecchymosis, acute kidney injury, injury of the wrists, fracture of the orbital floor (right side of

the eye / closed fracture), bilateral facial nasal bone fracture, and thoracic outlet syndrome.

Ultimately, as a result of the brutal assault, Mr. Samsel lost vision in his right eye (because of

what appears to be nerve damage), suffered two seizures at that time, and has continuing pain

and suffering, likely in relation to thoracic outlet syndrome as well as what appears to be a cystic

condition (that may have been aggravated by the assault), and a general lack of follow up care

and rehabilitative care.  Emergency Mot. for Medical Treatment (Sept. 11, 2021) (ECF No. 49).

Following his assault, Mr. Samsel was first transferred to the Rappahannock Detention

Center where Magistrate Judge Faruqui, concerned about Mr. Samsel's receipt of adequate

medical care, issued a Medical / Mental Health Alert to the Department of Corrections on May

14, 2021.  Minute Order (May 14, 2021); Emergency Mot. for Medical Treatment at 2 (ECF No.

49).  On May 24, 2021, Mr. Samsel moved the assigned Magistrate Judge for an Order seeking

---

[1] Despite two (2) separate consent motions filed with the Court seeking a continuance of the preliminary hearing
(and numerous additional oral requests by the government) in this matter based on the fact that, *inter alia*, "[t]he
government and [prior] counsel for the defendant . . . continuing to communicate in an effort to resolve this matter,"
to this day the government has yet to provide Mr. Samsel with a plea offer.  *See* Consent Mot. (March 30, 2021)
(ECF No. 11); Consent Mot. (May 4, 2021) (ECF No. 18).

his temporary release to the custody of the Pennsylvania Department of Corrections necessitated by an outstanding detainer for an alleged parole violation.  Mot. for Release from Custody (May 24, 2021) (ECF No. 23).  The government did not oppose Mr. Samsel's temporary release, but requested the Court find that Mr. Samsel's pretrial detention was necessary under the Bail Reform Act.  Mem. in Opp'n re Mot. for Release from Custody (June 2, 2021) (ECF No. 25); Tr. 6-8, 15-17 (June 4, 2021) (ECF No. 27).  On June 10, 2021, Magistrate Judge Faruqui Ordered Mr. Samsel's temporary release pursuant to 18 U.S.C. § 3142(i), while also finding that "no condition or combination of conditions would reasonably assure the safety of any other person and the community pursuant to 18 U.S.C. § 3142(e)(1).  Order (June 10, 2021) (ECF No. 28).

Thereafter, however, Mr. Samsel, through prior counsel, informed Magistrate Judge Faruqui that he no longer wished to be transferred to the custody of the Pennsylvania Department of Corrections and Magistrate Judge Faruqui rescinded his June 10 Order.  Order (June 14, 2021) (ECF No. 30).  On July 1, 2021, Magistrate Judge Faruqui stayed the U.S. Marshals' Service's planned transfer of Mr. Samsel from Rappahannock to the Central Virginia Regional Jail to permit "the court [and] the parties to locate the best available medical care for the defendant," (Minute Entry), although Mr. Samsel was nevertheless ultimately transferred to the Central Virginia Regional Jail where he would spend approximately two months in solitary confinement. On July 29, Mr. Samsel through prior counsel, filed a motion seeking an emergency status conference because, "Mr. Samsel [was] very concerned about the care he will receive after his medical procedures."  Mot. for Hr'g at 1 (July 29, 2021) (ECF No. 40).  Magistrate Judge Faruqui held a hearing on August 5, 2021, to which he ordered the presence of a representative of the U.S. Marshal's Service as well as a representative of the medical unit of the Central Virginia Regional Jail.  Mr. Samsel did not attend that hearing because he had surreptitiously

been taken to the University of Virginia for vascular studies and a visit with a vascular surgeon, which the court and counsel only learned of on the day of the scheduled Hearing.  Emergency Mot. for Medical Treatment and for Records at 3 (Sep. 11, 2021) (ECF No. 49).

On August 12, 2021, the undersigned moved the Court to substitute their appearance, (ECF No. 42), and on August 16, 2021, Magistrate Judge Faruqui held a hearing at which the motion was granted.  At that hearing, a representative of the medical unit of the Central Virginia Regional Jail represented that the U.S. Marshal's Service had approved all medical treatment that had been ordered and agreed to provide defense counsel with Mr. Samsel's medical records. Those records were not provided until August 30, 2021, following further delay by the U.S. Marshal's Service (after the Central Virginia Regional Jail refused to provide records directly to counsel citing the fact that they had been contracted by the U.S. Marshal's Service).

On September 11, 2021, Mr. Samsel filed an Emergency Motion seeking medical treatment and access to medical records because, *inter alia*, it had become clear to defense counsel that the U.S. Marshal's Service had not in fact authorized Mr. Samsel's medical treatment.  Concomitantly, following defense counsel's request to set a date for a preliminary hearing, and despite the passage of seven (7) months, the government filed its first indictment as against Mr. Samsel on August 25, 2021, charging him with seven (7) counts related to activities at the United States Capitol Building on January 6, 2021.[2]  Indictment (Aug. 25, 2021) (ECF No.

---

[2] The government has since superseded its indictment three times.  On November 17, 2021, despite the passage of nearly eleven (11) months and having only recently indicted Mr. Samsel to begin with, the government suddenly superseded Mr. Samsel's indictment.  First Superseding Indictment (Nov. 17, 2021) (ECF No. 61).  Just a few weeks after the November 23, 2021, status hearing, the government again superseded Mr. Samsel's indictment to include a co-defendant.  Second Superseding Indictment (Dec. 15, 2021) (ECF No. 69).  On January 13, 2022, the government again superseded Mr. Samsel's indictment, adding three additional codefendants to his case nearly a full year after Mr. Samsel's arrest.  Third Superseding Indictment (Jan. 13, 2022) (ECF No. 80).  The government claimed that superseding its indictment of Mr. Samsel was necessary because "[a]ll of the charges against [the added defendants] relate to the incident at Peace Circle and surrounding circumstances.  Notice (Jan. 12, 2022) (ECF No. 79).  The government nowhere alleges, and has no basis to allege, that any of these defendants knew each other, planned any of their alleged actions with each other, had any relationship or history of contact – their only commonality, they are each alleged to have been present at a protest at the Capitol on January 6th near the location of the Peace Circle.

46).  Thus, on September 14, 2021, the Court held an arraignment at which Mr. Samsel pleaded

not guilty to each of the counts in the indictment.  The Court further ordered the parties to

provide regular status reports concerning Mr. Samsel's medical treatment by the U.S. Marshal's

Service through the Central Virginia Regional Jail.

*The next day*, on September 15, 2021, Mr. Samsel was again injured in an altercation

with correctional officers while detained in solitary confinement.  Records provided by the U.S.

Marshal's Service document Mr. Samsel reporting being "dropped while being removed" from

his cell, presenting thereafter with "mild redness on the left side of his face at the cheek bone

area," and ultimately, he was transported to a medical facility where he reported having suffered

from a concussion.  Medical Status Report (Sep. 20, 2021) (ECF No. 50); Second Medical Status

Report (Oct. 4, 2021) (ECF No. 54).

In response to Mr. Samsel's status reports, the government advised the Court of its

position that Mr. Samsel appeared to be "challeng[ing] [the] conditions of [his] confinement"

and by requesting, *inter alia*, incident reports involving the altercation, Mr. Samsel was

"seek[ing] discovery regarding the same" (as opposed to records that would help medical

professionals diagnose and prescribe treatment) and recommended that "such a claim is

appropriately brought in a civil proceeding and not through the criminal process."  Gov't Status

Report Response (Sep. 20, 2021) (ECF No. 51).  Although Mr. Samsel had been scheduled to

appear before the Court on September 23, 2021, again he was surreptitiously scheduled for

medical treatment and rendered by the government, through the United States Marshal's Service,

as unavailable to attend the hearing, which the Court, therefore, vacated.  Second Medical Status

Report (Oct. 4, 2021) (ECF No. 54).

On September 29, 2021, Mr. Samsel was transferred to the Northern Neck Regional Jail in Warsaw, Virginia, per the request of the Central Virginia Regional Jail superintendent, where he would again spend approximately two months in solitary confinement (albeit with one hour of socialization time).  His transfer followed a visit by the Virginia State Police to check on Mr. Samsel's condition after numerous requests for updates on Mr. Samsel's status (e.g., why he remained in solitary confinement) as well as unanswered follow up requests for his medical records.  Second Medical Status Report (Oct. 4, 2021) (ECF No. 54).  And following his transfer, the U.S. Marshal's Service advised defense counsel:  "This is the last and only other facility I have left that can house Samsel.  This is the fourth facility he is going to be moving to[].  All previous facilities Samsel was housed in I was asked he be removed," *id.*, as if to somehow suggest that conditions of Mr. Samsel's pretrial confinement were somehow precipitated by defense counsel advocating zealously on his behalf.

On October 4, 2021, Mr. Samsel, through counsel, filed a second medical status report in which the Court was advised that defense counsel had been unable to communicate with Mr. Samsel following his transfer.  *Id.*  On October 7, 2021, *The New York Times* published an article describing how Mr. Samsel had refused to cooperate with the government following his initial questioning upon arrest by the FBI.  *See* Alan Feuer, *Dispute Over Claim that Proud Boys Leader Urged Attack at Capitol, The New York Times* (Oct. 7, 2021).[3]  According to the article, "[t]he government has not yet secured Mr. Samsel's cooperation in its investigation . . . , for reasons that remain unclear."  *Id.*  Despite a characterization that Mr. Samsel was not cooperating, however, the article's publication prompted the government to request that Mr. Samsel be placed in "protective custody," or solitary confinement.  Because of Mr. Samsel's

---

[3] https://www.nytimes.com/2021/10/07/us/politics/proud-boys-capitol-riot.html.

transfer to "protective custody," his ability to communicate with defense counsel was again delayed.  On October 12, 2021, Mr. Samsel was permitted an unrecorded video conference with counsel for the first time since his transfer to Northern Neck Regional Jail nearly two weeks prior.

Immediately following this call, Mr. Samsel was again injured in an altercation with correctional officers.  Medical records provided by the U.S. Marshal's Service provide that the Northern Neck Regional Jail's chief medical doctor insisted that emergency medical services were not needed.  Medical Status Report at 3 (Nov. 8, 2021) (ECF No. 60).  Nevertheless, later that night (or early the next morning), Mr. Samsel was transported to an emergency medical facility where he received treatment.  To date, no records from that facility – VCU Tappahannock Hospital – have been provided to defense counsel.

The day following this most recent altercation, October 13, 2021, defense counsel visited Mr. Samsel in person, who was visibly shaken, bruised in several places on his head, and both wrists presented as having been forcefully restrained as if he had been held down.  He also had other injuries, including on his ankle where he believes he had been stabbed by a handcuff key.

According to records provided by the U.S. Marshal's Service, Mr. Samsel refused to be hand-cuffed:  "All direct orders were refused.  [Mr. Samsel] then tried to pull the hand cuffs away.  The facility's records further provided, "*The necessary force was used to gain compliance.*  [Mr. Samsel] then refused to stand up and walk back [to his cell].  Upon reaching his cell [Mr. Samsel] became combative and *the necessary force was used to gain compliance*.  The cell door was shut and the hand cuffs were removed."  Third Medical Status Report (Oct. 14, 2021) (ECF No. 55).  Of note, the undersigned counsel observed Mr. Samsel *wearing handcuffs* during the video conference that preceded this altercation.

Despite the use of "the necessary force" to transport Mr. Samsel back to his cell, the U.S. Marshal's Service later advised that Mr. Samsel had suffered an injury after falling out of his bed: "I was notified this morning by the facility Inmate Samsel was taken to a local hospital for a routine check up. *Apparently he fell out of his bunk and hit his head.*" (emphasis added). When defense counsel asked about the preservation of any incident reports, photographs, and/or any videographic evidence of the altercation, the government advised that defense counsel could issue a subpoena for the same. Third Medical Status Report (Oct. 14, 2021) (ECF No. 55). The government argued that such information constituted discovery for a civil action and objected to defense counsel receiving any information other than medical records. Defense counsel subsequently requested an evidentiary hearing at which to challenge the veracity of these claims as well as the repeated representations that Mr. Samsel was being provided all necessary medical care. *Id.* In response, the government opposed this request, submitting a status report dedicating four (4) pages to the charges levied against Mr. Samsel as well as his criminal history and concluding that:

> The Injuries Samsel has sustained are alarming, regardless of the cause. And Samsel should have his medical records. But, the reports and differing accounts above cannot be sorted out in the criminal case. And, the appropriate place to sort out these allegations and Samsel's conditions of confinement *is not in this case.*

Gov't Medical Status Report (Oct. 21, 2021) (ECF No. 57) (emphasis added).

In response, the Court held a hearing at which a representative of the U.S. Marshal's Service as well as a representative of the Northern Neck Regional Jail were ordered to appear. Minute Order (Oct. 22, 2021). Following the hearing, the Court ordered that, "by November 9, 2021, the Government shall provide Defendant's counsel with all Defendant's medical records pertaining to the medical care he has received since being detained in this matter." Minute Order (Oct. 29, 2021). However, as detailed in the parties' November 8, 2021, joint medical status

report, it is undisputed that Mr. Samsel was not, in fact, provided all his medical records pursuant to the Court's prior Order.  Joint Medical Status Report (Nov. 8, 2021) (ECF No. 60).  A further status hearing was set for November 23, 2021.  Minute Entry (Nov. 9, 2021).

By November 22, 2021, however, it had become clear to Mr. Samsel that he was not likely to receive the medical treatment prescribed by the medical records he was slowly being provided.  Therefore, with the government's consent, he again asked the Court to order his temporary release to the custody of the Pennsylvania Department of Corrections.  Mot. for Temporary Release (Nov. 22, 2021) (ECF No. 63).  The Court granted this request the next day, at the previously scheduled status hearing (which had since been converted to an arraignment), Minute Entry (Nov. 23, 2021), and issued a written order on November 29, 2021, finding, "there is reason to believe that [Mr. Samsel] requires medical treatment that may be more readily available at the Pennsylvania facility" a sufficiently "compelling reason" under 18 U.S.C. § 3142(i) to justify his release.  Order (Nov. 29, 2021) (ECF No. 65).  Accordingly, Mr. Samsel was transferred to the custody Pennsylvania Department of Corrections on December 20, 2021.

However, despite Mr. Samsel's access to medical care being significantly greater, it continued to be stymied by the delay in the transfer of Mr. Samsel's medical records to the Pennsylvania Department of Corrections, which were not provided by the U.S. Marshal's Service until February 14, 2022.  Thereafter, Mr. Samsel diligently proceeded to make a number of medical appointments in collaboration with the Pennsylvania Department of Corrections. Appointments were made with Mr. Samsel's primary care physician, a plastic surgeon, an oncologist, a physical therapist, a neurologist, and a thoracic surgeon.  However, on or about February 28, 2022, Mr. Samsel was advised that the Pennsylvania Parole Board had concluded it would release Mr. Samsel.

Subsequently, Mr. Samsel was arrested on the outstanding detainer issued by the Court following his temporary release, and detained, again in solitary confinement under constant surveillance with the lights in his cell remaining on at all times, at the Federal Detention Center in Philadelphia, Pennsylvania, for twenty (20) days until he was ultimately transferred, on or about March 15, 2022, to USP Lewisburg, where he remains now.  There, Mr. Samsel again was held in solitary confinement for approximately seventeen (17) more days until his transfer, on March 29, 2021, to general population.  Unfortunately, Mr. Samsel is once again without access to his medical records or the treatment they prescribe.

## II.    LEGAL STANDARD

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *United States v. Salerno*, 481 U.S. 739, 755 (1987); *see also United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) ("The default position of the law . . . is that a defendant should be released pending trial." (internal quotation marks and citation omitted)); *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) ("[F]ederal law has traditionally provided that a person arrested for a non-capital offense shall be admitted to bail.  Only in rare circumstances should release be denied.  Doubts regarding the propriety of release should be resolved in favor of the defendant." (internal citations omitted)).

The Bail Reform Act of 1984 authorizes one of those carefully limited exceptions.  Relevant here, the government may seek a defendant's pretrial detention if it has charged an offense falling within one of five enumerated categories.  *See* Mem. Op., *United States v. Chansley*, No. 21-cr-00003-RCL, at 8 (D.D.C. March 8, 2021) (quoting 18 U.S.C. § 3142(f)(1)).  Assuming the court finds that the defendant has been charged with such an offense, the court "shall order" a defendant detained before trial if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any

other person and the community."  18 U.S.C. § 3142(e).  "In common parlance, the relevant

inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'"  *United States*

*v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).  "The crux of the constitutional

justification for preventative detention under the Bail Reform Act is that, '[w]hen the

Government proves by clear and convincing evidence that an arrestee presents an *identified and*

*articulable threat* to an individual or the community, . . . a court may disable the arrestee *from*

*executing that threat.*'"  *United States v. Munchel*, 2021 U.S. App. LEXIS 8810, at *13 (D.C.

Cir. March 26, 2021) (emphasis added) (*quoting Salerno*, 481 U.S. at 751).

    The assessment of that threat must be "individualized," *United States v. Tanios*, 856 Fed.

Appx. 325, 326 (D.C. Cir. 2021), and not based upon the actions of others, *United States v.*

*Fairlamb*, 535 F.Supp. 3d 30, 44 (D.D.C. 2021) ("The Bail Reform Act . . . calls for close

analysis of the relevant factors and evidence in an individual case.").  "Therefore, to order a

defendant preventatively detained, a court must identify an articulable threat posed by the

defendant to an individual or the community," *Munchel*, 2021 U.S. App. LEXIS 8810, at *19,

and "a defendant's detention based on dangerousness accords with due process only insofar as

the district court determines that the defendant's history, characteristics, and alleged criminal

conduct make clear that he or she poses a concrete, prospective threat to public safety."  *Id.* at

*13.

    Then, only after the government has met its burden of proving a specific articulable threat

to an individual or the community, the government must establish, again by clear and convincing

evidence, "that *no* condition or combination of conditions will reasonably assure the safety of

any other person and the community," 18 U.S.C. § 3142(f)(2), or, in other words, that pretrial

detention is the *only* means by which the safety of the community can reasonably be assured.
*See United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996).

Under 18 U.S.C. § 3145(b), a defendant ordered detained by a magistrate judge may file
"a motion for revocation or amendment to the order" with "a court having original jurisdiction
over the offense." This court has previously held that a magistrate judge's detention order is
subject to *de novo* review by the district court. *See United States v. Taylor*, 289 F. Supp. 3d 55,
63 (D.D.C 2018).[4]

### III.   THE BAIL REFORM ACT DOES NOT AUTHORIZE MR. SAMSEL'S PRETRIAL DETENTION.

Because the government has failed to prove, by clear and convincing evidence, that there
are no conditions or combinations of conditions that would reasonably negate any dangerous
threat posed by Mr. Samsel to the community or any other individual, the Court must revoke his
pretrial detention order.

#### A.   The Government Has Failed to Establish Any Articulable Threat Posed by Mr. Samsel to an Individual or the Community.

The government has failed to prove, by clear and convincing evidence, that Mr. Samsel
poses an articulable threat to an individual or the community. The crux of the constitutional
justification for preventative detention under the Bail Reform Act is that, '[w]hen the
Government proves by clear and convincing evidence that an arrestee presents an identified and
articulable threat to an individual or the community, . . . a court may disable the arrestee from
executing that threat." *Munchel*, 2021 U.S. App. LEXIS 8810, at *16 (*quoting Salerno*, 481 U.S.
at 751). "Therefore, to order a defendant preventatively detained, a court must identify an

---

[4] Although the Circuit Court for the District of Columbia has not expressly ruled on this issue, it has acknowledged in dictum, in a case arising under the predecessor Bail Reform Act that district courts review such prior determinations with "broad discretion." *Wood v. United States*, 391 F.2d 981, 984 (D.C. Cir. 1981).

articulable threat posed by the defendant to an individual or the community," *id.* at 16-17, and "a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety." *Id.* at 11.

In assessing whether pretrial detention is warranted for dangerousness, the district court considers four statutory factors:  (1) "the nature and circumstances of the offense charged;" (2) "the weight of the evidence against the person;" (3) "the history and characteristics of the person;" and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g)(1)-(4).

Additionally, "[d]etention cannot be based on a finding that the defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness or risk of flight; otherwise the scope of detention would extend beyond the limits set by Congress." *Munchel*, at 17.  Rather, the government must "clearly identif[y]" an "articulable threat." *Id.*

The assessment of that threat must be "individualized." *Tanios*, 856 Fed. Appx. at 326 (D.C. Cir. 2021) (reversing and remanding for pretrial release where the district court "clearly erred in its individualized assessment" where "[t]he record reflects that [the defendant] has no past felony convictions, no ties to any extremist organizations, and no post-January 6 criminal behavior that would otherwise show him to pose a danger to the community within the meaning of the Bail Reform Act").

Nor can the assessment be based upon the actions of the violent mob assembled on January 6.  *See United States v. Fairlamb*, 535 F.Supp. 3d 30, 44 (D.D.C. 2021) (recognizing that a defendant may "only [be] a danger in a mob") (citing *United States v. Klein*, 533 F. Supp. 3d 1 (D.D.C. Apr. 12, 2021)).  "Thus, a defendant's detention based on dangerous accords with

due process *only insofar* as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses *a concrete, prospective threat to public safety.*"  *Id.* at 11.  This holding of the D.C. Circuit is consistent with the Supreme Court's acknowledgement in *Salerno* that while constitutional on its face, the Bail Reform Act could nevertheless be unconstitutionally applied.  *Salerno*, 481 U.S. at 745 n.3.

Mr. Samsel's detention in this case is exactly the unconstitutional application of the Bail Reform Act contemplated by the Court in *Salerno*.  Where, as here, a defendant is detained based solely on the conduct they are alleged to have committed, the failure of the government to "clearly articulate" a future threat to an individual or the community constitutes a deprivation of that defendant's due process rights under the Fifth Amendment of the Constitution.  *See*, *e.g., Motamedi*, 767 F.2d at 1405 (The Fifth and Eighth Amendments' prohibitions of deprivation of liberty without due process and of excessive bail require careful review of pretrial detention orders to ensure that the statutory mandate has been respected.").

### i.   Nature and Circumstances of the Charged Offenses

"Despite the seriousness and unsettling nature of the events that transpired at the U.S. Capitol on January 6, 2021, the D.C. Circuit has made clear that detention *is not appropriate in all cases involving defendants who participated in the events.*"  *United States v. Gieswein*, No. 21-cr-00024, 2021 U.S. Dist. LEXIS 139235, at *24 (D.D.C. July 27, 2021) (citing *Munchel*, 991 F.3d 1273, 1285 (D.C. Cir. 2021)).  To assist this court in assessing the nature and circumstances of an individual defendant's alleged participation in this riot, Chief Judge Howell has delineated several factors she has deemed relevant.  *See United States v. Chrestman*, 525 F. Supp. 3d 14, 23 (D.D.C. Feb. 26, 2021).  The "differentiating factor[s]"  include:  (1) "whether a defendant has been charged with felony or misdemeanor offenses;" (2) "any indication that a defendant engaged in prior planning before arriving at the Capitol;" (3) whether a defendant is alleged to

have been equipped with a dangerous weapon "indicat[ing] at least some degree of preparation

for the attack and an expectation that the need to engage in violence against law enforcement or,

indeed, the Legislative branch, might arise;" (4) "[e]vidence of coordination with other

participants before, during, or after the riot"; (5) evidence that a "defendant . . . assumed either a

formal or a de facto leadership role;" (6) "a defendant's words and movements during the riot"

including, but not limited to, whether a defendant (i) "injured, attempted to injure, or threatened

to injure others;" (ii) "actively threatened or confronted federal officials or law enforcement;"

and/or (iii) "promoted or celebrated efforts to disrupt the certification of the electoral vote count

during the riot, thereby encouraging others to engage in such conduct." *Id.*

  Chief Judge Howell's delineation of factors, while not binding on this court's

determination, do reflect her participation in a number of detention hearings relating to the

violence at the Capitol on January 6.  *See, e.g., United States v. Gieswein*, No. 21-cr-00024, 2021

U.S. Dist. LEXIS 139235, at *24 (D.D.C. July 27, 2021) (noting that Chief Judge Howell "has

articulated 'guideposts' for assessing the 'comparative culpability of a given defendant in

relation to fellow rioters'" (quoting *Chrestman*, 525 F. Supp. 3d at 26)); *United States v.*

*DeGrave*, 2021 U.S. Dist. LEXIS 92102, at *26 (D.D.C. May 14, 2021) (noting that other Judges

in this District have found Judge Howell's guideposts as helpful "to differentiate the severity of

the conduct of the hundreds of defendants connected to the events of January 6" (quoting *United*

*States v. Klein*, 533 F. Supp. 3d 1, 7 (D.D.C. Apr. 12, 2021)); *United States v. Whitton*, 534 F.

Supp. 3d 32, 41 (D.D.C. Apr. 20, 2021) (finding Judge Howell's guideposts "persuasive for the

purpose of differentiating among Capitol Riot defendants").  While these factors are helpful to

making a pre-trial detention decision, nonetheless "[d]etention determinations must be made

individually and, in the final analysis, must be based on the evidence which is before the court

regarding the particular defendant. The inquiry is factbound." *Munchel*, 991 F.3d at 1283.  At the outset it bears noting that although Mr. Samsel has been charged with a felony, this one factor cannot, and should not, alone warrant his detention pending trial. *United States v. Fairlamb*, 535 F.Supp.3d 30, 44 (D.D.C. 2021) ("The Bail Reform Act . . . calls for close analysis of the relevant factors and evidence in an individual case.").  Indeed, it is axiomatic that the Bail Reform Act does not contemplate detention based purely on the *alleged* pending charges alone:  to do so would unconstitutionally controvert one's presumption of innocence by requiring detention based solely on the allegations giving rise to the need for a detention hearing and not the facts *and circumstances* requiring contemplation by the plain language of the statute itself. *See*, *e.g.,* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence."); *United States v. Klein*, 533 F. Supp. 3d 1, 12 (D.D.C. Apr. 12, 2021).

The government has not proffered any evidence, let alone clear and convincing evidence, *see* 18 U.S.C. § 3142(f), that Mr. Samsel "engaged in prior planning before arriving at the Capitol" or "coordin[ated] with other participants before, during or after the riot;"[5] that he "assumed either a formal or a de facto leadership role;"[6] that he brought a dangerous weapon with him to the Capitol evincing "some degree of preparation for the attack and an expectation that the need to engage in violence against law enforcement;" or that he ever entered the Capitol.

---

[5] To the extent that the government contends that Mr. Samsel's alleged conduct was coordinated with others because his conduct took place in conjunction with the crowd of rioters gathered at the Capitol, "violent conduct in the midst of a crowd is simply in the nature of the riot [and such] a broad interpretation of 'coordination' would sweep in nearly every January 6th defendant who engaged in any violence, fatally weakening the *Chrestman* factors' value in differentiating between the *varying* levels of culpability among the January 6th defendants." *United States v. Languerand*, 2021 U.S. Dist. LEXIS 156400, at *13 (D.D.C. Aug. 19, 2021).  *See also id.* (citing examples of coordination on January 6).

[6] "Mere presence on the front lines is not enough to weigh in favor of detention . . . ." *Id.* at *15.

The government has suggested some relevance to the allegation that Mr. Samsel was "the first out of the crowd to approach the barricade and engage with officers."  Status Report at 4 (Oct. 21, 2021) (ECF No. 57).  However, the government does not allege that the person depicted in any way commanded authority or otherwise served in any leadership role.  Indeed, the government acknowledges that "someone trailed closely behind him, and then, the rest of the crowd followed."  Mem. in Opp. re Mot. for Release from Custody at 1 (June 2, 2021) (ECF No. 25).  Thus, it was only after this second individual approached the barricade that any crowd members followed.  *See United States v. Languerand*, 2021 U.S. Dist. LEXIS 156400, at *13 (D.D.C. Aug. 19, 2021) ("[V]iolent conduct in the midst of a crowd is simply in the nature of the riot [and such] a broad interpretation of 'coordination' would sweep in nearly every January 6th defendant who engaged in any violence, fatally weakening the *Chrestman* factors' value in differentiating between the *varying* levels of culpability among the January 6th defendants.").  Further evidence of the government's exaggeration of any leadership role played by Mr. Samsel is the fact that at the time that the government alleges that Mr. Samsel approached law enforcement, in fact, the crowd that followed was already beyond one set barricades, and thus already within a restricted area at the time.

The government also proffers that Mr. Samsel "chose to travel to Washington D.C. and to assault a U.S. Capitol Police Officer," Mem. in Opp. re Mot. for Release from Custody at 1 (June 2, 2021) (ECF No. 25), but cites no evidence of any intent by Mr. Samsel (or anyone else) to travel to Washington for any purpose other than to attend President Trump's "Stop the Steal" rally.  The allegation that Mr. Samsel ultimately found himself amongst a crowd that "pushed and pulled the barricades until the *crowd* successfully pushed the barricades down on top of the officers," Complaint, at 5 (ECF No. 1) (emphasis added), does not establish any intent on behalf

of Mr. Samsel to assault any officer.  To that end, as the government concedes, and as the video

of the incident clearly establishes, it was the actions of the *crowd* which ultimately resulted in the

barricade's falling and Officer C.E. collapsing.

Nor has the government proffered any evidence of Mr. Samsel having "promoted or

celebrated efforts to disrupt the certification of the electoral vote count."  *United States v.*

*Chrestman*, 525 F. Supp. 3d 14, 27 (D.D.C. Feb. 26, 2021).  The government has noted in an

unrelated filing that he "bragged about how he led the crowd," Status Report at 4 (Oct. 21, 2021)

(ECF No. 57), but a plain reading of Mr. Samsel's purported messages do not in fact suggest that

he had any leadership role.  Nor can Mr. Samsel's alleged "bragging" be construed as the type of

promotional or celebratory efforts this and other Courts have deemed suggestive of a future

danger to the community.  See, e.g., *United States v. Dresch*, 2021 U.S. Dist. LEXIS 113633, *3

(D.D.C. May 27, 2021) (defendant posted to social media following the events of January 6, at

one point stating that "it was grand . . . best day ever . . . I think it was a good show of force . . .

look what we can do peacefully, wait til [sic] we decide to get pissed" and "look if they can't

hold the capitol with thousands of cops, how can they tell us what to do 1000 miles away");

*United States v. Whitton*, 534 F. Supp. 3d 32, *42 (D.D.C. April 20, 2021) ("Mr. Whitton

bragged in a text message to an acquaintance that he 'fed [Officer B.M.] to the people.'").

In summary, while the government passionately recounts the events of January 6 in its

pleadings, it also betrays its own bias by speculating as to Mr. Samsel's motives, asserting that

"[Mr.] Samsel chose to travel to Washington D.C. and to assault a U.S. Capitol Police Officer."

Memo. in Opposition of Defendant's Motion to Revoke Detention Order, at 1 (ECF No. 25).

That the Capitol was ransacked in a riot of pro-Trump supporters is a tragic episode in our

Nation's history and it is important that the Department of Justice hold those who participated

accountable for the conduct for which they are *individually* responsible.[7]  But it must do so fairly

and in indiscriminately, and any suggestion of nefarious motive on the part of Mr. Samsel is

clearly contradicted by the government's own acknowledgement that the person alleged to be

Mr. Samsel is also captured on video *helping* the same Capitol Police Officer he is alleged to

have assaulted.  *See* Complaint, at 5 (ECF No. 1).  This factor does not weigh in favor of Mr.

Samsel's pre-trial detention.

### ii.   *The Purported Weight of the Evidence.*

In determining whether conditions of release can assure the safety of others, "[t]he weight

of the evidence is the least important of the factors and the bail statute neither requires nor

permits a pretrial determination of guilt."  *United States v. Gebro*, 948 F.2d 1118, 1121-22 (9th

Cir. 1991) (citing *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986)); *see also United*

*States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) ("It is apparent from the record below

that the district court accorded great weight to the charges against [the defendant] and the

Government's assertions of his guilt.").  "[I]f the court impermissibly makes a preliminary

determination of guilt, the refusal to grant release could become in substance a matter of

punishment."  *Motamedi*, 767 F.2d at 1408.  *See also United States v. Brown*, No. 1:20-cr-00027,

2021 U.S. Dist. LEXIS 84332, at *8 n.4 (D.D.C. May 3, 2021) ("[A] district court assessing the

weight of the evidence must not consider the evidence of a defendant's guilt, but rather must

consider only the weight of the evidence of the defendant's dangerous.").  "It is not the purpose

of the bail system to punish an accused again for his past crimes, *or to punish him in advance for*

---

[7] Of note, another court in this District has astutely observed that no "significant weight" can be placed upon "any purported lack of remorse under . . . circumstances [where] [a defendant] ha[s] reason to suspect he was being investigated for his participation in the Capitol riot . . ., when the FBI executed a search warrant [and, accordingly,] a statement of remorse could be used against [the defendant] in his criminal trial as evidence of guilt."  *United States v. Taylor*, 2021 U.S. Dist. LEXIS 150500, at *18-19 (D.D.C. 2021).  Here, Mr. Samsel was arrested without incident less than a month after the events of January 6.  Mot. for Release from Custody (May 24, 2021) (ECF No. 23).

*crimes he has not yet been shown to have committed."*  *United States v. Alston*, 420 F.2d 176,

179 (D.C. Cir. 1969) (emphasis added).

> It is true of course, that [the predecessor to the current Bail Reform Act] requires the court to take into account 'the nature and circumstances of the offense charge [and] the weight of the evidence against the accused,' but the statute neither requires nor permits a pretrial determination that the defendant is guilty.  This is not merely a matter of the proprieties, though that is itself not unimportant for judicial actions.  If one bears in mind that one is examining only the evidence against the accused, for purposes of considering prospect of flight[,] [then, the only basis for detention], one is more likely to guard against the impermissible course of reaching some kind of partial determination of guild and beginning what is in substance a mandate of punishment.

*Alston*, 420 F.2d at 179-180.  "No one may be confined on the ground that he has committed an

offense when the determination is void of the protections that are the essentials of the Anglo-

American jurisprudence."  *Alston*, 420 F.2d at 179.  This factor should not weigh in favor of Mr.

Samsel's pre-trial detention.

### iii.  History and Characteristics of the Defendant

In considering Mr. Samsel's history and characteristics, the Court must "take into account

the available information concerning" Samsel's "character, physical and mental condition,

family ties, employment, financial resources, length of residence in the community, community

ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record

concerning appearance at court proceedings."  18 U.S.C. § 3142(g)(3)(A).  As a life-long

resident of Bucks County, Pennsylvania Mr. Samsel's strong ties to his community outweigh any

danger to the community imputed by his criminal history as Mr. Samsel has served his time for

those offenses.  Nor can it be said that Mr. Samel's alleged participation in the events of a protest

evidence anything other than his purportedly having been part of a mob.

### i). _Mr. Samsel's Life-Long Ties to His Community_

Mr. Samsel was born Bucks County, Pennsylvania, where he was raised by his aunt and uncle.  He has resided there with his girlfriend for more than three years, and together they are active members of a local Christian parish.  Although Mr. Samsel had previously been incarcerated, while imprisoned he sought to advance his character and completed a barber apprenticeship and has worked as a barber at various barber shops in Philadelphia and the surrounding suburbs for more than ten (10) years.  Despite the limited hours hair and beauty salons were permitted operations at the time of Mr. Samsel's arrest, he was working three days a week for eight (8) hours a day at local barber.

### ii). _The Government Misrepresents Mr. Samsel's Criminal History_

The government describes Mr. Samsel as having, "an extensive criminal history of assaultive and violent behavior . . . dating all the way back to 2006."  Gov't Opp. Mot. Temporary Release at 11 (June 2, 2021) (ECF No. 25).  _See also_ Gov't Status Report at 4 (Oct. 21, 2021) (ECF No. 57) ("[Mr. Samsel] has a lengthy and violent criminal history dating all the way back to 2006.").  However, neither in its opposition to Mr. Samsel's initial request for temporary release to receive necessary medical treatment, nor in its gratuitous status report filed four (4) months later does the government cite a finding of fact by a judicial officer to have considered the allegations and resulting charges as against Mr. Samsel.  Indeed, the only support for the government's broad conclusions are _the allegations of his accusers_ and the government cannot cite a single characterization of the offenses by any government representative. Moreover, as the Court is well aware, if the government were in possession of any evidence of his actually having been found, or otherwise pleaded guilty to, this allegedly violent conduct, it would have been required to produce the same pursuant to Rule 16(a)(1)(D).

Specifically, Mr. Samsel was last arrested *more than ten (10) years ago* and convicted after accepting responsibility – pleading guilty to – charges of conspiracy to commit witness intimidation and witness intimidation.  Those charges involved Mr. Samsel and his former girlfriend conspiring to provide "false or misleading information or testimony relating to the commission of any crime to any law enforcement officer . . . ."  18 Pa. Cons. Stat § 4952(a)(2). None of the charges Mr. Samsel actually faced in that matter were violent in nature.  *See also* 18 Pa. Cons. Stat. §§ 4952(a)(1)(3) (offenses to which Mr. Samsel was also pleaded guilty).  Of note, the "false or misleading" information Mr. Samsel and his former girlfriend were alleged to have conspired to provide involved her prior statements to law enforcement concerning Mr. Samsel's purportedly violent episode.  Mr. Samsel's criminal history is wholly unrelated to alleged conduct for which he has now been detained for more than fourteen (14) months.

Although the Court may rely on "investigatory descriptions of evidence (and similar hearsay)," it may do so only where the Court, "reasonably concludes that those descriptions, reports, and similar evidence, in the particular circumstances of the hearing, are reliable."  *United States v. Acevedo-Ramos*, 755 F.2d 203, 207 (1st Cir. 1985).  The government proffers no information or other indicia of reliability to corroborate the assumption that the events as described by his accusers and that ultimately led to his arrest were the same as the conduct for which he pleaded guilty, accepted responsibility, and served his prison sentence.  Unfortunately, we do not know what that was, because the government has proffered only the initial allegations lodged primarily by former girlfriends and no formal allocution related to his prior convictions. And contrary to the government's allegations, the Pennsylvania Parole Board ultimately concluded it had no basis – insufficient evidence of a parole violation – to continue to detain Mr. Samsel after his temporary release and transfer to the Pennsylvania Department of Corrections.

Regardless, the fact remains that the conduct with which Mr. Samsel is charged here is uniquely distinguishable by its very nature. The events at the Capitol on January 6 are unlikely to again occur in our lifetimes. The Court may consider a defendant's prior criminal history, but when it does, it must do so in the context of whether that defendant presents a specific "forward-looking" "articulable threat." *United States v. Taylor*, 2021 U.S. Dist. LEXIS 150500, at \*18-19 (D.D.C. 2021). That, more than ten (10) years ago Mr. Samsel is alleged to have been involved in an altercation does not suggest that he presents any future articulable threat.[8]

### iii). *The Deprivation to Mr. Samsel's Physical and Mental Health Warrant Release*

The circumstances and history of Mr. Samsel's present pre-trial detention weigh in favor of his release. Of most importance at this point in Mr. Samsel's detention is his physical and mental health. To date, Mr. Samsel has experienced continuous subjection to solitary confinement during his detainment, where Mr. Samsel has remained in solitary confinement throughout the vast majority of his detention, often unable to communicate with his counsel, and without access to his medical records or defense materials, let alone access to a law library or similar resource in preparation for trial. Ironically, at the Central Regional Virginia Jail, the U.S. Marshal's Service refused to facilitate Mr. Samsel's prescribed physical therapy, instead allowing him to be instructed on how to exercise in his cell. But while in the cramped cell necessitated by solitary confinement, Mr. Samsel could not perform the exercises he had been

---

[8] Judge Lamberth's decision in *United States v. Fairlamb*, 535 F.Supp. 3d (D.D.C. 2021), is not inapposite. There, the Court recognized that but for the presence of a mob at the Capitol Building, many of the offenses that occurred on January 6 would not have been possible. *Id.* at 43 ("[T]he specific circumstances of January 6 made it possible for the defendant to assault a police officer."). Nevertheless, Judge Lamberth ordered detention pretrial based upon Fairlamb's criminal history – which included an assault conviction just two years prior – as well as the defendant's allegedly having intentionally sought to injure a law enforcement officer. *Id.* at 42-44. Here, Mr. Samsel's most recent criminal conviction occurred more than ten (10) years ago, and Mr. Samsel is not alleged to sought to intentionally injured any law enforcement officers (and instead the government acknowledges he is filmed attempting *to assist* a fallen law enforcement officer).

taught.  That he was required to be continuously monitored, for reasons still unknown to defense counsel, he was required to sleep with lights on all times and shower in the same cell in which he was detained.  All of this, Mr. Samsel had been subjected to for over fourteen (14) months.

It cannot reasonably be disputed that to be subjected to this treatment risks extreme physical and emotional consequences for Mr. Samsel.  Numerous studies have been conducted on the effects of solitary confinement and the results include a mass documentation of adverse health effects.  *See* Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Just. 441, 475 (2006).  While Mr. Samsel is well aware that this is not the proper forum to litigate the conditions of his confinement, he nevertheless submits that it is a factor that may be considered by the Court in support of his pretrial release.  Moreover, considering the history of his pretrial detention to-date, including the previous request by the government that Mr. Samsel be placed in protective custody (effectively solitary confinement), defense counsel is not confident that Mr. Samsel does not face the possibility of similar treatment in the future.

Furthermore, while Mr. Samsel has been detained primarily in solitary confinement, he has been the victim of several assaults resulting in emergency medical treatment, including the infliction of "the necessary force to gain compliance."  As a result of these altercations, Mr Samsel was diagnosed with head strike and loss of consciousness, bilateral eye ecchymosis, acute kidney injury, injury of the wrists, fracture of the orbital floor (right side / closed fracture), bilateral facial nasal bone fracture, and thoracic outlet syndrome.  Mr. Samsel lost vision in his right eye, suffered two seizures at the time, and has continuing pain and suffering, likely in relation to thoracic outlet syndrome as well as what appears to be a cystic condition (that may

have been aggravated by the assault).  To date, Mr. Samsel has not received treatment or
rehabilitation for these injuries.

Mr. Samsel has now been detained for more than fourteen (14) months and he continues
to be denied access to medical records and the treatment prescribed by those records following
the injuries he sustained while detained pre-trial, when presumed innocent.  It is in the best
interest of Mr. Samsel who needs medical treatment he can manage if he is released, and he can
prepare the defense of his case, which has been woefully delinquent due to counsel's inability to
get access to Mr. Samsel during long periods of isolation.  To continue to hold Mr. Samsel
pending trial poses a serious threat to his own health and well-being, and if Mr. Samsel continues
to be held it is reasonable to assume that he will continue to be subjected to further injuries and
that he will continue to be neglected treatment for any such injuries.  On balance, Mr. Samsel's
history and characteristics do not weigh in favor of his continued pretrial detention.

### iv.   Danger to the Community

The final factor that the Court must consider is "the nature and seriousness of the danger
to any person or the community that would be posed by the defendant's release."  18 U.S.C. §
3142(g).  "Consideration of this factor encompasses much of the analysis set forth above, but it is
broader in scope," requiring an "open-ended assessment of the 'seriousness' of the risk to public
safety."  *Taylor*, 289 F. Supp. 3d at 70.  Because this factor substantially overlaps with the
ultimate question of whether any conditions of release "will reasonably assure . . . the safety of
any other person and the community," 18 U.S.C. § 3142(e), it should bear heavily on the Court's
analysis.  *See* Memorandum Opinion and Order, *United States v. Cua*, No. 21-107 (RDM)
(March 10, 2021).

The government bears the ultimate burden of establishing that no condition or
combination of conditions is sufficient to negate the risk of the accused's dangerousness by clear

and convincing evidence.  18 U.S.C. § 3142(e)(1); *see also United States v. Bell*, 209 F. Supp. 3d 275, 277 (D.D.C. 2016) (*citing United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987)). Clear and convincing evidence means proof that the defendant actually poses a danger to the community, not that a defendant "in theory" poses a danger.  *United States v. Patriarca*, 948 F.2d 789 (1st Cir. 1991).  Only when there is a "strong probability that a person will commit additional crimes if released" is the community interest in safety sufficiently compelling to overcome the criminal defendant's right to liberty.  *United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988).

In passing the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, Congress hoped to "give the courts adequate authority to make release decisions that give appropriate recognition to the danger *a person* may pose to others if released."  S. Rep. No. 98-225, at 3.

> The reference to safety of any person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community.

S.Rep. No.98-225 at 12–13, reprinted in 1984 U.S. Code Cong. & Adm. News 3182, 3195–3196, *quoted in* 3B Wright & Miller, Fed. Prac. & Proc. § 766 (4th ed.).

To that end, in *United States v. Salerno*, 481 U.S. 739 (1987), the Supreme Court held that "the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment" and that a valid regulatory purpose of pretrial detention is to "give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released."  *Id.* at 742 (quotation omitted).  Yet, the Court explicitly acknowledged the possibility of the Bail Reform Act *being applied* in a manner

constituting an unconstitutional violation of an accused's due process rights ensured by the Fifth Amendment.  *See id.* at 745 n.3.

In that vein, the D.C. Circuit has now explicitly articulated the unique confluence of events that gave rise to the violence at the Capitol on January 6 and admonished this court that although the defendants there were "a danger to 'act against Congress' in the future," it failed to "*explain[] how the [defendants] would be capable of doing so now that the specific circumstances of January 6 have passed*."  *Munchel*, 991 F.3d at 1284 (emphasis added).

Following its opinion in *Munchel*, the D.C. Circuit recognized that one can be "deemed a danger to the community sufficient to justify detention even without posing a threat of committing violence in the future."  *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021).  *See also United States v. Taylor*, 2021 U.S. Dist. LEXIS 150500, at *21 (D.D.C. 2021). ([T]he [D.C.] Circuit has indicated that merely identifying the danger that a person posed to others (or even our democratic institutions) on January 6 is not enough to justify pretrial detention.  Instead, now that 'the specific circumstances of January 6 have passed,' the Court should consider whether the defendant 'pose[s] a threat of committing violence in the future,' and make a 'forward-looking determination' in its dangerousness assessment.").

This Court need look no further than to the serious conduct that has led to the detention of individuals alleged to have participated in the events of January 6.  For example, in *Hale-Cusanelli*, detention was deemed warranted where the defendant used "voice and hand signals to urge other members of the mob at the Capitol to "advance," and ultimately entered the Capitol, only leaving after he learned that someone had been shot.  *Hale-Cusanelli*, 3 F.4th at 451.

Here, there has been no allegation that Mr. Samsel espoused any "animus toward certain groups of people, his having acted on that animus in the past, [nor] the possibility that he would

do so again in the future." *Id.* at 454. Nor has the government evinced any evidence of Mr. Samsel having anticipated the violence that occurred on January 6. *See id.* at 456 ("It is not obviously wrong to conclude that these statements, taken as a whole, demonstrate a potential danger to the community. This is particularly so when viewed with other statements [the defendant] made just prior to January 6, such as proclaiming a 'final countdown' and an intention to leave his employment in a 'blaze of glory.'").

Similarly, in *United States v. Pezzola*, 2021 U.S. Dist. LEXIS 49574 (D.D.C. Mar. 16, 2021), this Court ordered the detention of Mr. Pezzola pretrial where: "the proffered evidence show[ed] that before the Capitol assault, Pezzola engaged in planning and coordination with other Proud Boys;" that he "arrange[d] for concealed means of communicat[ion] by radio during the riot; that he "robbed a police officer of a riot shield and used it as a weapon to break a Capitol window [to] allow[] rioters to enter;" that he promoted the success of his efforts on social media while in the Capitol; and that at the time of his arrest he was in possession of "a thumb drive . . . that contained voluminous instructions for making bombs, firearms, and poisons suggesting that he was interested in assisting [the specific group of Proud Boys he accompanied on January 6]." *Id.* at *26-28. Other orders of detention depict similarly serious conduct. *See, e.g.*, *United States v. Gieswein*, No. 21-3052, 2021 U.S. App. LEXIS 31471, at *2 (D.C. Cir. Oct. 19, 2021) (affirming pretrial detention where district court found the defendant "arrived at the Capitol that day with tactical gear and weapons, discharged a chemical spray in the direction of the United States Capitol Police officers on multiple occasions, encouraged others to destroy a window through which he and other individuals entered the Capitol, and actively resisted arrest"); *United States v. DeGrave*, 2021 U.S. App. LEXIS 20512, at *2 (D.C. Cir. July 9, 2021) (affirming pretrial detention where the district court "found that since January 6, [the defendant]

has demonstrated a willingness to impede law enforcement investigatory efforts by falsely telling the FBI after he was arrested that he had not been to the Capitol, deleting social media messages relating to his conduct on January 6, encouraging others to do the same, and communicating via an encrypted messaging application about January 6"); *United States v. Sandlin*, 853 Fed. Appx. 682, 683 (D.C. Cir. July 9, 2021) (affirming pretrial detention where the district court found the defendant had "crisscross[ed] the country to evade law enforcement, used encrypted communications, and deleted incriminating social media posts"); *United States v. Biggs*, 851 Fed. Appx. 220, 220 (D.C. Cir. June 25, 2021) (affirming pretrial detention where district court found the defendants "provided leadership and planning for the Proud Boys in connection with the events at the Capitol on January 6,2 021, coordinat[ed] a large group of people and facility[ated] unlawful conduct").

Yet, again, here the government only alleges that Mr. Samsel traveled to Washington, D.C. to attend the "Stop the Steal" rally promoted by former President Trump and that after doing so, he allegedly joined a violent mob.  There is no proffered evidence that Mr. Samsel plotted or otherwise coordinated with others to commit violence, that he did anything after January 6 to promote further violence, or that he was anything other than an alleged participant in a violent mob.  There is no allegation that he went into the Capitol, and it is undisputed that he left the premises on his own volition.  Absent a "forward-looking" "articulable threat" of future acts against Congress by Mr. Samsel now that the specific circumstances of January 6 have passed, the government has failed to meet its burden, by clear and convincing evidence, that Mr. Samsel poses a danger to any individual or to the community and his detention is permitted neither by the Bail Reform Act, nor the due process clause of the Fifth Amendment to the Constitution.

As other courts have noted, a number of defendants alleged to have participated in the protests of January 6 have been ordered released pretrial despite having allegedly engaged in far more serious conduct. *See United States v. Klein*, 533 F. Supp. 3d 1 (D.D.C. Apr. 12, 2021).[9]

### B.  Conditions of Release Ensure that the Public's Safety Can be Reasonably Assured.

Even were this court to conclude that Mr. Samsel presents an articulable threat to an individual or the community, it must nevertheless assess whether "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The condition or combination of conditions need not guarantee the safety of the community, to so require would "fly in the teeth of Congress's clear intent that only a limited number of defendants be subject to pretrial detention." *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) (internal citation omitted). Rather, courts cannot demand more than an "objectively reasonable assurance of community safety." *United States v. Orta*, 760 F.2d 887, 891-92 (8th Cir. 1985), *quoted in Tortora*, 922 F.2d at 884.

Because the government has yet to articulate a specific threat to the community it is difficult, if not impossible, to understand how the panoply of release conditions, including GPS monitoring, available to the court would not assure the safety of the community. Absent some specifically articulable threat posed by Mr. Samsel, it is axiomatic that the safety of the community can reasonably be assured despite Mr. Samsel's release. Furthermore, in the alternative, the safety of the community would reasonably be assured by Mr. Samsel's release to the Pennsylvania Department of Corrections.

---

[9] The Office of the Federal Public Defender for the Eastern District of Pennsylvania recently compiled a list of nearly 90 January 6 defendants to have been released pre-trial despite allegedly having committed conduct substantially similar to the conduct with which Mr. Samsel is alleged to have engaged. *See* Mot. Revoke Pretrial Detention Ex. C, *United States v. Ballard*, No. 21-cr-00553 (D.D.C. March 25, 2022) (ECF 30-3).

## CONCLUSION

Mr. Samsel has now been detained pretrial for more than fourteen (14) months based largely on the government's allegation that he participated in the violence that occurred at the Capitol Building on January 6.  The government has superseded his indictment to include defendants who are only at the early stages of their cases, despite the fact that there is no allegation that he knows or planned to act with any of the co-defendants.  Because the government has failed to articulate a specific threat to the community posed by Mr. Samsel or that no condition or combination of conditions of release would reasonably assure such safety; or because, in the alternative, detaining Mr. Samsel while simultaneously depriving Mr. Samsel the right to a Speedy Trial would violate his due process rights, the Court must Order Mr. Samsel's release subject to any conditions the Court deems necessary to assure the safety of his community.

[SIGNATURE ON NEXT PAGE]

Dated: April 1, 2022                    Respectfully submitted,

                                        _____/s/ Stanley E. Woodward, Jr._____
                                        Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
                                        BRAND WOODWARD, ATTORNEYS AT LAW
                                        1808 Park Road NW
                                        Washington, DC  20010
                                        202-996-7447 (telephone)
                                        202-996-0113 (facsimile)
                                        Stanley@BrandWoodwardLaw.com

                                        _____/s/ Juli Z. Haller_____
                                        Juli Z. Haller, (DC 466921)
                                        The Law Offices of Julia Haller
                                        601 Pennsylvania Avenue, N.W., Suite 900
                                        Washington, DC 20004
                                        Telephone: (202) 729-2201
                                        HallerJulia@outlook.com

                                        *Counsel for Defendant Ryan Samsel*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | ) |
| | ) |
| | ) Case No. 1:21-cr-00537-TJK |
| v. | ) |
| | ) |
| **RYAN SAMSEL**, | ) |
| | ) |
| Defendant. | ) |
| | ) |

<u>**CERTIFICATE OF SERVICE**</u>

On April 1, 2022, the undersigned hereby certifies that a true and correct copy of the

foregoing was electronically filed and served via the CM/ECF system, which will automatically

send electronic notification of such filing to the following registered parties:


       */s/ Stanley E. Woodward, Jr.*
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD, ATTORNEYS AT LAW
1808 Park Road NW
Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*Counsel for Defendant Ryan Samsel*